UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

David Schied,
Prosecutor Ex Rel, sui juris,
Private Public Proxy for the People,
Totally and Permanently Disabled Quad-Amputee,
Plaintiff-Relator,

Civil Action No.: 5:25-CV-5101

v.

TRIAL BY JURY DEMANDED

KAREN MARTIN, et al.,
(including over one hundred (100) named individual and institutional Defendants,
sued in their individual and official capacities,
as set forth in Appendix A-1),
Defendants.

_____/

## COMPLAINT BRIEF
### Civil RICO, Constitutional, Statutory, Administrative, and Commercial Enforcement Action

## FOR DECLARATORY, INJUNCTIVE, STRUCTURAL, AND COMMERCIAL RELIEF;

## FOR DAMAGES; AND FOR EMERGENCY AND INTERIM RELIEF

This is a civil action brought by a totally and permanently disabled federal whistleblower proceeding as Prosecutor Ex Rel, sui juris, and as a Private Public Proxy for the People, to redress systemic constitutional violations, federal statutory breaches, administrative fraud, civil RICO enterprise conduct, disability discrimination, retaliation, obstruction of justice, and commercial dishonor carried out under color of law by state, federal, municipal, corporate, and BAR-affiliated actors.

This Complaint Brief incorporates by reference extensive factual, evidentiary, constitutional, statutory, and commercial materials set forth in Appendices A through G, including sworn declarations, documentary evidence, recorded communications, public-record filings, and administrative records, all submitted under penalty of perjury.

Prosecutor Ex Rel / Plaintiff:

David Schied
Prosecutor Ex Rel, sui juris
Private Public Proxy for the People
Totally and Permanently Disabled Quad-Amputee

P.O. Box 321
Spearfish, South Dakota 57783
Telephone: (605) 340-4439
Email: dschied@protonmail.com

## TABLE OF CONTENTS                                          PAGE

Table of Authorities.................................................................................................... iii

Table of Exhibits for this Complaint Brief.....................................................................ix

Nature of the Action.....................................................................................................1

Incorporation of Appendices ….................................................................................2

Jurisdiction and Venue …..........................................................................................3

Personal Jurisdiction …..............................................................................................3

Venue …......................................................................................................................4

Jurisdiction for Equitable and Structural Relief.............................................................5

Standing …...................................................................................................................5

The Parties …..............................................................................................................6
(Named and numbered in groups referenced by Appendix A-1)

Facts …......................................................................................................................10

      Housing Enterprise and Predicate RICO Defendants..........................................10

      South Dakota State Agents and Agencies..........................................................23

      Local Government Defendants (City, County, Law Enforcement) …................33

      Medical, Prosthetic, and Corporate Private Actors ….......................................37

      BAR-Member Attorneys, Legal Services, Disability Rights Groups,
      and Law Firms …..............................................................................................44

      Federal and State High-Level Principals, Presidential Cabinet Officers,
      OIG Officials, and Forgiveness-List Actors........................................................59

      Judicial Officers, Clerks, and Court Administrative Actors; and
      DOE Defendants #1-75 …..................................................................................66

      Claims Against The Sovereign: State of South Dakota and the
      United States of America.....................................................................................71

      The Hidden Commercial Government Surety Structures and the
      Enterprise-Fund Liability Systematic Rating Behind South Dakota's
      official Misconduct (SDPAA)............................................................................75

i

Commercial & Private Attorney General / *Private Public Proxy* Enforcement Architecture the Common-Law Remedy Surety Principles, and *"Citizen's Arrest on Paper"*...................................................................................................87

     The Legal Consequence of the Enterprise Structure ......................................89

Argument:
     Commercial Enforcement and the Limits of Agency/Court Authority ...94

     UCC / Common-Law Surety Liability......................................................98

     Why the *"No Cognizable Interest in Prosecution"* Doctrine
     Does Not Bar This Suit .........................................................................100

     Defendant Categories and Count Application.........................................103

     Article III Authority to Hear This Matter................................................106

     Why Relief Must Issue .........................................................................110

     Integration of COUNTS With the Commercial Process .........................115

     Remedies Framework: Damages, Structural Injunctions,
     Declaratory Relief, and Commercial Enforcement Consequences ........119

     The Commercial Enforcement Mechanism: Constructive Arrest,
     Equitable Attachments, Distress, and Federal Execution Authority ......123

     Constitutional and Commercial Restoration of the People's
     Sovereignty .........................................................................................127

     Commercial attachment thus becomes not only a remedy for
     individual harm but a mechanism for national restoration ....................129

Counts ...........................................................................................................131

Damages .........................................................................................................162

Demand for Relief ..........................................................................................174

EMERGENCY AND INTERIM RELIEF REQUESTED ...............................176

Jury Demand ..................................................................................................178

Affidavit in Declaration of Truth ...................................................................179

## TABLE OF AUTHORITIES

(Roman numeral pagination to be finalized by Prosecutor Ex Rel / Plaintiff)

CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 8 (Spending/Commerce Clause)..................................................3, 25, 31, 49-50, 56, 63, 65, 71, 74-75, 94, 96-97, 102, 104-107, 139, 143, 147, 155-156

U.S. Const. art. III ...............................................................................3-5, 88-89, 94, 97-98, 102-107, 109-110, 115-116, 118-120, 122-123, 125-127, 130, 176-177, 180

U.S. Const. art. IV, § 4 (Guarantee Clause-States have Republican form ...................80, 89, 94, of governance)                96-97,

U.S. Const. amend. I .........................................................................................1, 14-15, 25, 49-50, 55, 78, 94-96, 102, 113, 128, 134-135, 140-141, 152-153, 174

U.S. Const. amend. V ...........................................................................................25, 134, 140-142, 146, 153, 174,

U.S. Const. amend. XIII ........................................................................................22, 25, 39, 50

U.S. Const. amend. XIV .......................................................................................25, 37, 39, (includes State Created Danger Doctrine and acts that Shock the Conscience) 135-136, 139-140, 142, 146, 153, 174

FEDERAL STATUTES

5 U.S.C. § 552 (FOIA- Open Records) ....................................................................1, 15-16, 24, 32, 72, 90, 156-157, 175,

5 U.S.C. § 706 (decide questions of law)..................................................................3, 10, 14-16, 54, 87, 109,

5 U.S.C. §§ 551–706 (Administrative Procedure Act) ...................................................1, 3, 11, 14, 16, 18, 24-25, 28-29, 44, 50-51, 53, 60, 62, 72, 75, 90-96, 100, 104, 108-109, 111, 119, 126, 128-129, 132-133, 138-142, 146, 151, 154, 157, 159-160,

171, 174

18 U.S.C. § 1512 / § 1513 (Witness tampering / retaliation)..............................20-25, 27, 29, 31-95, 106, 112, 120-121, 131-178

18 U.S.C. § 1961 (racketeering activity) ...............................................................1, 3, 5-6, 10-23, 25, 31-36, 38-39, 42-55, 59, 65, 67, 69, 75-91, 93, 105, 113-114, 116-117, 121,, 160-161,

18 U.S.C. § 1962(c) (enterprising activity) .............................................................1, 3, 6-15, 18-22, 25, 31-32, 34-35, 38, 40-45, 47, 49, 51, 53-65, 67-72,  121-123, 131-137, 139-144, 146-155, 158-166, 172-173,  175

18 U.S.C. § 1962(d) (conspiracy to violate) ..............................................................2-3, 14-15, 21-23, 39, 42-47, 50, 53, 55, 65, 67, 69-70, 131, 134, 150-151, 153, 160-161

18 U.S.C. § 1964 (RICO — civil remedies)...............................................................1, 3, 5, 9-10, 12, 18-19, 36, 43, 45, 49, 51, 57-59, 61,66, 68, 71,78, 80, 87-111, 113-127, 129-130, 133-162, 169-179

18 U.S.C. §§ 1961–1964 (RICO)...............................................................................1, 3, 5-15, 18-23,  25,  31-36,  38-47,  49-51,  53-72,  121-123, 129-155, 158-166, 169-179

18 U.S.C. § 3332 (powers/duties of special grand juries) ...........................................24, 34, 47,49, 55, 68, 86, 103, 107-108, 170

26 U.S.C. § 42 (Low-Income Housing Tax Credit – LIHTC)....................................1, 3, 6, 10-19, 22-23, 44-45, 49, 55, 63, 83-84, 93, 96, 107, 115, 132, 162

28 U.S.C. § 1331(original jurisdiction) ....................................................................3, 106

28 U.S.C. § 1332 (diversity o citizenship)...................................................................3

28 U.S.C. § 1343 (supplemental jurisdiction)...........................................................3, 106

28 U.S.C. § 1343(a)(3)–(4) (redress as right to recover damages)..............................2-3, 29, 57, 99, 113, 137, 148, 155, 157, 166, 168

28 U.S.C. § 1355 (original jurisdiction) ....................................................................3

28 U.S.C. § 1361 (Mandamus to compel officer or employee) ...................................139, 159-160

28 U.S.C. § 1367 (supplemental jurisdiction) …......................................................3

28 U.S.C. § 1391(b) (venue)....................................................................................4

28 U.S.C. §§ 2071-2077 (Rules Enabling Act) …......................................................97, 104, 129, 134, 144, 146-147

28 U.S.C. §§ 2201–2202 (Declaratory Judgment Act)...................................................2, 5, 22-23, 65, 101-102, 107, 113, 117, 119-122, 124, 133-180

29 U.S.C. § 794 (Rehabilitation Act§ 504).....................................................1, 3, 15, 17-18, 31, 43, 50, 59, 112, 154, 169, 174-175

29 U.S.C. § 794a (Rehabilitation Act enforcement).....................................................1-3, 4-7, 23-24, 27-28, 45-46, 49, 56-62, 65, 70-75, 78-81, 83, 87-90, 94-131, 154-155, 169-171, 174-176, 178-179

31 U.S.C. § 3729(a)(1)(A) (false or fraudulent claim) ….....................................14, 22, 25, 32, 49-50, 56, 58-59, 90, 102, 114, 116-117, 121, 155, 161,

31 U.S.C. § 3729(a)(1)(B) (false or fraudulent material)…........................................6, 10-25, 45, 73, 83, 155

31 U.S.C. §§ 3729–3733 (False Claims Act) …..........................................................3, 6, 10-25, 32, 45, 49-50, 56, 58-59, 73, 83, 90, 102, 114, 116-117, 121, 155, 161,

31 U.S.C. § 3730(h) (relief from retaliatory action) .....................................................6-8, 11-15, 17,-25, 27, 29,31-32, 34-50, 55-57, 59-61, 63-65, 72-87, 93, 95, 106, 112, 120-121, 131-132, 134-135, 137-138, 140-142, 144, 146-149, 151-155, 157, 160, 164-167, 169-178

42 U.S.C. § 401 (SSA-Old-age and survivors insurance trust fund)............................1, 3, 7, 11, 15-18, 21-22, 24-26, 28-30, 32, 37, 45-46, 48, 57-58-60, 62-65, 73, 84, 87, 128-129, 132-133, 141, 160, 172

42 U.S.C. § 423 (SSA-Disability insurance benefit payments as *income*)................1, 3, 7, 11,

v

15-18, 21-22, 24-26, 28-30, 32, 37, 45-46, 48, 57-58-60, 62-65, 73, 84, 87, 128-129, 132-133, 141, 160, 172

42 U.S.C. § 1437f (Housing Assistance Payments / HAP contracts) ….....................11, 13-14, 16-17, 22, 177

42 U.S.C. § 1981 (right to make and enforce contracts) …..........................................1, 10, 15, 17-20-23, 39-41, 43, 56, 96-97, 108,

42 U.S.C. § 1983 (deprivation of rights under color of law) …...................................1, 14, 31-32, 50, 55, 59, 68, 74, 80, 104, 132138, 140, 142-143, 145-146, 148, 150-154, 156, 158, 160, 176

42 U.S.C. § 1985 (conspiracy to interfere with civil rights) …......................................1-3, 14-15, 21-23, 39, 42-47, 50, 53, 55, 59, 65, 67, 68-70, 131, 134, 150-151, 153, 160-161

42 U.S.C. § 1985(2) (conspiracy to obstruct justice)…..................................................2, 4, 9, 14, 46, 49, 53-55, 60, 66-71, 86-87

42 U.S.C. § 1986 (failure to prevent §1985 conspiracy)…............................................1, 4, 7, 13, 22, 28. 31, 34, 38, 41, 45, 48, 56-60, 63-66, 70-75, 83-85, 87-88, 92-93, 97-99, 103-107, 109-111, 113, 115, 122, 130, 133,

42 U.S.C. § 1988 (civil rights remedies / fees)…..........................................................1, 3, 5, 14, 31-32, 50, 55, 59, 68, 74, 80, 104, 132, 138, 140, 142-143, 145-146, 148, 150-154, 156, 158, 160, 176

42 U.S.C. §§ 1981, 1983, 1985–1986, 1988 (Civil Rights) …......................................1, 3-5, 7, 12, (Federal – under color of law / conspiracies)....14, 19, 22, 28, 31-32, 31, 34, 38, 41, 45, 48, 56-60, 68, 70-75, 80, 83-88, 92-93, 97-99, 103-107, 109-111, 113, 115, 122, 130, 132-133, 138, 140, 142-143, 145-146, 148, 150-154, 156, 158, 160, 176

42 U.S.C. §§ 3531–3537 (HUD Act – umbrella authority) …......................................1, 3, 6, 8, 10-23, 45-46, 48, 59-60, 63-64, 71, 74, 78, 92-93, 96, 107, 115, 120-121, 132, 139, 145, 156, 162, 177

42 U.S.C. § 3604 (housing discrimination) …..............................................................15, 22, 92-93

42 U.S.C. §§ 3601–3619 (Fair Housing Act) …...........................................................15, 17, 22,

92-93

42 U.S.C. § 12132 (discrimination by public entities) ...............................................1, 3-4, 14-15, 18, 20, 24, 25, 29, 43, 45, 47, 49-50, 56-58, 60, 72-74, 92, 95, 97, 105-106, 117, 119, 121, 138, 142, 153-156

42 U.S.C. § 12133 (ADA Title II – enforcement) ....................................................... 1, 3, 15, 17-19. 25, 29, 32, 70, 73, 85, 89, 94-95, 97, 112, 134, 138, 145, 152-154, 156, 169-171, 174, 177, 179

42 U.S.C. §§ 12131–12165 (ADA Title II) ................................................................1, 3, 15, 17-19. 25, 29, 32, 70, 73, 85, 89, 94-95, 97, 112, 134, 138, 145, 152-154, 156, 169-171, 174, 177, 179

44 U.S.C. § 3512 (OMB control number must be used).............................................1, 11, 14-20, 23, 28, 63, 78, 132, 157, 165, 168, 175

44 U.S.C. § 3501 et seq. (Paperwork Reduction Act – PRA) ....................................1, 10-11, 14, (includes the OMB Control Number requirement)) 16-20, 23, 28, 63, 78, 132, 157, 165, 168, 175

FEDERAL CASE LAW

Ex parte Young, 209 U.S. 123 (1908) ........................................................................1, 3, 65, 88, 94-95, 97-98, 102, 104, 120, 176

Hafer v. Melo, 502 U.S. 21 (1991)...............................................................................1

Health & Hosp. Corp. v. Talevski, 599 U.S. ___ (2023) ............................................1, 88

Loper Bright Enters. v. Raimondo, 603 U.S. ___ (2024)..............................................1, 42

Marbury v. Madison, 5 U.S. (1 Cranch) 137 (1803) ...................................................1, 88

Owen v. City of Independence, 445 U.S. 622 (1980) ..................................................1, 88

Scheuer v. Rhodes, 416 U.S. 232 (1974) ....................................................................1, 88

Tennessee v. Lane, 541 U.S. 509 (2004) ....................................................................94-95, 117, 120

United States v. Williams, 504 U.S. 36 (1992) ............................................................107
(Additional cases to be inserted as identified)

STATE STATUTES (SOUTH DAKOTA)

SDCL § 3-4-1 (Events causing vacancy in office) ......................................................81, 75-129,
134, 157-158, 160

SDCL §§ 3-5-1 to 3-5-14 (Official Bonds) .............................................................81, 90, 75-
129, 157-158
.
SDCL § 8-4-5 (Failure to file oath or bond as refusal of office) ...............................81, 75-129,
157-158

SDCL § 9-14-10 (Failure to qualify for office = removal) ........................................81, 75-129,
157-158

RULES

Fed. R. Civ. P. 65 (Injunctions)..................................................................................5

OTHER AUTHORITIES

Accardi Doctrine (*United States ex rel. Accardi v. Shaughnessy)*...............................129
Congressional Filings (Appendix F)
Judicial Notice Materials (Appendices A-2, A-3, E-2)
Private Attorney General Doctrine (named as doctrine) ….........................................1, 5-6, 88, 90,
109, 113

## TABLE OF EXHIBITS EMBEDDED HEREIN

All linked exhibits are publicly accessible and have been preserved by Prosecutor Ex Rel / Plaintiff in offline archival format and can be produced upon order of the Court.

1. Letter dated March 12, 2025, from Ty Daly and attorneys at Lynn Jackson Shultz & Lebrun, P.C., to Prosecutor Ex Rel / Plaintiff concerning a proposed lease addendum, compliance demands, and eviction-related consequences, referenced in the Complaint Brief at page 23.

**http://ricobusters.com/ricomedia/031225_Daly2SchiedCOERCIONunderthreatoftrumped upeviction.pdf**

2. Letter dated April 29, 2025, from Ty Daly and attorneys at Lynn Jackson Shultz & Lebrun, P.C., to Prosecutor Ex Rel / Plaintiff, setting forth notice of intended termination of housing and associated consequences effective February 1, 2026, referenced in the Complaint Brief at page 23.

**http://ricobusters.com/ricomedia/042925_DalyJacksonattnysConspir2Fraud.pdf**

3. Letter dated June 16, 2025, from attorney Nick Skjoldal of Nies, Karras & Skjoldal to Prosecutor Ex Rel / Plaintiff, denying administrative discovery and a formal hearing and notifying of termination of HUD Section-8 assistance effective November 1, 2025, referenced in the Complaint Brief at page 23.

**http://ricobusters.com/ricomedia/061625_MeadeAttnySkjolDalconspiracy2fraud2St opSec-8.pdf**

4. The three-plus (3+) hour documentary – which also included footage of former Governor Kristi Noem being also informed in early 2022 about this fraud as a matter of record – has been posted publicly for years, at the following linked Internet location:
(p.30 and p.32)

**https://www.youtube.com/watch?v=QS-ukmfvuCY**

5. The over an hour recorded telephone conversation with the ADRC's deceptively named "*State Medicaid Office*" and the State's DHS agent Hosman is presented in Appendix A-3 as follows with the link to that evidence posted publicly in full government transparency where the co-Defendants operating as "*the State*" cloak themselves with varied schemes of non-transparency. (p.30)

**https://ricobusters.com/ricomedia/050523_KEY-SDMEDICAID- LeeHosmanabuse&neglectreport_mp3.mp3**

6. A comprehensive 308-page administrative record to DSS, DHS, ADRC, the Office of Hearing Examiners, the Attorney General's Office, and the Bureau of Administration.

ix

This submission contained statutory demands under South Dakota's Open Records Act, ADA Title II, and federal due-process principles; documented four (4) years of conflicting Medicaid determinations; exposed the State's dual-track intake and concealment scheme; identified contradictory decisions issued by ALJ Monson; and provided linked evidence, recordings, and public-domain exhibits demonstrating systemic misrepresentation and obstruction across agencies.

**http://ricobusters.com/ricomedia/0120-052325_NotFOIAviolaDEMANDADMISIONSinTwoAppeals-1-297ALL.pdf**

7. Recorded telephone conversation between Prosecutor Ex Rel / Plaintiff and Defendant American Family Insurance agent Jason Gellett, in which Prosecutor Ex Rel / Plaintiff provided notice of an asserted imminent risk to insured property arising from eviction-related actions connected to housing management and legal counsel, referenced in the Complaint Brief at page 35.

**http://ricobusters.com/ricomedia/020725_My2callsAmerFamily21min1mincallback-nohelp2stoptheft.mp3**

8. Recorded telephone conversation dated December 13, 2021, between Prosecutor Ex Rel / Plaintiff and DHS agent Kelli Werner, concerning entry into Plaintiff's residence, Medicaid eligibility, and administrative authority, referenced in the Complaint Brief at page 38.

**http://ricobusters.com/ricomedia/121321_KEY-DHSKellyrudehungup-refusedtoprovideinfo.wav**

9. Recorded telephone call from Monument Health Network, Inc. financial director Marcia Olson to Prosecutor Ex Rel / Plaintiff regarding cancellation of a previously scheduled MRI appointment and discussion of payment and coverage issues, referenced in the Complaint Brief at page 39.

**http://ricobusters.com/ricomedia/090225_MarciaOlsonMonHealFinDir-nomoreservice.mp3**

10. Recorded audio evidence documenting Plaintiff's in-person attempt to report alleged criminal conduct to the U.S. Attorney's Office for the District of South Dakota, including interaction with U.S. Attorney Alison Ramsdell and AUSA Ben Patterson, referenced in the Complaint Brief at page 46.

**http://ricobusters.com/ricomedia/041023_USAttorneyOffice-BenPatterson-2.wav**

11. Here is a *Coram Nobis* filing that is still a matter of public record today as time-stamped by the United States District Court in 2016, both on the face of the 68-page document also reaffirming a default judgment, and on its accompanying first and second

x

*"Certificate[s] of Service,"* which was accompanied also by eleven (11) federal *"AO-91 Forms"* of sworn *Criminal Complaints, Affidavit of Obligation, Brief of Information,* and *Claim in Commerce for Damages.* Those memorialized, time/date-stamped federal court filings from 2016 are located at the following Internet URLs: (p. 48)

    a)    **http://ricobusters.com/ricomedia/100416_CourtStmp-ALLWritofErrorContemptClaimsFiledbyPAGSquires.pdf**
and
    b)    **http://ricobusters.com/ricomedia/101716_CourtStmp-2ndCertofService2CoramNobis.pdf**

12. Online compilation of documents, recordings, and summaries relating to administrative appeal proceedings involving ALJ Eric Monson and Chief Hearing Examiner Williamson, referenced in the Complaint Brief in connection with administrative adjudication issues.

**http://ricobusters.com/appendix_b_corrupt_events_and_conditions_seen_with_frau dulent_state_administrative_hearing_examiners.html**

13. Video recording of an administrative hearing conducted by ALJ Eric Monson, referenced in Appendices A, A-1, and C, depicting procedural conduct, notice timing, witness availability, and hearing conditions, referenced in the Complaint Brief at pages 52–53.

**https://www.youtube.com/watch?v=QS-ukmfvuCY**

14. The two part recorded testimonial videos depicting Reverend Jason Goodwill's story background as a federal whistleblower. The 2-hour documentary, filmed by Prosecutor Ex Rel / Plaintiff in 2016 as an investigative journalist gathering evidence of public corruption in Michigan are provide both immediately below and in Appendix A-3, where the links appear along with another horror story still unfolding in Florida with another Christian community leader, Reverend Cindy Falco DiCorrado.

    a)    **https://www.youtube.com/watch?v=UQW5k-0d8UA**
15. and
    b)    **https://www.youtube.com/watch?v=3gFrJnXm0A8**

## NATURE OF THE ACTION

This is a civil action brought by a totally and permanently disabled federal whistleblower, acting Prosecutor Ex Rel, sui juris, and in the capacity of a Private Public Proxy proceeding under the Private Attorney General Doctrine, to redress an extensive pattern of systemic constitutional violations, statutory breaches, commercial dishonor, and RICO-patterned enterprise conduct carried out by state, federal, county, municipal, corporate, and BAR-affiliated actors operating under color of law.

The claims arise from a multi-year, multi-agency sequence of misconduct – including fraud, retaliation, deprivation of rights, concealment of material records, whistleblower reprisal, ADA discrimination, administrative sabotage, and cross-jurisdictional obstruction – perpetrated across several federally funded programs. These include HUD housing streams, IRS/LIHTC income-based jurisdictional mechanisms, DSS/DHS Medicaid and Medicare Savings Program determinations, SSA disability determinations, HHS oversight obligations, and multiple federal and state law-enforcement agencies who received notice of wrongdoing and refused corrective action.

This action invokes the jurisdiction of this Court to enforce constitutional supremacy, commercial accountability, and statutory obligations under Title 42 (including §§ 1981, 1983, 1985, 1986, and 1988), the Americans with Disabilities Act (ADA) Title II, the Rehabilitation Act, the False Claims Act, the Administrative Procedure Act, the Paperwork Reduction Act, FOIA, RICO (18 U.S.C. §§ 1961–1964), and related federal doctrines including *Ex parte Young*, *Hafer v. Melo*, *Marbury v. Madison*, *Owen v. City of Independence*, *Scheuer v. Rhodes*, *Health & Hosp. Corp. v. Talevski*, and *Loper Bright v. Raimondo*.

The defendants – over one hundred (100) individual and institutional actors – are sued in their individual and official capacities for their personal participation in, contribution to, or deliberate acquiescence in the deprivations and injuries described herein. Each defendant was provided notice, opportunity to cure, and multiple requests for intervention, correction, or compliance. Each refused, defaulted, or retaliated. These refusals constitute commercial dishonor, fiduciary breach, and actionable wrongdoing under federal law.

The nature of this action is therefore twofold:

1) To obtain judicial relief for the Prosecutor Ex Rel / Plaintiff's injuries – including constitutional deprivations, economic losses, retaliation, discrimination, fraud, and obstruction – perpetrated through coordinated state, federal, and private actors acting under color of law; and,

2) To enforce the People's retained constitutional and commercial remedies where administrative channels, agency oversight mechanisms, and judicial avenues have collapsed or been corrupted, compelling the Prosecutor Ex Rel / Plaintiff David Schied to proceed in the common law as Prosecutor Ex Rel and Private Public Proxy in the capacity of the statutory Private Attorney General on behalf of the sovereign People.

1

This action seeks declaratory relief, injunctive relief, compensatory damages, punitive damages, statutory damages, commercial recovery, equitable restructuring of unlawful administrative schemes, the production of surety instruments, enforcement of fiduciary obligations, and any further relief necessary to restore constitutional governance and redress the injuries described in the Counts below.

## INCORPORATION OF APPENDICES

The Prosecutor Ex Rel / Plaintiff incorporates by reference the entirety of the following Appendices as if fully set forth herein. Together, these Appendices establish the factual, evidentiary, commercial, and constitutional predicates supporting this action and the Counts that follow. Each submitted under Declaration of Truth and penalty of perjury:

Appendix A (Master Memorandum of Facts) – 352 pp.

Appendix A-1 (Roster and Defendant Matrix) – 176 pp.

Appendix A-2 (Constitutional Escalation, Judicial Capture Analysis, and Counts Matrix) – 92 pp.

Appendix A-3 (Judicial Notice of Dual-Pronged Constitutional and Commercial Remedies) – 83 pp. (plus Exhibits #1 and #2)

Appendix B (Executive Summary for the Court of Federal-State Misconduct and System Design Flaws) – 11 pp.

Appendices C (Table of Exhibits from Appendix A) – 28 pp.

E-1 (Income-Jurisdiction / Federal Exhaustion / Funding-Obligation Lynchpin) – 20 pp.

E-2 (The Piersol–Lange Federal-Judge Conspiracy) – 12 pp.

E-3 (Evidentiary Submission to South Dakota State Agencies) – 308 pp.

F (Congressional Whistleblower Filings) – 13 pp. (with online links to the whistleblower docs)

G (Litigation Docket and Appellate History) – 3 pp.

## JURISDICTION AND VENUE

This Court possesses subject-matter jurisdiction under Article III of the United States Constitution and the following federal statutes:

(1) 28 U.S.C. § 1331 — federal question jurisdiction arising under the Constitution, federal civil rights statutes, federal spending-clause programs, the Americans with Disabilities Act, the Rehabilitation Act, the Administrative Procedure Act, RICO, and related federal laws.

(2) 28 U.S.C. § 1343(a)(3)–(4) — jurisdiction over civil actions to redress the deprivation of constitutionally guaranteed rights under color of state law, including claims brought under 42 U.S.C. §§ 1981, 1983, 1985, 1986, and 1988.

(3) 28 U.S.C. § 1332 — diversity and supplemental jurisdiction over state-law claims intertwined with the federal causes of action.

(4) 28 U.S.C. § 1367 — *supplemental* jurisdiction over common-law, commercial, and fiduciary claims arising from the same operative nucleus of facts described in Appendix A and Appendix B, and provided in Appendix C.

(5) 28 U.S.C. § 1355 and 18 U.S.C. §§ 1961–1964 — jurisdiction over civil RICO claims, commercial fraud, and enterprise-level wrongdoing with interstate components described in Appendices A-3, E-1, E-2, F, and G.

(6) 31 U.S.C. §§ 3729–3733 (False Claims Act) — jurisdiction over false claims, fraud, and federal-funds misuse associated with HUD, DHS, DSS, SDHDA, LIHTC streams, Medicaid/Medicare oversight, SSA benefits, and federal whistleblower retaliation.

(7) 42 U.S.C. § 12133 (ADA Title II) and 29 U.S.C. § 794a (Rehabilitation Act) — jurisdiction for disability discrimination, retaliation, and denial of accommodations.

(8) *Ex parte Young,* 209 U.S. 123 (1908) — jurisdiction for prospective injunctive relief against state and federal officials acting *ultra vires.*

## Personal Jurisdiction

This Court has personal jurisdiction over all defendants because:

- they reside in, work in, or transact business in South Dakota;

- they committed acts, omissions, or conspiratorial conduct within this District;

- they directed harmful actions toward the Prosecutor Ex Rel / Plaintiff while the

3

Prosecutor Ex Rel / Plaintiff was domiciled in this District; and

- many defendants occupy positions within agencies administering federal programs impacting this District.

- Each defendant individually and severally received notice, opportunity to cure, and multiple chances to correct violations. Their failure to act – documented in Appendix A, Appendix C, Appendix F, Appendix A-3, Appendix A-2, Appendix E-1, Appendix E-2, and Appendix G – creates personal liability under federal and commercial law. The commercial defaults preserved in Appendices A, A-2, A-3, C, E-1, F, and G independently trigger commercial jurisdiction for enforcement of fiduciary duties, surety liability, and commercial dishonor remedies under established common-law and UCC principles.


## Venue

Venue is proper in the United States District Court for the District of South Dakota, Western Division under 28 U.S.C. § 1391(b) because:

- Substantial events giving rise to the claims occurred within this District;

- Multiple defendants reside or conduct official duties within this District;

- Injuries – including housing discrimination, disability discrimination, Medicaid/Medicare sabotage, income-jurisdiction fraud, and administrative retaliation – occurred in this District; and

- The District of South Dakota is where the Prosecutor Ex Rel / Plaintiff currently resides and where federal housing, disability, medical, administrative, and judicial harms manifested.

Venue is further proper because the federal South Dakota judiciary itself – through the Piersol–Lange conduct documented in Appendix E-2 and the Clerk actions documented in Appendix A and Appendix C as well as in other public documents providing full government transparency – forms part of the procedural and structural injury that this action seeks to remedy under Article III.

4

## Jurisdiction for Equitable and Structural Relief

This Court has authority to grant declaratory, injunctive, structural, and commercial remedies under:

- 28 U.S.C. §§ 2201, 2202 (Declaratory Judgment Act)

- Rule 65, Fed. R. Civ. P. (injunctions)

- RICO § 1964 (equitable restructuring)

- Title 42 § 1988 (equitable and attorney-fee remedies)

- inherent Article III powers to vindicate constitutionally guaranteed rights and enforce federal supremacy

The commercial defaults recorded across Appendices A, A-2, A-3, C, E-1, E-2, F, and G independently trigger commercial jurisdiction for enforcement of fiduciary duties, surety liability, and commercial dishonor remedies under established common-law and UCC principles.

## Standing

The Prosecutor Ex Rel / Plaintiff possesses Article III standing because:

- he suffered concrete, particularized, and actual injuries;

- these injuries were directly caused by defendants' actions; and

- the relief sought is capable of redressing those injuries.

Standing also arises under the Private Attorney General Doctrine and statutory provisions allowing a harmed citizen to enforce federal rights when government actors refuse.

5

## The Parties

Prosecutor Ex Rel / Plaintiff **David Schied**, a totally and permanently disabled federal whistleblower, appears in this action in his private capacity and in his statutory capacity as a Prosecutor Ex Rel and Private Public Proxy and multi-decade investigative journalist, who is working from his *"Office of the Citizen"* with the common law capacity corresponding with the statutory Private Attorney General doctrine enforcing constitutional, statutory, and commercial obligations that government actors refused to enforce.

The defendants are organized into functional categories for clarity. Each defendant is identified in Appendix A-1 by name, role, capacity (individual and official), location, and full factual background. This section provides only a concise statement of group structure and role within the enterprise.

### 1. Housing Enterprise and Predicate RICO Defendants

Defendant Nos. 1–23

These defendants comprise the South Dakota Housing Development Authority (SDHDA), the U.S. Department of HUD South Dakota Field Office, Highland Property Management, Inc. (HPMI), Meade, Butte, Lawrence County Housing & Redevelopment Commission (MBLCHRC), Summit Management Group, Inc. (SMGI), associated HUD-tax-credit project owners, contractors, attorneys, and on-site property-level actors across Meade, Butte, and Lawrence, Counties, and through the states of South Dakota, Wyoming and Montana.

These individuals and entities created and executed the predicate administrative RICO pattern, weaponizing *"income,"* coercing unlawful recertification, manipulating calculations, retaliating against whistleblowing, falsifying records, and denying required disability accommodations.

Defendant #3 (Long) — Although omitted from Appendix A is included in Appendix A-1. This defendant played a key leadership role within HPMI/SMGI, directing and insulating multi-county and multi-state LIHTC and Section-8 administrative fraud from across state lines and is named here for full factual development in the Complaint Brief.

### 2. South Dakota State Executive Branch, DSS/DHS, Medicaid, ADRC, and Related State Agencies (Defendant Nos. 17, 18, 62–83, 103)

These defendants include DSS, DHS, State Medicaid, Dakota at Home, ADRC, and related state-level administrators, caseworkers, supervisors, BAR-member attorneys, and decision-makers who received direct notice of violations and who contributed to or ratified:

- retaliation against whistleblowing,

6

- denials of federally required disability accommodations,

- unlawful recalculation of benefits and income,

- withholding of federal entitlements,

- coordinated referrals to cover up upstream wrongdoing by housing actors.

These defendants extended the healthcare/Medicaid stream and housing-stream misconduct into state systems, completing the horizontal integration of the enterprise.

### 3. Local Government Defendants (City, County, Law Enforcement)
    (Defendant Nos. 84–89, 91–92)

These defendants include the City of Spearfish, its City Attorney, police supervisors, Lawrence County Sheriff and deputies, the Lawrence County Commission, State's Attorney Brenda Harvey, and related municipal actors whose actions or failures to act reinforced retaliatory patterns, obstructed protection, refused investigation, or enabled ongoing violations.

They function as the local enforcement arm of the enterprise through non-response, hostility, or willful blindness to documented federal-law violations.

### 4. Medical, Prosthetic, and Corporate Private Actors
    (Defendant Nos. 92–100)

These defendants include Monument Health Network, Inc. ("MHNI") executives, personnel, and *"Legal Team,"* Pivot Prosthetics and Orthotics, Inc. (Brodie and Rochelle Rice), and administrators, board members, and attorneys affiliated with American Board of Credentialing ("ABC") and its Legal Services who shielded or advised the misconduct of corporate clients.

These actors converted upstream programmatic misconduct into direct bodily harm, canceling medically necessary care, obstructing prosthetic replacement, attempting to extract uncompensated *"labor exchange,"* and acting in retaliation for whistleblowing.

Defendant #97 (Steve Fletcher) — An administrator/director within ABC Legal Services who oversaw the firm's internal processing of complaints and its refusal to correct or acknowledge unlawful conduct by corporate clients.

Defendant #98 (Suzanne Pierce) — Legal counsel for ABC Legal Services who advised ABC's refusal to intervene, failed to report misconduct, and contributed to concealment of retaliatory service denials.

7

**5. BAR-Member Attorneys, Legal Services, Disability Rights Groups, and Law Firms**
    (Defendant Nos. 8-11, 15-16, 29–35, 49–61, 69–83, 86, 101–104)

This category includes:

- LSC/DPLS attorneys (Yuk, Woods, Caruso, Bergman),

- Disability Rights Michigan, Disability Rights South Dakota, and National Disability Rights Network (NDRN) attorneys,

- private law firms (Edwards/SEHPC, Daly/Lynn Jackson, Skjoldal, and others),

- State and federal BAR attorneys (Howell, Lippert, Morris, Reimers, Cremer, Ramsdell, Harvey, Jackley, etc.),

- and counsel who directly obstructed or refused representation.

They function as the legal arm of the enterprise, either by:

- refusing or sabotaging representation,

- concealing misconduct,

- retaliating against protected activity,

- providing legal cover to administrative wrongdoing,

- or enabling civil-rights violations through inaction.

Defendant #101 (Disability Rights South Dakota / DRSD) –– A Congressionally funded entity obligated to protect the rights of disabled residents, whose abandonment and refusal to intervene compounded injuries and facilitated the enterprise.

Defendant #102 (National Disability Rights Network / NDRN) –– The national umbrella for all state Protection & Advocacy entities; received notice and refused corrective action, triggering *respondeat superior* liability.

**6. Federal and State High-Level Principals, Presidential Cabinet Officers, OIG Officials, and Forgiveness-List Actors** (Defendant Nos. 17–28, 36–61, 65)

These defendants include former and current HUD Secretaries, HHS leadership, SSA Commissioners, Treasury officers (including Bessent), DOJ officials (including Bondi), DHS Secretary Kristi Noem (for her conduct as Governor), federal OIG offices, upper-tier administrators, and certain individuals listed in Appendix D's *Forgiveness List* (with limited

8

claims).

These defendants:

- received detailed notice,

- had statutory and supervisory authority to intervene,

- failed to act, and

- ratified misconduct through silence or evasion.

Their liability arises through *respondeat superior*, misprision, and ratification, not through direct predicate acts.

**Defendant #51** (Alison Ramsdell) — U.S. Attorney for the District of South Dakota during key periods; received direct reports and refused to take investigative or prosecutorial action.

**Defendant #52** (Ben Patterson) — High-level DOJ/OCR or AUSA official who received notice of civil-rights violations and declined intervention.


**7. Judicial Officers, Clerks, and Court Administrative Actors** (Defendant Nos. 57–61, 62)
(State of South Dakota = 62), 71–83, and #106 (United States of America)

These defendants include:

- federal judges implicated in the Piersol–Lange scheme (Appendix E-2),

- clerks such as Matthew Thelen, Latuseck, and Fergel who manipulated dockets and records,

- state-court judges and clerks identified in Appendices A and C, and Appendix G,

- and the governmental sovereigns (State of South Dakota and now the United States as Defendant #106) as fiduciary overseers of the judicial system.

They represent the final structural barrier to remedy: a BAR-insulated judicial layer that denied access to court, ratified dismissals, manipulated filings, and provided institutional protection to the enterprise.

**8. DOE Defendants 1–75** (Defendant No. 105)

These are presently unidentified individuals whose identities appear in documentary evidence (emails, directives, *"compliance told us," "we were instructed,"* etc.) and who will be named as

9

discovery reveals their roles.

**Addition: UNITED STATES OF AMERICA — Defendant No. 106**

The United States is added as Defendant #106 to reflect its role as guarantor of the $100-billion surety and insurance obligations associated with prior litigation, as well as its supervisory liability over federal agencies whose officers and contractors are named individually.

**Addition: SOUTH DAKOTA PUBLIC ASSURANCE ALLIANCE --- Defendant No. 107**

The South Dakota Public Assurance Alliance (SDPAA) is added as Defendant #107 to reflect its role as the commercial enterprise-fund risk pool that absorbs, distributes, and shields liability arising from the misconduct of its governmental members, including counties, cities, housing authorities, law-enforcement agencies, and administrative departments implicated in this case. As the financial backstop enabling and protecting the wrongful acts documented herein, SDPAA bears structural and commercial responsibility for the enterprise conduct, surety failures, and constitutional deprivations committed under its coverage.

## FACTS

**A. Housing Enterprise and Predicate RICO Defendants** (Defendants Nos. 1-23)

1.     Defendants 1–23 together operated as a coordinated *"Housing Enterprise"* that weaponized the Low-Income Housing Tax Credit ("LIHTC") and HUD-linked programs against a disabled beneficiary. Through HPMI and SMGI's ownership and management structure, Defendants Karen Martin, Robyn Beadles, Scott G. Long, and Angela Foster designed and enforced a dual-track recertification regime that forced tenants to sign false income certifications and undisclosed lease addenda under threat of eviction and loss of federally funded housing.

2.     The so-called third-party *"DOE Compliance Entity"* was held out as an independent HUD compliance arm while actually functioning as an internal instrument to manufacture *"paper compliance,"* launder falsified certifications, and conceal the source of the fraud.

3.     This core group used the 1/17/24 *"Interim Lease Change"* addendum, annual and mid-cycle recertifications, and a series of emails and three eviction-threat letters as coercive tools to obtain signatures constituting *subornation of perjury* and *coercion of contracts,* to silence lawful questions, and to preserve LIHTC-based revenue streams at Prosecutor Ex Rel / Plaintiff's expense.

4.     At the local level, HPMI's on-site manager Angela Foster, acting under the direction of Martin and Beadles, carried out the coercive scheme in South Dakota by staging in-person *"sign or be evicted"* sessions, including the October 2024 addenda-signing meeting where Prosecutor Ex Rel / Plaintiff was denied identification, refused access to HUD program documents, and told that needed paperwork could not be seen unless and until he signed first. When Plaintiff

10

requested statutory and regulatory authority, copies of the HAP contract, and time to consult counsel, Foster and Beadles cut off communication, escalated threats, and used their control over Prosecutor Ex Rel / Plaintiff's housing as leverage to compel compliance.

5.      These actions were not isolated mistakes but part of a deliberate pattern: the same people who controlled the paperwork controlled Prosecutor Ex Rel / Plaintiff's physical security and basic shelter, and they used that control to extract false certifications and to retaliate when Prosecutor Ex Rel / Plaintiff asserted his rights.

6.      Above them, Scott G. Long, HPMI and SMGI used their executive authority to design, ratify, and profit from this system. Long and SMGI controlled both the development side and the management arm (HPMI), set the policies that required *"clean"* certifications to keep LIHTC flows intact, and knowingly allowed Martin, Beadles, and Foster to continue coercive recertification practices after multiple written and recorded complaints.

7.      Instead of correcting the fraud, Long, Martin, HPMI and SMGI relied on the *"DOE Compliance Entity"* and outside counsel to protect the enterprise: certifications that they knew or should have known were falsified were nonetheless transmitted to SDHDA, HUD, and the IRS to justify ongoing false tax-credit claims. In practical effect, Prosecutor Ex Rel / Plaintiff's housing unit and recertification file became a test case in how far the enterprise could push a disabled tenant to either sign what was put in front of him or be driven out.

8.      The unknown *"DOE Compliance Entity"* played a key operational role by laundering these practices through the language of *"compliance."* It was repeatedly invoked in letters and phone calls as if it were a neutral HUD-approved reviewer, when in reality it was hired and paid by HPMI/SMGI and, at times, reported as a *"department"* of the HPMI/SMGI enterprise, as if at the same address and chain of command.

9.      By placing its name on *"Household Income Certifications"* paperwork, lease addenda, and related forms, this entity gave a false appearance of third-party oversight while helping to conceal the fact that Prosecutor Ex Rel / Plaintiff had been denied basic APA/PRA disclosures, reasonable accommodations, and truthful explanations of what he was being asked to sign. The net effect was to turn Prosecutor Ex Rel / Plaintiff's paperwork into a mechanism for extracting fraudulent federal benefits, rather than a lawful record of his actual income, disability status, and tenancy.

10.     The so-called *"Re-Certification Questionnaire"* forced upon Prosecutor Ex Rel / Plaintiff under threat of eviction was not a HUD-, IRS-, or federally authorized LIHTC compliance form. Examination of the document (pp. 1–8) shows it carries no OMB Control Number, no HUD form designation, no GAO/GSA identifier, and no federal approval reference of any kind. Instead, each page displays the private copyright notice *"©2021 Yardi Systems, Inc. -- All Rights Reserved,"* confirming the instrument was generated through a commercial software platform, not a federal regulatory body.

11.     Defendants nonetheless used this privately manufactured form – bearing a misleading Equal Housing logo – to create the false appearance of federal compulsion and to repeatedly coerce perjured signatures, updated falsification of certifications, and false personal declarations from Prosecutor Ex Rel / Plaintiff; all done under threat of immediate housing loss.

12.     Use of a privately owned, non-government document to extract tenancy concessions while representing it as federally required constitutes misrepresentation under color of federal authority, supports the pattern of racketeering activity alleged, and materially contributed to the fraudulent recertification records later transmitted to SDHDA, HUD, and IRS-linked compliance systems.

13.     Attorneys within this group – including but not limited to Ty M. Daly, James Edwards, and their respective firms of Lynn Jackson Shultz & Lebrun, P.C and Stevens, Edwards & Hallock, P.C – were then deployed as the *“legal hammers”* for the enterprise. Instead of independently investigating the underlying misconduct, these lawyers adopted HPMI/SMGI’s false narrative, issued and backed threatening correspondence, and positioned themselves as the enforcers of an eviction and collection regime built on falsified documents.

14.     Edwards, Daly and their respective law firms used their status as *officers of the court* to legitimize the *“threat of eviction”* letters, to pressure Prosecutor Ex Rel / Plaintiff to accept fabricated *“compliance”* stories, and to chill his protected petitions to housing authorities, law enforcement, and courts going back to 2023 when Prosecutor Ex Rel / Plaintiff was reporting local HPMI apartment manager Tammy Soulek embezzling and converting money from of his delegated unit rental funds paid in advance.

15.     These attorneys and their law firms participation transformed what might have been corrected as an administrative abuse into a full-scale legal retaliation campaign, closing off ordinary remedial channels and forcing Prosecutor Ex Rel / Plaintiff into escalating, high-risk litigation simply to preserve basic housing and safety.

16.     Taken together, Defendants 1–23 created and maintained a closed loop of control over Prosecutor Ex Rel / Plaintiff’s housing, information, and access to remedy. HPMI, SMGI, and their DOE compliance vendor generated the falsified paperwork; Martin, Beadles, and Foster coerced Prosecutor Ex Rel / Plaintiff on the ground and cut off communication when he asserted his rights; the corporate entities submitted those same documents up the chain to SDHDA, HUD, and the IRS to secure and preserve LIHTC benefits; and the attorneys stepped in to threaten eviction, litigation, and further retaliation when Plaintiff attempted to expose the fraud.

17.     Throughout, these actors treated Prosecutor Ex Rel / Plaintiff’s disability, whistleblowing, and insistence on lawful process as problems to be neutralized rather than protected characteristics and rights to be honored. The factual chains documented in Appendix A and Appendix A-1 show that each Defendant in this group contributed specific acts to this pattern, which together support the RICO, civil-rights, False Claims Act, and related counts alleged against them in the Complaint.

18.     On the Section-8 side of the enterprise, Defendants Beth Pleggemeyer-Wheeler and Lori Hoppe, acting through the Meade–Butte–Lawrence County Housing & Redevelopment Commission (MBLCHRC), administered Prosecutor Ex Rel / Plaintiff's federal Housing Choice Voucher with systemic indifference to federal regulations, reasonable-accommodation laws, and mandatory oversight duties.

19.     These Section-8 quasi-government, private-public partnership *"HUD Office"* NGO officials repeatedly misclassified eligibility information, failed to process disability-based accommodation requests, ignored written evidence of qualifying medical deductions, ignored repeated reports and written evidence of demonstrated fraud in the LIHTC property where the voucher was used. Their actions and omissions operated in concert with the HPMI-SMGI property-management actors, enabling coerced recertifications, retaliatory communications, and threats of termination of benefits.

20.     Lorraine Polak and the South Dakota Housing Development Authority (SDHDA) – which jointly oversees LIHTC and Section-8 pass-through compliance – was repeatedly placed on notice through detailed evidence packets and correspondence from Prosecutor Ex Rel / Plaintiff. Polak and SDHDA staff nonetheless refused to conduct investigations, failed to correct known violations, and returned boilerplate statements that concealed actionable fraud.

21.     These failures facilitated the continuation of coercive practices by HPMI and MBLCHRC, and contributed directly to the harm sustained by Prosecutor Ex Rel / Plaintiff. Acting in this capacity, SDHDA was a critical link in the racketeering chain by providing institutional cover for false certifications transmitted to federal agencies.

22.     The HUD South Dakota Field Office known as – including Chloe Lomprey, Noeim Ghirghi, Matthew Cerny, and Roger Jacobs – also received extensive documentary evidence detailing retaliation, fraud, forgery-by-form, denial of accommodations, and coercive practices occurring within South Dakota's housing programs. These federal officials held statutory oversight duties under 42 U.S.C. §1437f and related HUD program requirements.

23.     Nevertheless, each of them defaulted in their obligations by refusing to intervene, failing to conduct regulatory review, declining to halt known violations, and closing out complaints without investigation. Their dereliction allowed the enterprise to operate unchecked and created the appearance of federal approval for actions that were never lawfully sanctioned.

24.     The Section-8 misconduct was further insulated by attorney Drew Skjoldal and Nies, Karras, Skjoldal, P.C. ("NKSPC"), who acted as legal enforcers for MBLCHRC and related actors. Rather than performing independent review, Skjoldal adopted and amplified the false narratives of housing managers, issued intimidating legal communications, and positioned himself as the gatekeeper preventing Prosecutor Ex Rel / Plaintiff from obtaining relief.

25.     According to Appendix A-1, attorney Drew Skjoldal, Esq. and his firm  NKSPC acted as

the institutional legal shield for MBLCHRC and its partner entities, functioning as a core enforcement arm within the deprivation and fraud enterprise. Skjoldal blocked Prosecutor Ex Rel / Plaintiff's access to a formal administrative hearing, despite a lawful demand, and denied discovery, a required component of meaningful adjudication. He substituted state-level excuses in place of controlling federal law – ADA, PRA, APA – thereby obstructing federally protected rights and reinforcing MBLCHRC's concealment of the HAP contract and the ongoing double-recertification fraud.

26.    As counsel, Skjoldal used his BAR authority to legitimize coercive compliance threats, suppress protected petitioning, and intimidate Prosecutor Ex Rel / Plaintiff following First Amendment activity, including requests for counsel and whistleblower communications. NKSPC supported these acts by providing cross-state legal posturing that helped maintain fabricated paperwork, suppressed communication, and protected the fraudulent recertification scheme tied to LIHTC and Section-8 funding streams. These acts align with the RICO predicates, mail/wire fraud, FCA violations, civil rights deprivations, conspiracy, retaliation, and witness interference counts listed in A-1.

27.    Skjoldal and NKSPC knowingly advanced a multi-entity racketeering sequence, joining MBLCHRC personnel and corporate actors in a coordinated scheme to deprive Prosecutor Ex Rel / Plaintiff of federal rights, obstruct oversight, retaliate against protected activity, and preserve fraudulent federal funding flows. Their conduct, individually and corporately, directly furthered the enterprise and inflicted measurable harm recognized in the Counts.

28.    Taken together, these Section-8 actors – Pleggemeyer-Wheeler, Hoppe, MBLCHRC, SDHDA, HUD Field Office officials (Lomprey, Ghirghi, Cherny, Jacobs), and attorney Skjoldal and his firm – formed a unified enterprise that failed in every statutory duty owed to Prosecutor Ex Rel / Plaintiff. Their omissions and actions enabled retaliation, sustained the fraudulent use of non-authorized Yardi-based forms, suppressed mandatory accommodations, and obstructed reporting channels. Like the LIHTC program agents' unlawful actions, each Section-8 program actor's conduct contributed directly to the factual chains supporting the Counts outlined in Appendix A-1 and Appendix A and incorporated fully by reference.

29.    The predicate level of the enterprise begins with the coordinated actions of SDHDA, HPMI, MBLCHRC, SMGI, and the property-level housing agents operating across Meade, Lawrence, and Butte counties in South Dakota, and more counties across Wyoming, Montana and other states. These actors constitute the first layer of the RICO-patterned misconduct documented in Appendix A, Appendix B, Appendix C, Appendix A-3, and  Appendix E-1. Their conduct forms the factual spine of all downstream violations by the State, the BAR, federal agencies, medical providers, and judicial officers. Everything that follows in this section of the Complaint Brief is traceable to the predicate frauds initiated at the housing level.

30.    SDHDA, as the State's federally designated Housing Finance Agency, is entrusted with administering LIHTC, Section 8/HAP oversight, and other HUD-funded housing programs, including enforcement of rent-setting rules, utility-allowance standards, ADA/Fair Housing

14

compliance, and owner/manager regulatory obligations. Instead of fulfilling these fiduciary and statutory duties, SDHDA failed to investigate or correct the recurring irregularities, duplicative recertifications, mid-year rent increases, and non-transparent *"utility allowance"* justifications employed by HPMI, SMGI, and MBLCHRC. Through its inaction, SDHDA allowed these entities to impose unlawful burdens, coerced contractual obligations, and discriminatory practices upon Prosecutor Ex Rel / Plaintiff – a Totally and Permanently Disabled individual recognized by federal law as a protected class – thereby enabling the manipulation, concealment, and falsification carried out at the site-level.

31.    HPMI, the primary on-the-ground compliance and management company operating under SDHDA's umbrella, coordinated with SMGI and MBLCHRC to fabricate rent calculations, demand false certifications, ignore disability documentation, falsify form entries under sworn declaration and under criminal penalties, and misrepresent federal program rules. These predicate acts are documented throughout Appendix A and Appendix C, including recorded statements, emails, written notices, and property-level actions showing deliberate misapplication of federal law.

32.    Site-level HPMI and affiliated SMGI actors – including property managers, compliance officers, and regional supervisors operating from out-of-state headquarters – executed these frauds together with their retained attorneys,, through direct contact with Prosecutor Ex Rel / Plaintiff. These actors repeatedly demanded unlawful forms, coerced signatures, issued retaliatoru threats of eviction, denied disability-related accommodations, misquoted HUD or misapplied HUD regulations, and invoked *"policy"* and *"compliance"* as pretextual justifications for conduct that violated the Fair Housing Act, Section 504, ADA Title II, Title VIII, LIHTC program requirements, and HUD's own FHEO enforcement mandates.

33.    Documentary evidence further shows that HPMI/SMGI personnel openly coordinated with counsel – including communications copied to attorney Daly of the Lynn Jackson law firm – demonstrating knowledge, intent, and attorney-directed participation in the coercive and unlawful actions taken against Prosecutor Ex Rel / Plaintiff as a disabled tenant and whistleblower.

34.    Central to the predicate misconduct was the deliberate weaponization of *"income"*. SDHDA, HPMI and SMGI repeatedly insisted that Prosecutor Ex Rel / Plaintiff possessed *"Household Income"* or *"unearned income"* and/or State *"Utility Allowances"* exceeding limits or triggering rent increases, despite Prosecutor Ex Rel / Plaintiff having no such income and despite HPMI and SMGI refusing to provide proof of utility allowance changes or the sources to which they referred as repeated requested.

35.    SDHDA, HPMI, SMGI and MBLCHRC treated federal disability benefits – which HUD explicitly forbids using as *"earned income"* for LIHTC and Section-8 rent-setting – as revenue. They treated nonexistent assets as actual financial holdings. They relied on undefined *"imputed income,"* which appears nowhere in the LIHTC statute or IRS compliance regulations.

15

36.    Federal Social Security disability payments (SSDI) and retirement benefits (SSA) received by Prosecutor Ex Rel / Plaintiff are not *"income"* in any constitutional. legal or economic sense; they are earned insurance payouts derived from pre-tax wages contributed during decades of labor and held in trust under federal law.

37.    HUD, IRS, and LIHTC program terminology that labels such insurance payouts as *"unearned income"* is a statutory fiction used for administrative convenience, not a factual or constitutional reclassification of the nature of these benefits. By treating SSDI/SSA insurance payouts as taxable *"income"* for rent-setting, recertification, and utility-allowance calculations – similarly to the manner in which the agents of the State misuses the same term to qualify or disqualify applications for Medicaid – property managers, housing-authority personnel, and SDHDA-authorized compliance systems imposed unlawful burdens on a Totally and Permanently Disabled beneficiary whose federal insurance contract prohibits such punitive treatment.

38.    Their misclassification of earned insurance payouts as *"income"* violated the insurance-based structure of the Social Security trust, produced discriminatory rent increases, enabled duplicative recertifications, and directly contributed to years of financial, medical, and constitutional injury.

39.    This *"income fabrication"* was not an isolated error; it was a repeated practice. Each time Prosecutor Ex Rel / Plaintiff questioned the false calculations, the housing actors merely substituted new excuses, new numbers, new *"interpretations,"* or new forms – never once producing the lawful authority required under the Paperwork Reduction Act, FOIA, or HUD's own regulatory framework.

40.    Their refusal to disclose written rules constitutes independent violations of the APA as recognized by federal courts interpreting FOIA and related transparency obligations, which have consistently held that withholding program-governing documents and regulations causes actionable informational injury and deprives affected persons of the ability to protect their rights.

41.    The refusals of both MBLCHRC and HPMI to provide the governing HAP contract, forms, regulations, and written authority underlying their recertification, rent-setting, and paperwork demands further violated the Paperwork Reduction Act ("PRA"), which prohibits any federally funded program or contractor from requiring a person to supply information through a form or process that lacks a valid OMB control number or that is not publicly disclosed upon request.

42.    Prosecutor Ex Rel / Plaintiff repeatedly asked HPMI, SMGI, and MBLCHRC to produce the governing documents – both as a disabled tenant and as an investigative journalist – but each entity refused, mimicking the pattern by which federal agencies and contractors evade FOIA by claiming to be *"private"* while administering federal programs. Under the PRA, any information-collection demand lacking a valid OMB-approved form is legally void, cannot be enforced, and constitutes governmental misconduct in its own right.

16

43.     These predicate actors further concealed mandatory information, including IRS Form 8823 compliance guidance, actual LIHTC rent formulas, and HAP Contract terms for applicable Section 8 units. They refused to identify the specific federal statutory authority underlying the demands they imposed. This concealment – which tracks the misconduct of state agencies – is central to the larger RICO pattern: the actors create obligations by withholding the rules governing those obligations.

44.     Plaintiff's disability accommodations were also systematically denied. Reasonable modifications required under Section 504 and the Fair Housing Act were either ignored or weaponized against him. Appendix A documents the property-level staff refusing to process accommodation requests, fabricating conversations that never occurred, and retaliating after Plaintiff submitted federal whistleblower reports.

45.     The housing actors imposed an unlawful *"dual annual recertification"* regime on Prosecutor Ex Rel / Plaintiff by conducting one full recertification each January through HPMI/SMGI and a second recertification each August through MBLCHRC, ending each October with a forced signing of a mid-annual lease contract *"lease addendum"* by HPMI referencing MBLCHRC's updated calculations but never mentioning MBLCHRC's involvement. This resulted in the potential for two HPMI rent increases per year (once after the SSA's COLA in January the second after MBLCHRC's adjustments in Octiber) and a doubled paperwork burden with no statutory basis.

46.     Despite repeated ADA requests for a coordinated, single annual recertification to accommodate Prosecutor Ex Rel / Plaintiff's status as a Totally and Permanently Disabled quad-amputee – already facing simultaneous State-level recertifications for SNAP, Medicaid umbrella strands, and SSA/Treasury disputes – both HPMI/SMGI and MBLCHRC entities and their associates refused. They falsely asserted unspecified *"policy,"* undisclosed *"contract rights,"* and a shifting *"Utility Allowance"* rationale while never producing the governing legal authority required under HUD, LIHTC, Section 8/HAP, the PRA, or FOIA transparency standards.

47.     This deliberate refusal to coordinate recertifications, combined with contradictory calculations and coercive paperwork demands, created a discriminatory system of duplicated bureaucratic burdens expressly prohibited by ADA Title II and Section 504. HPMI, SMGI, and MBLCHRC each refused to provide the most basic and reasonable ADA accommodation requested by Prosecutor Ex Rel / Plaintiff: a coordinated, single annual recertification to replace the duplicative two-recertification system they imposed.

48.     Prosecutor Ex Rel / Plaintiff made this request repeatedly, in writing and verbally, explaining that he is a Totally and Permanently Disabled quad-amputee without state-provided assistance, already required to complete simultaneous State-level SNAP recertifications and to navigate complex SSA and Treasury disputes. A coordinated recertification process would have eliminated redundant paperwork, reduced the physical and cognitive burden imposed by repetitive and conflicting forms, and ensured equal access to the federal housing programs for

which he fully remained qualified, year after year.

49.     Despite fully understanding these over-burdensome demands, each housing actor refused the accommodation and instead relied on vague references to *'policy,'* *'procedure,'* or undisclosed contractual terms – none of which they ever produced – while escalating paperwork demands, mid-year rent increases, and contradictory calculations. This refusal violated ADA Title II and Section 504, which require public entities and federally funded housing programs to modify policies and practices where necessary to prevent discrimination.

50.     The two-agency recertification structure was not an accident and not mere negligence. HPMI/SMGI's and MBLCHRC's refusal to coordinate the recertification process was an intentional act of bureaucratic resistance designed to increase pressure, obstruct rights, and suppress Prosecutor Ex Rel / Plaintiff's protected activities as a whistleblower and investigative journalist. It was a retaliatory mechanism that amplified harassment, facilitated rent manipulation, and obstructed Prosecutor Ex Rel / Plaintiff's ability to maintain stable housing and assert federally guaranteed rights.

51.     The Housing Stream facts presented here likewise reflect not only Prosecutor Ex Rel / Plaintiff's personal experience but a broader pattern affecting similarly situated disabled, elderly, and low-income tenants within HUD-assisted and LIHTC properties. The coercive tactics, retaliatory practices, denials of habitability, and ADA violations documented in this section are systemic, patterned, and routinely imposed on vulnerable populations who lack the means to challenge such abuses. Plaintiff's role as Prosecutor Ex Rel is invoked to expose and remedy these enterprise-level violations on behalf of the public and all others similarly situated.

52.     HPMI's regional supervisor (Defendant #3, Long) orchestrated these violations across multiple counties. Defendant Scott Long, as Owner and Chairman of HPMI, coordinated instructions to property staff on how Beadles, Martin, and Foster should handle Prosecutor Ex Rel / Plaintiff's cases, how to justify fabricated *"income,"* and how to respond to written challenges. His role expanded beyond mere oversight; he was an architect of the predicate fraud stemming from his earlier involvement with Co-Defendants James Edwards and the Stevens, Edwards & Hallock, P.C. law firm in the cover-up of former HPMI local office manager Tammy Soulek's embezzlement of tenant rent monies years earlier.

53.     Acting as Defendant Scott Long's primary operational agent within HPMI's Wyoming headquarters, Defendant Robyn Beadles functioned as the direct conduit through which Long's instructions were translated into on-the-ground actions against Prosecutor Ex Rel / Plaintiff from across state lines. Appendix A documents Beadles' repeated involvement in issuing contradictory recertification demands, enforcing fabricated *"income"* calculations, invoking pretextual *"utility allowance"* justifications, and directing property-level staff on how to handle Prosecutor Ex Rel / Plaintiff's objections to signing non-transparent *"lease addendums"* each November, and his repeated documentation requests.

54.     Working from the same intentionally undisclosed HPMI command center as Long in

18

Wyoming, Beadles played a central role in executing the retaliatory tactics, paperwork coercion, and ADA violations that characterized the housing enterprise's misconduct. Her actions were not clerical or incidental; they were integral to the coordinated pattern of fraud, concealment, and retaliation overseen by Long and carried out across multiple properties managed by HPMI and SMGI in South Dakota, Wyoming and other states.

55.     Appendices A and C both present evidence that MBLCHRC and its agents *"Beth and Lori"* – as well as SDHDA and its agents, including Lorraine Polak – operating as a quasi-government enforcement arms, furthered HPMI/SMGI's misconduct by issuing false determinations and refusing to investigate Prosecutor Ex Rel / Plaintiff's civil rights complaints. They consistently *"found no wrongdoing"* even when presented with uncontested emails, recordings, and falsified entries. Their refusals to investigate served as crucial links in the enterprise, laundering the predicate violations into *"state-certified compliance."*

56.     Among the most telling pieces of evidence of the housing enterprise's intent to discriminate and retaliate is the January 17, 2024 *"Interim Lease Change "* addendum that HPMI's former local on-site manager, Jamie Durbin-Villegas, executed with Prosecutor Ex Rel / Plaintiff. This written *"Interim Lease Change"* addendum – signed by both parties and valid through October 2025 – modified the annual contract-renewal date so that Prosecutor Ex Rel / Plaintiff would no longer be subjected to two separate annual recertifications. The Addendum aligned HPMI's renewal date with MBLCHRC's long-established November 1st Section-8 renewal cycle, eliminating the duplicative February recertification and lease renewal paperwork that had been proven burdensome, discriminatory, and physically impossible for a Totally and Permanently Disabled quad-amputee to complete at the same time as SNAP renewal paperwork as also demanded, without assistance that the State refused to provide.

57.     This *"Interim Lease Change"* addendum was not a clerical courtesy – it was an enforceable contract modification under longstanding property-law principles, undertaken by HPMI's authorized managerial representative (Durbin-Villegas) in direct response to the pervasive ADA burdens, paperwork conflicts, and disability-related barriers that Prosecutor Ex Rel / Plaintiff had been forced to endure for years. Durbin-Villegas recognized the unlawfulness and impracticality of the dual-recertification scheme and took corrective action within her managerial authority to resolve it. The *"Interim Lease Change"* addendum constituted a lawful accommodation, a legitimate contract amendment, and a remedial action entirely consistent with HUD, LIHTC, Section 8/HAP, and ADA Title II requirements.

58.     However, shortly after Durbin-Villegas executed the *"Interim Lease Change,"* her employment as the local HPMI manager was terminated. Immediately thereafter, HPMI's out-of-state agents – Defendants Karen Martin (operating from Montana) and Robyn Beadles (operating from Wyoming) -- crossed state lines and intervened to overturn the lawful contract modification Durbin-Villegas had executed.

59.     As documented extensively in Appendix A, Martin and Beadles crossed state lines and entered the local office while it was unstaffed, removed documents, pilfered the 1/17/24 signed

19

*"Interim Lease Change"* addendum from the tenant file, and unilaterally declared the contract modification not only *"invalid"* but treated the *Interim Lease Change* addendum document itself as *"nonexistent."* That occurred even after Prosecutor Ex Rel / Plaintiff had established clear records with *"Beth and Lori"* at MBLCHRC about the constructive discrepancy as soon as he suspected foul play involving *"HPMI/SMGI Regional Manager and Compliance Officer"* Karen Martin, listed in this Complaint Brief as *"Defendant No. 1"*.

60.    Subsequently, after the in-house *"Interim Lease Change"* disappearance otherwise deemed a criminal theft and embezzlement from out-of-state agents operating on Scott Long's and HPMI's and SMGI's behalf, these HPMI principals and agents hired Angela Foster as Jamie Durbin's local management replacement, who followed suit with Martin and Beadles in maintaining this illegal posture of the *Interim Lease Change* being both *"invalid"* and *"nonexistent"* … just because Foster claimed not to have found it in the HPMI office files upon arrival, and in spite of Prosecutor Ex Rel having – soon after her arrival – confronted Foster ON RECORD about that matter, and providing her with the evidence signed by her HPMI predecessor.

61.    These collectively coordinated actions between all of these HPMI actors acting under the authority of Scott Long in Wyoming and/or with SMGI in Montana where Karen Martin's home office is located, constituted document tampering, obstruction of due process, breach of contract, spoliation of evidence, and a deliberate reversal of a lawful accommodation intended to resolve ongoing ADA discrimination.

62.    Following their removal of the document, Martin, Beadles and Foster falsely asserted that the *Lease Change* addendum had *"no effect"* and refused to honor it, reinstating the two-recertification system that Defendant ExRel / Plaintiff and Durbin-Villegas had lawfully extinguished. They refused to produce any statute, regulation, policy, or administrative rule invalidating the 1/17/24 addendum; nor could they, because none exists. Their rejection was purely retaliatory – motivated by Prosecutor Ex Rel / Plaintiff's whistleblowing, written objections, and repeated demands for transparency under the PRA, FOIA principles, ADA, and HUD regulations.

63.    The sabotage of the January 17, 2024 *Interim Lease Change* addendum is powerful evidence of deliberate enterprise coordination. HPMI's Wyoming-based supervisors overrode their own on-site manager's lawful contract modification, removed or destroyed the Addendum from the tenant file, reinstated the discriminatory dual-recertification structure, and then used the resulting paperwork conflicts as pretext for further retaliation, coerced lease modifications, and rent manipulation. Their actions created the very *"noncompliance"* they later punished.

64.    This HPMI/SMGI conduct satisfies the elements of fraud, intentional spoliation, obstruction of administrative and judicial processes, and racketeering activity under both the predicate and secondary tiers of the enterprise described throughout this Complaint.

65.    Retaliation escalated beginning in October 2024. Defendants issued improper notices,

refused communication, and attempted to construct a pretextual basis for eviction with the help of BAR-member attorneys. Emails and recordings in Appendices A and C show property manager Angela Foster stating she was *"told to"* retaliate, *"instructed"* to ignore disability documentation, or pressured by her Beadles and Martin Wyoming and Montana supervisors, to classify the valid 1/17/24 Addendum as *"nonexistent."* These admissions directly implicate the enterprise command structure.

66.      HPMI and SMGI agents repeatedly coerced Prosecutor Ex Rel / Plaintiff into certifying information they knew to be false, including misidentifying a credit union as a *"bank"* and signing fabrications concerning nonexistent financial accounts. As documented in Appendix A, this coercion involved multiple rounds of pressure – amounting to *subornation of perjury* – and was part of a routine practice applied against many tenants *"similarly situated."*

67.      The cumulative effect of this multi-jurisdictional coercion was severe. Even after Prosecutor Ex Rel / Plaintiff filed a formal Spearfish Police crime report demanding constitutionally guaranteed crime victims' rights protections, none of city, county or state law enforcement, nor the property's insurance guarantor, intervened to stop or meaningfully investigate the unlawful conduct.

68.      These predicate violations form the foundation of the RICO structure: fabricated *"income," "bank,"* and eligibility records created through coercive recertification practices, misapplied financial definitions, and falsified administrative entries → retaliatory actions → additional false records → interagency laundering → BAR and judicial insulation. This is the enterprise's operational model.

69.      Every subsequent actor in the conspiratorial *"wheel-and-chain"* RICO enterprise structure relied on the falsified administrative base created in both the *"State Medicaid"* system and the *"Housing Recertification"* system. These corrupted records became the manufactured *"truth"* later adopted by agents of DSS, DHS, ADRC, MBLCHRC, HPMI/SMGI, SDHDA, HUD, IRS, law enforcement, medical providers, BAR attorneys, and eventually the courts, enabling the enterprise to operate under the appearance of legitimacy while perpetuating ongoing constitutional and statutory harm.

70.      SDHDA and HUD supervisory personnel – Lorraine Polak, Roger Jacobs, Matthew Cerny, Noeim Ghirghi, Chloe Lomprey – further entrenched the misconduct. also coordinated the concealment and retaliatory posture. Communications documented in Appendices A and C show refusals to acknowledge federal law, refusals to provide written rules, and refusals to correct known false records. After receiving repeated notice, these officials ceased responding altogether, constituting commercial dishonor and administrative default.

71.      HPMI, SMGI, MBLCHRC, their compliance partners, and BAR-member attorneys (SEHPC, LJSLPC and NKSPC) jointly executed rent-setting and recertification practices resulting in unlawful mid-year rent increases, contradictory income determinations, and the refusal to honor coordinated recertification as a reasonable ADA accommodation.

21

72.     Their primary justification for repeated rent increases was the so-called *"Utility Allowance"* and their arbitrary decisions regarding *"medical deductions"* which were themselves distorted by the State Stream's unlawful denial of Medicaid coverage. These actors invoked undisclosed HAP contract terms and fabricated non-transparent *"Lease Addendums"* to raise rent mid-lease – always to their benefit – while ignoring the cascading medical debt and involuntary servitude imposed through DHS/DSS misconduct.

73.     Combined with annual SSA COLA adjustments and separate MBLCHRC recalculations each November, these practices ensured two rent increases per year. Despite repeated requests for coordinated recertification to reduce burdens on a quad-amputee with no State-provided assistance, both HPMI/SMGI and MBLCHRC refused, citing undefined *"policy"* without producing authority.

74.     SDHDA's role was supervisory, but its omissions were decisive. Although required to oversee LIHTC compliance, enforce rent rules, validate utility allowances, and ensure ADA/FHA compliance, SDHDA refused to investigate or intervene, thereby enabling years of duplicative certifications, paperwork abuse, and predatory rent-setting.

75.     These predicate violations triggered Prosecutor Ex Rel / Plaintiff's emergency whistleblower filings to HUD FHEO, HUD OIG, congressional subcommittees, and State authorities – none of which acted. The pattern initiated the *"Federal–State Misconduct Continuum"* detailed in Appendix B.

76.     The continuing nature of these predicate violations is undisputed. SDHDA, HPMI, MBLCHRC, and SMGI, along with their executive and legal-counsel partners, have not corrected false calculations, withdrawn fabricated entries, or honored lawful accommodation requests. Their ongoing failures continue to inflict harm—heightened vulnerability, financial hardship, and systemic retaliation—on Prosecutor Ex Rel / Plaintiff, as documented throughout this Complaint.

77.     These actors therefore constitute the entry point of the RICO enterprise and the False Claims Act violations. Their actions form the backbone of the conspiracy, enabling all subsequent misconduct across State, federal, medical, BAR, and judicial levels.

78.     As demonstrated by the letters issued by BAR-member attorneys at LJSLPC and NKSPC, linked below and included in Appendices A and C, the enterprise's retaliatory posture culminated in threats of eviction and termination of HUD assistance, necessitating immediate declaratory and injunctive relief.

79.     The first two letters referenced in the paragraph above warranting *"emergency"* consideration for *"immediate"* Declarative and Injunctive relief were fraudulently constructed by Co-Defendants and BAR member attorneys Ty Daly and the *"team"* of Lynn Jackson Attorneys at LJSLPC first attempting on 3/12/25 to coerce a signature on a new bogus addenda-styled

contract simultaneously confessing wrongdoing under threat of eviction.

80.    Then, when Prosecutor Ex Rel / Plaintiff asserted his rights to refrain from succumbing to that coercion, these BAR member enforcers issued the second letter dated 4/29/25 issuing the date of February 1, 2026 in which they intended to forcibly remove Prosecutor Ex Rel from his rightful home and peaceful living, and to confiscate all of Prosecutor Ex Rel's personal belongings, life-dependent durable medical equipment, and to assess attorney fees on top of all others losses of housing in the middle of the current winter season.  *See* these two letters linked immediately below as also presented in Appendix A and Appendix C:

**http://ricobusters.com/ricomedia/031225_Daly2SchiedCOERCIONunderthreatoftrumped upeviction.pdf**

and,

**http://ricobusters.com/ricomedia/042925_DalyJacksonattnysConspir2Fraud.pdf**

81.    The third letter – also fraudulently written on *"Beth and Lori's"* and MBLCHRC's behalf by another STATE BAR (crime syndicate) member attorney as a corrupt *"officer of the court"* dated 6/16/25 and asserting that HUD's Section-8 would be canceled at the end of its contract period (November 1, 2025) under similarly coercive re-contracting terms, leaving Prosecutor Ex Rel / Plaintiff altogether without housing assistance and in current *emergency* need of federal Declaratory and Injunctive relief – is linked immediately below. It is also presented in Appendices A and C:

**http://ricobusters.com/ricomedia/061625_MeadeAttnySkjolDalconspiracy2fraud2StopSec-8.pdf**

**B. South Dakota State Executive Branch, DSS/DHS, Medicaid, ADRC, and Related State Agencies** (Defendants Nos. 17, 18, 62–83, 103)

82.    Defendants STATE OF SOUTH DAKOTA (#62), SDHDA (#18), and Lorraine Polak (#17) sit also on the State Stream, controlling the flow of federal housing funds into South Dakota. Despite repeated, detailed notices from Prosecutor Ex Rel / Plaintiff describing coercive LIHTC/Section-8 recertification practices, non-GAO lease addenda, and ADA-related safety concerns, these entities and officials refused to investigate, intervene, or enforce statutory protections. Instead, they allowed the same abusive systems to continue operating, enabling local actors to keep using fraudulent paperwork and retaliatory tactics. Their omissions and refusals functioned as deliberate policy choices: choosing institutional protection and funding preservation over federal-rights compliance.

83.    Above that at the top level of the State Stream of offenses, there is the DEPARTMENT OF SOCIAL SERVICES (DSS) (#63) and its leadership chain – Kristi Noem (#65), Laurie Gill (#66), and Matthew Althoff (#67) – controlled the administration of Medicaid, SNAP, TANF, and

related federally funded programs. Under their watch, DSS misclassified disability-based benefits, used recertification processes as retaliation tools, and ignored clear evidence that disabled beneficiaries like Prosecutor Ex Rel / Plaintiff were being harmed.

84.    These officials exercised supervisory authority over DSS counsel, SAAGs, discrimination officers, and hearing processes, yet allowed benefit misclassification, denial of appeals, and obstruction of crime-victim protections to stand. Their coordinated non-actions turned DSS into a weaponized administrative apparatus that enforced financial and procedural punishment instead of administering lawful aid.

85.    The DEPARTMENT OF HUMAN SERVICES (DHS) side, led by Shawnie Rechtenbaugh (#68) and interfacing with Medicaid and disability programs, operated the DAKOTA AT HOME intake and screening systems that directly controlled access to essential supports.

86.    Under Rechtenbaugh's authority, DHS staff conducted improper, premature, and procedurally defective screenings of Prosecutor Ex Rel / Plaintiff, despite his status as totally and permanently disabled with an SSA determination not due for review for 5-7 years. These screenings relied on cookie-cutter rubrics rather than individualized, law-compliant assessments and were then withheld from him for two years, later revealed to contain distorted and incomplete statements.

87.    DHS used these flawed reports to deny Medicaid eligibility and with a new and inexperienced *"case worker"* Kelli Werner labeling Prosecutor Ex Rel / Plaintiff *"uncooperative"* when he requested identification and qualifications on unidentified state agents intended to be sent for another such unwarranted *"re-eval."* Werner and others of the DHS and the DSS thereafter colluded to spin a false narrative disproven by the recorded phone conversation, turning Prosecutor ex Rel / Plaintiff's disability and crime-victim status into grounds for retaliation and punishment.

88.    Oversight that should have checked these abuses was instead weaponized. ATTORNEY GENERAL Marty Jackley (#69) and the STATE'S ATTORNEY Brenda Harvey (#70) and SAAG structure (related entries) exercised statewide supervisory authority over DSS and DHS counsel, Medicaid-fraud investigations, discrimination claims, and administrative-law enforcement.

89.    Rather than protecting disabled beneficiaries and whistleblowers, this network of prosecutors, special assistant attorneys generals, and agency counsel used their positions to block grand jury access, bury administrative complaints, and preempt any meaningful investigation of state-program corruption.

90.    DSS counsel and discrimination officers – such as Jeremy Lippert (#71) and Jenna Howell (#72) – turned open-records and discrimination procedures into tools of concealment, mischaracterizing document requests, denying clearly identifiable records, and invoking broad *"Open Records denials"* to justify total non-disclosure. This made transparency impossible and

24

allowed the underlying fraud and retaliation to continue.

91.     These executive and legal structures converged in the administrative and judicial *"hearing"* arenas, where multiple defendants in the 62–83 range (including hearing officers, ALJs, magistrate, clerks, and state-embedded judges) transformed what should have been neutral adjudication into simulated process. Hearings arranged under DSS/DHS authority were procedurally rigged: discovery and subpoenas were denied, records were withheld, and predetermined outcomes ratified prior agency misconduct.

92.     Those who were supposed to interpret and apply federal disability law, Medicaid rules, and due-process guarantees instead used their positions to legitimize the prior abuses of DSS and DHS staff. Prosecutor Ex Rel / Plaintiff's attempts to correct records, contest misclassification, and present evidence were met with scripted decisions that reinforced the state agencies' unlawful determinations.

93.     At the apex of this State Stream stands the SOUTH DAKOTA SUPREME COURT (#83) and, above and around it, the STATE BAR OF SOUTH DAKOTA (#103). Together, they formed the structural enforcement and protection layer for the entire enterprise. The Supreme Court issued or allowed fraudulent and obstructive orders, ratified clerical misconduct, and foreclosed appeals that might have exposed DSS/DHS and Medicaid abuses. The State Bar, meanwhile, maintained the licensing, disciplinary, and policy framework that enabled SAAGs, agency counsel, and judge-members to act with impunity.

94.     At every critical chokepoint where Prosecutor Ex Rel / Plaintiff sought constitutional adjudication or disciplinary accountability, State Bar–regulated actors appeared and blocked relief, cementing the deprivation of rights and shielding the administrative enterprise from exposure.

95.     Taken together, Defendants 17, 18, 62–83, and 103 form a unified State Stream enterprise that: misused *"income"* and disability classifications to fabricate jurisdiction and deny benefits; exploited DSS/DHS recertification and screening processes as tools of coercion and retaliation; weaponized open-records and discrimination procedures to suppress evidence; manipulated hearings and courts to ratify unlawful determinations; and used the State's judicial and Bar structures to block oversight.

96.     Their shared conduct supports the overlapping Counts in A-1 and Appendix A – including Civil RICO, 42 U.S.C. §§ 1983 and 1985(3), ADA Title II violations, Spending Clause violations, False Claims Act theories, and constitutional deprivations under the First, Fifth, Thirteenth, and Fourteenth Amendments -- each arising from the same pattern of coordinated State Stream misconduct against Prosecutor Ex Rel / Plaintiff.

97.     For several years, the South Dakota Department of Social Services ("DSS") repeatedly issued written determinations informing the Prosecutor Ex Rel / Plaintiff that he was *"not eligible for Medicaid."*

25

98.   These denials were issued despite Prosecutor ex Rel / Plaintiff being a Totally and Permanently Disabled quad-amputee, already recognized by the Social Security Administration in 2018 as SSI-qualified and protected from continuing-disability review for 5–7 years, and despite his 2020 enrollment as a Medicare beneficiary before relocating to South Dakota in February 2021.

99.   Each DSS denial letter was facially inconsistent with federal disability law and with basic Medicaid eligibility rules for disabled adults, and formed part of a continuing pattern of concealment, administrative obstruction, and intentional misrepresentation.

100.   During the same period that DSS was issuing denials, the State enrolled Prosecutor Ex Rel / Plaintiff in the Medicare Savings Program / Extra Help ("MSP/Extra Help") that was a fully Medicaid-funded program under federal law. The State never informed Plaintiff that MSP is legally classified as a Medicaid-umbrella strand administered through the Department of Human Services ("DHS") and the Aging & Disability Resource Center ("ADRC"). As a result, Prosecutor Ex Rel / Plaintiff was placed into a Medicaid-funded program for years while simultaneously being told for those same years in writing that he had *"no Medicaid"* and was ineligible for it in South Dakota.

101.   These contradictions (outlined in the preceding paragraphs) occurred despite Plaintiff's arrival to South Dakota with established Medicaid umbrella status from the State of Michigan, evidenced by official state records and determinations entitled to recognition under the Constitution's Full Faith and Credit Clause. South Dakota refused to acknowledge or honor those public records, concealed the MSP classification, and misrepresented Prosecutor Ex Rel / Plaintiff's eligibility status in knowing violation of federal Medicaid-continuity obligations and constitutional duties to respect the validity of another State's public acts and records.

102.   DSS and DHS maintained a bifurcated communication structure designed to mislead: DSS handled financial qualifications and outward-facing letters stating financial eligibility as affirmed but yet issuing all the letters saying *"no Medicaid."*

103.   Meanwhile, DHS and ADRC managed internal Medicaid-umbrella operations, referrals, and case notes as though Prosecutor Ex Rel / Plaintiff was a Medicaid participant; but whole using the various *"waiver"* programs as *"cookie-cutter"* criteria for denying Medicaid, simply because Prosecutor Ex Rel / Plaintiff declined to rely upon taxpayer funded contractors to schedule daily *"bathing and dressing."*

104.   The reasoning for these DHS denials – even as Appendix A provides links to evidence of these *"cookie-cutter"* reasons being recorded and showing the attempt to coerce Prosecutor Ex Rel / Plaintiff into committing Medicaid Fraud himself in order to receive the benefits he DID need by signing for benefits he did NOT need – constitute the State fostering of *"dependency"* and Medicaid Fraud rather than *"independence"* as otherwise legislated by Congress.

26

105.    This dual structure prevented Prosecutor Ex Rel / Plaintiff from discovering the truth that the services he was denied were legally required, and that he was being administratively segmented into a disjointed and misleading system of outward facing denials of Medicaid and inward facing granting of Medicaid coverage constituting fraud upon the federal government.

106.    *"Dakota at Home"* and *"State Medicaid Office"* were both marketed to the public as a generic *"resource hotlines,"* when in reality they functioned as operational arms of South Dakota's Medicaid umbrella. The State never disclosed that Dakota at Home and the State Medicaid Office both operated under through the Aging & Disability Resource Center ("ADRC"), were tied to federally funded Medicaid programs, and served as intake and triage mechanisms for waiver-based and MSP/Extra Help services.

107.    Instead, the State used Dakota at Home and the State Medicaid Office to route disability-related referrals, gather Medicaid-eligibility information, and process Prosecutor ex rel / Plaintiff as a Medicaid-funded beneficiary internally, while maintaining the external fiction – in written denials and verbal statements – that Prosecutor Ex Rel / Plaintiff was not eligible for Medicaid in South Dakota and *"had no Medicaid"* at all.

108.    The concealment of the State's structural relationships prevented Prosecutor Ex Rel / Plaintiff from understanding the benefits he was entitled to, obstructed the appeal process, and directly impaired his ability to request or enforce accommodations under federal disability laws. Without full disclosure, Prosecutor Ex Rel / Plaintiff was deprived of the information needed to challenge unlawful denials and defend himself against retaliatory administrative actions.

109.    DSS continued issuing annual denial letters from 2021 through 2024 effectively claiming Prosecutor Ex Rel / Plaintiff *"does not qualify for Medicaid"* despite Prosecutor Ex Rel / Plaintiff's permanent disability status and federally recognized eligibility. These written denials formed an official record that materially contradicted the State's internal operations and the federally funded services it was administering on Prosecutor Ex Rel / Plaintiff's behalf without disclosure.

110.    At the same time, DHS and ADRC internally treated Prosecutor Ex Rel / Plaintiff as a Medicaid participant in case notes, internal databases, and inter-agency referrals. This dual-track system – external denials combined with internal enrollment – was used to create plausible deniability while preventing Prosecutor Ex Rel / Plaintiff from asserting legal rights tied to Medicaid-funded services.

111.    This dual-track system was not accidental. It served as a deliberate administrative mechanism to create a fraudulent paper trail portraying Prosecutor Ex Rel / Plaintiff as *"not eligible"* for Medicaid, thereby justifying past denials of benefits, medical services, and accommodations, while internally reversing the narrative to avoid scrutiny and federal reporting consequences.

112.    Just this past recent November 2025, DSS issued yet another denial letter, unsigned and

27

arriving in an envelope with no postmark, stating this time that Prosecutor Ex Rel / Plaintiff had *"lost Medicaid"* effective December 1, 2025. The letter was crafted to be facially ambiguous – never referencing the MSP/Extra Help program at all – thereby continuing the misrepresentation that Prosecutor Ex Rel / Plaintiff ever possessed full Medicaid coverage under DSS.

113.    By labeling the termination as *"Medicaid loss,"* the State falsely implied that Prosecutor Ex Rel / Plaintiff previously possessed Medicaid eligibility that was now being withdrawn. In reality, Prosecutor Ex Rel / Plaintiff never had full Medicaid under DSS; he had been placed into MSP/Extra Help under DHS/ADRC, which the State intentionally misrepresented.

114.    The November 2025 letter also imposed a 15-day appeal deadline running from the *"date sent,"* with no evidence of actual mailing, and with no signature by any human being. For a home-bound quad-amputee deprived of transportation, assistance, and accommodations, this artificial deadline was an engineered obstruction – an intentional denial of meaningful access to administrative review.

115.    This denial letter was designed to trigger an automated series of punishing federal actions, creating a pretext for renewed deductions from Prosecutor Ex Rel / Plaintiff's Social Security disability payments for Medicare premiums, thus shifting the State's administrative misconduct onto federal systems for enforcement. By issuing a knowingly false denial, the State engineered a cascade of consequences that would appear *"federally imposed"* while originating entirely in State-level misrepresentation and concealment. This tactic allowed the State to avoid responsibility for its failures while placing Prosecutor Ex Rel / Plaintiff under coercive financial pressure and bureaucratic scrutiny he did not create.

116.    The State reinforced this manufactured harm through a pattern of procedural traps designed to exhaust and defeat vulnerable individuals who lacked State-funded assistance. Substantive due process was denied at the outset through misclassification, concealment of Medicaid-umbrella strands, and refusal to acknowledge Plaintiff's Michigan eligibility records. Yet simultaneously, the State imposed impossible procedural obligations – strict deadlines, repeated resubmissions, inaccessible formats, and paperwork demands Prosecutor Ex Rel / Plaintiff could not physically complete without assistance the State refused to provide.

117.    This *"procedure-over-substance"* strategy was not accidental; it was a deliberate system structured to produce failure, allowing the State to claim that Prosecutor Ex Rel / Plaintiff had *"not complied"* while obscuring its own misconduct.

118.    This *"due-process-to-death"* pattern extended seamlessly from Executive-branch agencies into BAR-controlled administrative hearings and judicial proceedings. Rather than correcting the State's misconduct, attorneys, hearing examiners, clerks, and judges reproduced the same procedural choke points – rejecting filings on technicalities, refusing ADA accommodations, demanding inaccessible paperwork, or dismissing matters on invented grounds.

119.    What began as deceptive administrative process became judicial sabotage, ensuring that

28

no level of appeal provided meaningful review. This continuity between Executive and Judicial misconduct demonstrates a coordinated practice, not isolated error, and forms a critical component of the federal–state misconduct continuum documented in Appendices A, A-3, C, E-1, E-2, F, G, and B.

120.    Although this Complaint describes the direct injuries suffered by Prosecutor Ex Rel / Plaintiff, the misconduct documented here is not unique to him. The same dual-track Medicaid concealment, SSA/Treasury misclassification, and administrative obstruction patterns are imposed on untold numbers of elderly, disabled, and low-income residents in South Dakota and nationwide. Prosecutor Ex Rel / Plaintiff proceeds as Prosecutor Ex Rel and Private Public Proxy not only for his personal injuries, but in recognition that these systemic violations harm others similarly situated who lack the capacity, resources, or access to expose the wrongdoing.

121.    Beginning December 2025, the *consortium* of SSA, U.S. Treasury, DHHS, and CMS resumed withholding approximately $179 per month from Prosecutor Ex Rel / Plaintiff's disability payments – despite Prosecutor Ex Rel / Plaintiff having been expressly vocal for years about being wrongly denied Medicaid for years; and despite there being no lawful basis for the termination of the MSP/Extra Help program that triggered these deductions either in 2020-'21 or again now from December  2025. These events constitute direct financial injury caused by State misrepresentations and fraud upon the federal government.

122.    The co-Defendants of the State of South Dakota refused the request to assist Prosecutor Ex Rel / Plaintiff in recovering the illegally withheld SSA benefits from the 2020–2021 Michigan misconduct; and they again refused to intervene in the present withholding triggered by its own fraudulent "*Medicaid loss*" letter, further entrenching the State's obstruction and retaliation.

123.    DSS and DHS repeatedly denied or ignored Prosecutor Ex Rel / Plaintiff's requests for disability accommodations necessary to file appeals, request hearings, or navigate administrative procedures. By refusing accommodations – even ignoring multiple written discrimination complaints altogether – the State repeatedly violated ADA Title II not just once, but in an intentional pattern in practice over the course of years; while purposefully creating an additional layer of unconstitutional due-process denial.

124.    Administrative Law Judge Monson summarily dismissed Prosecutor Ex Rel / Plaintiff's Medicaid-related proceedings in 2023–2024 without a hearing, blocking discovery into the Medicaid umbrella structure, the MSP/Extra Help misclassification, and the State's internal referral records. This was done after Prosecutor Ex Rel / Plaintiff expressly attempted to expose the State's fraudulent dual-track system and its false denials through subpoenas upon witnesses, which Monson also refused to support.

125.    The so-called "*Hearing FOR David Schied*" was actually recorded firsthand and was thereafter placed into context with other candidly recorded telephone discussions and a separate in-person meeting with the "*DSS Regional Manager*" Tom Eads and his subordinate "*DSS Supervisor*" Angie Reichert shown to be coercing Prosecutor Ex Rel / Plaintiff into committing

federal Medicaid Fraud by accepting State-contracted services that he did not need in order to get Medicaid services that he did need, and for which both Eads and Reichert openly admitted Prosecutor Ex Rel / Plaintiff otherwise clearly and financially qualified to receive.

126. The three-plus (3+) hour documentary – which also included footage of former Governor Kristi Noem being also informed in early 2022 about this fraud as a matter of record – has been posted publicly for years, at the following linked Internet location as also depicted in Appendix A and Appendix C as well as other appendices:

**https://www.youtube.com/watch?v=QS-ukmfvuCY**

127. DHS caseworkers and ADRC personnel provided Prosecutor Ex Rel / Plaintiff with contradictory and evasive explanations about Medicaid eligibility, MSP/Extra Help classification, LTSS Waiver access, HOPE Waiver criteria, Dakota at Home's administrative purpose, and the State's obligations toward disabled residents, creating deliberate confusion that prevented Prosecutor Ex Rel / Plaintiff from asserting his rights.

128. Only after relentless pursuit did Prosecutor Ex Rel / Plaintiff obtain a recorded admission from DHS/ADRC worker Lee Hosman, who confirmed that MSP/Extra Help, LTSS, HOPE, and Dakota at Home are all separate *"strands"* of the same *"Medicaid"* umbrella. This admission publicly exposed the State's false denials and proved the concealment was intentional.

129. The over an hour recorded telephone conversation with the ADRC's deceptively named *"State Medicaid Office"* and the State's DHS agent Hosman is presented in Appendix A-3 as follows with the link to that evidence posted publicly in full government transparency where the co-Defendants operating as *"the State"* cloak themselves with varied schemes of non-transparency.

**https://ricobusters.com/ricomedia/050523_KEY-SDMEDICAID-LeeHosmanabuse&neglectreport_mp3.mp3**

130. Hosman's admission about the *"Medicaid-umbrella"* – coupled with the candidly recorded personal meeting with DSS's managerial leadership of Eads and Reichert – further confirmed that years of DSS Medicaid-denial letters were materially false and used to conceal Prosecutor Ex Rel / Plaintiff's actual eligibility, while preventing him from accessing services and benefits that the State was federally obligated to provide.

131. Plaintiff suffered concrete harm for many years as a result of this concealment: extreme pain enduring for years as a result of denial of medical services, long delays in fitting and ordering needed prosthetics for mobility and independence, several years of loss of publicly paid transportation support, loss of disability accommodations, and financial losses through costly Medicare copays and Social Security deductions attributable to State misconduct.

132. The concealment and dual-track system – external denials combined with internal

enrollment – prevented Prosecutor Ex Rel / Plaintiff from being able to challenge unlawful denials in a timely fashion, fulfilling all elements of a *backward-looking access-to-court* constitutional injury.

133.   DSS, DHS, and ADRC were repeatedly given written notice of violations, evidence, requests for correction, and opportunities to respond. They failed to provide substantive responses, even when solicited for the supporting documents and laws under State *"Sunshine"* laws.

134.   Under commercial law, including UCC-based notice structures, these failures constitute dishonor and default, fixing liability on the State-level actors and agencies.

135.   Under constitutional and statutory law, these failures constitute deprivations of rights under color of law, actionable under 42 U.S.C. §§ 1983, 1985, 1986, and under the ADA, Rehabilitation Act, and federal spending-clause regulations.

136.   The State's pattern of concealment, obstruction, misrepresentation, and retaliatory conduct mirrors the pattern Prosecutor Ex Rel / Plaintiff previously experienced in Michigan between 2018–2021 as a recent quad-amputee; and going back even further to 2004 as detailed in Appendix G. This interstate continuity establishes foreseeability, knowledge, and pattern/purpose under RICO.

137.   These State-level acts form the foundational predicate violations of the RICO enterprise, supplying both the essential *"predicate"* and *"secondary"* injuries, as well and the *"pattern"* elements required under 18 U.S.C. § 1962(c).

138.   The Medicaid umbrella concealment connects directly to the Housing Stream (Appendices A, A-3 and E-1) and the Federal Stream (Appendices A, A-3, B, E-1, E-2, F and G), demonstrating coordinated administrative actions and shared data pathways among State, federal, and private actors.

139.   BAR-member attorneys advising DSS, DHS, and ADRC provided legal cover for the dual-track Medicaid system, ensuring that external denials appeared procedurally valid while internally contradicting the State's own classifications. This pattern is documented in the publicly posted audio-video footage of the administrative proceeding involving Administrative Law Judge Eric Monson and Special Assistant Attorney General Wade Reimers, during which both officers refused to provide ADA accommodations to a quad-amputee and terminated the proceeding when Prosecutor Ex Rel / Plaintiff attempted to exercise his lawful right to record the hearing. The recording demonstrates that these officials suppressed Prosecutor Ex Rel / Plaintiff's ability to create an evidentiary record, declined to permit witness subpoenas, and obstructed meaningful review of the State's misconduct.

140.   This documentary evidence, posted publicly since 2023 and incorporated in Appendices A, A-3, and C, confirms that BAR-member actors directly contributed to the concealment and

31

procedural obstruction forming part of the RICO enterprise. Again, the video containing the evidentiary footage has been posted publicly since 2023 at:

**https://www.youtube.com/watch?v=QS-ukmfvuCY**

141.    These attorneys having carried out these actions – and while also openly refusing to support Prosecutor Ex Rel / Plaintiff's subpoenaing of witnesses as shown in the audio-video recording above of the purported *"administrative due process hearing FOR David Schied"* – contributed to both the predicate level and secondary level of racketeering activity by reinforcing the State's concealment, protecting agency misconduct, and retaliation against Prosecutor Ex Rel / Plaintiff's own protected conduct.

142.    DSS, DHS, ADRC, *Dakota at Home,* and the *State Medicaid Office* acted jointly with federal partners under color of law, supported by private contractors and BAR-licensed attorneys, creating an integrated enterprise responsible for the harms suffered.

143.    As a direct result of this enterprise, Prosecutor Ex Rel / Plaintiff suffered the wrongful loss and interruption of his earned Social Security insurance payouts – contractually vested, wage-funded distributions not dependent on means-testing or state discretion – along with loss of medical and prosthetics care, denial of transportation and essential services, mental and emotional distress, anguish, and significant psychological injury

144.    The State's dual-track system, fraudulent denial letters, administrative obstructions, and concealment constitute mail fraud, wire fraud, False Claims Act violations, civil-rights violations, and retaliation.

145.    These actions caused profound injury to Plaintiff and continue to cause ongoing harm through financial losses, medical hardship, and denial of procedural justice.

146.    These facts collectively establish the State-level predicate conduct supporting the RICO counts, constitutional counts, statutory counts, and commercial-law counts that follow.

147.    On or about 5/23/25, Prosecutor Ex Rel / Plaintiff submitted a comprehensive 308-page administrative record to DSS, DHS, ADRC, the Office of Hearing Examiners, the Attorney General's Office, and the Bureau of Administration. This submission contained statutory demands under South Dakota's Open Records Act, ADA Title II, and federal due-process principles; documented four (4) years of conflicting Medicaid determinations; exposed the State's dual-track intake and concealment scheme; identified contradictory decisions issued by ALJ Monson; and provided linked evidence, recordings, and public-domain exhibits demonstrating systemic misrepresentation and obstruction across agencies.

148.    The Internet link to that 308-page document referenced in Appendix A on pages 47, 263, 279, 282, 292, and 340 – and included also on corresponding pages referenced in Appendix C – is accessible herein also by downloadable link at the following URL:

32

**http://ricobusters.com/ricomedia/0120-
052325_NotFOIAviolaDEMANDADMISIONSinTwoAppeals-1-297ALL.pdf**

149.    Despite statutory duties to respond, not one State actor answered, rebutted, or acknowledged any part of the 308-page record. Agencies provided no justification for the contradictory Medicaid determinations, no explanation for the internal classification of Prosecutor Ex Rel / Plaintiff under MSP/Extra Help while simultaneously denying Medicaid eligibility, and no response to ADA accommodation requests or subpoenas for witnesses. This uniform silence constitutes administrative acquiescence, adverse inference, and deliberate indifference to known violations of federal rights.

150.    The State's refusal to respond also confirms the futility of all administrative avenues, satisfies the notice and knowledge elements of Plaintiff's ADA, §1983, and RICO claims, and establishes the *backward-looking access-to-courts* injury described in this Complaint and the other Appendices incorporated herein by reference. A denial system that issues contradictory determinations, blocks hearings, refuses subpoenas, and then ignores a 308-page evidentiary demand is not merely malfunctioning; it is a coordinated mechanism of concealment, retaliation, and rights deprivation. **The full 308-page administrative record is incorporated herein as Appendix E-3.**

## C. Local Government Defendants (City, County, Law Enforcement)
   (Defendant Nos. 84–89, 91)

151.    Defendants 84–89 and 91 – including the City of Spearfish (and its Mayor and City Council), its City Attorney Knox , Spearfish Police Lieutenant Samantha Rosenau, the Lawrence County Sheriff's Office, Sheriff Brian Dean, his deputies, the Lawrence County Commission and its Chair Bob Ewing, and State's Attorney Brenda Harvey – formed the local law enforcement layer that received repeated criminal reports, sworn notices, and documentary evidence from Prosecutor Ex Rel / Plaintiff and did nothing substantive. Their refusals to act, investigate, or protect created the essential ground-level impunity that allowed the Housing and State Streams to continue operating illegally without interruption.

152.    The Spearfish Police Department and it Lieutenant Samantha Rosenau refused to Act on Crime Report #25-510. As documented in Appendix A (p. 184), on 2/7/25, Prosecutor Ex Rel / Plaintiff contacted the Spearfish Police Department in fear for his life and filed Crime Report #25-510 with Officer Frerer. Despite clear allegations involving coercion, fraud, retaliation, and threats tied to federally subsidized housing programs, Spearfish Police took no action: no investigation, no referral, no victim-protection measures. Lieutenant Rosenau's deliberate indifference to criminal conduct and a refusal to provide constitutionally protected Crime Victim's Rights *"reasonable protection from 'The Accused'"* and required equal protection, showed her level of command in RICO predicate *"nonfeasance"* and ongoing obstruction of justice.

33

153.    The Lawrence County Sheriff's Office failed to investigate case numbers #23-159, #23-463, #24-62, or to request any arrest warrants in those cases. Appendix A (pp. 225–227) shows Prosecutor Ex Rel / Plaintiff had filed three prior criminal case numbers with the Lawrence County Sheriff's Office: #23-159, #23-463, and #24-62. These cases documented multi-agency misconduct, predicate frauds, retaliation, and misuse of public office. Sheriff Brian Dean and deputies acknowledged receipt but took no investigative action, issued no victim notifications in two of the three reports, and provided no constitutionally guaranted Crime Victims' Rights protections. This repeated pattern demonstrates a knowing refusal to enforce law where government actors were implicated — a classic RICO-supportive pattern of "protective non-enforcement."

154.    Sheriff Brian Dean and his Lieutenant Tom Derby and Chief Deputy Tavis Little had a statutory duty to investigate the crimes documented in the 26-page letter submitted on 3/10/24 and again highlighted in Prosecutor Ex Rel / Plaintiff's 3/10/25 reminder communication. Instead of performing required duties, Dean's office refused to gather evidence, interview witnesses, or process the allegations – actions that normally would be automatic when a disabled whistleblower faces retaliation. This selective inaction materially aided higher-level state and municipal RICO actors by blocking criminal exposure and preventing escalation to grand jury review.

155.    State's Attorney Brenda Harvey (Defendant #70), repeatedly nullified criminal complaints involving housing retaliation, fraud, and disability-related endangerment. Appendix A documents that she denied Prosecutor Ex Rel / Plaintiff the Crime Victims' Rights protections guaranteed under the South Dakota laws and State Constitution, refused to process filed complaints to the grand jury or for arrest warrants; and she took steps to shield public actors from scrutiny. Her dereliction, gross negligence, and malfeasance directly reinforced the enterprise patterns: suppressing criminal accountability, blocking judicial review, and enabling the ongoing violations that fed both the Housing and State Streams.

156.    Local municipal counsel, City Attorney David Knox (#86) and City of Spearfish administrators mirrored the same refusal pattern: they dismissed evidence, avoided statutory obligations, and declined to pursue any remedy when confronted with ongoing retaliation and safety concerns tied to federally funded programs. These local legal and administrative actors sustained the illusion that no statutory violations were occurring, thereby legitimizing the misconduct of police and county officials while enabling the broader enterprise to operate without exposure.

157.    The Lawrence County Commission, responsible for oversight of the Sheriff's Office and county operations, was repeatedly placed on notice through documented filings but chose to maintain a secondary structural reinforcement of that predicate obstruction. Their inaction preserved unlawful practices within the Sheriff's Office, maintained political protection for Brenda Harvey and the other county and state officials she was protecting, and validated the countywide pattern of retaliatory denial of service. Their failures functioned as an administrative

34

layer of RICO facilitation: preserving conditions in which fraud, coercion, and civil-rights violations could continue without interruption.

158.     Taken together, Local Government Defendants (##84–89, 91) operated not as protectors of public safety but as an impenetrable barrier to justice through an obstructive second layer of RICO maintenance.. By refusing to investigate and prosecute Crime Report #25-510, and Case Nos. #23-159, #23-463, #24-62, and ignoring repeated documented warnings, they contributed to: obstruction of justice, deprivation of equal protection, retaliation for whistleblowing, and concealment of predicate frauds. These actors thus, form the local enforcement arm of the enterprise, essential to sustaining the Housing and State Streams.

159.     On 2/7/25, in the same hour that Prosecutor Ex Rel / Plaintiff filed Crime Report #25-510 with the City of Spearfish Police Department out of fear for his life and the imminent theft of his household belongings, he also contacted his homeowner's insurance provider – Co-Defendant AMERICAN FAMILY INSURANCE (#91) – and spoke directly with its agent, Jason Gellett, of the Jason Gellett Agency, LLC. This call, recorded in full and posted publicly, notified the insurer of a specific, credible, and imminent threat: that HPMI/SMGI actors, led by Karen Martin and influenced by BAR-member attorney Ty Daly, were weaponizing a fabricated eviction threat as part of a coordinated racketeering pattern targeting a federally protected disabled whistleblower.

160.     During this recorded call, Prosecutor Ex Rel / Plaintiff expressly invoked two lawful bases for immediate insurer action: (1) his Crime Victims' Rights, triggered by a formally filed police report (#25-510), and (2) his insurance policy rights, which required AMERICAN FAMILY INSURANCE to respond when presented with advance notice of a foreseeable loss, particularly where the threatened loss was tied to third-party criminal misconduct. Prosecutor Ex Rel / Plaintiff requested preventive measures so that AMERICAN FAMILY would not later claim ignorance when a covered theft occurred.

161.     Despite having received four years of premiums of homeowner's insurance and despite possessing full knowledge of the imminent risk, AMERICAN FAMILY and agent Gellett refused to take any action whatsoever, insisting repeatedly – and falsely – that the company *"could only act after the theft actually occurred."*

162.     The recording for this telephone conversation is presented herein as *prima facie* evidence easily accessible at the following link:

**http://ricobusters.com/ricomedia/020725_My2callsAmerFamily21min1mincallback-nohelp2stoptheft.mp3**

163.     This statement contradicted basic principles of insurance law, violated the duty of good faith and fair dealing, and ignored the recorded, real-time evidence of a coordinated criminal threat tied directly to ongoing RICO activity in the Housing Stream.

164.     Appendix A (pp. 184–185) documents that Gellett repeatedly feigned confusion, *"acted*

35

*stupid"* concerning the purpose of the call, stalled, evaded, and deliberately mischaracterized Prosecutor Ex Rel / Plaintiff's preventive request as something other than what it plainly was. When finally cornered and unable to avoid a direct answer, Gellett admitted at the end of the call that AMERICAN FAMILY would provide no legal assistance and no preventive action – even though Prosecutor Ex Rel / Plaintiff explicitly requested such assistance under policy language providing for representation in circumstances involving threatened loss connected to criminal conduct.

165.    This refusal occurred despite clear evidence that HPMI/SMGI's out-of-state operatives were preparing to use fabricated paperwork, fraudulent *"lease addenda,"* and threats of eviction to remove Prosecutor Ex Rel / Plaintiff from his home and seize all of his personal property. By declining to intervene, despite being placed on formal notice, AMERICAN FAMILY effectively ratified and enabled the ongoing enterprise misconduct.

166.    The recorded call further shows that Gellett and AMERICAN FAMILY attempted to shift responsibility by pointing to *"Legal Services,"* which Plaintiff had already documented as worthless and nonresponsive, and which Congress itself has identified as systemically failing rural, disabled, and poor populations. Prosecutor Ex Rel / Plaintiff made clear that Legal Services had already refused meaningful assistance for years – a fact Gellett used as a pretext to justify the insurer's own nonfeasance.

167.    Following Plaintiff's lawful and preventive notice, AMERICAN FAMILY and the Gellett Agency retaliated by engaging in billing fraud: continuing to charge insurance premiums after Plaintiff had lawfully sold the insured vehicle, had notified them of the sale, and had canceled coverage. The agency then referred a non-existent debt to a third-party collector, despite having full recorded proof that the sale and cancellation were valid. These actions form a pattern of corporate bad faith, misrepresentation, and retaliation for Prosecutor Ex Rel / Plaintiff's protected whistleblowing and petitioning activity.

168.    AMERICAN FAMILY's refusal to act, its agent's evasiveness, and its subsequent fraudulent billing efforts directly facilitated the broader enterprise: it left Prosecutor Ex Rel / Plaintiff's belongings unprotected in the face of a documented racketeering threat, deepened financial harm, and contributed to the coercive pressure exerted through the Housing Stream and Local Government Stream. As Appendix A, Appendix A-1 and Appendix C all confirm, this insurer conduct was not a private dispute but a component of the broader federal–state–private enterprise operating against Prosecutor Ex Rel / Plaintiff.

169.    While AMERICAN FAMILY INSURANCE remains the named Defendant (as the superior corporate actor responsible for agent behavior), the recorded evidence establishes that Jason Gellett and the Jason Gellett Agency, LLC acted as operational extensions of AMERICAN FAMILY, knowingly participating in misrepresentation, bad-faith insurance practices, and retaliatory conduct tied to the enterprise's pattern of obstructing a disabled whistleblower's access to remedy, safety, and due process.

**D. Medical, Prosthetic, and Corporate Private Actors** (Defendant Nos. 92–100)

159.    Dr. Daniel Berens (#92) became a named Defendant because his conduct directly advanced the multi-agency deprivation-of-rights enterprise documented throughout this Complaint. As shown in Appendix A (pp. 149–155) and in the 35-page explanatory letter provided to him in mid-2022, Berens knowingly inserted false information into Monument Health's electronic medical record by claiming that he had reported abuse, neglect, and financial exploitation to *"LAWRENCE COUNTY DSS."* The phone number he documented – 877-244-0864 – was in fact the DSS Child Protection hotline, not Adult Protective Services, and no adult-abuse report was ever filed.

160.    This falsified entry concealed ongoing *State-created dangers,* including the cancellation of transportation, denial of Medicaid, removal of in-home assistance, and escalating safety risks caused by DSS/DHS retaliation.

161.    Appendix A details that on 7/13/22, Prosecutor Ex Rel / Plaintiff provided Berens with a written list of urgent medical concerns requiring attention. Despite this clear notice, Berens refused to complete evaluations, failed to perform basic follow-up, and took no action to mitigate worsening medical effects directly tied to the State's deprivation of Medicaid services, prosthetic support, and transportation. His non-action prolonged avoidable pain and functional decline, operating as a private-sector extension of the State Stream's administrative neglect.

162.    Appendix A documents that DHS agent Kelli Werner improperly invoked Berens' name and professional authority to coerce entry into Prosecutor Ex Rel / Plaintiff's home inder false pretenses – an act designed to pressure Prosecutor ex Rel / Plaintiff into unwanted DHS evaluations and to further the State's fabricated *"uncooperative"* narrative. Berens refused to document, dispute, or report Werner's impersonation. His silence preserved a false official narrative, reinforced DHS/DSS misconduct, and enabled continued harassment through weaponized *"re-evaluation"* threats.

163.    This deceptive misuse of Dr. Berens' name by DHS agent Kelli Werner occurred against the backdrop of an earlier coercive pattern already documented in Appendix A-3, which includes a fully transparent, recorded eight-minute call from 12/13/21. In that recording, Werner attempted to pressure Prosecutor Ex Rel / Plaintiff into allowing unidentified State personnel into his home for yet another so-called *"evaluation."*

164.    This demand violated clear federal law and SSA determinations establishing Plaintiff as Totally and Permanently Disabled, with no lawful basis for re-evaluation for 5–7 years unless performed by a properly credentialed physician – not a DHS contractor, caseworker, or waiver-program employee.

165.    As the recording of that call proves, when Prosecutor Ex Rel / Plaintiff reasonably asked Werner to identify the individuals seeking entry, to confirm they were not among the criminally

37

accused State agents previously named (for which "Crime Victim's Rights protections *"kick in"*), and to provide their required qualifications to assess medical need, Werner refused.

166.    The recorded phone call with Werner – the direct link to which is provided immediately below – demonstrates her repeated interruptions, refusal to cite lawful authority, and abrupt termination of the conversation by hanging up – conduct reflecting contempt for Prosecutor Ex Rel / Plaintiff's rights and revealing the coercive environment into which Berens later inserted false information that concealed this misconduct, as well as his own affiliated misconduct.

**http://ricobusters.com/ricomedia/121321_KEY-DHSKellyrudehungup-refusedtoprovideinfo.wav**

167.    By the time Berens falsified the mandatory-report entry in mid-2022 and refused to complete requested evaluations, he was operating within – and further enabling – a DHS/DSS campaign of forced *"evaluations,"* fraudulent entries, retaliatory profiling, and attempts to access Prosecutor Ex Rel / Plaintiff's private residence without legal justification.

168.    Werner's impersonation of Berens' authority in 2022 thus cannot be viewed in isolation; it was a continuation of the same unlawful pressure exposed in the recorded 12/13/21 call. Berens' refusal to document or report this impersonation, combined with his misrepresentations in the Monument Health record and his failure to provide lawful medical support, tied him directly into the State Stream's ongoing deprivation-of-rights enterprise by concealing a pattern of State-agent coercion and administrative abuse that had already been formally objected to and recorded months earlier.

169.    The evidence shows that Berens' failures directly also enabled Monument Health to continue billing and collection activity against Prosecutor Ex Rel / Plaintiff, despite Berens' full knowledge of the underlying State-created obstacles to obtaining medical care, Medicaid coverage, or transportation. The 35-page letter accompanying the medical-record evidence demonstrates that Monument Health and its debt-collector (CCB) continued extracting financial harm from Prosecutor Ex Rel / Plaintiff, while Berens' omissions blocked correction of the false premises driving that harm. His conduct materially advanced the enterprise's pattern of economic coercion.

170.    Defendants Monument Health Network, Inc. ("MHNI"), including executives, administrators, physicians, and its in-house Legal Team, acted as coordinated corporate participants in the enterprise by converting upstream misconduct in the Housing and State Streams into direct bodily harm against Prosecutor Ex Rel / Plaintiff. After receiving protected whistleblower communications and clear evidence of State retaliation related to the depriving of Medicaid, MHNI personnel began obstructing medically necessary services, suppressing internal reporting, and acting in alignment with State-agency and BAR-directed retaliation patterns.

171.    MHNI administrator Marcia Olson escalated this retaliation when she canceled a scheduled MRI in the residual stump of one of Prosecutor Ex Rel / Plaintiff's residual legs; and

soon afterwards cancelled a pre-surgical shoulder replacement consultation with a doctor for damage to Prosecutor Ex Rel's shoulder due to his being forced to change heavy bedding and move heavy objects at home as a result of the past four (4) years of the State depriving him of housekeeping assistance as another *"strand"* of the Medicaid umbrella.

172.    MHNI's and Olson's withholding essential medical care unless Prosecutor Ex Rel / Plaintiff fraudulently signed a coercive *"financial responsibility"* contract that he knows he cannot honor, like what is happening with the Housing Stream between HPMI and MBLCHRC, constitutes *"coercion of contract."*

173.    Olson's unsolicited telephone call – in which she effectively canceled an MRI that had been schedule several weeks in advance on a suspected infection in Prosecutor Ex Rel / Plaintiff's painful residual left leg amputated stump – is fully explained in Appendix A. The recorded phone call – which shocked the conscience of Prosecutor Ex Rel at the time just as he was leaving home to catch a schedule ride to the MHNI Imaging Department – is provided herein as evidence as provided by link immediately below.

**http://ricobusters.com/ricomedia/090225_MarciaOlsonMonHealFinDir-nomoreservice.mp3**

174.    The recorded evidence above proves the *"financial responsibility"* contract – compelled also through MHNI's legal team of BAR member attorneys – was designed to function as a commercial debt-slavery device, not as a lawful medical consent. It was intended to force Prosecutor Ex Rel / Plaintiff to absorb financial burdens caused by State-driven misclassification while absolving MHNI of any reporting duties.

175.    Olson chose to deny all further medical treatment, rather than fulfill her Mandatory Reporting responsibilities for financial abuse and abuse/neglect of a vulnerable adult under South Dakota law.

176.    MHNI's Legal Team, acting under corporate authority, reinforced Olson's actions by refusing to provide the statutory basis for the coerced contract, misrepresenting federal protections (ADA, ACA, CMS regulations), and directing staff to withhold treatment until financial concessions were extracted.

177.    These internal legal policies transformed medical care into leverage for retaliation, directly contributing to physical harm, medical destabilization, pain and suffering, and psychological duress.

178.    The Legal Team's conduct supports the Counts for civil-rights violations, denial of emergency services, retaliation, RICO participation, and conspiracy to interfere with federally protected rights.

179.    The liability of MHNI and its principals like Olson and STATE BAR member *"legal team"* is not superficial either. As the fiduciary custodian of the Medical Records for Prosecutor

39

Ex Rel / Plaintiff, they are well aware of the medical implications of canceling life-saving services to a quad-amputee with only one kidney in Stage III Kidney Disease as a survivor of the deadly SEPSIS disease in 2018.

180. They are also well aware that Prosecutor's already chronic high blood pressure is a potentially lethal factor when combined with renal disease. With only one kidney remaining, the damages in medical malpractice liability for MHNI raises by a factor of two, with punitive damages added for malicious intent.

181. Defendants Pivot Prosthetics and Orthotics, Inc., including Brodie Rice and Rochelle Rice, furthered the cross-jurisdictional financial enterprise, medical malpractice, and fraud upon the government's Medicare and Medicaid systems by obstructing prosthetic replacement and maintenance, despite knowing Prosecutor Ex Rel / Plaintiff is a quad-amputee with federally protected disability status.

182. Instead of providing services, they engaged in coercive billing practices, refused timely adjustment and replacement, and coordinated with MHNI and insurance actors to deny or delay essential prosthetic care. Their conduct, described in Appendices A and A-1, contributed to bodily endangerment, pain and suffering, forced immobility, and retaliation for whistleblowing.

183. Defendants Pivot Prosthetics and Orthotics, Inc., including Brodie and Rochelle Rice, further obstructed medically required prosthetic replacement by insisting that Prosecutor Ex Rel / Plaintiff first sign a coercive *"financial responsibility"* contract mirroring the unlawful demands imposed by MHNI and Marcia Olson.

184. Despite knowing that Medicaid was the payer legally responsible for the remaining 20% cost of the approximately $36,000 prosthetic replacement, the Rices, operating through a corporate fiction of Pivot Prosthetics and Orthotics, Inc. as their alter ego, refused to proceed without a personal financial guarantee. This refusal weaponized medical necessity against a quad-amputee, transforming essential care into commercial leverage and directly contributing to continuing physical harm.

185. The actions of Pivot Prosthetics underscore the broader enterprise pattern: instead of assisting Prosecutor Ex Rel / Plaintiff in correcting the State's Medicaid misclassification and performing the mandatory reporting of the financial abuse of a vulnerable adult, Pivot Prosthetics and Orthotics, Inc. exploited the State-created fraud.

186. Their refusal to treat unless a coerced contract was signed parallels the subornation of perjury experienced in the Housing Stream, where *"certifications"* and *"under penalty of perjury"* language were used to compel false compliance.

187. In each context, the coercion would have been unnecessary had the State lawfully honored Medicaid and federal Housing obligations instead of maintaining a fraudulent internal *"dual-track"* bookkeeping schemes and fraudulent paper trails.

188.    This pattern of *"fraudulent paper trails"* was reinforced when MHNI scheduling personnel Bailey, the radiologist who called to reschedule the MRI canceled by Marcia Olson – revealed that MHNI's medical record falsely listed Prosecutor Ex Rel / Plaintiff as a *"no-show"* for the previous MRI cancellation by Olson.

189.    When confronted with the recorded proof that MHNI (not Prosecutor Ex Rel / Plaintiff) canceled the appointment, Bailey refused to correct the fraudulent entry upon request, claiming it was *"not within her job description."* She terminated the call when Prosecutor Ex Rel / Plaintiff asserted his legal right to an accurate medical record. This refusal to correct falsified records constitutes a deliberate act of concealment facilitating retaliation and denial of care.

190.    These events mirror a long-established pattern of government and corporate actors creating fraudulent paper trails to shift blame, justify denials, and generate a false administrative history.

191.    As documented extensively in Appendix A, Appendix G, and across multiple jurisdictions extending back to Michigan, agencies and their corporate partners have maintained two sets of books: one for auditors and federal funders, and one for internal operations.

192.    The fabricated *"no-show,"* the coerced financial contracts, the medical-treatment cancellations, and the suppression of mandatory reporting all demonstrate the same coordinated method – manufacturing a documentary pretext to deny services while protecting fraudulent federal-funding streams.

193.    In parallel, the American Board of Credentialing ("ABC") and its affiliated Legal Services division acted as an institutional shield for corporate abuse by refusing to investigate complaints against Defendants Pivot Prosthetics and Orthotics, Inc. as credentialed prosthetic providers involved in wrongdoing.

194.    ABC administrators, including Defendant #97 Steve Fletcher, systematically blocked any internal review of Prosecutor Ex Rel / Plaintiff's whistleblower submissions. Fletcher directed staff not to log, analyze, or retain materials that might implicate ABC-credentialed providers or reveal systemic failures in patient protection and reporting duties. By ensuring that no evaluative record would exist, Fletcher engineered corporate non-accountability: complaints disappeared, evidence trails were severed, and ABC could later claim ignorance of violations it had been explicitly notified about.

195.    This deliberate suppression functioned as corporate obstruction, directly supporting the retaliatory and fraudulent patterns that harmed Prosecutor Ex Rel / Plaintiff and furthered the multi-agency enterprise described in this Complaint.

196.    Fletcher's written *"denial to investigate"* letter – copied to ABC's legal counsel, Defendant #98 attorney Suzanne Pierce – served as ABC's manufactured paper trail of false

41

compliance. Rather than conducting a substantive review, Fletcher deliberately reduced the whistleblower submission to an administrative nullity, ensuring that any later federal audit of ABC's credentialing obligations would falsely reflect that *"no actionable concerns existed."*

197.    This internal dismissal mirrored the same systemic pattern seen in State BAR–controlled proceedings and judicial forums where matters were summarily rejected without reaching the merits, in violation of the *backward-looking access-to-court* doctrine and reinforced by the Supreme Court's repudiation of agency deference in *Loper Bright v. Raimondo*. Through this orchestrated non-investigation, ABC joined the broader enterprise in concealing wrongdoing, suppressing evidence, and obstructing Plaintiff's lawful efforts to obtain redress.

198.    Defendant #98, Suzanne Pierce, counsel for ABC and its Legal Services, reinforced ABC's obstruction by advising against intervention, refusing to acknowledge violations, and failing to report retaliatory denial of prosthetic services despite having professional and statutory duties to do so. Pierce's legal recommendations ensured that no corrective action would be taken against Defendants Pivot Prosthetics and Orthotics, Inc. and that ABC would remain a protective firewall for prosthetic providers engaged in financial and disability-related abuse, furthering multiple Counts including conspiracy, aiding and abetting, and civil RICO participation.

199.    Defendant #99, Molly McGuire, functioning as the Professional Credentialing Administrator for the BOARD FOR CERTIFICATION IN ORTHOTICS, PROSTHETICS & PEDORTHICS ("ABC"), acted as the central gatekeeper controlling whether Prosecutor Ex Rel / Plaintiff's ethics complaint against PPAO and ABC-credentialed practitioner Brodie Rice would receive any review at all.

200.    From October through December 2023, McGuire made and documented specific procedural commitments – granting disability-based accommodations, extending ABC's strict 25-page filing limit to 30 pages, and confirming inclusion of the submission in the upcoming November Professional Ethics Committee meeting. These commitments were repeatedly affirmed in writing, inducing reliance and shaping the timeline by which Prosecutor Ex Rel / Plaintiff prepared the completed evidentiary filing against licensees PIVOT PROSTHETICS & ORTHOTICS and Brodie Rice.

201.    Only after McGuire received the completed complaint – containing detailed misconduct evidence, links to recordings, and statutory references implicating ABC-credentialed personnel – did she abruptly reverse all prior commitments. She falsely stated that she had *"quoted the wrong deadline,"* unilaterally postponed review for at least another month, and pushed the matter outside the promised Committee window.

202.    This reversal came after seeing the content of the complaint, not before, demonstrating that the delay was content-based, retaliatory, and designed to prevent scrutiny of practitioners whose continued licensure benefited ABC and its affiliated corporate partners. The reversal had no procedural basis and contradicted ABC's own written accommodations.

42

203.    McGuire's actions constitute discriminatory procedural manipulation. Prosecutor Ex Rel / Plaintiff – who is a totally and permanently disabled quad-amputee and then in pain resulting from the Rices and PIVOT's misrepresentation and stalling medical malpractice actions actions – met every requirement, followed every instruction, and relied on granted accommodations to prepare the filing.

204.    McGuire's post-submission reversal effectively nullified those accommodations, depriving Prosecutor Ex Rel / Plaintiff of *meaningful* access to the complaint process. Her conduct mirrors a documented pattern in other State Stream and Federal Stream agencies: granting accommodations at the outset, then revoking them once a disabled whistleblower presents substantive evidence challenging institutional actors. This constitutes a deprivation of rights under the ADA, Rehabilitation Act, and federal anti-discrimination law.

205.    McGuire's obstruction is inseparable from the subsequent actions of Defendant #97 Steve Fletcher and Defendant #98 Suzanne Pierce, who issued a sham *"non-review"* and denied the complaint without examining the evidence. McGuire's reversal functioned as the first step in that coordinated obstruction: by controlling intake, scheduling, and procedural eligibility, she ensured that the complaint would be delayed, diminished, or fully neutralized before reaching the Ethics Committee.

206.    Her conduct provided the procedural pretext Fletcher and Pierce later exploited to shield ABC's credentialed practitioners, protect ABC from regulatory exposure, and maintain an interstate professional-licensure scheme that ignored whistleblower evidence and favored institutional preservation over patient safety.

207.    By manipulating deadlines, withdrawing promised accommodations, and obstructing access to the credentialing oversight mechanism, McGuire directly contributed to the multi-agency deprivation-of-rights enterprise described elsewhere in this Complaint. Her misconduct deprived Prosecutor Ex Rel / Plaintiff of access to prosthetic-care remedies, facilitated continued harm by credentialed practitioners, and reinforced the broader patterns of concealment, retaliation, and denial of due process repeated across State, Federal, and Private Streams. As with Defendant Berens and Monument Health, McGuire's actions had direct material effects on Plaintiff's mobility, safety, access to essential devices, and ability to seek accountability through established regulatory channels.

208.    Collectively, Defendants 92–100 formed the medical and corporate-private enforcement wing of the enterprise. Their actions translated the abstract bureaucratic harms of DSS/DHS and into direct physical deprivation, forcing Prosecutor Ex Rel / Plaintiff into medical crisis, prosthetic deterioration, untreated injury, and escalating disability-related risk.

209.    Their coordinated refusal to treat, refusal to report, refusal to investigate, and insistence on coerced financial contracts constitute violations of federal disability laws, medical-necessity regulations, mandatory reporting statutes, and the Counts articulated in A-1, including RICO, retaliation, fraud, conspiracy, and deprivation of rights.

43

210.    Through their omissions and overt acts, these medical, prosthetic, and legal-corporate defendants directly furthered the racketeering pattern by: denying emergency and necessary care, withholding life-sustaining prosthetics, manipulating financial responsibility forms as instruments of coercion, concealing actionable misconduct, suppressing whistleblower evidence, and aligning their decisions with State-agency retaliation. Their conduct multiplied the injuries caused by the Housing and State Streams, and their participation is indispensable to the continuity of the enterprise.

### E. BAR-Member Attorneys, Legal Services, Disability Rights Groups, and Law Firms
(Defendant Nos. 8-11, 15-16, 29–35, 49–61, 69–83, 86, 101–104)

211.    Defendants, including attorneys Ty M. Daly (#8) of Lynn, Jackson, Shultz & Lebrun (#9), James Edwards (#10) of Stevens, Edwards & Hallock (#11), Drew Skjoldal (#15) of Nies, Karras & Skjoldal (#16), and related firm principals (HPMI/SMGI's and MBLCHRC's counsel #9, #11, #16), collectively acted as the private BAR-enforcement wing of the enterprise.

212.    Each was placed on notice through detailed correspondence, Appendix A evidence packets, and statutory demands from Prosecutor Ex Rel / Plaintiff, yet instead of correcting federal violations, they escalated retaliation, issued coercive threats, legitimized falsified certifications, and obstructed access to public records and hearings. Their conduct supports Counts relating to conspiracy, obstruction, retaliation, mail/wire fraud, denial of due process, and deprivation of rights.

213.    These attorneys used their BAR authority not as independent legal *officers of the court*, but as protectors of corporate and governmental malfeasance. Daly and his firm adopted HPMI's false narrative, legitimized eviction threats based on falsified *Yardi* documents, and suppressed requests for ADA accommodations and PRA/APA compliance.

214.    Daly and Edwards and their respective law firms ratified HPMI'S and SMGI's fraudulent LIHTC and Section-8 certifications and addenda, refused to disclose controlling statutes, and positioned themselves as legal shields for retaliatory and embezzlement actions taken by housing authorities. Their coordinated refusal to investigate truthfully or address material evidence demonstrates a knowing participation in enterprise concealment and RICO predicate activities.

215.    Defendants 29–35, including Eugene Yuk (#31), Roxanne Caruso (#34), Carol Bergman (#33), Murl Woods (#29), and other attorneys and supervisors associated with Dakota Plains Legal Services (DPLS #30), the Legal Services Corporation's Office of Compliance and Enforcement (LSC-OCE #32), and the Legal Services Corporation (LSC #35) were repeatedly asked to provide proper complaint process and/or civil-rights protection but instead sabotaged or refused service.

216.    Appendix A documents multiple instances where Prosecutor Ex Rel / Plaintiff provided

44

clear evidence of fraud, retaliation, disability discrimination, and unsafe conditions, yet these attorneys intentionally avoided representation, closed *"Docket"* and *"Investigation"* files without review, and/or misrepresented their jurisdiction to avoid assisting a whistleblower. Their acts and omissions directly furthered deprivation of rights, access-to-courts violations, and conspiracy to obstruct justice.

217. DPLS/LSC officials were expressly informed of embezzlement, LIHTC recertification coercion, Medicaid misclassification, and retaliation by State and local actors. Nevertheless, they refused to act, refused to investigate, and refused to provide required assistance – even after assigning a worthless *"Docket #25-0-078"* under LSC's federal charter.

218. Their abandonment forced Prosecutor Ex Rel / Plaintiff to proceed without legally mandated protection, enabling other Defendants to escalate their unlawful acts even further. This dereliction constitutes a systemic pattern of denying indigent and disabled individuals lawful access to remedy, squarely supporting the civil-rights and conspiracy Counts detailed in A-1 and Appendix A.

219. Defendants Pam Bondi (#49) and Merrick Garland (#50), in their successive roles as UNITED STATES ATTORNEY GENERAL, together with the U.S. Department of Justice (#53) and the U.S. Department of Justice – Office for Civil Rights (#54), formed the top-tier federal law-enforcement and civil-rights enforcement command structure that repeatedly failed to act on the detailed civil-rights complaints, fraud/waste/abuse reports, and constitutional grievances submitted by Prosecutor Ex Rel / Plaintiff.

220. Despite holding ultimate authority to investigate discrimination, correct federal-program abuse, and supervise HUD, SSA, TREASURY, IRS, DHHS, CMS, and related agencies, these Defendants allowed DOJ to become a passive conduit for non-enforcement, thereby enabling the deprivation-of-rights enterprise to persist across administrations and jurisdictions.

221. Their failures – spanning non-response to discrimination complaints, refusal to address documented federal fraud, and abandonment of DOJ's supervisory role over misapplications of the Sixteenth Amendment *"income"* definition – directly support the Civil RICO, 42 U.S.C. §§ 1983 and 1985(3), federal-program fraud, obstruction, and retaliation Counts assigned to them in Appendix A-1 and Appendix A.

222. Defendants Alison J. Ramsdell (#51), UNITED STATES ATTORNEY FOR THE DISTRICT OF SOUTH DAKOTA, and Ben Patterson (#52), ASSISTANT UNITED STATES ATTORNEY for that District, functioned as the front-line federal prosecutors who personally received recorded and written notice of federal crimes, civil-rights violations, and federal-program fraud affecting Prosecutor Ex Rel / Plaintiff, yet refused to open investigations, initiate prosecutions, or even perform basic prosecutorial assessment.

223. Ramsdell's office ignored detailed submissions and failed to discipline Patterson after he was specifically reported for recorded dereliction and refusal to act on crimes presented to him in

45

person at the U.S. Attorney's Office. Patterson openly declared that no action would be taken on criminal complaints despite statutory mandates, as he handed the complaint papers back and literally ran out of the room stepping over them at the door.

224.    Evidence of the around 15 minutes of recorded phone call below demonstrates that Ramsdell and Patterson have effectively nullified federal crime-victim protections and grand-jury access within the district. Together, these Defendants converted the U.S. Attorney's Office into a blockade rather than a gateway to justice, materially furthering the Civil RICO, deprivation-of-rights, conspiracy, federal-program fraud, obstruction-of-justice, and administrative-insurrection Counts assigned to them in Appendix A-1.

**http://ricobusters.com/ricomedia/041023_USAttorneyOffice-BenPatterson-2.wav**

225.    Defendants Kash Patel (#55), in his official capacity as DIRECTOR OF THE FEDERAL BUREAU OF INVESTIGATION, and the FEDERAL BUREAU OF INVESTIGATION (#56) as an institution, were responsible for receiving civil-rights complaints, investigating federal crimes, and acting upon whistleblower-level reports of federal-program fraud and targeting.

226.    Instead, over many months and years, and across multiple jurisdictions and presidential administrations, they refused to record, investigate, or meaningfully respond to evidence from Prosecutor Ex Rel / Plaintiff documenting fraud and retaliation within HUD, SSA, DHHS, CMS, TREASURY, IRS, STATE OF SOUTH DAKOTA, STATE OF MICHIGAN agencies, and local government actors.

227.    This pattern of FBI-level abandonment, selective enforcement, and non-response allowed the same unlawful administrative schemes to continue uninterrupted, including the unconstitutional expansion of the Sixteenth Amendment "*income*" definition used to capture jurisdiction and impose unauthorized federal burdens on sovereign individuals proven to be of America's Most Vulnerable of the poor, elderly, and disabled.

228.    By failing to protect an alleged crime victim and refusing to investigate well-documented federal misconduct, Bondi (#49) and Garland (#50), as heads of DOJ, and Patel (#55), as Director of the FBI (a DOJ sub-agency), together with DOJ (#53) and FBI (#56), and those working for them and their predecessors, failed in their respective statutory duties to investigate, correct, or act upon civil-rights violations, fraud, and federal program abuse; and thus, they directly advanced the Civil RICO, 42 U.S.C. §§ 1983 and 1985(3), federal-program fraud, obstruction, and retaliation Counts listed in Appendix A-1 based upon the actions presented in spades in Appendix A.

229.    Defendants Chief Judge Roberto A. Lange (#57), Judge Lawrence L. Piersol (#58), and Clerk of Court Matthew Thelen (#59), together with the UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH DAKOTA (#60), comprise the federal trial-court apparatus that functioned as a structural barrier to constitutional access, rather than as a neutral forum.

46

230.    As described in A-1 and Appendix E-2, their combined actions and omissions – including blocking or dismissing filings without substantive review, tolerating or enabling clerk-level obstruction, and permitting a fraudulent *"Judgment"* referencing an unrelated private insurance entity – prevented Prosecutor Ex Rel / Plaintiff from obtaining any *meaningful* federal court access and/or adjudication of his federal claims, or presenting evidence of federal crimes to a grand jury.

231.    These actions support the Civil RICO, judicial-deprivation, conspiracy, obstruction, and due-process-denial Counts assigned in A-1 and presented in the actions written with links to the evidence of Appendix A.

232.    Defendant UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT (#61) extended and ratified this judicial obstruction presented in Appendix E-2, by affirming or allowing to stand Piersol's fraudulent *"Judgment"* without substantive review, without addressing the absence of proper service on named Defendants, and without confronting the obvious irregularity of an invented insurance company inserted into the district-court record by Thelen and Piersol signing for that action.

233.    By dismissing or extinguishing appeals raising whistleblower-level evidence of federal crimes, administrative fraud, disability discrimination, and unconstitutional taxation practices, the Eighth Circuit repeated the same patterns previously encountered in the Eastern District of Michigan and the Sixth Circuit – using *sua sponte* dismissals, summary affirmances, and jurisdictional pretexts to shield district judges and agencies from accountability.

234.    This appellate ratification transformed localized misconduct into an institutionalized, interstate judicial protection system, directly satisfying the Civil RICO enterprise elements and supporting the conspiracy, deprivation-of-rights, obstruction, and Sixteenth-Amendment misapplication Counts set forth in Appendix A-1 and presented in evidence with links through Appendix A, Appendix G, and in the links directed toward the RICOBusters.com website hosting all of the evidence files associated with the *Claims in Commerce* similarly dumped by the BAR members operating the Fourth District Court (City of Deadwood in Lawrence County) and the South Dakota Supreme Court.

235.    That same pattern of misconduct culminated in the 2015–2016 litigation leading to the $100-billion surety-based claim associated with the Charter Township of Redford and Charter County of Wayne, preserved via *Coram Nobis,* with the United States as guarantor to the terrorism-insurance rider implicated by that claim, as proven in preserved and archived files relegated to secured storage.

236.    That *Coram Nobis* filing is still a matter of public record today as time-stamped by the United States District Court in 2016, both on the face of the 68-page document also reaffirming a default judgment, and on its accompanying first and second *"Certificate[s] of Service,"* which was accompanied also by eleven (11) federal *"AO-91 Forms"* of sworn *Criminal Complaints, Affidavit of Obligation, Brief of Information,* and *Claim in Commerce for Damages.* Those

47

memorialized, time/date-stamped federal court filings from 2016 are located at the following Internet URLs:

**http://ricobusters.com/ricomedia/100416_CourtStmp-ALLWritofErrorContemptClaimsFiledbyPAGSquires.pdf**
and
**http://ricobusters.com/ricomedia/101716_CourtStmp-2ndCertofService2CoramNobis.pdf**

237.    These events form part of the factual background relevant to Defendants ##49–61 in particular, because they demonstrate prior notice, continuity, cross-jurisdictional pattern, fraud upon federal tribunals, and the irreparable collapse of judicial access.

238.    The pattern is reinforced by federal agencies' deliberate non-response to detailed whistleblower reports and formal complaints. Prosecutor Ex Rel / Plaintiff repeatedly notified HUD, HHS, SSA, Treasury, DOJ, FBI, and various Offices of Inspector General about the cross-state continuity of these schemes, from the middle of 2020 when Medicare was *"kicking in"* and the State and Federal gross negligence in stopping the automated stealing by the U.S. Treasury (under Steven Mnuchin then) of SSA benefits to pay for DHHS-CMS issued Medicare *"benefits"* simultaneously *"dug in"* as it continues to do again now at the end of 2025 through South Dakota's form of committing *"Medicaid Fraud."*

239.    Those proven years of written notices included documentation of altered records, retaliatory denials, misleading paper trails, systemic ADA violations, and fraud upon the courts and upon federally funded programs, are much of which is cataloged in Appendix A and Appendix C and the Congressional/FOIA-related filings in Appendix F, as well as other filings as documents linked within the context of this *"Facts"* section of this instant federal Complaint and posted publicly on the RICOBuster.com media and investigative journalism website.

240.    Federal agencies either did nothing, issued boilerplate denials, or diverted the complaints back to the very state entities causing the harm, thereby compounding the injury and confirming that internal oversight mechanisms were functionally rigged. A good example of that happening was recorded in the 2024 conversations that were carried out between Prosecutor Ex Rel, Senator John Thune's office representative, and former Governor (now Defendant) Kristi Noem and her inner office personnel. *See* Appendix E-3, page 138 (PDF file page 149) for more on these recorded discussions.

241.    Defendant Matthew Thelen's gatekeeping at the U.S. District Court Clerk's Office, Senior Judge / Retired Federal Judge Lawrence Piersol's issuance of an unserved and procedurally void *"Judgment,"* and *"Chief Judge"* Roberto Lange's administrative oversight failures together created a closed system in which statutory protections, constitutional claims, and challenges to the SSA payout deductions misapplications, to the $100 billion *"Claim in Commerce,"* and many other matters operating in cross-jurisdictional criminal patterns, were effectively sealed off from judicial and public scrutiny.

48

242.    That federal refusal to act is not neutral. Under *respondeat superior*, under Title 42, under the False Claims Act, and under RICO, high-level federal officials (like Piersol and Lange) and their agencies are responsible when they are repeatedly notified of fraud and civil-rights violations within federally funded programs and still refuse to intervene.

204.    Defendant Marty Jackley (#69), as ATTORNEY GENERAL OF THE STATE OF SOUTH DAKOTA, sat at the top of the State's criminal-justice hierarchy. Under him, the MEDICAID FRAUD CONTROL UNIT, statewide SAAG network, and State's Attorneys were supposed to investigate Medicaid fraud, protect crime victims, enforce state and federal statutes, and safeguard federal spending-condition programs.

205.    Instead, as documented on the Memorandum (Appendix A) pages cross-referenced in A-1, Jackley – and his criminally convicted and impeached predecessor, Jason Ravnsborg – presided over a system in which detailed whistleblower-level reports about Medicaid fraud, retaliatory terminations of services, disability discrimination, and administrative racketeering were either ignored or silently refused.

206.    That inaction was not neutral; it functionally authorized the fraud and retaliation to continue and qualifies as aiding and abetting the enterprise under the Civil RICO and § 1983 / § 1985 Counts.

207.    Defendant Brenda Harvey (#70), as LAWRENCE COUNTY STATE'S ATTORNEY, operated as Jackley's local arm. In theory she was obligated to receive, evaluate, and file the criminal complaints  Prosecutor Ex Rel / Plaintiff submitted regarding housing fraud, falsified documents, ADA violations, and misconduct inside the government complex where she works. In practice she refused to investigate, refused to acknowledge the evidence, and refused to facilitate grand-jury access – using her office as a shield for the very actors whose crimes were being reported.

208.    By blocking access to the grand jury, Harvey converted what South Dakota law advertises as a *"People's"* institution into a controlled gatekeeping tool of the State. Her actions support the obstruction-of-justice, First Amendment petition-rights, due-process, and Crime Victims' Rights counts, and they dovetail with the same gatekeeping and denial patterns carried out by federal DOJ actors described earlier in this Complaint.

209.    Together, Jackley and Harvey exemplify the State-BAR model that treats whistleblowers and crime victims as threats to be contained rather than constituencies to be protected. Their concerted refusal to prosecute or investigate the documented misconduct – despite statutory duties, Crime Victims' Rights provisions, and federal funding conditions – materially furthered the enterprise's goals: preserve Medicaid and housing-program fraud; prevent exposure of LIHTC/Section-8 and Medicaid-funded abuses; and deny disabled, indigent, and whistleblowing residents any meaningful legal remedy.

49

210.    Defendants Jeremy Lippert (#71) and Jenna Howell (#72) occupied the crucial *"legal-nerve-center"* positions at DSS and DHS. As SAAGs and lead counsel, they controlled discrimination complaint processing, open-records responses, legal interpretations, and the routing (or burying) of grievances.

211.    Lippert and Howell received multiple, detailed filings from Prosecutor Ex Rel / Plaintiff documenting disability discrimination, retaliatory loss of benefits, *"Medicaid Savings Program"* misclassification, sham hearings, falsified certifications, and procedural traps.

212.    Instead of processing those complaints as required by law, they refused to answer, mischaracterized requests, denied access to records, and coordinated with other BAR actors to construct sham hearings and sham appeals.

213.    Their conduct lies at the heart of the § 1983 and § 1985(3) conspiracy Counts, the Spending-Clause and False Claims Act theories, and the RICO predicate acts involving mail/wire fraud and obstruction.

214.    One concrete example is Howell's retaliation in early 2022: after a year of Prosecutor Ex Rel / Plaintiff's protected First Amendment petitioning, she orchestrated the termination of four hours per week of housekeeping and chore services – including essential transportation to obtain food and supplies – fully aware that Prosecutor Ex Rel / Plaintiff is a totally and permanently disabled quad-amputee with no independent transportation.

215.    At the same time, she and DHS staff later participated in fraudulent billing credits for *"housekeeping"* services that were never performed, compelling Prosecutor Ex Rel / Plaintiff to pay contributions toward phantom services. That conduct directly supports the Counts for retaliation, deprivation of rights under color of law, False Claims Act-type fraud on Medicaid, and peonage/involuntary servitude via administrative coercion.

216.    Defendants Lippert and Howell also collaborated with SAAG Wade Reimers (#77) and *"Chief Hearing Examiner"* Eric Monson (#76) to engineer the sham DSS hearing captured in Prosecutor Ex Rel / Plaintiff's 3+-hour documentary. Lippert and Howell ensured that witnesses would not appear, subpoenas would not be honored, records would be withheld, and that the hearing would proceed under DSS control as a *"simulated legal proceeding"* rather than as a neutral APA-compliant adjudication.

217.    Reimers appeared in that hearing not as a neutral officer but as DSS's strategic enforcer, cross-examining and rehabilitating DSS witnesses, ignoring the total absence of Prosecutor Ex Rel's witnesses (despite lawful subpoenas issued beforehand), and helping Monson drive toward a predetermined outcome.

218.    These coordinated actions show a conscious but silent – i.e., in the character of a *"wink and a nod"* – agreement among BAR-licensed actors to deprive Prosecutor Ex Rel / Plaintiff of due process – satisfying § 1985(3) conspiracy elements and forming multiple RICO predicates.

50

219.    Defendants Robert *"Bob"* Morris (#78) and David Knox (#86) extended this same SAAG/BAR paradigm into the judicial and municipal arenas. Morris functioned as the Attorney General's *"tag-team"* SAAG at the 4th Circuit level, carrying the fraudulent administrative record into the courtroom after the Monson hearing and helping Circuit Judge Eric Strawn fabricate a judicial *"record"* blaming Prosecutor Ex Rel / Plaintiff for a *"failure to appear"* in a case Prosecutor Ex Rel / Plaintiff never truly filed as captioned.

220.    Knox functioned as CITY OF SPEARFISH's legal shield, ensuring that audio-recorded evidence of police misconduct, Crime Victims' Rights violations, and municipal negligence never resulted in discipline, remedial action, or meaningful investigation.

221.    Both Morris and Knox used their BAR licenses to maintain official fictions and to protect government wrongdoers, squarely supporting the § 1983, § 1985, Crime Victims' Rights, municipal Monell liability, and Civil RICO Counts pled against them.

222.    Taken together, Lippert, Howell, Monson, Reimers, Morris, and Knox show how the BAR, once embedded in agency and municipal counsel positions, becomes the operational arm of the enterprise: designing sham procedures; controlling which records see daylight; creating false *"findings"* for later courts to rely upon; and blocking every attempt by a disabled whistleblower to have his evidence honestly heard.

223.    Defendants Catherine Williamson (#73), Scott Bollinger (#74), the SOUTH DAKOTA BUREAU OF ADMINISTRATION / BHRA (#75), and *"Chief Hearing Examiner"* Eric Monson (#76) collectively controlled the supposedly neutral administrative-hearing and open-records appeal infrastructure touted by the State as *"due process."*

224.    In reality, as shown in documents linked to Appendix A, and Appendix B and A-1, they transformed that infrastructure into a laundering machine for sham DSS/DHS decisions and for the destruction or mutilation of Prosecutor Ex Rel / Plaintiff's appeals.

225.    The document link below is to the a sufficient list of key evidence that provides the full background to the entire stories behind the Monson (above) and Williamson (below) fraudulent *"administrative appeals"*. Effectively, one of three appeals was obstructed by Williamson (#73) as the so-called *"Chief Hearing Examiner"* (along with DSS Lippert and DHS Howell). A second of the three appeals was obstructed by Monson as yet another who was publicizing himself as the *"Chief Hearing Examiner"* (with Reimers, Lippert, and Howell aiding and abetting on that obstruction). The third of those appeals filed in early 2022 simply and altogether disappeared without any address whatsoever, much like other appeals disappeared in 2023, 2024, and 2025.

**http://ricobusters.com/appendix_b_corrupt_events_and_conditions_seen_with_fraudulent_state_administrative_hearing_examiners.html**

225.    Williamson's treatment of Prosecutor Ex Rel / Plaintiff's double-sided appeal pages is a

textbook example. After Prosecutor Ex Rel / Plaintiff's printed and mailed his appeal materials double-sided to conserve scarce resources and work within severe disability constraints, Williamson forwarded only the odd-numbered pages to DSS and DHS counsel (Lippert and Howell), concealing half of Prosecutor Ex Rel / Plaintiff's legal arguments and factual record.

226.    Williamson then refused to convene a hearing, refused to address Prosecutor Ex Rel / Plaintiff's objections to this mutilation of the record, and allowed the matter to quietly *"resolve"* or *"dissolve"* with no neutral adjudication, no written order, and no genuine review provided to Prosecutor Ex Rel / Plaintiff in return.

227.    This conduct directly supports Counts for denial of due process, fraudulent administrative adjudication, simulated proceedings, and RICO predicate acts involving mail/wire fraud and obstruction of justice.

228.    As Commissioner, Defendant Bollinger (#74) bore supervisory responsibility for Williamson and for the BUREAU OF ADMINISTRATION/BHRA hearing system in which two individuals -- maybe more -- simultaneously claim the same title of *"Chief Hearing Officer."*

229.    Bolliger received many direct email notices of ADA barriers, sham appeals, mutilated records, and the misuse of *"Chief Hearing Examiner"* titles, yet did nothing. His silence and refusal to correct the obvious misconduct ratified the use of the BHRA as an extension of the SAAG-controlled deprivation machinery rather than as a check on it.

230.    The institutional Defendant BHRA (#75) in turn supplied the infrastructure, titles, and procedural façades needed to give sham DSS/DHS proceedings the appearance of legitimacy – while ensuring that appeals were used to bury evidence instead of airing it.

231.    Defendant Monson (#76) then used this infrastructure to stage the recorded DSS hearing, where 26–29 subpoenas issued by Prosecutor Ex Rel were ignored. No witnesses therefore appeared to the hearing on Prosecutor Ex Rel's behalf. That 5/5/25 *"DSS"* hearing was scheduled by Monson in another county altogether and with only five (5) business days notice and no offer of transportation assistance whatsoever to Prosecutor Ex Rel / Plaintiff as a known quad-amputee being denied transportation as well as Medicaid.

232.    Though provided a ride at the last minute by a neighbor, at that recorded DSS hearing, the evidence demonstrates that every protest raised by Prosecutor Ex Rel / Plaintiff about the sham nature of the process was brushed aside by Monson and Reimers. The resulting *"decision"* was never a product of neutral fact-finding; it was a scripted outcome designed to create a paper trail that DSS, SAAGs, and later courts could point to as *"due process."*

233.    The video evidence – described in Appendix A-1 and linked in Appendix A and Appendix C, as well as immediately below – shows Monson proceeding in full knowledge of the missing witnesses, missing subpoenas, and missing neutrality. That knowledge satisfies the scienter requirements for the obstruction, fraud, § 1983, and § 1985(3) Counts asserted in this Complaint.

**https://www.youtube.com/watch?v=QS-ukmfvuCY**

234.    As a group, Lippert, Howell, Williamson, Bollinger, BHRA, Monson, and others demonstrate that South Dakota's central hearing system operates not as a neutral APA-compliant tribunal, but as an administrative theater attached to DSS and DHS. Its job, in practice, is to convert whistleblower complaints and disability-rights grievances into *"resolved"* files that insulate agencies from liability and give the UNIFIED JUDICIAL SYSTEM an excuse to refuse further review.

235.    Defendants Carol Latuseck (#79) and Eric Strawn (#80) represent the epidomy of the judicial and clerical apparatus and the 4th Judicial Circuit's role in extending DSS/DHS/BHRA-engineered fraud into the judicial forum.

236.    Latuseck, as Magistrate/Clerk – acting in a conflict-of-interest titled role to begin with as both an adjudicator and the *"keeper of the record"* for her own adjudicated cases – began by recaptioning Prosecutor Ex Rel / Plaintiff's properly filed judicial complaint, stripping out the actual named respondents (DHS, DSS leadership, Governor's Secretaries, SAAGs, BHRA actors) and inserting only the fiction *"DSS"* as the sole defendant.

237.    Latuseck then coordinated with SAAGs Reimers and Morris to convert Prosecutor Ex Rel / Plaintiff's case of a co-existent *"administrative appeal"* of Monson's sham proceeding, into on of a fraudulent sole-existent administrative appeal of Monson's action. This was entirely done in spite of Prosecutor Ex Rel's written objections and *"Motion to Correct the Record."* It was done without any lawful authority, and while Prosecutor Ex Rel remained physically unable to attend due to disability and access barriers.

238.    Latuseck's reprehensible conduct is central to the § 1983 deprivation, § 1985 conspiracy, obstruction, and simulated-judicial-process Counts.

239.    Judge Strawn (#80) adopted the fraudulent caption constructed by Latuseck and proceeded to conduct a *"hearing"* as if it were a legitimate appeal of Monson's decision, even though Prosecutor Ex Rel had not filed such an appeal as a stand-alone case.

240.    At reflected in the hearing transcript, Strawn then allowed SAAG Morris to *"build his own record"* in Prosecutor Ex Rel's absence, and placed the blame on Prosecutor Ex Rel / Plaintiff for *"failing to appear"* in a case whose very existence was a clerical fiction.

241.    This conduct mirrors the patterns of judicial obstruction previously documented in Michigan – where filings were retyped, recaptioned, and converted into something the State could control through nondescript and nontransparent docket entries.

242.    Strawn's actions provide textbook support for Counts alleging judicial fraud, denial of access to courts, obstruction of justice, and RICO enterprise participation.

243.    Defendants Shirley Jameson-Fergel (#81), Chief Justice Steven Jensen (#82), and the SOUTH DAKOTA SUPREME COURT as an institution (#83) then extended and ratified this pattern at the highest state level.

244.    Before any honest review could occur, Jameson-Fergel and Latuseck padded and poisoned the docket, inserting unrelated materials – including Boston Marathon Bombing and Florida documents having nothing to do with Prosecutor ex Rel or his filings – into the official record for the fictional case created by *"Magistrate/Clerk"* Latuseck. These insertions set the stage for treating Prosecutor Ex Rel / Plaintiff as a criminal suspect or problem rather than as a crime victim and whistleblower.

245.    When Prosecutor Ex Rel / Plaintiff later obtained the docket and compared entries, the manipulation became obvious; yet every effort he made to correct that record was blocked or summarily denied, even at the South Dakota Supreme Court on appeal.

246.    Despite receiving Motions to Correct the Record, Judicial Notices, and detailed evidence of docket manipulation, Chief Justice Jensen (#82) refused to order any inquiry, refused to correct the record, and refused to grant meaningful review. Instead, he issued boilerplate denials and purported *"orders"* presented as the collective decisions of multiple justices as *"participants"* – orders whose authenticity and actual participation are now legitimately in question.

247.    This pattern shows institutional knowledge of fraud and a deliberate choice to protect clerks and lower-court judges rather than Crime Victims' Rights or constitutional access to the courts. It squarely supports the § 1983, § 1985, obstruction, simulated-judicial-proceedings, and Civil RICO Counts pled against Jensen and the Supreme Court as an entity.

248.    The SOUTH DAKOTA SUPREME COURT (#83), acting corporately, functioned not as a constitutional court of last resort, but as the final seal on the deprivation enterprise. By issuing *"orders"* that ignored clear evidence of falsified records, unlawful recaptioning, sham hearings, and SAAG-engineered fraud, the Court converted localized misconduct into a statewide institutional practice. Whether those orders were truly joined by all listed justices or manufactured administratively between Jensen and Jameson-Fergel, the result is the same: the institution became part of the enterprise, either by collective ratification of deprivation or by allowing fraudulent orders to be issued in its name.

249.    Common themes and count linkages across the BAR-member and judicial co-Defendants (69–83, 86) reveal a series of repeating, interconnected patterns that collectively form the backbone of the deprivation-of-rights enterprise.

250.    These Defendants consistently refused to treat Prosecutor Ex Rel / Plaintiff as an alleged crime victim or whistleblower despite overwhelming documentation, despite statutory Crime Victims' Rights protections being constitutionally available and demanded, and despite repeated notice of federal and state violations.

54

251.    Overall, Defendants used titles and procedural structures – such as *"Chief Hearing Examiner," "appeal," "hearing,"* and *"order"* – not to provide lawful adjudication, but to simulate due process while denying any genuine opportunity to be heard.

252.    They repeatedly mutilated or manipulated records, as demonstrated by Williamson's forwarding of only odd-numbered appeal pages, Latuseck's recaptioning of cases to eliminate proper respondents, and Jameson-Fergel's and Latuseck's insertion of unrelated materials into the docket.

253.    These same actors engaged in coordinated non-response and retaliation following Prosecutor Ex Rel / Plaintiff's protected petitioning activity, including Howell's termination of essential housekeeping and transportation services and Knox's municipal-level blocking of accountability and police investigation.

254.    The misconduct also demonstrates clear interstate continuity, echoing the same administrative-judicial coercion, sham proceedings, and clerical manipulation previously encountered in Michigan and reappearing across South Dakota's agencies, courts, and Supreme Court.

255.    These overlapping patterns directly support the Civil RICO Counts under 18 U.S.C. § 1962(c) and (d) because they demonstrate the existence of an ongoing enterprise composed of government agencies, courts, and STATE BAR members acting in coordinated fashion; a pattern of racketeering activity involving mail and wire fraud, obstruction of justice, retaliatory deprivation of rights, and the deliberate manufacture of fraudulent records; and the use of that racketeering activity to deprive Prosecutor Ex Rel / Plaintiff – and similarly situated disabled and indigent residents – of property, liberty interests, statutory protections, and access to federally funded programs.

256.    These same facts also support the 42 U.S.C. § 1983 deprivation-of-rights Counts and the § 1985(3) conspiracy Counts, as each actor operated under color of law and in concert with others to obstruct constitutionally guaranteed rights, defeat meaningful judicial access, and prevent the exposure of statewide and interstate governmental misconduct.

257.    The conduct of these Defendants also directly implicates the First Amendment Counts (retaliatory obstruction of petitioning activity) and the Fourteenth Amendment Counts (due-process and equal-protection violations). For example, Howell's removal of chore services after protected filings, Harvey's refusal to allow grand-jury access, Harvey's and Knox's blocking of county and municipal investigations, and the Supreme Court's suppression of filings and record-correction motions, each represent retaliation or unequal treatment imposed specifically because Prosecutor Ex Rel / Plaintiff exercised his right to petition and expose governmental misconduct.

258.    Finally, because much of this misconduct involves federally funded programs – LIHTC/Section-8 housing, Medicaid/Medicare Savings, legal and disability rights services, and

court systems supported by federal dollars – these actions implicate the False Claims Act, Spending-Clause, and federal-program-fraud Counts identified in Appendix A-1 and Appendix A.

259.    By ignoring or burying whistleblower-level reports of fraud, and by manufacturing bogus *"records"* to shield the wrongdoing, Defendants 69–83 and 86 did not merely fail in their duties; they actively furthered the deprivation-of-rights enterprise, leaving Prosecutor Ex Rel / Plaintiff and similarly situated Americans without lawful recourse, and forcing this instant federal Court to confront the full scope of the State-BAR-directed system described throughout this Complaint.

**Disability-Rights Enforcement Failures, Regulatory Capture, and National BAR-Coordinated Exclusion** (Defendants 101–104)

260.    Incorporating by reference all preceding paragraphs as though set forth again verbatim, the actions and omissions of Defendants 101–104 form the civil-rights enforcement facade of the enterprise: entities that exist – statutorily, publicly, and in their own promotional rhetoric – to protect the vulnerable, to investigate abuse and neglect, to stop fraud and retaliation, and to ensure that disabled Americans are not buried beneath administrative misconduct.

261.    Instead of fulfilling those duties, these Defendants became a shield for lawless State and federal agencies, refusing to intervene even when presented with detailed, multi-year documentation of discrimination, medical denial, Medicaid concealment, targeting of a vulnerable adult, procedural abuse, and interstate fraud schemes harming Prosecutor Ex Rel / Plaintiff across two states.

262.    Defendant DISABILITY RIGHTS SOUTH DAKOTA ("DRSD") (#101), though funded by Congress to investigate abuse, neglect, discrimination, financial exploitation, and ADA retaliation, repeatedly refused to review evidence, open a case, or provide mandatory advocacy in response to detailed submissions describing denial of Medicaid, Medicaid Fraud, termination of essential services, coerced contracts by medical corporations, transportation blocks, financial abuse of a vulnerable adult, and retaliation by DSS/DHS personnel.

263.    DRSD's conduct was not a mere oversight or capacity issue; it fit a consistent pattern of Biden Administration dictated DEI-based discriminatory screening that punished Anglo-American disabled males seeking protection while selectively assisting favored categories of clients. By failing to intervene despite years of statutory notice, DRSD became an active enabler of the deprivation-of-rights enterprise, allowing State actors to continue their misconduct unchecked.

264.    Defendant NATIONAL DISABILITY RIGHTS NETWORK ("NDRN") (#102), which holds federal authority to audit, correct, discipline, and override State Protection & Advocacy (P&A) failures, likewise ignored hundreds of pages of whistleblower-level evidence, multiple detailed submissions, recorded calls, and statutory citations.

265.    NDRN had declined to request evidence, declined to investigate, and declined to require

56

P&A branch franchisees' compliance since 2019-2020. This abdication did not merely *"fail to protect"* Prosecutor Ex Rel / Plaintiff; it perpetuated the harm, confirming to State and federal actors alike that no external oversight would intervene regardless of how egregious the violations became. The result was a closed-loop system where civil-rights enforcement existed only on paper, while in practice, it functioned as camouflage for discrimination, retaliation, and medical deprivation.

266.    NDRN's failure was not an isolated incident but the continuation of a pattern originating in Michigan. During the years following Prosecutor Ex Rel / Plaintiff's catastrophic amputations in 2018, when he was medically frail, severely disabled, and seeking life-sustaining advocacy, Michigan's P&A program – then operating under leadership that has been subsequently running NDRN – refused to investigate, refused to provide representation, and refused to intervene in State-level abuse and discrimination.

267.    Despite extensive evidence, detailed requests, recorded calls, and statutory obligations identical to those governing DRSD, Michigan's P&A acted as a gatekeeper preventing disabled individuals from accessing lawful remedies. When the same leadership later oversaw NDRN, this organizational culture of exclusion simply migrated to a national stage.

268.    The continuity of misconduct between Michigan's MPAS/DRM and NDRN system and South Dakota's DRSD under NDRN's national leadership demonstrates that the deprivation-of-rights enterprise was not confined to one State but reflected a national structural failure. Across both jurisdictions, disability-rights agencies funded by Congress systematically ignored statutory duties, failed to protect disabled citizens, and allowed agencies receiving federal money to retain those funds while denying legally guaranteed services.

269.    This nationwide pattern of Protection and Advocacy non-enforcement parallels the broader expenditure-stream abuses underlying this Complaint: federal benefits flow outward, but the oversight designed to ensure constitutional compliance has been hollowed out by politically filtered, BAR-aligned leadership.

270.    The same dual-track deception that allowed DSS and DHS to hide South Dakota's Medicaid-umbrella structure also appeared in Michigan, where agencies misclassified income, misrepresented eligibility, and fabricated *"over-payments"* to justify administrative punishment.

271.    In one such instance, Michigan State actors used a proven fraudulent administrative determination to subsequently defraud the U.S. Treasury by seizing a tax refund belonging to Prosecutor Ex Rel / Plaintiff's ex-wife with a lifetime documented disability – three years after their divorce – under a theory that benefits paid to the Prosecutor Ex Rel / Plaintiff were recoverable from an unrelated third party merely because she maintained the same last name after the divorce and declined to succumb to the State of Michigan's DHS demands for her banking information before stealing those funds from the U.S. Treasury using her name.

272.    Federal agencies and BAR-regulated attorneys at every level refused to correct any of

this fraud, refused to investigate any of it, and refused to acknowledge any of it, further demonstrating the permeation of the enterprise across State lines and federal oversight channels.

273.    At both the national and State levels, the disability-rights organizations were constructed as a protective layer between vulnerable citizens and abusive agencies. Instead, they became revenue streams from the federal Taxpayers through False Claims about legislated federal programs that controlled barriers under the guise of remedies.

274.    Their failures also enabled DSS, DHS, SSA, CMS, Treasury, IRS, and local administrative actors to continue discriminatory practices while reporting compliance to Washington. In effect, the P&A system allowed States to present one face to federal auditors – claiming oversight, participation, and compliance – while presenting another face to Prosecutor Ex Rel / Plaintiff and others similarly situated: one of denial, dismissal, discrimination, and abandonment.

275.    Defendant STATE BAR OF SOUTH DAKOTA (#103), operating as the disciplinary and licensing authority over every attorney embedded across the State's judicial and administrative structure, played a critical role in preserving this deprivation-of-rights enterprise. The State Bar's members appeared at every point where legal protection or accountability should have occurred – DSS counsel, DHS counsel, DPLS attorneys, SAAGs, municipal prosecutors, county attorneys, MHNI corporate counsel, ABC credentialing lawyers, and court staff acting as *"officers of the court."* Each time, their response was the same: concealment of misconduct, destruction or alteration of records, denial of statutory rights, recaptioning of filings, misuse of administrative hearings, and uniform refusal to investigate or address crimes reported by Prosecutor Ex Rel / Plaintiff. This institutional non-accountability reveals the State Bar's role as an enforcement hub ensuring that no legal remedy, no statutory protection, and no judicial oversight would reach the Prosecutor Ex Rel / Plaintiff.

276.    The misconduct of the State Bar cannot be divorced from that of Defendant AMERICAN BAR ASSOCIATION (#104), the national accreditor and policy-setter whose ideological and structural frameworks shape every State Bar and every law school. The ABA built the architecture that enabled both Michigan and South Dakota to maintain identical patterns of attorney-shielding and judicial impunity – despite different actors, different agencies, and different events.

277.    Through its monopolistic control over accreditation, judicial training, disciplinary norms, DEI-screening standards, and political gatekeeping, the ABA created the conditions under which State and federal judges, clerks, prosecutors, agency counsel, and legal-aid lawyers uniformly refused representation, rejected evidence, and insulated each other from accountability. What occurred in this case is not local misconduct but the predictable output of a statewide and nationwide legal monopolies.

278.    The convergence of these entities – DRSD, NDRN, STATE BAR OF SOUTH DAKOTA, and the ABA – forms a specialized substructure of the enterprise: the enforcement-avoidance

mechanism. These Defendants did not directly deny Medicaid, fabricate *Yardi* records, falsify income classifications, or manipulate Treasury deductions. Instead, they ensured that when Prosecutor Ex Rel / Plaintiff sought to expose these unlawful acts, no legal advocate, no investigative body, no regulatory office, and no judicial tribunal would intervene. Their silence and non-action were not neutral; they were the essential condition that allowed State and federal agencies to escalate deprivation, retaliation, and fraud with impunity.

279.    Together, Defendants 101–104 transformed the very institutions designed to protect civil rights into a defensive shield for government misconduct. By refusing to act in Michigan and South Dakota, by ignoring whistleblower submissions, by failing to discipline attorneys, and by promulgating national policies that suppress dissent and eliminate independent representation, these entities ensured that Prosecutor Ex Rel / Plaintiff – like countless similarly situated individuals – would be deprived of the statutory protections Congress enacted for him.

280.    Their conduct materially contributed to the violations underlying the RICO, §1983, §1985(3), ADA, Rehabilitation Act, False Claims Act, due-process, equal-protection, and federal-program-fraud Counts set forth in Appendix A-1 and incorporated herein by reference.

## F. Federal and State High-Level Principals, Presidential Cabinet Officers, OIG Officials, and Forgiveness-List Actors *(*Defendant Nos. 17–28, 36–61, 65)

259.    Prosecutor Ex Rel / Plaintiff includes and incorporates paragraphs 1 – 258 above as if repeated herein verbatim. The following section of these ongoing proven facts pertain to Defendants numbered as Defendant Nos. 17–28, 36–61, 65 as depicted further details in Appendices A, A-1, A-2, A-3, B, C, D, E-1, E-2, F and G.

260.    This cluster of Defendants represents the upper tier of the same deprivation-of-rights enterprise already documented elsewhere in the Memorandum (Appendix A): an intertwined federal apparatus made up of enforcement agencies, oversight bodies, and judicial institutions that were all on notice for years yet chose to ratify, perpetuate, and expand the harm instead of correcting it.

261.    Where earlier sections focused on frontline program administrators, local actors, and State-level BAR networks, this portion of the roster identifies the federal decision-makers, institutional *"fictions,"* and judicial gatekeepers who had the power, the duty, and the statutory authority to stop what was happening -- but instead either actively participated in it or stood by in knowing silence while it spread across jurisdictions and programs.

262.    At the enforcement core of that structure is the U.S. DEPARTMENT OF JUSTICE ("USDOJ" - Def. #53) and its civil-rights subdivisions, including the OFFICE FOR CIVIL RIGHTS ("USDOJ OCR" – Def. #54), which are supposed to function as backstops when agencies like HUD, SSA, DHHS, CMS, TREASURY, and the IRS violate the law or weaponize

59

administrative power.

263.    In practice, as documented in the Memorandum (Appendix A), USDOJ and USDOJ OCR did the opposite: they ignored detailed, evidence-backed submissions; refused to investigate discrimination, retaliation, disability violations, and federal-program fraud; and allowed a pattern of administrative abuse to harden into a standing operating procedure.

264.    Their steadfast non-response, year after year, did not arise from a lack of knowledge but from a deliberate, discriminatory, institutional choice to leave vulnerable individuals without enforcement, while continuing to draw federal appropriations earmarked for *"civil-rights protection," "fraud prevention,"* and *"crime victims' rights"* enforcement relief and restitution.

265.    The FEDERAL BUREAU OF INVESTIGATION ("FBI"-#56), together with its Director Kash Patel (#55), occupies a parallel enforcement role. FBI is billed to the public as the premier investigative body for federal crimes, civil-rights violations, and serious fraud, including fraud involving federal housing, Medicaid, Social Security, and tax systems.

266.    Yet in this case, over more than two decades, the FBI's operational response to whistleblower-level evidence was consistently to do nothing: no case numbers that led anywhere, no meaningful interviews, no investigation, no referral, and no protection of crime victims. The Bureau repeatedly refused to take or record complaints, brushed aside documentary proof, and allowed coordinated misconduct by HUD, SSA, DHHS, CMS, TREASURY, IRS, and State-based actors to continue uninterrupted. It also repeatedly refused to fulfill FOIA requests for documents.

267.    That pattern is not an accident; it is the federal enforcement side of the same enterprise, enforced by omission and by a carefully maintained culture of selective enforcement.

268.    Layered on top of this enforcement failure is a judicial obstruction system operating through the UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH DAKOTA ("USDC-SD"- Def. #60), the UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT ("8TH CIRCUIT"- Def. #61), and the individual judicial and clerical actors who administer those institutions.

269.    Judges Roberto A. Lange (#57) and Lawrence L. Piersol (#58), in both their individual and official capacities, together with Clerk of Court Matthew Thelen (#59), did not merely *"rule against"* the Prosecutor Ex Rel / Plaintiff in the ordinary sense; they used docket control, service irregularities, fabricated or misdirected *"Judgments,"* and clerk-level gatekeeping to prevent the case from ever being lawfully joined, heard, or adjudicated on the merits.

270.    Filings were blocked, misrouted, or buried; appeals were dismissed without addressing glaring jurisdictional and procedural defects; and a fraudulent Piersol *"Judgment"* referencing a non-party insurance company was allowed to stand uncorrected and unexamined. The Eighth Circuit then ratified that fraud by dismissing the appeal without confronting the absence of

60

service, the lack of adversarial process, or the fabricated insurance reference, thereby institutionalizing the obstruction and closing off appellate remedy.

271.    This pattern in South Dakota is not isolated. It matches and extends the Michigan-era experiences already set forth in the Appendix A (Memorandum), where both State and Federal courts controlled by STATE BAR members in the Eastern District of Michigan and the Sixth Circuit Court of Appeals similarly blocked access to grand-jury processes, ignored or mischaracterized filings naming federal judges and officials, and shut down attempts to expose nationwide program abuses.

272.    The interstate continuity – Michigan to South Dakota, Sixth Circuit to Eighth Circuit – shows that what is at stake is not a local *"bad judge"* or a single bad clerk, but a recurring judicial shield over federal agencies and their BAR-managed State partners. The enterprise depends on courts refusing to accept, process, or honestly adjudicate evidence of federal misconduct; otherwise, the entire architecture of fraud, retaliation, and deprivation would collapse under its own illegality.

273.    Within this same upper tier, Kristi Noem is included because she now sits at the supervisory hinge point between State-level misconduct and the nationalized federal apparatus. As former Governor of South Dakota, she exercised ultimate executive authority over DSS, DHS, their appointed Secretaries, and their embedded Special Assistant Attorneys General (SAAGs), including those who directly executed and defended the abusive Medicaid, disability, and crime-victim practices described in the Appendix A Memorandum.

274.    For more than three full years, Noem's office received detailed written complaints, statutory citations, evidentiary documentation, and direct notice that DSS and DHS were violating federal law, weaponizing SAAG authority, and using procedural attrition to exhaust and silence the Prosecutor Ex Rel / Plaintiff. Noem had the constitutional and statutory obligation to investigate, to order compliance, and to correct agency behavior. Instead, she did nothing – no investigation, no corrective policy, no enforcement – thereby providing supervisory ratification of the very enterprise these Counts describe.

275.    Noem's role does not end at the Statehouse door. Through her elevation and federal positioning within the U.S. DEPARTMENT OF HOMELAND SECURITY ("DHS") framework, she now operates – according to the service structure identified in this action – inside the same federal enforcement and oversight matrix that coordinates cross-agency policy on *"fraud,"* *"benefits,"* and *"security."* The same Governor's office that once ignored detailed notices about DSS/DHS misconduct, Medicaid denials, and SAAG-led suppression of complaints now participates in a national environment that repackages those same patterns as *"program integrity"* or *"fraud control."* Again, it's the *"fox guarding the hen-house"*.

276.    This gives Noem a dual character inside the enterprise: first as the State executive who allowed the abuses to take root and flourish, and second as a federal-level actor whose silence and inherited loyalties help protect those abuses from scrutiny, even as they are exported and

61

normalized as national templates.

277.    That pattern follows the transition of the MDHHS Director, Robert Gordon under the Michigan's Gov. Gretchen Whitmer, as he transitioned to the incoming Biden Administration's federal HHS leadership, uniquely enabling him to target and quash Prosecutor Ex Rel / Plaintiff's persisting whistleblower complaints at the federal even after a national regime change.

278.    The DOJ–FBI–federal-courts–Noem axis therefore forms one continuous chain. DOJ and DOJ OCR refuse to investigate or enforce civil-rights protections and fraud laws against agencies and State partners who are plainly on notice. The FBI refuses to investigate, document, or pursue the resulting crimes, including those occurring in housing, Medicaid, Social Security, and tax enforcement. Federal courts and their clerks then close the last lawful doors by blocking filings, engineering procedural dismissals, and ratifying fraudulent judgments designed to ensure that no evidentiary hearing ever occurs.

279.    At the same time, supervisory officials like Noem (and Gordon in Michigan), who were fully informed and had a clear duty to intervene, instead provide continuing cover through deliberate non-action, political indifference, and continued reliance on SAAG and BAR structures that weaponize procedure against the complainant.

280.    All of this is intertwined with the deeper constitutional issue already outlined in Appendix E-2: the long-running administrative distortion of the term *"income"* under the Sixteenth Amendment and its deployment as a jurisdictional weapon against sovereign individuals.

281.    Treasury, IRS, SSA, DHHS, CMS, and their State and federal partners have quietly converted *"incomes, from whatever source derived"* into a catch-all category that captures private labor, disability benefits, housing assistance, and ordinary human productivity – then used that distortion to justify unauthorized deductions, denials, and classifications under the guise of *"taxpayer"* status, *"eligibility,"* or *"benefit coordination."*

282.    DOJ, DOJ OCR, FBI, the federal courts, and supervisory officials like Noem were all in positions where they could have questioned, corrected, or at least examined those unconstitutional misapplications. Instead, they each played their part in preserving them – whether through silence, refusal to investigate, procedural obstruction, or overt ratification of obviously defective outcomes.

283.    By the time the Prosecutor Ex Rel / Plaintiff's case reached the posture described in the Memorandum, these Defendants – 53 through 61 and 65, together with their related institutional fictions – had already demonstrated an unbroken record of choosing institutional self-protection over law, policy convenience over rights, and political loyalty over constitutional duty. Their liability in this action does not rest on a single act, but on sustained patterns of omission, deception, and obstruction that, when combined, form the federal-level backbone of the deprivation-of-rights enterprise.

284.    The failures of these federal Defendants cannot be understood in isolation. They exist within a national administrative architecture where federal spending streams – HUD LIHTC, Section-8, Medicaid/MSP, SSA disability, Medicare Part B, and IRS/Treasury tax-withholding systems – depend upon accurate reporting, lawful classifications, and genuine civil-rights oversight.

285.    Instead, as shown through Appendix A, C, and A-1, these systems were weaponized against Prosecutor Ex Rel / Plaintiff, becoming tools of coercion, retaliation, and paper-trail manipulation. Each federal Defendant named in this section inherited, continued, or ratified those unlawful systems, thereby contributing to the broader deprivation-of-rights enterprise.

286.    This enterprise did not begin in South Dakota. It followed Prosecutor Ex Rel / Plaintiff from Michigan, where federal and state actors jointly used misclassifications, false *"income"* assumptions, administrative recaptioning, and intimidation-by-paperwork to obstruct access to courts, deny jury trials, and suppress statutory rights. Those same mechanisms reappeared nearly verbatim in South Dakota: denials of life-sustaining federal an/or state funded benefits, mislabeling of benefits, automated Treasury seizures, suppression of criminal complaints, clerical obstruction, and retaliatory non-responses. Such geographic continuity proves that the misconduct here is not local or accidental – it is the expression of national administrative practices that federal Defendants failed to correct.

287.    A central nationwide mechanism enabling this misconduct is the unconstitutional administrative expansion of the term *"income"* under the Sixteenth Amendment. Federal agencies, under DOJ's uncorrected interpretations, treated private labor and personal productive capacity – particularly of disabled Americans – as taxable *"income,"* thereby fabricating jurisdiction to seize SSA benefits, trigger Medicare premium deductions, and justify Medicaid-denial narratives. By failing to correct this distortion, federal Defendants allowed Treasury, SSA, DHHS, CMS, and State agencies to impose unauthorized burdens on Prosecutor Ex Rel / Plaintiff for the better part of this past decade since his losing parts of all four of his major limbs to surgical amputations, and with the Sepsis disease damaging virtually every organ in his body. Their inaction ratified a nationwide administrative fiction that harmed him materially and repeatedly.

288.    This misapplication was not theoretical. Between 2020 and 2021, the U.S. Treasury automatically siphoned Social Security disability benefits before they ever reached Prosecutor Ex Rel / Plaintiff, all during the period when federal and state governments were effectively non-functioning due to the COVID shutdown. When Prosecutor Ex Rel / Plaintiff sought investigation or reimbursement, both Michigan and South Dakota refused assistance, while federal agencies of SSA, Treasury, DHHS, CMS, FBI, USDOJ and their respective OCRs – despite receiving hundreds of pages of notice – ignored their own duties. These deductions occurred without lawful consent, clear statutory basis, or meaningful review, illustrating federal Defendants' supervisory indifference to unlawful financial deprivation of a disabled beneficiary.

63

289.    The same concealment pattern resurfaced when South Dakota began issuing contradictory Medicaid notices – including the unsigned, non-postmarked 11/17/25 letter pretending that Medicaid had long existed and was now being revoked. Yet evidence in Appendix A and other evidence linked by reference therein and herein proves that Medicaid had been denied for years, while DSS and DHS suppressed the truth: the *"Medicaid umbrella"* contained MSP, Extra Help, LTSS and HOPE waiver programs that were never disclosed.

290.    Federal Defendants – HUD, HHS, CMS, SSA, DOJ, OCR, and OIG offices (and even the congressional offices of John Thune, Dusty Johnson, Mike Rounds, and more like Jim Jordan and Harriett Hageman as members of the Select Subcommittee on the Weaponization of the Federal Government) – received detailed whistleblower submissions but took no corrective action, enabling the State's fraudulent two-book accounting system to flourish.

291.    The seventy-minute recorded conversation with State Medicaid agents – Kelli and Hosman – exposed the deception. They admitted MSP payments were being made while Medicaid coverage was simultaneously denied, confirming that South Dakota was drawing federal funds for a fictional classification while depriving Prosecutor Ex Rel / Plaintiff of actual medical access, prosthetic services, transportation, and LTSS supports. Federal Defendants, who have jurisdiction over Medicaid-matching arrangements and program integrity, ignored this evidence despite receiving copies of the recordings, timelines, and statutory citations. Their silence constitutes ratification, misprision of felony, perjury of oath, and supervisory dereliction.

292.    This same duplicity is reflected in the federal Defendants' tolerance of two parallel narratives: one reported to Washington to justify funding, and the other used to deny care to the disabled beneficiary. In their federal reports, State actors claimed Medicaid participation, compliance, and service delivery; in practice, they delivered none. These federal Defendants possessed the authority – and the legal obligation – to investigate discrepancies, audit State reporting, and correct fraud. Instead, their collective inaction allowed falsified paperwork, retaliatory denials, and discriminatory withholding of medical services to continue unchecked.

293.    Defendant Kristi Noem (#65), though now a federal cabinet official, contributed to this enterprise by leaving South Dakota's agencies in a condition of systemic corruption, knowing full well from direct notice that DSS and DHS were misclassifying benefits, retaliating against disabled residents, obstructing crime-victim complaints, and concealing Medicaid-umbrella structures. Her failure to correct these unlawful systems, despite repeated opportunities, allowed the same misconduct to migrate into the federal sphere upon her appointment to the U.S. Department of Homeland Security. Her supervisory neglect directly intersects with the federal failures of Defendants 53–61.

294.    The federal Defendants' refusal to act – even when presented with hundreds of pages of linked exhibits, statutory authorities, recorded calls, medical denials, eviction threats, financial exploitation evidence, and constitutional-violation documentation – confirms a national pattern of administrative attrition. Instead of intervening, they placed Prosecutor Ex Rel / Plaintiff into an endless loop: State actors blamed the federal government; federal actors blamed the State; and no

one with authority exercised it. This closed-loop evasion forms a core element of the RICO and conspiracy structure described in Appendix A-1.

295.    Together, Defendants 53–61 and 65 constitute the federal executive and judicial branch component of the deprivation-of-rights enterprise: the supervisory tier that was fully informed, fully empowered to act, and yet uniformly non-responsive. Their silence, omissions, failures to investigate, and refusal to correct known abuses transformed inherited problems into ongoing constitutional injuries, and transformed local misconduct into a national system of fraud, retaliation, and civil-rights deprivation. Their liability arises not from isolated "*bad acts,*" but from their collective ratification of unlawful practices that harmed Prosecutor Ex Rel / Plaintiff across two states and more than twenty years.

296.    Certain federal Defendants listed in Appendix D appear on the Prosecutor Ex Rel / Plaintiff's "*Forgiveness List.*" Their inclusion in this section does not arise from direct predatory acts but from supervisory failures, omissions, or institutional dereliction that enabled State and federal agencies to inflict the harms documented throughout this Complaint. These Defendants received notice, possessed the legal authority to intervene, and yet failed to act; however, their roles within current federal structures uniquely position them to assist in correcting the systemic defects identified in this action.

297.    The criteria for the Forgiveness List include: (a) no personal participation in threats, retaliation, or discriminatory acts; (b) a demonstrated capacity to initiate structural correction; (c) legal jurisdiction over corrupted federal–state program architecture; and (d) the potential to serve as part of a "*Constitutional Restoration Team*" capable of restoring lawful definitions, making recommendations to Congress, dismantling discriminatory administrative schemes, and reforming the federal oversight failures that allowed these harms to propagate across, arguably, at least the states of Michigan, Wisconsin, and South Dakota, and quite likely also Wyoming and Montana. Liability for those co-Defendants on the "*Forgiveness List*" is therefore limited to declaratory relief, injunctive oversight duties, and prospective correction, not punitive damages or personal sanctions.

298.    These individuals, though named as Defendants, are also the parties best situated to repair the unconstitutional expansion of "*income,*" the misuse of Treasury/SSA withholding mechanisms, the Medicaid-umbrella concealment, the obstruction of civil-rights investigations, and the systemic denial of access to federal courts and independent grand juries. By acknowledging their authority and inviting them into a lawful correction role, this instant Complaint presents a path toward remediation that is consistent with both *Ex parte Young* and Congress's Spending Clause oversight framework.

299.    Thus, the inclusion of *Forgiveness List* Defendants in this section reflects not hostility but necessity. Their prior inaction injured the Prosecutor Ex Rel / Plaintiff, but their present authority can restore constitutional boundaries, repair administrative abuses, enforce statutory protections, and dismantle the deprivation-of-rights enterprise. Their designation signals Prosecutor Ex Rel / Plaintiff's willingness to pursue accountability hand-in-hand with restoration, thereby

transforming institutional failure into a mechanism of national correction.

### G. Judicial Officers, Clerks, and Court Administrative Actors; and DOE Defendants #1-75
Defendant Nos. 57–61, 62, 71–83, 62 (State of South Dakota), and #106 (United States of America)

314.    The structural misconduct documented in this Complaint cannot be understood as a local dispute or as the misbehavior of a few officials. It exists within a national framework in which BAR-controlled courts, BAR-controlled prosecutors, BAR-controlled clerks, and BAR-controlled disciplinary bodies exercise functional power over every gateway to justice. Within that system, institutional actors decide who receives protection, who receives retaliation, and who is permitted to bring wrongdoing into public view.

315.    This architecture produced the conditions under which the Prosecutor Ex Rel was targeted, silenced, medically endangered, and denied lawful redress across multiple states and more than two decades.

316.    The same structural features that shielded misconduct in Michigan and South Dakota are now visible to the entire nation through the high-profile targeting of former (and current) President Donald J. Trump, whose post-presidential first years exposed the public to the same BAR-driven judicial machinery long used against non-public individuals.

317.    National audiences witnessed coordinated, parallel prosecutions launched across multiple jurisdictions by BAR-licensed prosecutors; indictments issued without evidentiary hearings or adversarial testing; judicial assignments that consolidated politically aligned judges over the proceedings; civil *"fraud"* trials where no victims or losses were identified yet sweeping penalties were imposed; procedural gag orders restricting lawful speech; unprecedented equitable remedies such as dissolutions of businesses without jury findings; and appellate reviews that accelerated or delayed scheduling not based on law but on strategic electoral timing.

318.    These events demonstrated for the public the existence of a judicial-administrative apparatus operated by BAR members capable of manufacturing outcomes, controlling narrative exposure, and weaponizing statutory process, mirroring the same mechanisms that operated against the Prosecutor Ex Rel / Plaintiff outside the public spotlight for more than two decades.

319.    Although the scale and public visibility differ, the mechanics are identical: procedural attrition, selective prosecution, judge-shopping, docket manipulation, weaponized ethics complaints, and a judiciary insulated by private guild discipline rather than constitutional accountability. The public has only recently begun to grasp what the Prosecutor Ex Rel / Plaintiff endured privately for years – a justice system that behaves as a political instrument rather than a neutral arbiter.

320.    This pattern is not theoretical. It manifested in the warnings delivered to Prosecutor Ex Rel / Plaintiff from a federal whistleblower-turned-forensics specialist, Susan Rydberg, who uncovered a RICO-scale, antitrust-level enterprise within SUPERVALU's massive mega-billion dollar Wall Street financed corporate structure, that included partnership businesses tracked by the FBI and prosecuted by the USDOJ as connected to international terrorism financing networks perpetrated by a national crime syndicate of manufacturer coupon fraud.

321.    The written warning by Susan Rydberg – included as evidence sent to Congress' House Select Subcommittee on the Weaponization of the Federal Government shown in this case within Appendix F incorporated herein – was delivered at the end of March 2018, just three (3) days before the Prosecutor Ex Rel / Plaintiff suffered a life-threatening biological attack requiring emergency hospitalization and resulting in his near death and his total and permanent future lifetime of disability as a quad-amputee.

322.    Perhaps the factual basis for the warning and the aftermath of the near-death experience and life-changing amputation and permanent lifetime medical needs results have something to do with the seven or so formal whistleblower notices Prosecutor Ex Rel / Plaintiff sent to federal leadership in the months prior to that near death experience. Those written notices were all sent to the U.S. Attorney Generals Loretta Lynch and Jeff Sessions, as well as to the FBI, the two U.S. Presidents (Obama and Trump), and many more; in which no investigation whatsoever was initiated, mirroring the same federal indifference documented throughout this Complaint.

323.    Parallel patterns have long appeared in the now nearing twenty (20) years of ordeals perpetrated against Rev. Jason Goodwill, who remains paralyzed after well over fifteen years of state-sponsored prosecutorial and judicial retaliation, perpetrated without a grand-jury indictment, without a jury trial, or any lawful adjudication. His case, like that of the Prosecutor Ex Rel, shows how "*dirty cops*" and their partnering BAR-dominated prosecutors and judges can suspend constitutional protections indefinitely while maintaining the outward appearance of legality, after a simple computer repair operation resulted in his stumbling upon a conspiracy inside the Sheboygan, Wisconsin police department, to rid the city of its first Hispanic Mayor by the intent to frame the mayor's young son for a crime.

324.    The story – originating from the very same Eastern District of Wisconsin noted for the prosecutorial and judicial events associated with the independently produced television series, "*Making a Murderer*" distributed by Netflix – has been recorded in a two-part documentary, as told by Rev. Goodwill himself in 2016 just before another seven (7) years of retaliatory false incarceration was carried out in Wisconsin at a non-governmental facility. This is a place that Rev. Goodwill describes as a private and corporately owned and managed "*detention*" facility – "*an American 'POW Camp*'" – where even his citizenship was stripped away along with all of his constitutional guarantees to due process.

325.    The two part recorded testimonial videos depicting Goodwill's story background are provide both immediately below and in Appendix A-3, where the links appear along with another horror story still unfolding in Florida with another Christian community leader, Reverend Cindy

67

Falco DiCorrado.

**https://www.youtube.com/watch?v=UQW5k-0d8UA**
and
**https://www.youtube.com/watch?v=3gFrJnXm0A8**

326.    The links to Rev. Goodwill's 2-part testimonial documentary with the evidence embedded in the video timeline – as provided by Rev. Goodwill, for viewing by American public audiences – was produced and edited by Prosecutor Ex Rel / Plaintiff in his *"Office of the Citizen"* role working as an investigative journalist, combining that role with that of a professional educator.

327.    Similar deprivation patterns are seen in Florida through the targeting of elderly civil rights advocate, Cindy Falco DiCorrado, demonstrating that these abuses recur wherever unchecked judicial guild power intersects with vulnerable individuals who expose corruption.

328.    Together, these macrocosmic (targeting of Donald J. Trump) and microcosmic examples reveal the same concealed machinery: a national system in which private guild actors wield public power without public accountability. The Prosecutor Ex Rel / Plaintiff's case is therefore, not an isolated grievance but a detailed forensic map of how the American justice system has been weaponized against whistleblowers, disabled individuals, political dissidents, and ordinary citizens.

329.    This Complaint then, presents all those findings to the federal judiciary and to the sovereign People so that what was hidden in private can now be scrutinized in public, where constitutional correction becomes possible.

330.    The judicial misconduct documented herein does not arise from isolated errors or misunderstandings but from a coordinated pattern spanning multiple jurisdictions, decades of litigation, and the same recurring clusters of judicial and clerical actors. Federal judges including Lawrence Piersol and Roberto Lange, acting in tandem with Clerk of Court Matthew Thelen and later ratified by the Eighth Circuit, played indispensable roles in constructing procedural barriers, sealing pathways to review, manipulating filings, and extinguishing statutory remedies before they could be heard. These actions mirror earlier misconduct by Michigan federal judges and clerks, revealing a long and uninterrupted continuum of judicial obstruction, retaliation, and suppression.

331.    In South Dakota's federal courts, the pattern followed the same formula observed in Michigan: the blocking of filings raising constitutional issues, the refusal to serve defendants, the issuance of fraudulent or procedurally void orders, and the protection of agency misconduct through judicial silence or pretextual dismissals. Judges Piersol and Lange issued rulings that ignored statutory requirements, mischaracterized filings, erased evidence of wrongdoing, and prevented access to the grand jury or any meaningful judicial inquiry. Their supervisory duties – particularly Lange's administrative authority – required intervention, correction, and oversight. Instead, they allowed the deprivation-of-rights enterprise to operate unchallenged.

332.    This federal-level pattern then merged seamlessly with the State-level judicial machinery, where Circuit Court Judge Eric Strawn, Magistrate/Clerk Carol Latuseck, Supreme Court Clerk Shirley Jameson-Fergel, and Chief Justice Steven Jensen each played roles in extending the administrative fraud into the judicial domain. Strawn's unlawful "*hearing*" was more of a "*setup*" using Latuseck's fabricated case caption and altered filings. Jameson-Fergel's fraudulently padded docket, and Jensen's refusal to correct any part of the record collectively formed the State judicial branch's contribution to the enterprise.

333.    Each of these actors used their positions to ratify simulated legal proceedings originating inside DSS, DHS, and the Bureau of Administration.

334.    The recurrence of identical obstruction techniques – case recaptioning, suppression of filings, docket manipulation, falsification of judicial records, refusal to hear evidence, and summary dismissals without addressing substance – demonstrates that these judges and clerks were not acting independently. Rather, they operated within a unified system that views constitutional petitioners, whistleblowers, and disabled complainants as disruptions to be neutralized rather than rights-holders to be protected.

335.    This continuity between federal and State judicial actors, and between Michigan and South Dakota proceedings, establishes an interstate pattern of conduct that satisfies the elements of conspiracy, coordination, and enterprise under RICO, §1983, and §1985(3).

336.    The actions of these judicial officers also must be evaluated in light of the hidden commercial structures governing modern government liability. Each of these courts – federal and State – operates under commercial surety bonds, blanket liability coverage, and enterprise-fund structures in which judicial outcomes directly affect financial exposure. The reluctance or refusal to hear cases involving State misconduct, fraud, or constitutional violations reflects not judicial impartiality but commercial self-protection. Judicial actors avoided factual findings because such findings would trigger liability, open the door to claims against sureties, and create precedents exposing systemic wrongdoing across agencies.

337.    This commercial liability context is further evidenced by the involvement of the South Dakota Public Assurance Alliance (SDPAA), a privately controlled but publicly funded insurance consortium that manages risk for State agencies, courts, and officials. By controlling which claims are acknowledged, which records are preserved, and which cases proceed, SDPAA effectively positions itself as a shadow government, determining outcomes and suppressing exposure. Judicial actors insulated by SDPAA protection have financial and institutional incentives to avoid adjudication of constitutional claims, to conceal agency fraud, and to eliminate whistleblower-level evidence before it can reach a jury.

338.    At the State administrative level, the SAAG network – including Jeremy Lippert, Jenna Howell, Wade Reimers, Bob Morris, Catherine Williamson, Eric Monson, and others – served as the operational arm ensuring that judicial review never occurred. Monson's sham hearing,

69

Reimers' enforcement of predetermined outcomes, Williamson's mutilation of filings, Howell's retaliatory termination of essential services, Bollinger's supervisory silence, and Morris' fraudulent judicial record creation formed a seamless pipeline from administrative fraud to judicial rubber-stamp. These actors coordinated across departments, manipulating records, obstructing evidence, and using simulated legal process to eliminate the Prosecutor Ex Rel / Plaintiff's statutorily and constitutionally guaranteed rights.

339.    This pipeline was then legitimized through the participation of State judicial officers who transformed administrative abuse into judicial doctrine. By accepting fabricated captions, suppressing motions, ignoring ADA Title II rights, and dismissing filings without analysis, clerks and judges became co-conspirators in a deprivation-of-rights enterprise. The STATE, as sovereign Defendant #62, is therefore liable for the actions of its officers and for its failure to supervise, investigate, or correct the misconduct reported over multiple years and through multiple formal channels.

340.    DOE Defendants #1--75 represent the unidentified personnel whose actions materially contributed to the deprivation-of-rights enterprise documented herein. Many of these actors are not truly unknown at all – their roles, functions, internal communications, and participation were already exposed in the two South Dakota cases:

> (1) the case the Prosecutor Ex Rel actually filed (naming over a dozen STATE actors), which the UNIFIED JUDICIAL SYSTEM unlawfully refused to acknowledge until Chief Justice Jensen finally referenced it only for the purpose of summarily dismissing it; and

> (2) the fraudulent administrative-appeal fiction created by SAAG Morris and Magistrate-Clerk Latuseck (*"Schied v. DSS"*), which was preserved as the only surviving case via docket manipulation.

341.    The same pattern occurred years earlier in federal court when Judge Piersol dismissed the Plaintiff's federal action by fraud without serving 50+ fully identified federal and state defendants, then fabricated service and entered a void judgment. These represent two longstanding, backward-looking access-to-court claims that remain viable and unresolved, and whose participants may later be called as witnesses or re-named formally in this action after jurisdiction is secure.

342.    Other DOE Defendants include individuals whose names have not yet surfaced but whose participation is evidenced through documentary indicators: JT personnel who manipulated docket entries or blocked uploads; administrative supervisors issuing directives such as *"we were instructed," "the judge wants it routed differently,"* or *"compliance said this must be done"*; clerical workers who intercepted filings or withheld notices; agency personnel who issued contradictory or anonymous denials; and unidentified actors within DSS, DHS, BOA/BHRA, the UJS, and federal agencies who carried out retaliatory or obstructive actions without signing their names.

70

343.    These DOE Defendants will be identified through discovery tools including subpoenas to state and federal servers, email-header forensics, credential-log audits, ECF/UJS access logs, deposition of supervisory officials, and cross-referencing of timestamps against withheld or altered filings. Their conduct forms part of the broader enterprise of administrative-judicial obstruction, and the Complaint reserves the right to amend once identities are confirmed.

344.    The factual record set forth in this section establishes that the harms suffered by the Prosecutor Ex Rel were not isolated administrative errors but the product of a coordinated, multi-layer structure spanning agencies, courts, BAR institutions, and sovereign actors. With the mechanics of that enterprise now fully documented. The Complaint now turns from fact-finding to the legal and commercial implications of those facts, including the duties triggered under constitutional guarantees, federal statutes, Spending Clause conditions, and the commercial liability architecture governing public officers, sureties, and enterprise funds.

345.    What follows, therefore, addresses the legal consequences that flow from the misconduct proven above: the sovereign claims, the commercial obligations, the disclosure and surety requirements, the citizen's-arrest-on-paper doctrine, and the remedies necessary to restore constitutional order.

## CLAIMS AGAINST THE SOVEREIGN:
## STATE OF SOUTH DAKOTA AND THE UNITED STATES OF AMERICA

346.    The United States of America, as Defendant #106, bears responsibility not only for the failures of federal officers involved in this case but as *guarantor* of federal program integrity across SSA, CMS, HHS, HUD, the Department of Justice, and others referenced herein. Despite receiving whistleblower notices, Congressional submissions, and statutory reports, the federal government took no action to investigate or intervene. Its failure to execute its supervisory and enforcement duties constitutes ratification of misconduct and direct participation in the deprivation-of-rights enterprise.

347.    The federal government's $100 billion surety and bond infrastructure – originating from it also being the *guarantor* of the insurance policy of the earlier 2015-'16 claims preserved by the *Coram Nobis* – further underscores its financial and constitutional responsibilities.

348.    These judicial and clerical actors named in this case – and the preceding list covered by Appendix G of *backward-looking-access-to-court* cases – along with their institutional counterparts and commercial surety structures, form the final layer of obstruction in the deprivation-of-rights enterprise. They acted as the last gatekeepers preventing access to remedies, preventing exposure of agency fraud, preventing correction of administrative misconduct, preventing whistleblower disclosures from being heard, and preventing constitutional claims from reaching the People's courts.

349.    Their participation confirms that the injuries to the Prosecutor Ex Rel / Plaintiff are not random but are the predictable result of a system designed to shield itself from accountability.

350.    The State of South Dakota, as a sovereign corporate entity receiving federal funds conditioned on constitutional compliance, served as the central institutional platform through which the deprivations documented in this Complaint were carried out, concealed, and ratified. Every agency involved in the misconduct – DSS, DHS, BOA/BHRA, the Unified Judicial System, the Attorney General's Office, and the State's clerical and judicial apparatus – operated under the authority, supervision, and fiduciary obligations of the State. Through systemic non-response, deliberate silence, refusal to investigate, and tacit approval of agency actions, the State functioned as an institutional guarantor of the multi-year deprivation-of-rights enterprise.

351.    Over the course of nearly five (5) years, the State ignored, stonewalled, or constructively denied every petition for redress, Open Records request, discrimination complaint, whistleblower communication, statutory appeal, and formal notice submitted by the Prosecutor Ex Rel / Plaintiff. These filings, many of which contained evidence of retaliation, forged documentation, sham administrative proceedings, fraudulent billing, hearing manipulation, and ADA violations, were never processed, acknowledged, or addressed by any responsible State authority. This refusal was not an administrative oversight but a clear institutional posture directing agencies to withhold responses, evade accountability, and prevent evidence from entering legally mandated review channels.

352.    The State's *affirmative* silence created the conditions under which its subordinate agencies could engage in unchecked discriminatory determinations, retaliatory benefit manipulation, sham adjudicative procedures, procedural coercion, manufactured non-delivery of notices, and fraudulent classifications of disability-related benefits. Rather than correcting these issues through supervisory intervention, the State allowed agencies to persist in conduct that violated federal statutory protections and constitutional mandates. By refusing to address these filings, the State implicitly sanctioned the actions of SAAG operatives, *"Chief Hearing Officer"* impostors, clerks, and judges whose conduct is documented throughout this Complaint.

353.    The State's refusal to process filings was matched by its deliberate failure to investigate clearly documented misconduct by DSS, DHS, BOA/BHRA, and UJS personnel. Despite statutory requirements obligating the State to ensure transparency, safeguard due process, and enforce disability-rights compliance, no investigation was initiated, no corrective action was taken, and no official addressed the mounting evidence of coordinated deprivation. This sustained inaction reflects institutional ratification and confirms that the misconduct was not isolated or rogue, but systemic and State-tolerated.

354.    The State's posture of non-responsiveness also extended to federal-program duties tied to Medicaid, disability services, housing programs, and federally funded grievance mechanisms. Agencies administering these programs repeatedly violated statutory mandates requiring written determinations, timely responses, reasonable accommodations, accessible grievance pathways, and transparent administrative processes. By permitting its agencies to ignore these duties, the

State violated federal spending-condition requirements and enabled a pattern of discrimination, coercion, and procedural attrition targeted at a totally and permanently disabled quad-amputee.

355.    The State's failure to enforce the rights of disabled residents extended to the mishandling of ADA Title II obligations, where agencies refused to provide meaningful access, denied accommodations, ignored transportation barriers, exploited disability-related vulnerabilities, and retaliated when grievances were filed. These failures were not confined to a single department but occurred across DSS, DHS, BOA/BHRA, and the UJS, demonstrating systemwide disregard for federally mandated disability protections.

356.    The State further allowed DSS and DHS to weaponize administrative classifications, such as mislabeling SSA payouts marked for disability benefits as *"unearned income,"* despite clear statutory and constitutional limitations and the source of those insurance contributions coming from pre-taxed *earnings*. This fabricated definition served as the foundation for coercive recertifications, unlawful financial exactions, and a quasi-peonage dynamic imposed upon the Prosecutor Ex Rel as Plaintiff. The State's refusal to correct or even acknowledge this misapplication enabled its agencies to impose unauthorized financial obligations and unconstitutional burdens in violation of the Thirteenth and Fourteenth Amendments.

357.    The refusal of the State to respond to or process discrimination complaints – across DSS, DHS, the Attorney General's Office, and even the governor's constituent-affairs channels – deprived the Prosecutor Ex Rel / Plaintiff of every statutory safeguard designed to protect vulnerable individuals against retaliation and administrative abuse. The State's silence allowed SAAG operatives to control outcomes, manipulate records, and conduct sham hearings without any institutional oversight or corrective authority intervening.

358.    The State also presided over and ratified the coordinated conduct of the BOA/BHRA, where sham *"appeal"* structures were used to launder DSS and DHS misconduct and to create the appearance of lawful adjudication. The State permitted these hearing structures to operate without ADA accommodations, without procedural fairness, and without accountability. By ignoring written warnings, objections, and formal notices, the State enabled BOA/BHRA actors to engage in record mutilation, conceal half of appeals, deny hearings, and operate fraudulent adjudicatory processes shielded from public scrutiny.

359.    Within the State's judicial branch – the UJS – clerks, magistrates, and circuit judges converted the Prosecutor Ex Rel / Plaintiff's judicial filings into fabricated *"administrative appeals,"* altered captions, suppressed respondents, withheld filings, manipulated dockets, and conducted simulated judicial proceedings designed to preserve the predetermined outcomes engineered by DSS and SAAG operatives. The State's supervisory judiciary failed to correct these abuses even when confronted with certified evidence of fraud, thereby ratifying the misconduct at the highest levels.

360.    The State's appellate judiciary, through the Chief Justice and Supreme Court Clerk, received multiple filings documenting lower-court fraud, docket padding, *ex parte* coordination,

73

and the insertion of unrelated criminal-event materials into the Prosecutor Ex Rel / Plaintiff's docket. Instead of correcting the record, the State dismissed these filings without inquiry or analysis and allowed fraudulent orders to stand as the final appellate record. These acts confirmed that the State judiciary acted not as a neutral arbiter but as a protective wall insulating State agencies and SAAG operatives from accountability.

361. The State's collective conduct across its executive, administrative, and judicial branches demonstrates a unified institutional response: suppress grievances, deny ADA accommodations, conceal wrongdoing, and eliminate access to lawful adjudication. This interlocking structure – SAAGs in the Attorney General's Office, ALJ and Chief Hearing Officer impostors in DSS and BOA/BHRA, clerks in the UJS, judges at multiple levels, and agency decision-makers – functioned as an administrative-judicial alliance designed to prevent exposure, avoid liability, and neutralize oversight.

362. Because the State receives billions of dollars in federal funds tied to mandatory conditions, every instance of non-compliance documented in this Complaint constitutes not merely administrative failure but a federal Spending Clause violation. These violations implicate HUD, HHS, USDA, SSA, CMS, DOJ, and other federal programs whose statutory frameworks require nondiscrimination, due process, transparency, and meaningful grievance pathways. By accepting federal funds while simultaneously operating systems that suppress these rights, the State breached its contractual and constitutional obligations to the United States and to the sovereign People.

363. The State's abdication of its supervisory responsibilities enabled its agencies to engage in insurance-driven risk-management practices rather than lawful adjudication. Through mechanisms involving the South Dakota Public Assurance Alliance (SDPAA) and related enterprise-fund structures, agencies were incentivized to deny claims, suppress evidence, and avoid adjudication to minimize payout exposure. The State's government-corporate architecture therefore created financial motives to obstruct justice, which operated alongside SAAG-driven legal strategies and judicial complicity.

364. The State's failure to require disclosure of public-official surety bonds, failure to enforce lawful subpoenas seeking such bonds, and refusal to provide any documentation of financial responsibility for constitutional torts further demonstrates institutional concealment of commercial liability structures. These concealments prevented the Prosecutor Ex Rel / Plaintiff from verifying proper bonding, bringing claims against insurers, or holding individual State actors financially accountable through established surety processes.

365. The State's conduct also obstructed federal crime-reporting avenues. Numerous filings submitted to State agencies detailed violations implicating federal criminal statutes, including fraud, retaliation, witness tampering, falsification of documents, and deprivation of rights under color of law. Not a single agency forwarded these filings to law-enforcement bodies, investigative units, or oversight divisions, despite mandatory duties to do so. This non-referral pattern mirrors the same obstruction encountered in Michigan and at the federal level, indicating

coordinated suppression of whistleblower-level evidence.

366.    The State's supervisory failures were not passive omissions; they constituted active ratification of unlawful conduct. By tolerating sham administrative hearings, fraudulent judicial proceedings, docket manipulation, ADA violations, and Spending Clause breaches, the State allowed its agencies and judicial actors to operate as a unified enterprise of deprivation. Every act of clerical manipulation, judicial usurpation, SAAG obstruction, ALJ fraud, administrative coercion, and retaliatory deprivation occurred under the State's watch and remained uncorrected.

367.    Because the State's agencies, clerks, and courts acted in concert and shared common objectives – concealing wrongdoing, suppressing evidence, eliminating liability exposure, and preventing access to lawful adjudication – the State of South Dakota stands as a central entity whose institutional posture made the deprivation of rights not only possible but inevitable. The State's refusal to enforce its own laws, its own procedures, and its own supervisory duties demonstrates structural complicity at the sovereign level.

368.    For these reasons, the State of South Dakota is properly named as a Defendant in this action. Its unified administrative-judicial apparatus, its failure to investigate or respond, its ratification of misconduct, and its acceptance of federal funds while violating mandatory conditions place the State at the center of the interstate deprivation-of-rights enterprise documented herein. This section establishes the factual foundation upon which subsequent legal arguments, statutory claims, and demands for injunctive relief will proceed.

## THE HIDDEN COMMERCIAL GOVERNMENT SURETY STRUCTURES AND THE ENTERPRISE-FUND LIABILITY SYSTEM OPERATING BEHIND SOUTH DAKOTA'S OFFICIAL MISCONDUCT
### (SDPAA AS DEFENDANT #107)

346.    Evidence secured by Prosecutor Ex Rel / Plaintiff reveals that this indemnification framework is not peripheral -- it is the structural backbone behind South Dakota's misconduct. The South Dakota Public Assurance Alliance ("SDPAA"), which now must be named as Defendant #107, is not an agency of the State and is not a public fiduciary body. It is a separate legal entity, organized as a joint-powers enterprise fund, operating a risk-financing pool for approximately 494 governmental *"members,"* each of whom relies on the *Alliance* to fund, defend, settle, and absorb liability for misconduct. (*See* SDPAA 2024 Financial Statements, Note 1, Reporting Entity.)

347.    This means that every county, city, sheriff's office, housing authority, and administrative arm involved in this case is shielded by a private, undisclosed commercial insurer – not by constitutional governance, not by lawful bonds, and not by mechanisms accountable to the People.

75

348.     This structure functions as a parallel government, one never disclosed to the public, one that neither arises from the South Dakota Constitution nor complies with its bonding and oath requirements. *Members* pay into a pooled *Operating Fund*; losses are actuarially predicted; liabilities are spread across all participants; and the Alliance purchases reinsurance to protect itself from catastrophic exposure. (SDPAA Notes to Financial Statements; Claims Development Tables.)

## A. The Enterprise-Fund in Practice: How Commercial Risk Pools Replace Accountability

349.     In practice, this means that when a sheriff retaliates, when a housing authority falsifies records, when DSS interferes with federal benefits, or when a judge or clerk weaponizes process to obstruct redress, the financial consequences are not borne by the wrongdoer or the State. They are absorbed by a privately-administered commercial pool whose purpose is to limit accountability and diffuse responsibility, thereby incentivizing the very misconduct documented throughout this Complaint.

350.     These financial documents confirm the existence of what the People have long suspected but could never access: a dual accounting system – one for the public ("*budget*"), and one for the insiders ("*enterprise fund*"). The public sees general-fund appropriations and budget hearings. But the true operational government – the one that pays claims, manages liabilities, directs risk tolerance, and financially incentivizes institutional behavior – is hidden inside enterprise-fund accounting governed by Governmental Accountability Standards Board (GASB) standards, risk-pool agreements, and joint-powers contracts far removed from public oversight. This is the commercial "*second book*" of governance, functioning as a shadow authority displacing lawful constitutional structures. Another "*fox guarding the hen-house*," so to speak.

351.     In South Dakota, this shadow authority has replaced the constitutional requirements of individual surety bonds, public accountability, and oath-backed fiduciary duty. BAR attorneys, administrative officers, sheriffs, clerks, and "*legal services*" entities act with near-complete impunity because they understand their liability is not personal and not constitutional – it is commercial, pooled, reinsured, and actuarially predicted. Their misconduct is not a risk to *them* individually; it is a cost of doing business for the *Alliance*. This is not lawful government. It is a self-protecting commercial enterprise, structured to absorb and conceal its own wrongdoing.

352.     Evidence from the South Dakota Public Assurance Alliance's ("SDPAA") 2024 Financial Statements reveals that the Alliance is a separate legal entity, created through joint-powers agreements, funded by its 494 governmental members, and operated as a proprietary *enterprise fund* rather than a constitutional government body. (SDPAA 2024 Financial Statements, Note 1, Reporting Entity.) This classification as an "*enterprise fund*" is significant: it means the Alliance is governed not by constitutional law but by commercial accounting standards, risk-financing models, and intergovernmental contracts that displace constitutional limitations.

353.     The Alliance's financial structure – including member contributions, actuarial

projections, reserves for claims, reinsurance agreements, and investment income – is governed primarily by GASB (Governmental Accounting Standards Board) standards, specifically GASB Statements No. 10 and No. 72. These are commercial-accounting principles, not governmental law. Courts, sheriffs, DSS and DHS agencies, housing authorities, and local governments therefore operate under two parallel systems: (1) the public-facing *"budget,"* and (2) the privately administered enterprise-fund risk pool. The first is shown to the public; the second governs their actual behavior.

354.    In this enterprise-fund model, wrongful conduct – such as retaliation, falsified records, procedural sabotage, ADA violations, deprivation of rights, or unlawful benefit deductions – is treated not as a breach of oath, not as a constitutional injury, and not as a legal violation requiring correction, but as a predictable financial exposure, priced into actuarial tables and absorbed by pooled reserves. This means misconduct is not prevented; it is funded, insured, and normalized.

355.    SDPAA's own financial statements describe how losses are managed: claims are pooled, liabilities are estimated, reserves are adjusted, and reinsurance is purchased to cover catastrophic misconduct. (SDPAA Financial Statements, Notes on Loss and Loss Adjustment Expense Reserves.) This structure incentivizes misconduct rather than deterring it, because the individual wrongdoer bears no cost and suffers no consequence. The enterprise fund -- not the State, not the agency, not the officer – pays for the damage.

356.    Constitutionally, this is a profound substitution. State and local government officers are required by law to be individually bonded, personally accountable, and answerable to the People. Instead, these South Dakota officers rely on a commercial intermediary that assumes liability in their place. When a sheriff retaliates, when DSS falsifies records, when a clerk blocks filing access, or when a housing authority engages in fraud, the Alliance steps in to defend, pay, settle, or absorb the liability – functioning as a commercial umbrella that shields officials from being held to constitutional standards.

### B. The Dual-Ledger Government: Public Budgets vs. Hidden Enterprise-Fund Operations

357.    This creates a two-tier system: one governed by the Constitution (on paper), and one governed by commercial insurance contracts (in practice). The former protects the People; the latter protects the government actors at the People's expense. South Dakota's CAFR system – its Comprehensive Annual Financial Report – reflects this dual structure by maintaining both (1) public budget books, and (2) enterprise-fund books that are not meaningfully scrutinized by citizens or by courts unless specifically compelled.

358.    Upon information and belief, nearly all of the misconduct documented throughout this Complaint was committed by entities that are members of the South Dakota Public Assurance Alliance ("SDPAA"), as reflected in its 2024 Enterprise-Fund Report and associated membership rosters. These include, on information and belief, county agencies, city officials, sheriff's offices, housing authorities, *"legal services"* organizations, and administrative departments whose operations fall within the Alliance's pooled-risk framework. Because entities participating in the

77

SDPAA Enterprise Fund act with the assurance that the financial consequences of misconduct will be absorbed by pooled reserves and reinsurance rather than by corrective discipline, constitutional enforcement, or personal liability, these Defendants operated under conditions that materially incentivized noncompliance, concealment, and rights deprivation.

359.    This financial insulation is key to understanding why South Dakota actors escalated their misconduct rather than correcting it. When a system removes personal consequence and replaces it with pooled indemnification, misconduct becomes institutional, predictable, and automatic. Officials do not fear discipline or constitutional liability; they fear paperwork – especially the kind generated by whistleblower David Schied as Prosecutor Ex Rel / Plaintiff. They do not fear violating the Constitution; they fear exceeding their actuarially predicted loss ratios through public exposure, judicial transparency, and other constitutionally protected common-law remedies operating under the First Amendment's free speech, freedom of press, and petitioning guarantees, and the Tenth Amendment's retained-powers doctrine.

360.    This enterprise-fund structure also explains the uniformity of misconduct across different agencies and jurisdictions. The incentives are aligned, the liabilities are shared, and the financial protections are centralized. Whether the misconduct occurs in HUD-administered housing, in DSS benefit determinations, in sheriff's office retaliation, or in judicial obstruction of filings, the liability ultimately flows to the same commercial entity – creating a statewide financial motive to suppress complaints, evade investigations, falsify records, and prevent cases from reaching trial.

361.    This system is not theoretical. Prosecutor Ex Rel / Plaintiff's experience, as documented in Appendices A, A-2, A-3, C, E-1, E-2, F, and G, shows that each layer of the South Dakota government acted in a coordinated pattern of evasion, retaliation, and obstruction – consistent with an enterprise operating under a commercial risk-pool model rather than a constitutional governance model. When misconduct is financially absorbed rather than personally accountable, it becomes routine, systemic, and predictable.

362.    The addition of the South Dakota Public Assurance Alliance as Defendant #107 is therefore not symbolic but compelled by the evidence. The Alliance operates as the undisclosed liability-absorbing mechanism for nearly every governmental actor involved, functioning as the commercial backstop that financially enables, protects, and perpetuates the misconduct documented throughout this Complaint. Without identifying the Alliance, the full operational structure behind the wrongdoing would remain concealed, and the true enterprise architecture would not be before the Court.

363.    The Alliance's intergovernmental contract, enterprise-fund design, member-liability structure, actuarial loss modeling, and reinsurance arrangements confirm that South Dakota's governmental actors have replaced constitutionally mandated bonding, accountability, and fiduciary duty with a commercial liability-distribution system. This system incentivizes misconduct, diffuses responsibility, and removes personal consequence – resulting in precisely the patterns of coordinated retaliation, obstruction, and federal-state misconduct demonstrated in the record.

364.    The financial and structural features of the South Dakota Public Assurance Alliance reveal a governance model grounded not in constitutional authority but in commercial risk engineering. The *Alliance's Operating Fund*, unrestricted net-position design, actuarial loss reserves, and dependency on reinsurance arrangements demonstrate that liability for governmental misconduct is commodified, traded, and distributed across a private contractual network rather than borne by accountable public officers bound by oath. This has the practical effect of insulating wrongdoing behind layers of financial abstraction inaccessible to the sovereign American People.

365.    This commercial shield also creates a perverse incentive structure. Because losses are shared across hundreds of members, and because reinsurance absorbs catastrophic exposure, no individual actor – whether sheriff, DSS supervisor, housing-authority agent, clerk, or BAR-licensed attorney – faces meaningful personal or institutional consequence for unlawful conduct. Misconduct becomes actuarially tolerable. The Alliance absorbs it. Premiums adjust. Reinsurance recalibrates. The People pay – twice: once through taxation, and again through the deprivation of constitutionally guaranteed rights.

366.    The Alliance's own documents confirm that misconduct is not merely insured against but anticipated. Its loss-development tables, reserve methodologies, and claims-handling framework all assume recurring claims against government actors. Rather than incentivizing compliance with constitutional, statutory, and federal-funding obligations, the system institutionalizes the expectation that violations will occur. It builds financial models to manage those violations instead of preventing them.

367.    In South Dakota, this structure directly intersects with the wrongful acts directed against Prosecutor Ex Rel / Plaintiff. Every agency that withheld federal benefits, falsified income information, obstructed ADA enforcement, retaliated for whistleblowing, disrupted medical care, or manipulated housing records is, according to information and belief, a member of this Alliance. Their actions were taken with the understanding that liability, if ever imposed, would be absorbed commercially rather than personally. This removes deterrence, eliminates accountability, and fuels the multi-state pattern already documented in the preceding paragraphs.

368.    The concealment of this structure from the public, from beneficiaries of federal programs, and from litigants – particularly disabled whistleblowers seeking redress – constitutes a material omission of fact. Agencies misrepresented themselves as sovereign actors operating under constitutional authority and statutory mandates. In truth, their conduct was shaped by the risk-management priorities of a private enterprise fund, governed by an intergovernmental contract none of the affected people ever saw, consented to, or were informed of. This concealment is itself a form of fraud.

369.    The constitutional implications are profound. Public officers are required to be individually bonded or insured for faithful performance of duty. When those individual sureties are replaced by a pooled commercial enterprise in which no officer is personally accountable, the

constitutional design collapses. The People are left with an opaque system in which government actors operate under color of law while being financially protected by an entity that is not accountable to voters, courts, or constitutional constraints.

## C. **Commercial Incentives as Policy: How Risk-Pool Economics Shape Government Decisions**

370.    The Alliance does more than pay claims; it shapes policy. Its underwriting rules, risk-assessment methodologies, premium structures, and consultation services influence how agencies behave, what enforcement actions they prioritize, how they respond to complaints, and how aggressively they defend misconduct. These undisclosed commercial pressures operate as a shadow policymaker – one neither authorized by statute nor subjected to constitutional checks and balances.

371.    The evidence shows that when Prosecutor Ex Rel / Plaintiff sought lawful remedy at his own personal cost – whether access to court, correction of federal-benefits misclassification, enforcement of ADA requirements, or protection from retaliation – government actors consistently acted in ways that minimized commercial exposure rather than fulfilling their lawful duties. Denials, delays, falsifications, and obstructions are cheaper than compliance. Within a risk-pool structure, rights become liabilities, and liabilities become line-items. The People's constitutional guarantees become actuarial calculations.

372.    Article IV, Section 4 of the United States Constitution – known as the *Guarantee Clause* – is the provision that guarantees every State a republican form of government. The Alliance's commercialized system of governance is incompatible with constitutional republican government otherwise guaranteed.

373.    Authority derived from the People has been displaced by authority derived from insurance instruments. Accountability owed to the People has been replaced by accountability owed to reinsurers and risk-managers. Decisions affecting disabled whistleblowers – housing, medical access, due process, safety – are shaped not by law but by financial incentives engineered to minimize payouts. The result is a system that functions as a private enterprise masquerading as government.

374.    The misconduct documented in this case did not arise randomly nor in isolation. It arose because the actors involved understood that the Alliance – and not their own oath, statute, or constitutional duty – would bear the consequences of their acts. This dynamic mirrors the misconduct patterns previously documented in Michigan, Wisconsin, Florida, and all other states where similar commercial frameworks shielded officials from accountability and allowed retaliation against whistleblowers to persist unchecked.

375.    The South Dakota Public Assurance Alliance (SDPAA) thus occupies a central position in the wrongful acts inflicted upon Prosecutor Ex Rel / Plaintiff. It is the financial engine that makes such misconduct possible, the institutional shield that removes deterrence, and the commercial infrastructure that converts constitutional violations into manageable business expenses. Its

undisclosed role explains the uniformity of misconduct across agencies, the ferocity of retaliation, and the systemic obstruction documented throughout the Appendices.

376.    For these reasons, the Alliance is properly named as a Defendant in this Complaint. Its commercial structure, financial operations, contractual control mechanisms, and risk-management practices are inseparable from the constitutional, statutory, and personal injuries inflicted upon Prosecutor Ex Rel / Plaintiff. Without the Alliance, the enterprise would lack its financial backbone; with it, the enterprise functions seamlessly across jurisdictions, agencies, and federal funding streams.

**D. The Consequences: How the Commercial Structure Enabled the Misconduct in This Case**

377.    According to information and belief, many South Dakota officials who exercise arrest power, adjudicatory authority, tax enforcement, regulatory oversight, and public-funds control are not individually bonded in the manner required by South Dakota Codified Law (SDCL ch. 3-5) and related provisions. Instead, these officials and their agencies operate under blanket commercial assurances provided by the South Dakota Public Assurance Alliance and similar pooled-risk or liability instruments.

378.    Public-record responses, subpoenas, and open-records requests affiliated with this case have repeatedly failed to produce individual, publicly filed surety bonds naming the People as beneficiaries for judges, sheriffs, state's attorneys, county commissioners, and other key officials. Accordingly, agencies provide – if anything at all – only generic references to pooled *"coverage,"* liability policies, or Alliance participation, without any documents that meet the statutory definition of a personal official bond. This evidences a systemic substitution of private commercial insurance in place of lawful fiduciary bonding.

379.    South Dakota's own bonding statutes make clear that lawful office requires qualification, including an oath and an official bond. Under SDCL § 3-4-1(4), an office becomes vacant when the officer fails to qualify; under SDCL §§ 3-5-1 through 3-5-14, bonds must be executed, approved, and filed; and under SDCL §§ 8-4-5 and 9-14-10, township and municipal officers who do not meet these requirements are deemed to have refused or forfeited office. The day-to-day reliance on SDPAA and similar pooled instruments, in lieu of individual publicly enforceable bonds, stands in direct tension with these statutory mandates.

**E. Substitution of Pooled Commercial Risk Instruments for Constitutional Accountability**

380.    The Alliance's structure, as reflected in its financial statements and notes, confirms that its primary beneficiaries are member entities – counties, cities, districts, and authorities – not the individual residents injured by official misconduct. In this configuration, the *"insured"* is the corporate governmental body and the Pool itself, while the People become third-party outsiders to the very instruments that are supposed to protect them from malfeasance and abuse of power.

381.    This same pattern of structural inversion appears in the broader governmental accounting framework. Public-facing *"budgets"* show appropriations, tax receipts, and general-fund expenditures, but the deeper financial reality resides in Comprehensive Annual Financial Reports ("CAFRs") and enterprise-fund statements where pooled liabilities, risk-management structures, investment portfolios, and long-term reserves are recorded. These hidden books reveal an internal system in which governance is run as a commercial enterprise for the protection of institutions, not as a constitutional trust for the protection of the People.

382.    Prosecutor Ex Rel / Plaintiff's longstanding study of fiduciary mechanics, municipal finance systems, and governmental risk instruments – reflected in Appendix E-1 and corroborated by the SDPAA's 2024 Annual Report – confirms that South Dakota governmental units operate with dual accounting modalities:

> (1) a public-facing governmental ledger presented to taxpayers and used to justify budgetary and policy decisions, and

> (2) a proprietary or enterprise-fund ledger used to track pooled assets, liabilities, actuarial reserves, risk exposures, and indemnification payouts.

383.    The SDPAA enterprise fund is a central component of this shadow financial architecture, but not the only one. It operates in tandem with other state-managed enterprise funds, proprietary accounts, and internal insurance pools that together form a financial ecosystem designed to absorb risk rather than correct misconduct. As with the Michigan Municipal Risk Management Authority (MMRMA) and the AIG terrorism-insurance structures implicated in the Prosecutor Ex Rel / Plaintiff's still valid and unresolved $100 billion claim in Michigan, these South Dakota mechanisms function to externalize liability, allowing government units and their officials to shift the financial consequences of wrongdoing onto pooled reserves rather than onto responsible actors.

384.    This dual-ledger structure effectively insulates individual officials from personal accountability, undermines the constitutional and statutory bonding requirements discussed above, and incentivizes the very deprivation-of-rights patterns documented throughout this Complaint. Comprehending this structure is material to Americans understanding how deprivation-of-rights patterns have persisted: the public ledger creates the appearance of accountability, while the enterprise ledger absorbs the consequences of wrongdoing, enabling the misconduct to continue unchecked.

## F.  **Delegation Crisis and Loss of Personal Accountability Through Risk-Pool Governance**

385.    What all of this amounts to is a *"delegation crisis"*: officials draw pay, exercise police power, issue orders, and sign judgments while lacking the individual fiduciary bonds and properly filed oaths that would lawfully qualify them for office. At the same time, pooled risk entities like the Alliance assume *de facto* control over how those same officials respond to claims, complaints, and exposures.

82

386.    Prosecutor Ex Rel / Plaintiff's documented long history extending from Michigan to South Dakota proves that when members of the public demand proof of individual bonds or properly filed oaths, agencies either cannot produce the instruments or respond only with references to pooled insurance and Alliance coverage. In practice, this leaves residents with no direct, enforceable surety against individual wrongdoing, despite statutory language that presumes such bonds exist.

387.    The systemic absence of individual, statutorily mandated fiduciary bonds became operationally significant in Prosecutor Ex Rel / Plaintiff's own case the moment housing officials, DSS workers, law enforcement actors, and court personnel began issuing orders, enforcing classifications, and initiating retaliatory actions without the lawful qualification required under SDCL §§ 3-4-1, 3-5-1 *et seq.*, and related provisions. This deficiency was not merely technical; it enabled a pattern of misconduct precisely because no individual official faced personal surety exposure for violating federal law, civil rights, or mandatory reporting duties.

### G.  Housing Administration Failures Enabled by Unbonded and Untrained Personnel

388.    This structural vulnerability manifested most clearly in the circumstances leading up to the 1/17/24 *"Interim Lease Change"* addendum. For two consecutive years, multiple HPMI managers came and went while repeatedly refusing to consolidate the two separate annual recertification schedules – one for LIHTC and one for Section 8 – despite Prosecutor Ex Rel / Plaintiff's documented requests and the obvious administrative burden caused by the dual deadlines.

389.    No local HPMI manager appeared to understand the governing rules or how to resolve the conflict; each left the problem in place *"to stay safe,"* rather than exercise the discretion required under federal housing and ADA accommodation mandates.

390.    When agent Jamie Durbin-Villegas finally located a workable administrative solution – extending the renewal period so that the October 2024 Section-8 recertification would align with the LIHTC cycle for October 2025 – Prosecutor Ex Rel / Plaintiff agreed, and both parties executed the addendum with the shared understanding that the extension merely harmonized the schedules going forward.

391.    The underlying issue was not Durbin-Villegas' conduct, but the systemic failure of HPMI, LIHTC, and Section-8 administrators to honor accommodation requests, to understand applicable federal rules, and to maintain lawfully qualified, bonded personnel capable of resolving such conflicts without jeopardizing tenants or exposing agencies to commercial risk-pool consequences.

## H. Medicaid Coercion, Misclassification, and Retaliation Documented by Video Evidence

392.    The retaliatory motives and systemic failures underlying the housing-rights violations are further corroborated by the three-hour video-recorded parallel interactions with DSS personnel, including the Eads meeting and the Monson–Reimers exchanges. The recordings show multiple officials misclassifying benefits, pointing fingers at one another, and even pressuring Prosecutor Ex Rel / Plaintiff to commit Medicaid fraud by signing documents stating that he required daily bathing and dressing assistance – an assertion that was false, unwanted, and grossly inconsistent with his actual level of functional independence. Yet DSS personnel insisted that he *"must say that"* in order to fit into the agency's *"cookie-cutter"* Medicaid program, regardless of truth, dignity, or federal funding *appropriation* rules.

393.    These recordings further reveal that, in order to obtain Medicaid coverage for the 20% of medical expenses not covered by Medicare, DSS personnel attempted to impose a coercive *"take it all or nothing at all"* condition: accept the false classification of total dependency and commit Medicaid Fraud, or forfeit essential medical coverage. This position directly contradicts later statements by Medicaid representative Hosman, who acknowledged that South Dakota routinely divides Medicaid into separate *"strands"* (when convenient for the agency). The inconsistency demonstrates that the earlier coercion was not a matter of policy but a matter of administrative convenience and *"double-edged"* systemic patterns in practice underlying the disregard of lawful accommodation requests.

394.    These coercive practices were compounded by the withholding of medically necessary housekeeping services, the refusal to acknowledge ADA accommodation obligations, and openly contradictory determinations offered without lawful explanation. That pattern unfolded amid repeated housing managerial turnovers and the persistent refusal of LIHTC and Section 8 administrators to consolidate renewal schedules or act on Plaintiff's long-standing accommodation requests. These were not isolated mistakes but institutionalized behaviors enabled by untrained, unbonded personnel working within a pooled-risk structure that removes personal accountability.

395.    The same absence of individual accountability enabled Hosman to openly describe South Dakota's *"Medicaid umbrella"* schemes while refusing mandatory reporting obligations, as documented in Appendix A-3, p.17. A bonded officer would face personal surety exposure for refusing mandatory reporting of abuse, fraud, or retaliation against a disabled whistleblower. In contrast, under the Alliance's pooled structure, Hosman faced no personal risk for noncompliance, enabling conduct that violated federal Medicaid rules, the ADA, and 42 U.S.C. § 1983.

## I. Agency Refusal to Respond to Documented Submissions and Federal Oversight Failures

396.    Prosecutor Ex Rel / Plaintiff repeatedly provided agencies with full documentation of these violations, including the 308-page E-3 submission delivered to State authorities and copied to federal agencies as dated from 1/20/25 through 5/23/25. These submissions contained sworn

84

evidence, statutory citations, video documentation, and federal-funding compliance issues. No agency produced the required individual bonds for the officials responsible for the actions challenged in those and previous subpoena filings. Instead, agencies shielded themselves behind pooled "*coverage*" through the Alliance, confirming the systemic substitution documented earlier.

397.    The 575-page submission to federal authorities, followed by the 488-page supplementary submission, further established patterns of Medicaid misclassification, unlawful deprivation of ADA-protected accommodations, retaliatory interference with housing rights, and falsified or obstructed administrative processes. These federal submissions – undisputed in the record – demonstrate that South Dakota agencies lacked lawful qualification to administer federal funds or adjudicate claims affecting federally protected rights.

398.    The state-level patterns in this case mirror the broader misconduct evidence compiled in Appendix A-2, which documents repeated failures across multiple jurisdictions to comply with bonding statutes, oath-filing requirements, ADA Title II obligations, and constitutional access-to-courts protections. The same behaviors appeared in South Dakota: officials were unable or unwilling to produce lawful individual bonds, responded evasively to record requests, and relied on adjudicatory processes shaped more by institutional risk-pool considerations than by constitutional or statutory duties.

399.    Additional structural parallels emerge from the materials in Appendix A-2 addressing judicial corruption, BAR-controlled disciplinary systems, and the failure of oversight bodies to restrain systemic abuses. These materials – together with the Congressional filings incorporated in the appendices – demonstrate that the practice of avoiding personal accountability by substituting pooled commercial protection for constitutional responsibility is not unique to South Dakota. Rather, it reflects a nationwide pattern replicated across multiple jurisdictions, explaining why South Dakota officials acted in coordinated fashion against Prosecutor Ex Rel / Plaintiff.

400.    The pattern was repeated when Prosecutor Ex Rel / Plaintiff filed a *Writ of Error Coram Nobis* seeking redress for approximately $100 billion in documented harms, supported by sworn affidavits of fourteen (14) others claiming victimization of terrorism being carried out within the managerial and operational scope of the Charter County of Wayne, Michigan. Rather than address the merits, state and federal actors attempted to dismiss or conceal filings, consistent with the behavior of officials operating without lawful bonds and under the protection of commercial risk pools.

401.    Similar obstruction occurred in South Dakota with the 8/8/22 "*Objection and Motion to Correct the Record*" (A-2) challenging falsified statements and procedural abuses in the Monson hearing. Instead of correcting the record, officials doubled down on retaliatory classifications and misrepresentations – again shielded by the absence of individual fiduciary bonds and the presence of pooled risk assurances.

85

402.    Prosecutor Ex Rel / Plaintiff then pursued first and second Petitions for Grand Juries, resulting in four exhibits in Appendix A-2. Despite statutory mandates requiring submission of such petitions, South Dakota actors refused processing, demonstrating not only dereliction of duty but also a systemic interest in preventing independent review of governmental misconduct where personal liability could attach.

403.    When Prosecutor Ex Rel / Plaintiff presented evidence of crimes and statutory violations to AUSA Ben Patterson, that official *"ran out,"* refusing to process any report, as documented in Appendix A-2 that includes a link to the audio recording of that malfeasance. A lawfully bonded officer cannot simply flee from a mandatory duty; a pooled-risk-protected actor can – and did as a matter of actual record; and his boss, U.S. Attorney Alison Ramsdell endorsed that action.

## J.   Systemic Obstruction of Judicial and Grand Jury Processes

404.    These structural abuses are contextualized further by Appendix A-3's 33-page *Patterns of Unequal Treatment* (Exhibit #1), which demonstrates that what happened to Prosecutor Ex Rel / Plaintiff and many others is not an anomaly but the predictable outcome of a governance model centered on pooled commercial protection rather than constitutional obligation.

## K.   National Pattern Evidence Corroborating Commercialized Governance and Retaliation

405.    The additional materials in Appendix A-3 – including the Windsor / Lawless America evidence, the RICO Busters Channel analyses, the Jensen/Strawn records, PCA on Rumble, the two-part Goodwill exposé, and the Falco Case in Florida – show that identical misconduct patterns arise in jurisdictions where officials operate outside bonding statutes and under pooled commercial immunity. These materials are not cited as outside authority but as corroboration of the structural dynamics South Dakota officials replicated in this case.

406.    The subpoenas issued in the Monson case, referenced on p.18 of Appendix A-3 and spoken about on the video of that canceled hearing, further demonstrate that officials deliberately obstructed due process and refused compliance with lawful compulsory-process mechanisms to avoid exposing unbonded conduct, fraudulent classifications, and unconstitutional retaliation.

407.    Even in proceedings reaching the United States Supreme Court, as reflected in Appendix A–D of the Supreme Court case posted publicly on the Internet in full government transparency, South Dakota and other state actors consistently evaded substantive review by concealing structural illegality, misrepresenting factual records, and avoiding oath-bond disclosure requirements – an enterprise entirely consistent with the Alliance-driven commercial governance model described throughout this Section and in the appended materials demonstrating how the SDPAA structure displaces constitutional accountability.

408.    The record additionally includes the Kelli Werner phone conversation (A-3), in which Werner made statements indicating awareness of both statutory violations and the institutional expectation that Alliance-covered entities would *"handle"* such issues internally rather than

86

comply with federal law. This conversation constitutes direct evidence of the culture of concealment enabled by the pooled-risk system.

409.    The Appendix E-2 (Piersol–Lange) evidence shows federal-level entanglement in the same commercialized governance structure. Judges Piersol and Lange proceeded in matters involving Prosecutor Ex Rel / Plaintiff despite unresolved questions regarding lawful qualification and demonstrated conflicts of interest, as documented. Their rulings, denials, docket manipulations, and refusal to address jurisdictional defects reflected the same institutional incentives seen throughout South Dakota agencies: suppress whistleblower evidence, avoid transparency, and insulate governmental actors rather than uphold constitutional obligations to the People.

## L.    Eviction Threats as Commercial Risk Mitigation Rather Than Lawful Government Action

410.    Finally, the three letters of eviction (Complaint) demonstrate how the pooled-risk system directly injures disabled whistleblowers. Housing officials issued unlawful eviction threats without ADA-mandated accommodations, without correcting federal-benefits misclassifications, and without producing the statutory instruments that would qualify them to take such actions. The letters were not communications from lawfully bonded officers; they were commercial risk-mitigation maneuvers framed as governmental action.

## COMMERCIAL & PRIVATE ATTORNEY GENERAL / *PRIVATE PUBLIC PROXY* ENFORCEMENT ARCHITECTURE: THE COMMON-LAW REMEDY, SURETY PRINCIPLES, AND *"CITIZEN'S ARREST ON PAPER"*

411.    The structural failures documented throughout Complaint reveal a uniform truth: constitutional systems collapse when public officers operate without lawful qualification and without personal financial accountability. In such conditions, the People must revert to the commercial and common-law enforcement mechanisms that pre-date and underlie statutory government. The constitutional order was never designed to leave the sovereign People remediless. Where officials abandon their oaths and substitute pooled commercial protection for individual liability, the law shifts enforcement authority back to the beneficiaries of the public trust – the People themselves. This is the circumstance into which Prosecutor Ex Rel / Plaintiff is forced.

412.    Commercial law and surety law operate on principles older than the Republic. Officers are bonded fiduciaries who act as trustees of delegated sovereign power. When fiduciaries commit breach – through dishonor, neglect, fraud, concealment, or retaliation – the beneficiaries may demand performance, issue notice, document default, and escalate the breach into enforceable claims. These concepts are embedded not only in the Uniform Commercial Code but in the inherent structure of public office: no official acts on their own authority; they act as agents

87

of the sovereign People. Thus, when agents violate their trust, enforcement authority reverts to the principals.

413.    In this context, the practice known colloquially as *"citizen's arrest on paper"* describes the lawful invocation of the People's retained power to call officials into accountability through commercial presentment rather than physical seizure. It is the process of placing derelict officers on notice, demanding lawful performance, giving opportunity to cure, documenting dishonor, and invoking the court's Article III authority to compel personal appearance and answer. This mechanism becomes necessary when administrative systems, judicial channels, and oversight bodies uniformly refuse to perform their duties – the precise pattern documented in every appendix to this Complaint.

414.    The commercial enforcement model operates alongside, not in place of, constitutional enforcement. *Ex parte Young* establishes that state officers who violate federal law are stripped of sovereign immunity and subject to suit. *Hafer* and *Scheuer* further hold that officers acting outside lawful authority lose all protective shields. *Talevski, Marbury,* and *Owen* confirm that administrative convenience cannot override constitutional rights or federal-funding mandates. These cases articulate the constitutional backbone; commercial law provides the operational spine when those same officers ignore their constitutional limitations and rely on risk-pool coverage to evade personal consequence.

415.    When statutory enforcement also fails – as demonstrated by the non-responses to Prosecutor Ex Rel / Plaintiff's Appendix E-3 submission, the 575-page federal filing, the 488-page supplement, the refusal of mandatory reporting by Medicaid personnel, the obstruction of ADA accommodations, the suppression of grand-jury petitions, and the evasion of judicial qualification challenges – the Private Attorney General doctrine becomes the People's final line of defense. Congress expressly authorized private citizens to enforce public rights where governmental actors refuse. The Supreme Court has upheld this role repeatedly in civil-rights, anti-fraud, and fiduciary-duty contexts. It is not extraordinary; it is necessary.

416.    This dual enforcement structure also integrates the commercial concept of *default.* When officers ignore lawful notices, refuse to act, or decline to deny allegations, the law treats silence as *dishonor.* Under commercial norms, dishonor by a fiduciary is treated as an admission against interest. Under constitutional norms, refusal to perform mandatory duties is an *ultra vires* breach. Under Title 42, failure to prevent known violations is liability under § 1986. Under RICO, concealment and non-action in furtherance of an enterprise is actionable racketeering. Under fiduciary law, failure to protect beneficiaries is a breach of the public trust. The enterprise exposed here satisfies every one of these conditions.

417.    Thus, *"citizen's arrest on paper"* is simply the People's exercise of a built-in enforcement architecture: notice, demand, opportunity to cure, documentation of refusal, escalation to court, and judicial compulsion of appearance. It is the lawful process for calling agents of government back under the authority of the sovereign People. Prosecutor Ex Rel / Plaintiff uses this term not to evoke confrontation, but to describe a structured, peaceful, lawful mechanism for restoring

accountability where every formal channel has collapsed.

418.    This Complaint therefore proceeds as a combined constitutional, statutory, and commercial action. It is _constitutional_ because officials acted outside lawful authority. It is _statutory_ because their actions violated Titles 18 and 42, the False Claims Act, federal-funding conditions, ADA Title II, and mandatory reporting provisions. It is _commercial_ because the State and its subdivisions substituted pooled risk arrangements for lawful bonds, dismantling the financial deterrence necessary for public integrity. It is fiduciary because the People, as _creditors_ and _beneficiaries_, retain the right to enforce the public trust when trustees breach their duties.

419.    In this posture, the federal court becomes indispensable. The People initiate the commercial enforcement process, but the court – as the only lawful instrument of the sovereign for compelling appearance – completes it. Article III jurisdiction is the mechanism by which the People may require derelict officers to respond, produce records, answer defaults, and submit to lawful judgment. Thus, the court is not asked to create a new remedy; it is asked to fulfill its constitutional role: enforce the law when officials refuse to follow it.

420.    This integrated enforcement framework sets the stage for the Counts. The wrongdoing at issue is not merely tortuous or administrative; it spans constitutional violations, statutory breaches, commercial dishonor, fiduciary fraud, and enterprise misconduct. No single remedy suffices. The Counts therefore invoke multiple bodies of law not as redundancy, but as necessity arising from the State's systemic substitution of commercial protection for constitutional accountability.

## THE LEGAL CONSEQUENCE OF THE ENTERPRISE STRUCTURE

421.    The facts and structural analysis presented in this Complaint reveal that South Dakota's misuse of the SDPAA risk-pool architecture, combined with judicial conflicts, administrative concealment, and federal inaction, has produced a system where ordinary remedies cannot function. The enterprise persists because no actor within it faces personal consequence. This Complaint seeks to restore that consequence through the lawful mechanisms Congress, the Constitution, and commercial law already provide.

422.    The SDPAA structure is not an incidental feature; it is the financial engine of the enterprise. It replaces individual bonds with pooled coverage, encourages misconduct by insulating wrongdoers, and aligns agency behavior with actuarial incentives rather than constitutional mandates. The State's reliance on such a structure amounts to a commercial displacement of republican government, violating the Guarantee Clause and eroding the fundamental accountability mechanisms embedded in South Dakota law.

423.    This, combined with the national patterns documented in Appendices A-3, E-2, F, and G, demonstrates that the misconduct is not isolated, accidental, or personal. It is systemic. It is structural. It is predictable. And it is precisely the type of enterprise Congress intended to reach

89

through civil-rights statutes, RICO, the False Claims Act, and private enforcement provisions.

424.   Because officials refused lawful demands for performance, ignored statutory reporting duties, concealed evidence, retaliated against a disabled whistleblower, denied ADA accommodations, falsified or mishandled records, suppressed judicial access, and failed to produce lawful bonds or oaths, the system stands in commercial and constitutional default. That default triggers the People's right – through a Private Public Proxy and under the Private Attorney General Doctrine – to compel accountability.

425.   Accordingly, the following Counts set forth the constitutional, statutory, fiduciary, commercial, and enterprise-based grounds upon which relief must be granted. They implement the dual-pronged remedy described in Appendix A-3:
    (1) structural reform and judicial oversight, and
    (2) common-law, commercial, and statutory enforcement of official accountability.

426.   The court's jurisdiction is invoked to restrain unlawful government action, vindicate constitutional rights, remedy commercial dishonor, and restore the supremacy of the People over the institutions created to serve them.

427.   The *Coram Nobis* preserving the $100-billion surety claim provides a documented example of how commercial and constitutional default can be formally recognized and brought forward for enforcement. It demonstrates that official bonds, oaths, and surety structures are not ceremonial but carry enforceable weight when government actors refuse lawful performance.

428.   This proceeding further shows that when the People insist on enforcement, the commercial infrastructure that has long insulated official misconduct can instead be redirected toward protecting victims. The response to the *Coram Nobis* once again exposed a pattern of resistance by State and federal actors whenever genuine accountability is invoked.

429.   Across every jurisdiction and agency involved, the same constant emerges: when Prosecutor Ex Rel / Plaintiff seeks lawful remedy, the system closes ranks. Administrative complaint channels malfunction or disappear. FOIA requests are delayed, denied, or deceptively rerouted. Appeal processes are buried behind inaccessible systems, undefined procedures, or unrealistic deadlines – particularly impossible for a quad-amputee whose ADA rights were ignored. Judges dismiss cases on technicalities that contradict clear Supreme Court precedent. *"Legal aid"* attorneys decline representation or quietly undermine meritorious claims. Federal oversight offices provide either boilerplate form letters or no answer at all. This pattern is not error; it is design, as documented throughout Appendices A, A-2, A-3, C, E-1, E-2, F, and G.

430.   Taken together, these facts establish that the federal–state misconduct continuum is real, operational, and well-documented. It explains why the same categories of harm manifest across Michigan, Wisconsin, and South Dakota; why federal agencies consistently refuse intervention; why BAR-controlled courts repeatedly deny access to adjudication; and why Prosecutor Ex Rel / Plaintiff has been forced to proceed in the capacity of Private Attorney General as a Private

90

Public Proxy. It further clarifies why constitutional, statutory, fiduciary, and commercial remedies must now be invoked to halt an enterprise that crosses agency lines, State borders, and federal jurisdictions.

431.    The evidence throughout this Complaint demonstrates that the enterprise exposed herein does not limit its misconduct to a single person. Prosecutor Ex Rel / Plaintiff's experience provides a documented, traceable example of how the enterprise operates, but the methods – fraudulent classifications, contradictory determinations, coercive denials, ADA violations, procedural sabotage, and administrative concealment – are inflicted upon countless others who lack the means to assemble the record presented here. The enterprise operates systemically, and Prosecutor Ex Rel / Plaintiff proceeds to expose it systemically.

**Pattern of Administrative Obstruction**

432.    Documented evidence throughout this Complaint shows that, when Prosecutor Ex Rel / Plaintiff sought lawful administrative remedies, State agencies repeatedly obstructed the process rather than investigate or correct wrongdoing.

433.    One of the clearest examples appears in the three-plus-hour documentary video, which captures DSS Regional Manager Tom Eads and DSS supervisor Angie Reichert attempting to compel Plaintiff to commit Medicaid fraud by pressuring him to swear – under penalty of perjury – that he required daily bathing and dressing services he neither wanted nor needed. This coercion was presented as the only way to access the *"cookie-cutter"* Medicaid package, despite Prosecutor Ex Rel / Plaintiff explaining that the law supports independence, not forced dependence, and that the actual supports he required were Medicaid's payment of the 20% gap Medicare does not cover and transportation to access the community as a quad-amputee.

434.    The same documentary shows that, even after Prosecutor Ex Rel / Plaintiff rejected the unlawful pressure to commit fraud, DSS did not offer any lawful path to access the supports he was entitled to. Instead, DSS personnel repeatedly asserted that Prosecutor Ex Rel / Plaintiff actually *"financially qualified"* for Medicaid; but while finger-pointing to the DHS as the culprit in misrepresenting what services existed, misstating eligibility rules, and refusing to acknowledge Prosecutor Ex Rel / Plaintiff's documented medical needs and disability accommodations.

435.    The video demonstrates a clear pattern: DSS and DHS personnel were determined to fit Prosecutor Ex Rel / Plaintiff into a standardized package – even through coerced perjury on Medicaid *"application"* forms – rather than to *"apply"* the laws that define what constitutes "total and permanent" classification status resulting in the SSA letter in 2018 stating that *"re-review"* of *"SSI-eligibility"* should not even be considered for 5-7 years, and even then, only by a competent medical doctor familiar with SSA legislation and disability classifications.

436.    The documentary further records that at the end of this process, when Prosecutor Ex Rel / Plaintiff attempted to secure an administrative due-process hearing, DSS officials Eric Monson

and Wade Reimers derailed the proceeding. They attempted to conduct the hearing without Prosecutor Ex Rel / Plaintiff's subpoenaed witnesses present and refused to provide the ADA accommodations he required to participate meaningfully. Because Prosecutor Ex Rel / Plaintiff has no fingers and cannot take handwritten notes, he requested to record the hearing, which is a well-established ADA accommodation. Instead of granting the accommodation or providing a scribe, the officials canceled the hearing entirely, denying him access to the very *"due process"* the agency claimed was available.

437.    Outside the DSS context, Prosecutor Ex Rel / Plaintiff submitted extensive evidence to SDHDA and HPMI documenting falsified *"Interim Lease Change"* paperwork, contradictory statements by housing personnel, and even embezzlement of rent payments by Tammy Soulek as a former local HPMI office manager. Despite these detailed notices, neither SDHDA nor HPMI/SMGI conducted any investigation, corrected the record, or provided the required procedures for review. These failures mirrored the obstruction observed in the DSS documentary: agencies were unwilling to take any action that would expose internal wrongdoing.

438.    Prosecutor Ex Rel / Plaintiff also submitted large, fully documented packets to State and federal entities – including a 308-page State-focused filing and additional 575-page and 488-page federal filings – that were received but never acted upon. HUD's regional offices, FHEO, and other federal oversight divisions acknowledged receipt but then went silent, providing no investigation, no findings, and no referrals, despite the evidence involving federal funding, discrimination, retaliation, and program violations.

439.    Legal Services Corporation and Dakota Plains Legal Services reproduced this same pattern. LSC opened a docket but took no action, conducted no review, and provided no communication thereafter. LCS attorney Eugene Yuk claimed to be investigating DPLS and Murl Woods' refused representation on a housing *"threat of eviction"* and *"APA/PRA"* matters that also involved clear statutory violations and federal disability protection; yet this American BAR attorney too simply fell completely silent once he received an abundance of the evidence that he had requested from Prosecutor Ex Rel / Plaintiff. That evidence proved both Woods and DPLS – as Yuk's peer group of other BAR attorneys – being involved in fiduciary wrongdoings and Congressional misappropriations effectively and *discriminatingly* eliminating another channel of relief and leaving Plaintiff without access to legal assistance that is federally funded and intended to assist vulnerable populations.

440.    These events, taken together, show a persistent pattern of administrative obstruction: when Plaintiff sought lawful remedy, agencies did not investigate, did not correct records, did not follow statutory procedures, and did not provide the basic administrative processes required under State and federal law.

**Pattern of Constitutional Injury / Denial of Redress**

441.    Judicial bodies acted similarly. In both State and federal courts, including the Sixth Circuit and Eighth Circuit, Prosecutor Ex Rel / Plaintiff's filings were dismissed based on

92

technicalities that contradicted controlling Supreme Court precedent. These dismissals repeatedly referenced doctrines used to deny crime victims and whistleblowers access to prosecutorial and grand jury processes, despite Prosecutor Ex Rel / Plaintiff presenting documented evidence of misconduct, retaliation, falsified records, and violations of federal-funding requirements.

442.    Federal investigative and oversight channels failed in the same way. HUD FHEO, HUD regional offices, OIG units, SSA, FBI and USDOJ-OCR oversight divisions received Prosecutor Ex Rel / Plaintiff's detailed submissions – including video evidence, transcripts, and hundreds of pages of documentation – but never initiated investigations, issued determinations, or referred the matters appropriately. Requests for updates went unanswered or were met only with automated form letters such as those sent in 2023 by the SDHDA and USDOJ-OCR, both finger-pointing. The State AG's office and Marty Jackley failed to review or even acknowledge evidence of Medicaid Fraud implicating State actors in retaliation against a disabled whistleblower; and the State's Attorney Brenda Harvey did the same in trashing the evidence against similar retaliation by County-level actors employing her as Lawrence County Commissioners and Sheriff Department personnel.

443.    Repeated attempts to obtain bonding, oath, and accountability records were blocked by agencies that either denied the existence of such records or refused to disclose them. SDHDA, MBLCHRC, HPMI/HPMI  provided no access to risk-management or surety documents when confronted with the conversion and embezzlement of Prosecutor Ex Rel / Plaintiff's HUD-program associated rent check. This was despite Prosecutor Ex Rel / Plaintiff's explicit requests for assistance and evidence that the LIHTC and Section-8 systems being operated by HUD had displaced individual accountability structures. Even federal agencies, including HUD, failed to identify the officials responsible for enforcing program integrity, leaving Prosecutor Ex Rel / Plaintiff unable to ascertain who within the chain of authority possessed the lawful duty to respond.

444.    The cumulative result of these failures was a complete denial of redress. No agency, court, prosecutor, or oversight office provided a functioning process through which Prosecutor Ex Rel / Plaintiff could secure review, correction of records, investigation, or protection under federal law. These systemic denials forced Prosecutor Ex Rel / Plaintiff to assemble the comprehensive record contained in this Complaint and proceed herein as Prosecutor Ex Rel and Private Public Proxy in order to expose and challenge an enterprise of misconduct that spans agencies, jurisdictions, and federal-state boundaries.

445.    Taken together, these administrative failures formed a continuous pattern: whenever Prosecutor Ex Rel / Plaintiff sought lawful remedy or attempted to invoke statutory protections, each agency refused to process evidence, provide procedures, or conduct required oversight. These events were recorded, documented, and transmitted to multiple State and federal entities – and each time the response was either silence, deflection, or disappearance of the complaint. This pattern of obstruction rendered ordinary administrative remedies unavailable.

## ARGUMENT
### Commercial Enforcement and the
### Limits of Agency/Court Authority

## I.    Constitutional Foundations for Accountability

The Constitution has always imposed a structural mandate that government actors remain answerable to the People and to the law. This mandate is not aspirational; it is enforceable through a combination of equitable remedies, statutory provisions, and common-law mechanisms that have evolved in tandem with the constitutional order. The doctrines discussed below – *Ex parte Young,* ADA Title II as interpreted by *Tennessee v. Lane,* the First Amendment *Right to Petition,* the Guarantee Clause, the Spending Clause enforcement structure, and Article III jurisdiction – constitute the legal foundation upon which private enforcement actions and commercial remedies rest when public institutions fail to provide lawful redress.

These doctrines, taken together, establish a coherent and constitutionally anchored mechanism through which a private litigant may compel compliance, restrain unlawful behavior, and initiate a lawful process of accountability even where State systems have collapsed or have been co-opted to defeat their own remedial purposes.

## A. Ex parte Young and the Constitutional Right to Restrain Ongoing Violations of Federal Law

The landmark decision *Ex parte Young,* 209 U.S. 123 (1908), remains one of the most powerful mechanisms available to ensure that State officials may not violate federal law with impunity. *Young* establishes a foundational principle: sovereign immunity does not protect a State official who is acting unconstitutionally or *ultra vires,* because such conduct "strips" the official of the State's sovereign protection and places him in the position of a private wrongdoer.

The doctrine rests on the constitutional supremacy of federal law. The Supremacy Clause requires that federal rights remain enforceable regardless of State resistance, and federal courts must have the power to restrain ongoing violations. *Young* therefore authorizes suits for prospective relief against State officials to halt continuing breaches of constitutional or statutory duty.

This mechanism is not merely an exception to sovereign immunity; it is the constitutional safeguard that ensures State power can never negate federal rights. When State processes collapse – whether through obstruction, refusal to act, procedural sabotage, or systemic dishonor – *Ex parte Young* provides the gateway into Article III for judicial intervention and command.

Crucially, *Young* aligns with commercial-law concepts of *default* and *dishonor.* A State officer who refuses to perform mandatory duties is, conceptually, in default relative to the superior law that binds him. Once default occurs, equitable jurisdiction arises to compel performance, restrain violations, or impose remedial structure. Thus *Young* supplies the constitutional authorization for

94

the commercial enforcement mechanisms later invoked.

**B. <u>ADA Title II and Tennessee v. Lane: Accessibility as a Constitutional Imperative</u>**

Title II of the Americans with Disabilities Act is not merely a statutory requirement; its enforcement intersects directly with constitutional concerns. In *Tennessee v. Lane*, 541 U.S. 509 (2004), the Supreme Court held that Title II validly abrogates State sovereign immunity when violations implicate fundamental rights, especially the right of access to courts.

*Lane* emphasizes that Congress enacted *Title II* under its enforcement powers granted by Section 5 of the Fourteenth Amendment, responding to a long historical record of State discrimination and exclusion. The Court found a sufficient *"congruence and proportionality"* between the harms identified and the remedies imposed. As a result, federal courts retain full authority to enjoin State actors who deny meaningful access to public services, courts, administrative remedies, or procedural mechanisms.

The ADA's structure mirrors common-law principles that prevent a party from imposing barriers that defeat another's ability to fulfill obligations or access remedies. In commercial terms, a party who imposes such barriers acts in bad faith and forfeits procedural protections. *Lane* formalizes this concept constitutionally: when State officials create or maintain barriers that prevent disabled individuals from accessing the processes meant to protect their rights, federal courts may intervene directly, override State immunity, and impose corrective measures.

The Title II framework therefore reinforces the constitutional obligation that remedy must be accessible and meaningful – not illusory. Procedural access is a constitutional requirement, not discretionary benevolence.

**C. <u>First Amendment Right to Petition: Structural Protection of Redress Mechanisms</u>**

The First Amendment guarantees the right *"to petition the Government for a redress of grievances."* This guarantee was historically understood as a structural obligation of government to receive, consider, and not obstruct petitions for relief. While modern jurisprudence often focuses on retaliation principles, the deeper constitutional meaning remains: government may not erect barriers that functionally eliminate the capacity of the People to seek remedy.

The Petition Clause is the procedural backbone of republican accountability. It ensures that every individual retains the capacity to invoke the law against public officials, agencies, or institutions. Courts have consistently held that the government may not impose conditions or barriers that *"chill or foreclose"* access to redress mechanisms.

When combined with the Due Process Clause, the Petition Clause operates as a constitutional warranty ensuring that *procedures* cannot be manipulated to defeat *substantive* rights. This principle directly parallels common-law rules against procedural bad faith, where a party cannot rely on process to defeat justice.

Within the commercial-law analogy adopted here, Petition rights reinforce that commercial default occurs when government actors refuse to acknowledge or process legitimate claims, impairing the People's access to lawful remedy. Such refusal opens the door to alternative enforcement mechanisms – common-law distress, distraint, equitable liens, and other remedies – precisely because the State has abdicated its constitutional duty to provide redress.

## D. <u>The Guarantee Clause: Protection Against Systemic Breakdown</u>

Article IV, Section 4 guarantees to every State a *"Republican Form of Government."* Though the Clause is rarely litigated directly, its function is foundational. A republican government demands public accountability, the rule of law, transparency of official conduct, and accessible remedy for wrongs committed under color of office.

The Supreme Court has repeatedly reaffirmed that republican governance requires the preservation of structural protections that maintain the People's supremacy over government institutions. When States adopt systems that effectively nullify accountability – whether by replacing individual responsibility with risk-pooling mechanisms, insulating officials from scrutiny, or creating procedural regimes that foreclose remedy – such systems strain the constitutional commitment to republicanism.

While the Guarantee Clause has sometimes been described as *non-justiciable,* federal courts regularly interpret and enforce the structural principles that underpin it – separation of powers, due process, access to courts, and the ability to check government abuse. In this way, the Clause informs the constitutional foundation for private enforcement mechanisms, including commercial procedures that arise when republican structures break down.

A government that forecloses remedy ceases to act in a republican capacity. When that occurs, equity and commercial law supply the tools to restore accountability through lawful private action.

## E. Spending Clause Obligations: Conditional Federal Funding as Enforceable Law

Under the Spending Clause, Congress may attach conditions to federal funds provided to States. When a State accepts those funds, the conditions become binding law. The Supreme Court has long held that States may not accept federal dollars while refusing to comply with the obligations attached to them.

This doctrine is central to federal programs like Medicaid, HUD programs, LIHTC administration, and civil-rights enforcement. Federal funding conditions are not voluntary guidelines – they are enforceable legal duties, breach of which may trigger federal oversight, civil liability, or equitable intervention.

From the perspective of commercial law, acceptance of federal funds creates a fiduciary contract-

like obligation, imposing performance duties on the State. Failure to perform constitutes breach and default. Where statutory remedies are obstructed or unavailable, courts may enforce these federal conditions through equitable relief, damages, or sanctions.

The Spending Clause framework therefore integrates seamlessly with commercial-law principles: when a State accepts federal funds under conditions requiring nondiscrimination, due process, transparency, or record maintenance, and then violates those conditions, the State enters commercial dishonor. This dishonor justifies judicial intervention, commercial remedies, or both.

## F. Article III Jurisdiction When State Remedies Collapse

Article III courts serve as the constitutional forum of last resort when State processes collapse or become incapable of providing lawful remedy. Federal intervention becomes obligatory when State procedures are unavailable, when remedies are rendered illusory through obstruction, when rights secured by federal law are denied, when agencies act *ultra vires* or in violation of federal statutes, or when procedural devices are employed to defeat substantive rights in contravention of the Rules Enabling Act. In such circumstances, the constitutional structure requires federal courts to supply the remedy the State has refused or made impossible to obtain.

The Rules Enabling Act (28 U.S.C. § 2072) prohibits federal courts from interpreting procedural rules in a manner that abridges, enlarges, or modifies substantive rights. When State or federal tribunals use technicalities, procedural traps, or administrative maneuvers to nullify substantive rights, their actions exceed lawful authority. Such actions resemble commercial dishonor – an actor refusing lawful presentment – and trigger judicial capacity to impose equitable and commercial remedies.

Article III courts therefore become the proper venue, not merely because State actors erred, but because they ceased to perform their constitutional role. When traditional remedies fail, equity fills the void; and where equity identifies structural failure, commercial enforcement mechanisms such as liens, forfeitures, distraint, and distress become conceptually relevant as judicially supervised counterparts of ancient common-law remedies.

Federal courts, sitting in equity and law, possess inherent authority to fashion remedies that restore lawful order, prevent further violation, and enforce obligations arising under federal statutes, constitutional mandates, and accepted commercial principles.

Together, *Ex parte Young,* ADA Title II, the Petition Clause, the Guarantee Clause, the Spending Clause enforcement structure, and Article III jurisdiction form a unified constitutional framework that mandates accountability, ensures the availability of remedy, prohibits procedural manipulation, and authorizes judicial enforcement – even through mechanisms with commercial analogues – when State actors refuse to honor their legal obligations.

This foundation supports the next sections of the ARGUMENT, where commercial-law concepts such as suretyship, default, distress, distraint, liens, garnishment, and forfeiture will be integrated

with constitutional doctrine to form a coherent pathway to lawful private enforcement.

## II. UCC / COMMON-LAW SURETY LIABILITY

The constitutional structure of the United States presupposes that every public office is a public trust, and that the individuals who occupy such offices bear enforceable fiduciary duties to the People. These duties are not ceremonial; they arise from longstanding common-law principles that predate the Constitution and remain operative unless expressly displaced. The Constitution did not erase the common law; it absorbed and preserved it where consistent with federal rights. Thus, the framework governing oaths of office, bonds, fiduciary obligations, and the personal liabilities attached to official misconduct derives not only from statutory enactment but also from centuries of common-law doctrine concerning suretyship, agency, public trust, and constructive obligation.

At common law, anyone entrusted with public authority was understood to stand as a fiduciary for the community, and the breach of such trust created personal liability enforceable through courts of law or equity. This structure continues today through the mechanisms of oaths, bonds, and the surety relationships that arise from them.

An oath is not a mere formality. It is a binding declaration of duty, sworn under penalty, and it forms the basis of personal accountability when an official acts outside the authority granted. The official who violates his oath does not merely err; he steps outside the lawful boundaries of delegated power and thereby forfeits the protections attached to official status. The principle is analogous to the doctrine articulated in *Ex parte Young*: an official acting unlawfully ceases to act as the State and becomes personally answerable.

These common-law principles have modern expression through bonding requirements. Many public offices require bonds – statutory, official, performance, or fidelity – issued by corporate sureties that guarantee the official's performance of lawful duties. The bond is a commercial instrument that creates a tri-partite relationship: the People as *beneficiaries*, the official as *principal*, and the surety as *guarantor*. When the official violates the duties owed, a breach occurs, and the commercial liability shifts to the surety. The law has long held that the surety stands in the shoes of the principal for purposes of accountability; thus, misconduct or dishonor by the official places the surety at risk, generating a legally cognizable obligation to compensate for the harm or to remedy the breach.

Even where statutory bonding is circumvented or replaced – such as through risk pools, indemnification schemes, or self-insurance funds – the underlying legal principle does not disappear. The trust relationship remains, and the official continues to bear a personal fiduciary duty that arises from the oath, not from the bond alone. The common-law rule is unequivocal: the absence, failure, corruption, or concealment of a bond does not eliminate liability; it shifts the nature of accountability.

98

When bonding structures break down, courts of equity may impose constructive trusts, equitable liens, or surcharge remedies to ensure that fiduciary breaches do not go unremedied. Public office cannot be used as a shield against responsibility, and commercial forms cannot be manipulated to evade the obligations inherent in service to the People.

From the perspective of the Uniform Commercial Code, public officials operate as fiduciaries whose conduct must conform to standards of honesty, fair dealing, and good faith. Though the UCC does not govern public administration directly, its principles reflect longstanding commercial norms that courts routinely apply by analogy in the absence of contrary rules. When an official refuses to perform a mandatory duty, obstructs access to remedy, withholds required process, or violates statutory obligations, such conduct mirrors commercial dishonor – the refusal to accept presentment, failure to perform a required obligation, or repudiation of a contractual undertaking. In commercial law, dishonor triggers liability, default consequences, and enforcement rights; the same structure applies, conceptually, to public fiduciaries acting outside lawful authority.

The doctrine of constructive trust arises precisely in circumstances where legal title or authority has been abused. Courts impose constructive trusts to prevent unjust enrichment, recover misapplied funds, or rectify breaches of fiduciary duty.

The trust is *"constructed"* by law, not by agreement, and it functions as a commercial mechanism to restore the property or rights to the lawful beneficiary. When a public official misuses authority, manipulates process, or violates statutory obligations, the constructive trust framework permits courts to impose remedies that ensure accountability even in the absence of express statutory enforcement provisions. Equity will not allow an official to retain the benefit of misconduct, nor permit governmental entities to profit from wrongful acts carried out under color of office.

This fiduciary framework extends to the State agencies that supervise, insure, indemnify, or manage public officials. When agencies create structures – whether risk pools, insurance mechanisms, or internal indemnification schemes – that insulate officials from personal accountability, those agencies may themselves become subject to constructive obligations. Courts have long recognized that public funds cannot be used to underwrite unlawful conduct; where agencies knowingly permit officials to act without accountability, or where they facilitate or conceal misconduct, equity may impose a duty upon the agency to restore losses, correct wrongs, or disgorge benefits obtained through maladministration.

Suretyship at common law contained not only the obligation to compensate for breaches but also the mechanism of subrogation, in which the surety, after paying the loss, acquires the right to pursue the official for reimbursement. Modern public accountability retains this principle conceptually: even where indemnification exists, the State or insurer may recover against officials who acted outside the scope of lawful authority.

The presence of a risk pool or indemnity mechanism does not absolve the individual of

99

responsibility; it merely determines the initial flow of compensation. The foundational rule remains that the wrongdoer is ultimately liable for the consequences of his dishonor.

These principles merge with the commercial enforcement concepts recognized in UCC-adjacent jurisprudence. When an official or agency refuses lawful presentment – whether of evidence, claims, notices, or mandatory duties – that refusal constitutes a form of dishonor. In commercial contexts, dishonor triggers the right to enforce the obligation, demand cure, impose interest or penalties, or initiate remedies such as distress, distraint, garnishment, or forfeiture.

Equity and common law permit similar remedies against officials who, by refusing lawful duties, place themselves in a position analogous to commercial default. Federal courts, sitting in equity, possess the power to order disgorgement, impose surcharge, direct restitution, or establish constructive trusts to remedy official misconduct.

The commercial analogy is not rhetorical. It reflects the deep structural logic of Anglo-American law: public office is a trust, breach of trust creates accountability, and accountability may be enforced through equitable devices that mirror commercial remedies. When officials violate statutory mandates, obstruct access to justice, ignore required procedures, or weaponize process against the People, they trigger fiduciary liability analogous to commercial default. Commercial law teaches that obligations do not vanish because an obligor refuses to perform; they become more enforceable, not less.

Thus, the constitutional, statutory, and common-law foundations converge on the same point: when public officials dishonor their oaths, violate their duties, or obstruct lawful remedy, their actions carry commercial consequences enforceable through courts of law and equity.

In such circumstances, the People retain the right – grounded in the structure of the Constitution and confirmed by the traditions of common law – to invoke remedies that ensure accountability, even when administrative systems collapse. This includes the imposition of constructive trusts, the recognition of fiduciary breach, and the activation of commercial enforcement procedures that mirror those used in the private sphere to address default, dishonor, and breach of obligation.

### III. Why the "*No Cognizable Interest in Prosecution*" Doctrine Does Not Bar This Suit

Federal courts have long recognized a distinction between a litigant who seeks to compel the government to prosecute another individual and a litigant who seeks to vindicate his own rights under federal law. This distinction lies at the heart of the "*no cognizable interest in prosecution*" doctrine – an often-misunderstood framework whose misapplication has, for decades, resulted in the improper dismissal of civil actions that do not seek prosecutorial compulsion but instead demand enforcement of constitutional, statutory, or fiduciary obligations. The present action falls wholly within the latter category.

The doctrinal origins of the rule trace primarily to *Linda R.S. v. Richard D.*, 410 U.S. 614 (1973), where the Supreme Court held that a private citizen lacks standing to compel a criminal

100

prosecution. The holding was narrow: the Court reasoned that the plaintiff's alleged injury was not redressable by the requested relief because prosecution of another individual would not necessarily produce a tangible benefit to the plaintiff. Nothing in *Linda R.S.* suggested that a private citizen cannot sue to enforce his own federal rights, obtain equitable relief, restrain unconstitutional behavior, challenge systemic misconduct, or compel officials to comply with duties imposed by Congress.

Subsequent decisions – *Diamond v. Charles*, 476 U.S. 54 (1986); *Leeke v. Timmerman*, 454 U.S. 83 (1981); and *Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005) – further clarified that *"no cognizable interest in prosecution"* is confined to circumstances where the plaintiff seeks criminal enforcement for its own sake. These cases involved individuals attempting to require government prosecutors or police officers to pursue particular criminal charges. They do not address, and do not restrict, actions seeking civil remedies, declaratory relief, equitable redress, structural reform, commercial accountability, or constitutional enforcement when public officers violate federal law.

The problem arises when lower courts misread these precedents, extending them far beyond their intended scope. Numerous courts have mistakenly cited *Linda R.S.* and related cases to dismiss actions where plaintiffs were not seeking criminal prosecution at all, but rather seeking relief for violations of their own rights. This misuse transforms a narrow standing doctrine into a sweeping immunity shield – one unsupported by the Constitution and inconsistent with centuries of Anglo-American law recognizing the People's right to hold public officials to account.

This pattern of misuse is documented extensively in the legal literature and reflected in the materials compiled in Appendices A, A-1, A-2, A-3, C, F, and G, which demonstrate how courts have sometimes reflexively invoked the *"no cognizable interest in prosecution"* doctrine without scrutinizing whether the claim actually sought prosecutorial compulsion. These appendices detail numerous instances where litigants – particularly whistleblowers, disabled individuals, and those confronting entrenched administrative misconduct such as Prosecutor Ex Rel / Plaintiff in his earlier years of employment as a public official – were denied access to civil remedies based on mischaracterized standing rules.

The misuse of the *"no cognizable interest in prosecution"* doctrine is further illustrated by the line of rulings summarily invoking *Schied v. Ward*, which has been cited repeatedly as though it stands for a broad proposition that citizens may not seek judicial intervention when public officials violate federal law. However, the citations often divorced themselves from the underlying factual record and the procedural posture of the case.

The misapplication of *Schied v. Ward* – sometimes used as shorthand to dismiss complex civil actions without considering the substance of the pleadings – has contributed to a distorted interpretation of what the doctrine actually means. The appendices referenced above catalog how this misapplication produces ripple effects: errors, omissions, and procedural shortcuts become falsely calcified into *"precedent,"* influencing subsequent cases with no regard for the underlying facts or proper constitutional analysis.

Properly understood, the *"no cognizable interest"* doctrine applies only where a litigant demands that the State initiate criminal prosecution of another person. This Complaint does no such thing. It seeks redress for violations of federal constitutional rights, statutory rights, fiduciary duties, and commercial obligations arising under federal law and common-law principles. The relief sought is civil, equitable, and prospective. It includes structural reform, enforcement of statutory conditions attached to federal funds, recognition of fiduciary breach, and commercial accountability mechanisms that follow from public office. None of these forms of relief depend upon, or require, criminal prosecution of any defendant.

The Supreme Court has long recognized that private individuals may enforce federal rights through civil actions. Section 1983 exists for precisely that purpose, and the Court has repeatedly held that sovereign immunity does not bar suits for prospective relief against State officials acting unconstitutionally (*Ex parte Young*). Federal statutes, including the ADA, Fair Housing Act, and False Claims Act, authorize private enforcement to ensure compliance. The First Amendment protects the right to petition the courts for redress. The Spending Clause authorizes Congress to impose conditions on federal funds that are judicially enforceable. Article III empowers the federal judiciary to provide remedies where State processes fail.

Thus, the present action fits within a well-established category of civil enforcement litigation – not an attempt to compel prosecution, but an effort to secure remedy for harms directly inflicted through unlawful State conduct. The court's role is not to second-guess prosecutorial discretion, but to enforce federal rights, restrain unlawful behavior, and ensure the structural integrity of constitutional government.

It is also essential to distinguish between prosecution and accountability. Criminal prosecution is a sovereign function. But accountability – through injunctions, declaratory relief, equitable remedies, commercial enforcement, constructive trusts, fiduciary surcharge, and statutory damages – is not exclusive to the criminal domain. Courts regularly impose accountability on public officials for breaches of duty even where no criminal charges are pursued. Accountability in commerce, accountability in equity, and accountability under federal statutes do not require – and have never required – the initiation of criminal proceedings.

That distinction is reinforced by the common law of public office. A fiduciary's breach does not become insulated merely because a prosecutor declines to act. The law has always provided private parties with remedies when public officials dishonor their obligations. As documented in Appendices A-2 and A-3, centuries of common-law doctrine permit private enforcement when the official charged with execution of the law refuses to perform. The doctrine of distrain and distress, the use of constructive trusts, the imposition of forfeiture, and equitable liens all arose precisely because public officers could not be depended upon exclusively to police themselves. These remedies serve as the historical antecedents to the modern commercial-enforcement mechanisms argued elsewhere in this Complaint.

In this way, the *"no cognizable interest in prosecution"* doctrine functions as a narrow limitation

102

on one category of relief – it does not restrict, narrow, or diminish the judicial power to enforce constitutional and statutory rights through civil action. Nor does it impede the ability of the People, acting through a Private Attorney General or Private Public Proxy model, to invoke commercial processes that arise upon official dishonor. The doctrine cannot be stretched to bar actions that seek the enforcement of duties imposed by federal law, the restoration of constitutional order, or the imposition of civil accountability where government officials violate clearly established obligations.

Furthermore, misapplication of this doctrine undermines the core values of Article III. Federal courts are constitutionally mandated to adjudicate cases and controversies arising under federal law. When lower courts incorrectly invoke the *"no cognizable interest in prosecution"* rule to dismiss actions that seek reinforcement of constitutional rights or statutory obligations, they effectively abdicate jurisdiction granted by the Constitution itself. The judicial power is diminished when standing doctrines are misused to avoid reaching the merits of legitimate claims.

Finally, the commercial-process components of this Complaint – including the preservation of the $100-billion surety claim, the invocation of fiduciary and constructive-trust principles, and the reliance on common-law remedies arising from official dishonor – fall entirely outside the prosecutorial realm. These mechanisms derive from the People's right to hold public fiduciaries accountable through lawful processes independent of criminal prosecution. They exist precisely because the common law recognized that sovereign officials could and would fail to enforce the law against themselves.

For these reasons, the *"no cognizable interest in prosecution"* doctrine provides no barrier to this suit. The relief sought is civil, equitable, commercial, and constitutional – not criminal. The doctrine's narrow purpose does not encompass private enforcement of rights, nor does it shield public officials from accountability for violating federal law. When courts have misapplied the doctrine – including through mis-citations of *Schied v. Ward* – their reasoning collapses under proper doctrinal scrutiny.

This action proceeds under the well-established constitutional and common-law mechanisms designed to ensure that the People retain the ability to restrain unlawful government conduct when the State's internal systems of remedy have failed. In this case, the evidence proves that failure as occurring over and over again, as a matter of pattern in practice.

## IV. Defendant Categories and Count Application

The administration of remedy in a constitutional republic requires that courts apply law and equity to the specific actors whose conduct gives rise to liability. The Complaint's structure reflects this necessity by organizing the defendants into functional categories, as set forth in Appendix A-1, and by aligning each category with the Counts that address the legal, fiduciary, statutory, and commercial breaches implicated by their conduct. This section explains the doctrinal basis for applying those Counts to the defendants, and the commercial-law reasoning

103

that converts those claims into enforceable obligations within Article III jurisdiction.

Federal courts routinely categorize defendants according to their status, duties, and the legal frameworks governing their obligations. Officials who exercise statutory authority, administer federal funds, operate State programs, or act under color of law occupy distinct legal positions that determine the nature of their liability. Appendix A-1 identifies these categories clearly, organizing defendants into groups such as State administrators, licensing entities, judicial actors, federal oversight personnel, private corporate agents acting under federal programs, risk-pool managers, and others who operate within the channels of public trust. Each category corresponds to a distinct relationship between authority and responsibility, which in turn determines how Counts apply and how commercial obligations arise upon breach.

Counts in a federal complaint function as the formal articulation of the legal duties breached and the remedies available for those breaches. They are not mere labels; they are the operative legal channels through which a court assesses liability, applies statutory requirements, and imposes equitable or commercial consequences. When linked to the defendant categories in Appendix A-1, the Counts create a transparent matrix by which the court may determine which duties attach to which actors, and how liability flows. This methodology mirrors commercial practice, in which parties are assigned obligations according to their roles in the transaction or trust relationship. Public administration, built on fiduciary foundations, is no different in principle.

The Complaint's FACTS and Appendices contain the evidentiary *"containers"* that establish the underlying conduct attributed to each defendant category. These containers include documentary evidence, statutory duties, administrative procedures, funding conditions, and records of dishonor, obstruction, or *ultra vires* action. The role of the ARGUMENT section is not to reproduce the facts but to explain the legal process by which those facts – once presented – attach to the Counts and, through the Counts, to the commercial remedies available. This preserves judicial neutrality while ensuring that the court is guided through the doctrinal steps that convert breach into liability.

The linkage between Counts and defendants is rooted in the constitutional and common-law rule that every duty, once imposed, creates a corresponding right of enforcement. When a State official violates federal law, civil-rights statutes, or spending-clause obligations, the official becomes subject to *Counts* rooted in constitutional enforcement (*Ex parte Young*), statutory accountability (e.g., ADA, FHA, Section 1983, Section 1985), or commercial trust law. When a corporate entity accepts federal program duties under contract or regulatory obligation, liability arises through *Counts* addressing misuse of federal funds, failure to perform programmatic obligations, or breach of statutory conditions. When judicial actors act without jurisdiction, deny due process, or violate procedural rules that have the force of law under the Rules Enabling Act, they become subject to *Counts* addressing structural breaches, constitutional injuries, and commercial dishonor analogous to *ultra vires* action.

Commercial-liability alignment occurs when a Count does more than establish a violation; it identifies the operative breach of duty under principles of trust, suretyship, or constructive

obligation. A fiduciary who refuses to perform, conceals required actions, or obstructs lawful remedy enters a condition of commercial default. Default gives rise to the remedies historically available through courts of equity, which include constructive trusts, surcharge, disgorgement, restitution, or recognition of liens and forfeitures arising from the breach. This framework has been recognized for centuries: where officeholders dishonored their duties, courts imposed personal liabilities to ensure accountability in the absence of criminal enforcement or administrative correction.

In modern administrative governance, commercial alignment also occurs through the structure of federal funding. Many defendants identified in Appendix A-1 operate programs funded wholly or partially by federal dollars. Acceptance of these funds binds the defendant to federal obligations whose breach forms the basis for multiple *Counts* within the Complaint. The Spending Clause conditions function as enforceable contracts: breach of these conditions provides grounds for civil liability and corrective action. Thus, when the Complaint asserts *Counts* relating to misuse of federal funds, discrimination under federal statutes, or failure to maintain federally mandated processes, it links each defendant category to a specific commercial obligation arising from the acceptance of federal benefits.

The alignment between Counts and defendants also reflects the constitutional hierarchy of duties. Certain defendants owe direct constitutional duties – such as due process, equal protection, nondiscrimination, and access to courts – that cannot be displaced by State policy or administrative practice. Others owe statutory duties created by federal law, such as the ADA, the Fair Housing Act, program-integrity statutes, or fiduciary duties arising from the administration of federal funds. Still others owe duties arising from oaths of office, which create binding obligations under common-law surety principles. When a defendant violates one of these duties, the corresponding *Count* identifies the breach and provides the court with the doctrinal basis for remedy.

Commercial-liability principles operate regardless of whether a defendant is a public officer, private contractor, judicial actor, or oversight administrator. When the defendant's role places them in a position of *trust* relative to the People, breach of that trust triggers obligations cognizable in equity. Courts have repeatedly held that public officers cannot use procedural constructs or indemnification systems to escape accountability. When an official's duty arises from federal law, the breach of that duty creates a cognizable claim that federal courts must adjudicate under Article III, even if State systems fail to enforce their own obligations.

This Complaint employs the defendant categories in Appendix A-1 as the structural foundation for integrating the Counts into the commercial enforcement pathway. Each category corresponds to a different layer of authority within the enterprise described in the FACTS and Appendices. The Counts reflect the distinct legal consequences that arise when that authority is misused. In this manner, liability flows according to legal duties, not subjective judgments or discretionary considerations. Federal courts sitting in law and equity do not invent duties; they enforce duties already imposed by the Constitution, federal statutes, trust principles, and commercial law.

The commercial-process pathway further clarifies how Counts function as *"claims in commerce."* When a Count asserts violation of a constitutional or statutory duty, the defendant enters dishonor relative to the superior law. When a Count asserts breach of fiduciary duty, misuse of public funds, or obstruction of remedy, the defendant enters commercial default analogous to breach of trust. When a Count asserts discrimination, retaliation, or violation of access rights, the defendant violates spending-clause obligations or federal-rights guarantees, which commercial law analogizes to failure of performance under a binding agreement. These defaults authorize the court to impose remedies that mirror commercial enforcement: constructive trusts, forfeiture of ill-gotten benefit, surcharge of fiduciaries, equitable liens on interests tied to the misconduct, and injunctive restructuring to prevent further breach.

As the Complaint transitions from the ARGUMENT section into the COUNTS and DEMAND FOR RELIEF, this structure ensures that each Count is more than a legal citation. Rather, each Count is an actionable component of a lawful commercial-constitutional enforcement model. The defendant categories in A-1 demonstrate who owes which duties. The Counts identify the nature of each breach. The commercial-law framework clarifies the consequences of those breaches. And Article III provides the judicial authority necessary to enforce the obligations arising from the defaults.

This alignment gives the federal court a clear roadmap: it need not exercise broad discretion or create new doctrine. Its task is simply to apply established law – constitutional, statutory, fiduciary, and commercial – to the defendants whose conduct, duties, and positions fall within the categories identified in Appendix A-1. Where the law imposes duty and breach is shown, liability must follow. Through this process, the sovereign People obtain the remedy the Constitution guarantees and commercial law enforces.

## V.    Article III Authority to Hear This Matter

Federal courts derive their jurisdiction from Article III, which empowers them to adjudicate cases arising under the Constitution, federal statutes, and laws of the United States. This case falls squarely within that jurisdiction because it seeks enforcement of federal rights, vindication of duties imposed by federal law, and remedy for violations of constitutional protections. Article III courts do not merely possess the capacity to hear such matters; they bear the affirmative duty to provide redress when federal rights have been burdened or extinguished by State actors or federal officers acting *ultra vires.*

Statutory jurisdiction supplements this constitutional foundation. Title 28 U.S.C. §§ 1331 and 1343 authorize federal courts to adjudicate civil-rights actions and claims arising under laws enacted to protect federal rights. Congress created these jurisdictional grants precisely because State systems cannot always be relied upon to furnish remedy, particularly where federal funds, federal mandates, and the structural integrity of constitutional guarantees are implicated. When State processes have collapsed – as documented throughout the Complaint's FACTS and Appendices – federal jurisdiction becomes not merely available but indispensable.

Injunctive and declaratory authority follow directly from Article III and from the Declaratory Judgment Act. Federal courts routinely issue equitable relief to restrain ongoing violations of federal law, to clarify legal rights, and to enforce duties arising from federal obligations. These remedies operate without regard to sovereign resistance, because the supremacy of federal law requires that violations be halted and redress provided. When State actors refuse, obstruct, or undermine the processes required by law, federal courts have the inherent authority to impose structural, injunctive, or declaratory remedies necessary to restore legality.

A further foundation for jurisdiction arises from the Spending Clause. States and private entities that administer federally funded programs – whether Medicaid, HUD programs, LIHTC systems, or ancillary public services – operate under binding conditions attached to federal funds. These conditions create enforceable rights, and federal courts possess the jurisdiction to adjudicate claims arising from the breach of those conditions.

Federal spending oversight failures fall squarely within federal judicial competence because Congress intended such conditions to operate as enforceable obligations. When actors entrusted with these funds violate program rules, obstruct statutory protections, or deny federally guaranteed rights, they enter into breach of the conditions that justify federal funding itself. Article III courts must intervene to correct such breaches, enforce accountability, and safeguard public trust.

Thus, both constitutional and statutory frameworks converge to authorize federal adjudication of this matter. The claims arise under federal law; the defendants' obligations derive from federal statutes, federal funds, and constitutional duties; and the relief sought falls within the traditional powers of courts of law and equity. There is no jurisdictional barrier to hearing or remedying these claims.

## A.      Prosecutorial Duties Under Federal Law and the §3332(a) Grand Jury Mandate

One of the most frequently misunderstood – but legally unambiguous – federal duties arises under 18 U.S.C. §3332(a). The statute provides that a United States Attorney *"shall"* present to a federal special grand jury any information about federal crimes received from *"any person."* Courts interpreting this language have consistently acknowledged the mandatory nature of the duty. The special grand jury, unlike the ordinary one, exists as an independent constitutional body, empowered to investigate offenses against the United States free from control by any branch of government. In *United States v. Williams*, the Supreme Court emphasized the grand jury's independence and its historic role as a buffer between the People and governmental abuse.

The textual command of §3332(a) leaves no discretion to the U.S. Attorney. The prosecutor may not screen, withhold, or suppress information offered by a member of the public. Once the grand jury is empaneled, the statute grants the sovereign People explicit participatory authority. The public is invited to present information, and the prosecutor is required to transmit it. This is not a matter of prosecutorial discretion; it is a statutory obligation with constitutional implications.

When a prosecutor refuses to transmit evidence to the special grand jury – whether by denying access, refusing to receive submissions, or ignoring sworn declarations – such refusal constitutes obstruction of an official proceeding under federal criminal law. It may also constitute misprision of felony, accessory after the fact, interference with victims' rights, and violations of ethical duties imposed upon federal officers. The refusal further undermines the grand jury's institutional independence, which the Supreme Court has repeatedly identified as a structural safeguard essential to constitutional governance.

The Complaint does not seek to compel prosecution. Instead, it identifies the prosecutor's refusal to transmit evidence as a breach of duty that contributes to commercial and constitutional default. When the official charged with performing the statutory gateway function refuses to act, the pathway for public accountability collapses. In commercial terms, the prosecutor becomes a party in dishonor: he has refused presentment of a lawful claim. This dishonor activates alternative enforcement mechanisms – the very ones recognized in common law, equity, and commercial jurisprudence.

Accordingly, prosecutorial nonfeasance under §3332(a) becomes a critical component of the liability structure. It demonstrates, at the structural level, that administrative and legal systems have ceased to perform their intended functions, thereby triggering the commercial enforcement pathway modeled on default, dishonor, and constructive accountability.

## B.    How Blanket Refusals Trigger Commercial Liability

Commercial law has long recognized that when a party refuses to receive presentment, declines to perform mandatory duties, or obstructs the enforcement of obligations, that party enters into commercial default. Default creates liability even before harm is fully adjudicated. The principle applies equally to private contracts, fiduciary duties, and public administration. When officials entrusted with statutory or fiduciary responsibilities refuse to act, deny remedy, or conceal mandatory processes, they place themselves in a condition of dishonor that courts must recognize and remedy.

Blanket refusals by officials and agencies – whether refusing to accept evidence, refusing to process filings, refusing to transmit information to a grand jury, or refusing to provide required administrative procedures – are not mere errors. They constitute breaches of legal obligations analogous to contractual repudiation. In commercial doctrine, repudiation authorizes the harmed party to pursue remedies without waiting for further performance. In the public trust context, the repudiation of official duty justifies equitable interventions including constructive trusts, forfeiture, surcharge, and the imposition of obligations akin to commercial liens.

The Complaint's Appendices – including A, A-1, A-2, A-3, C, F, and G – contain detailed documentation of the systemic refusals and procedural denials that mark the defendants' dishonor. These materials provide the factual foundation for the commercial argument: when administrators, officials, or judicial actors refuse to carry out federally mandated processes, they trigger a shift from administrative jurisdiction to commercial and constitutional accountability

108

enforceable in Article III courts.

Commercial liability arises not from criminal wrongdoing but from breach of obligations inherent in the trust relationship between public officials and the People. The refusal to perform mandatory duties signals abandonment of that trust, and courts of equity possess the authority to impose obligations that ensure accountability even when administrative systems fail.

## C.    Private Attorney General Doctrine and the Restoration of Public Enforcement Authority

The Private Attorney General doctrine reflects the fundamental principle that private litigants may enforce federal rights when public officials fail to do so. Congress has repeatedly enacted statutes that explicitly authorize private enforcement – civil-rights laws, disability statutes, housing statutes, and program-integrity provisions among them. These statutes embody a structural recognition: government actors cannot always be relied upon to enforce compliance with the law, and the People must retain the means to do so. (Tenth Amendment)

The doctrine corresponds directly to the traditional concept of the sovereign People delegating authority to governmental institutions. (Ninth Amendment) When the institutions fail to act, the People retain residual authority to enforce the law in their own name. Courts have long recognized suits brought by private parties serving in a representative capacity, including *qui tam* relators, civil-rights litigants, and individuals invoking equitable doctrines to restrain unlawful State action. This Complaint's invocation of a Private Public Proxy model falls squarely within this established tradition. It is neither novel nor extraordinary; it is a modern expression of the legal and constitutional principle that governmental accountability ultimately belongs to the sovereign People.

The doctrine also integrates seamlessly with commercial enforcement. When public fiduciaries refuse to perform, the harmed party becomes entitled to initiate processes historically used to secure performance or remedy, including constructive trust actions, injunctions, and commercial-enforcement mechanisms recognized in equity. The courts' duty is not to question the propriety of private enforcement but to apply the law to the breach presented.

## D.   *"Citizen's Arrest on Paper"* as the Commercial Analog of Compelled Accountability

The concept sometimes described as a *"citizen's arrest on paper"* is not a criminal act but a commercial and constitutional process that arises when public officials default on mandatory duties. Historically, when sheriffs, magistrates, or officers of the Crown refused to enforce the law, private citizens invoked distress, distraint, lien rights, or presentment before courts of equity to compel action. These procedures were lawful mechanisms by which the People preserved the rule of law when officials were unwilling to enforce it.

Modern doctrine does not use the same terminology, but the underlying principles remain intact. When an official refuses to act, a private party may initiate judicial proceedings that compel

accountability through civil process. Counts grounded in fiduciary breach, statutory violation, commercial dishonor, constructive fraud, and deprivation of federal rights serve as the modern equivalent of these historic remedies. The judicial enforcement of such Counts is not criminal prosecution; it is equitable administration of obligations arising from default.

This Complaint formalizes that principle within constitutional bounds. By invoking equitable and commercial doctrines, the filing becomes the procedural vehicle through which accountability is compelled. The court's role is to determine whether breach has occurred and to impose remedy accordingly, not to penalize criminally but to restore lawful governance.

## E.    The Commercial Enforcement Process and Its Alignment With Article III Jurisdiction

The commercial enforcement process outlined in this Complaint consists of several stages recognized by courts for centuries: notice, opportunity to cure, default, administrative findings, surety exposure, and judicial enforcement. These steps reflect both common-law tradition and the modern legal structure. *Notice* informs the obligor of the claim; *opportunity to cure* provides a final chance to perform; *default* marks the refusal; *administrative findings* may be derived from the evidentiary record or agency inaction; and *surety exposure* arises from breach of duty or trust.

This framework aligns directly with Article III jurisdiction because federal courts historically adjudicate matters arising from default, breach, or fiduciary failure. When administrative systems collapse or refuse remedy, the federal court assumes the role once held by courts of equity, ensuring that obligations of law and trust are enforced despite the failures of the State. Constructive trusts, equitable liens, forfeiture of wrongful gains, and injunctive restructuring are inherent components of federal equitable power.

The Complaint's structure – linking Counts to defendant categories, linking facts to Counts, and linking Counts to Claims in Commerce – creates a coherent enforcement pathway fully compatible with Article III authority. Federal courts do not act outside their role by enforcing such obligations; they act within the core of their constitutional power to interpret the law, provide remedy, and restore legal order.

## VI.    Why Relief Must Issue

Federal courts exist for moments precisely like this – moments when statutory schemes have been frustrated, constitutional rights suppressed, and administrative processes deliberately obstructed to the point that traditional channels of remedy no longer function.

Article III was constructed to ensure that the People, as sovereign, never lose the ability to vindicate federal rights even when State or federal officers refuse to perform. Relief must issue in this case because the constitutional design does not tolerate a vacuum where law *should* operate but *doesn't*. Where public mechanisms fail, the courts are mandated to act, applying law and equity to restore the conditions under which rights may again be meaningfully exercised.

110

Relief is not *discretionary* when structural injury is shown. A plaintiff seeking to restrain ongoing violations of federal law need not wait for successive harms to unfold; nor must he accept the collapse of remedy as an insurmountable barrier. The Supreme Court's equitable jurisprudence makes clear that federal courts possess both the authority and the _duty_ to prevent irreparable injury, to correct systemic violations, and to ensure that the enforcement of federal law is not left to the whim of administrative actors whose conduct undermines statutory commands.

The relief sought here flows directly from that mandate, for without judicial intervention, the breaches at issue would remain unremedied and the structural integrity of the constitutional system would continue to deteriorate.

## A. Structural Reform as a Judicial Obligation

When the patterns of misconduct documented in the Complaint's FACTS and Appendices represent not isolated acts but systemic failures across multiple institutions, the judiciary must look beyond individual wrongdoing and address the structural deficiencies enabling such violations. Federal courts have long recognized their authority to impose structural reform as necessary to remedy entrenched constitutional violations. Whether in institutional reform litigation, civil-rights enforcement, or statutory compliance actions, the courts' role is not merely reactive but *corrective*; they ensure that systems operate within legal parameters.

Structural reform becomes indispensable where the system itself functions to negate remedy. The evidence containers incorporated into this Complaint – Appendices A, A-1, A-2, A-3, C, F, and G – demonstrate patterns of systemic obstruction, procedural manipulation, and administrative dishonor. In such circumstances, the court's equitable jurisdiction empowers it to impose structural remedies that restore accountability, safeguard rights, and prevent recurrence. This may include mandating revised administrative procedures, appointing monitors, issuing supervisory injunctions, restructuring agency practices, or prohibiting the continuation of practices that interfere with federal rights.

Structural reform is therefore not an extraordinary remedy but a necessary one. Where constitutional guarantees and federally protected rights are thwarted by systemic design or deliberate misuse, only structural intervention can restore the conditions under which the rule of law may meaningfully operate.

## B. Injunctive Relief: An Immediate and Necessary Remedy

Injunctive relief is among the most central tools in federal adjudication. It halts ongoing violations of law, prevents irreparable injury, and restores lawful order pending resolution of substantive claims. The circumstances presented in this Complaint warrant immediate injunctive action in multiple dimensions.

First, federal courts possess nationwide injunctive authority when adjudicating violations of federal law. This authority has been repeatedly exercised across administrations and was

prominently visible during the litigation surrounding the actions of the Second Trump Administration, where district courts issued injunctions with nationwide effect to restrain executive orders and federal practices. The Department of Justice repeatedly challenged this authority, but the courts consistently reaffirmed that when federal rights are at stake, a district court may enjoin conduct occurring anywhere within the United States. That principle applies equally here.

Accordingly, the court has the power – and the duty – to issue immediate/emergency injunctive relief to protect the life and safety of Reverend Jason Goodwill, a federal whistleblower whose endangerment is documented in Appendix F. The evidence therein establishes cognizable, ongoing harms that fall within the protective scope of equitable jurisdiction. Courts have never required a plaintiff to tolerate life-threatening conditions when federal intervention can prevent irreparable injury. The injunction sought here is not discretionary; it is a mandatory exercise of judicial power in response to credible, documented threats to the life of a federal whistleblower.

Second, injunctive relief is similarly urgently required to prevent irreparable harm to housing stability. The Complaint documents that unlawful practices by HPMI/SMGJ, MBLCHRC, and their associated legal entities have created imminent risk of eviction based on constructive misrepresentations and retaliatory conduct. Federal courts routinely enjoin evictions when they implicate federal rights, including rights arising under the Fair Housing Act, Sections 504 and 1983, and disability-related protections. Because housing loss constitutes irreparable harm, and because the circumstances described in the evidence containers reflect violation of federal norms, the court must enter an injunction preventing any eviction activity pending final adjudication.

Third, injunctive relief is warranted to secure ADA-mandated access to the courts. A disabled litigant is entitled to reasonable accommodations that ensure meaningful participation in judicial proceedings. Courts within every circuit have recognized electronic filing access, extended deadlines, hearing accommodations, and other modifications as routine, necessary measures under Title II of the ADA. The denial of such access constitutes ongoing injury. Therefore, injunctive relief granting electronic filing privileges and related accommodations is necessary to fulfill constitutional and statutory requirements.

Fourth, injunctive relief must issue with respect to the waiver of fees and costs. Federal courts routinely waive such fees for indigent litigants, and statutory law safeguards the right of indigent citizens to access federal court regardless of economic status. Because denial of fee waivers obstructs access to justice and contradicts federal law, injunctive relief formalizing the waiver is appropriate.

Fifth, Injunctive relief is also required to compel the immediate restoration of Prosecutor Ex Rel / Plaintiff's access to his long-standing Yahoo! email account, which contains extensive documentary evidence relevant to the claims in this action and to ongoing federal whistleblower matters. The sudden and unexplained account denial operates as a constructive destruction of evidence, impedes the preservation of electronically stored information, and interferes with Prosecutor Ex Rel / Plaintiff's ability to assemble, authenticate, and present materials tied to

federal oversight complaints, statutory filings, and protected First Amendment petitioning activity.

Because Plaintiff is a quad-amputee relying on electronic communication to compensate for physical limitations, the loss of access also constitutes an ADA-implicating barrier to meaningful participation in litigation. Federal courts routinely issue preservation and access injunctions when third-party service providers hold material evidence at risk of loss. Restoration of account access is therefore not merely appropriate but necessary to prevent irreparable spoliation, ensure evidentiary integrity, and safeguard Prosecutor Ex Rel / Plaintiff's federal rights pending adjudication.

Together, these injunctions – relating to safety, housing, ADA access, and barriers to justice – constitute the minimum relief needed to prevent the escalation of harm and to preserve the integrity of the judicial process.

## C.  <u>Declaratory Relief and the Continuity of the Private Public Proxy Role</u>

Beyond injunctions, declaratory relief serves a critical function in clarifying legal rights and obligations. Declaratory judgment is particularly important when the rights at issue involve structural constitutional guarantees, federal programmatic obligations, or the authority of a litigant to proceed in a representative capacity.

In this case, declaratory relief should confirm the authority of Prosecutor Ex Rel / Plaintiff to continue operating under the Private Public Proxy doctrine, including if and when the United States declines to assume the opportunity to cure the systemic failures identified in the Complaint. Courts have repeatedly upheld the right of private litigants to pursue enforcement of federal law when public officials decline to act. The declaratory judgment sought here merely formalizes that right within the specific context of this litigation, ensuring continuity and preventing future disputes about standing or authority should the matter be unsealed or should executive nonfeasance persist.

Declaratory relief is also appropriate to clarify the illegality of the defendants' systemic practices and the obligations of federal and State actors to comply with statutory and constitutional requirements. Such declarations guide future conduct, prevent recurrence, and form the basis for ongoing judicial supervision if necessary. Declaratory relief therefore complements injunctive and structural remedies by placing the authority of the court squarely behind the recognition of rights at issue.

## D.  <u>Damages, Treble Damages, and Statutory Liability</u> (Including RICO and FCA)

While equitable remedies restrain ongoing violations and restore lawful order, monetary remedies address the concrete harms inflicted by the defendants' unlawful conduct. Federal law provides several avenues for such recovery, including compensatory damages, punitive damages in appropriate cases, treble damages under RICO, and statutory penalties or restitution under the

113

False Claims Act.

RICO treble damages serve a structural purpose: they deter coordinated wrongdoing that harms the public. When enterprises, whether public or private, operate in ways that inflict systemic injury or misuse federal funds, treble damages ensure that the cost of misconduct outweighs the benefits. Similarly, the False Claims Act exists precisely because Congress recognized that fraud against the federal government often occurs through complex administrative schemes. Liability under the FCA not only compensates the government but protects the integrity of federal programs.

These monetary remedies also serve as functional analogues to commercial enforcement mechanisms. In commercial law, default triggers interest, penalties, or disgorgement. In the public context, damages and statutory penalties serve the same structural purpose. They correct the imbalance created by official dishonor, restore equity, and ensure that public trust is not eroded by the absence of meaningful consequences.

### E.     Restoring Constitutional Order

Ultimately, relief must issue because constitutional order itself has been compromised. The Constitution presupposes that the People may hold officials accountable when they violate federal law. When administrative systems collapse, when prosecutors refuse statutory duties, when courts misapply doctrines to avoid reaching the merits, and when federally funded actors disregard the conditions attached to their funding, the constitutional framework is no longer functioning as intended.

The judiciary exists to restore that order. It cannot decline responsibility when the structural integrity of the constitutional system is at stake. Relief issued under these circumstances is not an intrusion upon administrative prerogatives; it is the fulfillment of the judiciary's constitutional function.

### F.     Returning Accountability to the People

The foundational principle of the American constitutional system is that sovereignty resides in the People. Government institutions are servants, not masters. When those institutions fail, the People must retain the capacity to enforce rights through judicial processes grounded in law and equity. This Complaint invokes that capacity, using Counts tied to commercial principles, fiduciary obligations, statutory mandates, and constitutional guarantees.

Relief must issue because accountability must be restored. Without judicial action, the People lose their remedy, and the Constitution loses its force. With judicial action, the People reclaim the authority the Constitution always preserved for them.

114

## VII. <u>Integration of COUNTS With the Commercial Process</u>

Federal courts do not adjudicate isolated narratives; they adjudicate obligations, breaches, and remedies. The function of the Counts in a federal complaint is to translate factual misconduct and statutory violation into legally recognizable obligations capable of enforcement under Article III.

In this Complaint, the Counts serve an added structural role: they are the bridge between constitutional injury, commercial dishonor, fiduciary breach, and the equitable remedies necessary to restore accountability. This section explains how the Counts operate within a unified commercial-constitutional framework, how they attach to the defendant categories in Appendix A-1, how they activate personal and institutional liability through surety exposure, and how they direct the court to the remedies required by law.

The Counts are not mere organizational markers. Each Count identifies a specific form of legal dishonor: a violation of a duty arising under the Constitution, federal statute, fiduciary principles, or commercial-trust law. When a Count is alleged, it signals that a defendant has breached an obligation owed either directly to the Prosecutor Ex Rel / Plaintiff as the rights-holder, or indirectly to the sovereign People through statutory conditions, fiduciary duties, or federal program requirements. In commercial terms, the Counts represent *presentment* of obligation.

Once the Count is articulated, the defendant must answer; a failure to answer, or an answer that admits or confirms breach, results in default or dishonor. This is the commercial backbone of the enforcement process.

Each Count maps onto a corresponding category of defendants identified at the beginning pages of this Complaint, as well as in Appendix A-1. That Appendix organizes defendants according to their legal status and their role within the administrative, judicial, federal, corporate, or quasi-governmental systems implicated by this case.

Whether the defendant is a State official, a federal officer acting *ultra vires*, a judicial actor, a private contractor administering federal funds, or a corporate entity operating under federal program authority, the Counts attach according to the duties inherent in that category. The map created between this Complaint and Appendix A-1 is thus a liability matrix: it identifies who owed what duty, under what authority, and in what capacity the breach occurred.

For examples:

- Counts invoking the ADA attach to any defendant exercising authority over public services, program access, housing administration, or judicial access.
- Counts based on federal-funding conditions attach to all defendants operating programs funded through HUD, Medicaid, LIHTC structures, or other federally subsidized systems.
- Counts alleging constitutional violations attach to any actor operating under color of State law or federal law, whether through direct action, refusal to act, or obstruction of federally guaranteed rights.

115

- Counts invoking RICO, fraud, or false claims attach to defendants whose conduct reflects coordinated action, misrepresentation, or misuse of federal funds.

The Counts thus function as the doctrinal mechanism by which authority and responsibility crystallize into legally enforceable obligations.

The relationship between Counts and commercial liability arises from the common-law principle that every duty implies a corresponding remedy. A breach of duty is not merely wrongful; it creates enforceable consequences.

In the context of public administration, breach of duty also implicates the surety structure underlying public office. Whether or not an official has a physical bond in place, the oath of office itself constitutes a commercial undertaking. The official pledges fidelity to the Constitution and to federal law, and this pledge creates a fiduciary obligation enforceable in courts of law and equity.

When the official acts outside lawful authority, obstructs access to remedy, or misuses statutory power, he or she violates the oath in a manner equivalent to commercial breach. In such cases, surety exposure arises: the official, and sometimes the institution backing the official, becomes personally or collectively liable for the consequences of dishonor.

In commercial law, when a party repudiates duties, refuses presentment, or obstructs performance, that party enters into default. Default is not a technicality; it is the commercial condition that authorizes the non-breaching party to seek equitable and legal remedies. In this Complaint, the Counts serve as the articulation of default.

When a defendant fails to comply with federally mandated duties, refuses to accept filings, denies procedural access, or blocks statutory rights, the Count corresponding to that violation documents the breach and establishes the formal condition of dishonor. The court then has authority to enforce obligations arising from that condition.

The structural purpose of organizing Counts in this manner is to eliminate the procedural traps that have historically derailed litigants – even when they possessed meritorious claims. Across the country, many Americans who attempted to assert commercial or constitutionally guaranteed rights were met with procedural dismissal based not on substance but on form. Courts often misconstrue incorrect terminology, imperfect formatting, or imprecise invocation of commercial principles as grounds for dismissal, even though the underlying injuries were real and protected by law. The purpose of the Counts in this Complaint is to remove those vulnerabilities by grounding the commercial enforcement pathway in constitutional doctrine, statutory authority, and the recognized jurisdiction of Article III courts.

When Americans attempted to invoke UCC concepts or commercial remedies outside of judicial frameworks, courts frequently misinterpreted their intentions, construing these efforts as attempts to evade jurisdiction rather than as attempts to assert rights. The problem was rarely *substantive*;

116

it was *procedural*. The litigants understood the underlying commercial principle – that officials who breach duties owe remedy – but lacked the doctrinal vocabulary to express that principle within the accepted structures of federal litigation.

This Complaint corrects that historical problem. The Counts translate commercial concepts into the precise legal doctrines that courts already recognize, ensuring that the substance of the claim cannot be dismissed on superficial grounds.

Each Count therefore serves dual purposes: doctrinal precision and commercial clarity. Doctrinal precision ensures the court recognizes the source of the obligation – the Constitution, federal statutes, fiduciary duties, or funding conditions. Commercial clarity ensures the breach is characterized correctly as dishonor or default, triggering the remedial processes recognized in equity.

This alignment creates a litigation structure that courts cannot disregard lightly. Dismissal on procedural grounds becomes much harder when the Counts are properly tethered to binding law, when facts and the defendants are clearly depicted in Appendix A and categorized in Appendix A-1, and when the remedies requested correspond directly to the obligations breached.

The integration of Counts with remedies begins with the recognition that every Count contains within it a remedy implicit in its nature.

- A Count alleging violation of federal constitutional rights implies injunctive relief, declaratory relief, and damages.
- A Count alleging breach of fiduciary duty implies constructive trust, disgorgement, or surcharge.
- A Count alleging misuse of federal funds implies restitution, oversight restructuring, and statutory penalties.
- A Count alleging discrimination under federal law implies direct remedial orders, program modification, and enforcement supervision.
- A Count alleging procedural obstruction under the ADA implies accommodations, procedural correction, and access guarantees.
- A Count alleging obstruction of grand-jury transmission duties implies declaratory relief, structural injunctions, and accountability measures necessary to restore lawful process.

Counts corresponding to RICO or civil fraud further imply treble damages, sanctions, and personal liability for enterprise-based misconduct.

Counts invoking false claims statutes imply restitution to the United States, penalties for misuse of federal funds, and structural oversight.

Counts invoking deprivation of access to courts imply remedial authority under *Tennessee v. Lane*.

Counts invoking the Guarantee Clause and structural constitutional principles imply court-ordered reform to restore republican governance.

The commercial implications of these Counts arise from equitable doctrines such as constructive trust, equitable lien, forfeiture, and remedy of distress.

- When a Count establishes breach of fiduciary duty or misuse of statutory authority, a constructive trust may be imposed on any benefit gained or any interest derived from the misconduct.
- When a Count establishes obstruction of remedy or procedural dishonor, equitable liens may be applied to ensure compliance.
- When a Count shows wrongful deprivation of property or right, forfeiture may be warranted.

These remedies correspond to commercial enforcement mechanisms and fall within the inherent equitable authority of federal courts.

The linking of Counts to defendants ensures that liability attaches correctly. The defendants categorized in this complaint corresponding to ordered numbers in Appendix A-1 are not mere names; they represent categories of authority -- administrative, judicial, corporate, federal, local, and hybrid. Each category carries its own duties, and each duty corresponds to specific Counts. By explicitly mapping the Counts onto the defendant categories, the Complaint provides a blueprint for liability. The court does not need to infer or reconstruct relationships; they are presented through the FACTS, the Appendices, and the Counts in a structured manner.

The Counts also direct how remedies must be applied collectively or individually. Some Counts, by nature, apply to entire systems, requiring structural injunctions. Others apply to individual actors, requiring personal accountability. Others apply to institutional entities, requiring programmatic reform, restitution, or forfeiture of ill-gotten gains.

The relationship between Counts and remedies is therefore integrated: the Count identifies the breach, the Appendices identify the responsible actor, and the commercial process identifies the consequence.

In this structure, the Counts function as the litigation equivalent of commercial notices in private law. They identify the obligation, specify the breach, and state the remedy sought.

But unlike private commercial notices, the Counts are adjudicated by Article III courts with constitutional authority to enforce rights and impose remedies. This transformation – from private notice to judicially enforceable claim – is the hallmark of a lawful commercial-constitutional enforcement process.

In summary, the Counts activate liability by presenting legally cognizable breaches of duty. They map to defendants through Appendix A-1, triggering surety exposure through common-law

fiduciary obligations, statutory mandates, and federal program conditions. They feed directly into remedies grounded in constitutional law, statutory authority, equity, and commercial doctrine.

In this unified structure, the litigation becomes both a constitutional enforcement action and a commercially recognized method of restoring accountability. This is the first time such a process has been presented within a fully compliant judicial format, eliminating the procedural vulnerabilities that have historically undermined Americans asserting similar principles.

## VIII. Remedies Framework: Damages, Structural Injunctions, Declaratory Relief, and Commercial Enforcement Consequences

The remedies sought in this Complaint arise not from preference but from legal necessity. Federal courts possess both the constitutional authority and the statutory obligation to supply effective relief when State processes collapse, when federal rights are obstructed, and when breaches of fiduciary duty or commercial dishonor invalidate the legitimacy of administrative actions. Article III does not merely adjudicate disputes; it restores lawful order when public institutions fail to do so.

Remedies fall into several interlocking categories:

1. structural injunctions designed to correct systemic patterns of misconduct;
2. declaratory relief clarifying legal obligations and extinguishing administrative uncertainty;
3. monetary damages reflecting constitutional and statutory violations;
4. treble damages mandated by RICO and permitted under civil remedies doctrines;
5. False Claims Act liability where federal funds were misused;
6. and the commercial consequences inherent in fiduciary breach, surety exposure, constructive trust, and equitable forfeiture.

Each remedy derives from principles already woven into federal law, equity, and commercial jurisprudence, and each is properly invoked by the structure of this Complaint.

Structural reform is central to the remedial authority of Article III courts when administrative systems operate in a manner inconsistent with the Constitution. Federal courts have long recognized that where the State, through its agencies, courts, or contractors, engages in repeated patterns of denial, obstruction, discrimination, or unconstitutional procedure, the appropriate relief extends beyond compensatory damages.

Courts may order systemic restructuring, mandate oversight mechanisms, require programmatic corrections, or impose supervisory frameworks to ensure compliance with federal law. These structural remedies are justified where the injury arises not from isolated misconduct but from systemic conditions.

In this case, the documentation contained in the Appendices, together with the Counts that link

each defendant category to its breach of duty, establishes a persistent pattern of institutional obstruction across DSS, DHS, SDHDA, HUD contractors, judicial bodies, prosecutors, and oversight agencies. Such a pattern warrants a structural remedy compelling the State and its agents to comply with the ADA, federal funding conditions, federal constitutional guarantees, and the fiduciary and commercial duties inherent in public office.

Injunctive relief is warranted where irreparable harm is ongoing and cannot be remedied through damages alone. Federal courts issue such relief when constitutionally guaranteed rights are threatened, when denial of due process is ongoing, or when government actors wield authority in violation of federal law.

In this case, injunctive relief is necessary not only to prohibit further obstruction but also to preserve evidence, protect whistleblowers, prevent retaliatory housing actions, and ensure ADA-compliant access to litigation. The requested injunctions, including those requiring immediate restoration of electronic access, protection from constructive eviction, oversight of federal whistleblower safety, and accommodation for electronic filing, fall squarely within Article III authority under *Ex parte Young*.

Where State actors wield power unlawfully, federal courts must restrain them.

Where federal contractors misuse housing authority or federal funds, courts must halt the ongoing harm.

Where administrative bodies deny accommodations essential to meaningful participation in litigation, courts must intervene to uphold *Tennessee v. Lane*. Injunctions are not discretionary under these circumstances; they are mandatory to prevent further constitutional injury.

Declaratory relief accompanies and strengthens injunctive relief. A declaratory judgment clarifies the rights, duties, and legal relationships of the parties, providing an authoritative statement of law that governs subsequent conduct. Declaratory findings in this case are necessary to establish the illegality of the defendants' practices, affirm the Prosecutor Ex Rel / Plaintiff's standing and authority to proceed as Prosecutor Ex Rel and Private Public Proxy, clarify the obligations imposed by the ADA and federal funding statutes, and confirm the ongoing commercial and constitutional defaults created by the defendants' dishonor.

Importantly, declaratory relief will articulate that federal courts, upon cognizable pleading of wrongdoing, possess nationwide authority to issue injunctions wherever federal rights are at stake – a principle confirmed in nationwide injunction cases arising from federal immigration, civil rights, and administrative law disputes. This clarification is necessary not only for this case but for the federal judiciary's own understanding of its constitutional responsibility when State systems fail or refuse to provide remedy.

Damages constitute another essential component of relief. Compensatory damages remedy the concrete injuries suffered as a result of constitutional violations, statutory breaches, ADA

120

obstructions, retaliation, and denial of rights. These damages encompass emotional, financial, and physical harms, as well as deprivation of liberty, loss of housing stability, interference with medical services, and impairment of federally protected participation in civic life.

The assessment of damages in this case must reflect both the direct injuries and the extended period over which harm accumulated. Where intentional conduct, reckless disregard, or discriminatory motive is shown, punitive damages may also be awarded.

Punitive damages exist to deter misconduct, punish egregious wrongdoing, and reinforce constitutional boundaries that public actors may not transgress.

Additional monetary remedies arise under the civil RICO statute. RICO authorizes *treble damages* when a defendant participates in an enterprise that engages in a pattern of racketeering activity causing injury.

The enterprises documented in the Appendices meet this standard: recurring fraud, obstruction of justice, retaliation, witness interference, deprivation of rights, and misuse of federally subsidized programs are classic RICO predicates. The structural organization of State agencies, risk-pool mechanisms, HUD contractors, and judicial administration, as documented here, satisfies the elements of enterprise existence, pattern continuity, and causation.

Treble damages under RICO therefore serve both remedial and deterrent functions. Their purpose is not merely compensation but correction of systemic misconduct.

False Claims Act liability similarly arises when federal funds are misused or misrepresented. Where housing authorities, State agencies, or contractors receive federal funds under conditions requiring adherence to regulations, nondiscrimination, program integrity, and truthful reporting, misuse of those funds creates liability to the United States.

The Plaintiff's role as Prosecutor Ex Rel and Private Public Proxy permits him to initiate these claims where the United States has been defrauded or where federal program requirements were disregarded. Remedies under the False Claims Act include restitution, statutory penalties, treble damages, and mandatory correction of program structures that allowed the misconduct. These remedies help ensure that federal resources benefit the People rather than subsidizing unlawful conduct.

The commercial enforcement consequences form a separate but integrated layer of remedy. In commercial terms, the breaches documented in this Complaint constitute dishonor, default, and repudiation of fiduciary duties.

When a public official violates the oath of office, obstructs remedy, or acts outside lawful authority, the official enters commercial default. Courts may therefore impose equitable remedies such as constructive trust, surcharges, equitable liens, forfeiture of ill-gotten gains, and restitution.

121

Constructive trust arises when a defendant holds property, authority, or benefit that was acquired or maintained through violation of duty. *Forfeiture* is appropriate where public office was abused for improper purpose or where authority was exercised outside lawful bounds. These commercial remedies are essential to restoring the integrity of public administration.

Surety exposure is equally important. Every public office creates inherent surety obligations, whether or not a physical bond exists. The oath of office is itself the bond, creating a fiduciary relationship between the officeholder and the People. When the officeholder breaches that duty, the court may impose equitable liabilities corresponding to the commercial principles of suretyship. This may include personal liability for damages, surcharge for misused authority, and remedial orders compelling performance of duties previously obstructed. When multiple actors within an enterprise jointly breach their fiduciary obligations, joint and several liability may be imposed.

These remedies collectively serve to restore constitutional order. The purpose of Article III intervention is not only to compensate the injured party but to correct systemic failures and reaffirm the supremacy of federal law. Remedies therefore must address both individual and structural dimensions of the wrongdoing.

- Structural injunctions reform programs;
- declaratory relief clarifies legal duties;
- damages compensate injury;
- treble damages deter misconduct;
- constructive trust and forfeiture restore equity; and
- surety enforcement ensures accountability.

Through these mechanisms, accountability returns to the People and government actors are reminded that authority is neither inherent nor absolute; it is conditional, fiduciary, and enforceable.

Finally, the remedies requested here facilitate the continuation of the Private Attorney General function.

If the United States declines to exercise its duty to cure the injuries documented in this Complaint – particularly those identified in Appendix F involving the federal whistleblower Goodwill – the court must recognize the Prosecutor Ex rel / Plaintiff's authority to proceed in the People's name.

Declaratory relief confirming this authority is essential to preserving the constitutional balance when executive discretion is misused or withheld. The Constitution does not permit systemic wrongdoing to persist merely because government actors choose not to act. Where the People step forward to enforce federal law, the courts *must* empower them.

122

Through these remedies, the court fulfills its constitutional role: to enforce rights, compel accountability, restore equity, and ensure that public power is exercised lawfully.

The remedies framework is not aspirational; it is the legal and commercial necessity that arises whenever public administration collapses into obstruction, dishonor, or enterprise-level misconduct. It is the means by which constitutional order is restored and by which the People reclaim the authority that public officials hold only in trust.

## IX. The Commercial Enforcement Mechanism: Constructive Arrest, Equitable Attachments, Distress, and Federal Execution Authority

The law of the United States rests upon a tripartite foundation: constitutional command, statutory mandate, and the inherited common-law principles that inform judicial power. When executive actors refuse to perform duties, when State systems collapse into obstruction, and when constitutionally guaranteed rights are systematically denied, Article III courts are vested with the full remedial authority of law, equity, and the commercial jurisdictions historically entrusted to them.

Remedies in such situations do not arise solely from statute; they arise from the structural necessity of preserving the rule of law itself. At the intersection of constitutional enforcement and commercial accountability lies a body of doctrine sometimes misunderstood, often misapplied, and almost never articulated in a single unified framework: the doctrine of constructive arrest, equitable attachment, commercial distress, and federal execution authority.

This section explains how these principles operate within the lawful boundaries of judicial process and how they compel accountability from individuals and institutions – including public officials, corporate actors administering federal programs, and members of the BAR – whose misconduct or dishonor has resulted in constitutional harm.

Constructive arrest, in the legal sense, is not a physical act but a judicial one. It is the court's formal declaration that an individual's conduct, breach, or dishonor has placed that person in a condition equivalent to arrest for purposes of jurisdiction, remedy, and enforcement.

Historically, common law recognized two forms of arrest: corporeal seizure and constructive seizure. The latter involves no physical restraint but subjects the wrongdoer to the court's authority through summons, attachment, sequestration, or compulsory orders. In modern federal practice, constructive arrest manifests through judicial orders imposing restraints, obligations, or limitations on a defendant's rights or property interests to compel compliance with law.

These principles remain embedded in Article III authority even if contemporary vocabulary has shifted. What was once called *"arrest"* is now called *"attachment," "sequestration," "injunctive restraint,"* or *"court-ordered compulsion."* The terminology evolved, but the power did not diminish.

Commercial attachment is the natural consequence of dishonor. When a party entrusted with fiduciary or statutory duties violates those duties, *equity* authorizes the court to identify, secure, and, if necessary, freeze interests belonging to the wrongdoer to ensure that remedies can be satisfied. This principle is foundational to equitable jurisprudence. It is the mechanism by which courts prevent defendants from evading remedy or dissipating assets.

In the context of public office, commercial attachment applies not only to monetary assets but also to authority itself. If a public official has abused or exceeded authority, the court may restrain that authority, reassign it, or suspend its exercise. These remedies are recognized in case law concerning *ultra vires* actions, administrative law violations, ADA obstruction, civil rights enforcement, and structural injunctions. When State systems collapse or refuse to act, commercial attachment ensures that judicial remedies remain effective.

Distress, an ancient common-law remedy, also retains vitality within federal equity jurisdiction. The principle of distress arises when one party has suffered injury due to another party's breach and the injured party seeks provisional or permanent relief to secure compliance or satisfaction. Although modern courts rarely use the word *"distress,"* the remedy survives in the form of prejudgment seizure, equitable liens, constructive trusts, mandatory injunctions, and court-appointed oversight.

When applied to public actors, commercial distress operates through orders compelling performance of duties wrongfully withheld, compelling disclosure of records withheld in violation of law, compelling accommodation denied under the ADA, or compelling administrative action improperly obstructed. The relief is not punitive; it is corrective. It restores the lawful relationship between sovereign and servant.

Equitable liens serve similar corrective functions. When a defendant derived authority, benefit, or position through breach of duty or violation of law, equity may impose a lien on the interest so derived. This lien does not require the existence of physical property; it may attach to authority, office, program administration, contractual rights, or any legally cognizable participation in a system of public governance.

An *equitable lien* is a form of constructive arrest: it restricts the defendant's ability to exercise authority until compliance is achieved. When courts impose such liens upon BAR members, judicial officers, administrative officials, or contractors, they do so not as punishment but as a method of ensuring that legal obligations are fulfilled.

Federal *execution authority* completes this framework. When a federal court issues an order, whether injunctive, declaratory, constructive, or equitable, enforcement ultimately lies with the Executive Branch through the United States Marshals Service and, where appropriate, other federal law enforcement agencies.

The Marshals Service is the constitutionally designated enforcement arm of the federal judiciary. Its duties include executing all lawful writs, orders, and decrees of federal courts; seizing

124

property or interests subject to attachment; enforcing injunctions; and ensuring compliance with judicial mandates. This authority extends to State actors, federal officials, corporate contractors, and, when necessary, *officers of the court* such as BAR members.

Membership in the BAR does not confer immunity. To the contrary, because attorneys are officers of the court, their obligations are heightened, and the judiciary retains inherent authority to enforce discipline, impose sanctions, and restrain misconduct when necessary to preserve the integrity of judicial process.

The popular misconception that courts cannot enforce remedies against attorneys or judges arises from a superficial understanding of judicial immunity and prosecutorial discretion. Judicial immunity protects adjudicative functions, not administrative misconduct or constitutional violations.

Prosecutorial discretion limits criminal charging decisions, not civil remedies or structural injunctions. When the issue concerns deprivation of rights, ADA obstruction, *ultra vires* action, or dishonor of federally mandated duties, Article III courts possess full remedial authority. They may issue declaratory findings, structural orders, injunctions, and commercial attachments that bind officers of the court and compel compliance under threat of contempt.

If contempt arises, constructive arrest becomes literal enforcement; the Marshals may detain individuals who defy court orders. These principles are well established.

The *"citizen's arrest on paper"* arises naturally from this framework. It is not an extrajudicial maneuver; it is the structured legal process by which a private litigant initiates the enforcement of public obligations in the absence of government action.

It begins with presentment of claims, proceeds through opportunity to cure, articulates breach through formal Counts, and culminates in judicial imposition of equitable restraints, attachments, and corrective orders.

Once the court validates the breach through findings of fact and conclusions of law, the paper arrest becomes enforceable through the Marshals Service. The litigant does not arrest anyone; the court does. The litigant triggers the process by proving dishonor. That is the constitutional distinction that separates *lawful* commercial enforcement from the criminalized missteps of those who misunderstood the doctrines.

For decades, Americans attempting to assert common-law or commercial remedies were misled or entrapped by the weaponization of procedural technicalities. Those individuals were not wrong about the underlying principle: that officials who breach duties owe remedy, that dishonor triggers accountability, and that the People hold inherent authority.

They erred in navigating the judicial architecture that channels these principles into enforceable orders. They attempted to apply commercial law outside the courtroom, or they rejected

125

jurisdiction, or they utilized terminology inconsistent with federal pleading requirements. Courts seized upon these errors to dismiss their claims not because the claims lacked substance, but because the filings lacked procedural conformity.

What distinguishes this Complaint is that it conforms completely to Article III procedure while preserving the commercial principle in its proper form.

Below, this Argument section of Prosecutor Ex Rel / Plaintiff's instant Complaint explains why courts *must* enforce these remedies even when they implicate powerful institutional actors.

First, courts are constitutionally obligated to enforce federal rights where State systems fail.

Second, commercial dishonor by public actors negates any shield of immunity because *ultra vires* conduct, ADA obstruction, and deprivation of rights place the actor outside lawful authority.

Third, BAR membership does not confer immunity; attorneys are fiduciaries whose misconduct creates personal liability.

Fourth, federal funding conditions impose enforceable obligations on State agencies and their contractors.

Fifth, whistleblower protections and obstruction statutes impose independent duties.

Sixth, Article III courts possess equitable and commercial authority that extends to all persons within their jurisdiction, regardless of office or affiliation.

Constructive arrest and commercial attachment become necessary when defendants demonstrate persistent refusal to comply with law.

If the court determines that an official or institution has failed to perform legally required duties, the court may impose structural restraints on their authority. If an official or contractor has misused federal funds, the court may impose constructive trust and forfeiture. If a BAR member has interfered with access to courts or violated fiduciary obligations, the court may suspend their authority or impose sanctions. These remedies are not theoretical; they have long been exercised, though rarely articulated in unified terms.

The role of the Marshals Service is indispensable. Once the court issues an order of attachment, restraint, or enforcement, the Marshals *must* execute it. They may seize documents, secure electronic records, protect whistleblowers, enforce ADA accommodation orders, restrain unlawful administrative conduct, or take individuals into custody for contempt of court. This enforcement is not optional. Federal law requires all persons to comply with lawful orders of the court, and the Marshals are the designated instrument of this compliance.

When the defendants include State officials or BAR members, the Marshals' authority remains intact because federal judicial orders trump State preferences and professional affiliations. The Supremacy Clause ensures that federal orders prevail over contrary local or institutional interests.

In this integrated framework, *constructive arrest* is not a metaphor; it is the commercial and constitutional mechanism by which the court asserts jurisdiction over recalcitrant actors. *Equitable attachment* is not punitive; it preserves the efficacy of the remedy. *Distress* ensures that wrongful withholding of rights is corrected. *Equitable liens* ensure that benefits derived from wrongdoing cannot be retained. *Federal execution* ensures that the remedy is real, not symbolic.

Together, these elements constitute the lawful process through which the People restore accountability when government actors refuse to act.

The Counts in this Complaint activate each of these remedial tools by identifying breaches, mapping them onto duty-bearing defendants, and demonstrating the dishonor that justifies equitable and commercial enforcement. Upon entering findings of fact, the court will have full authority to impose attachments, constructive restraints, sequestration of authority, and enforcement through the Marshals Service.

The law provides no refuge for actors who violate federally protected rights, obstruct remedy, or refuse to comply with judicial process. The commercial and constitutional remedies described here are the means by which the judiciary fulfills its obligation to uphold the supremacy of law and to return accountability to the People.

## X.    **Constitutional and Commercial Restoration of the People's Sovereignty**

The Constitution of the United States begins with the pronouncement that all governing authority originates in the People.

This was not poetic language; it was a structural command. The People are the principals, and government is their agent. Government exercises only *delegated* authority, and that authority remains valid only to the extent that it conforms to constitutional limits. When government actors – whether legislative, executive, or judicial – extend their reach beyond those limits, their actions lose the force of law.

In such circumstances, Article III courts, acting through the *law* and *equity* jurisdictions entrusted to them, possess full remedial authority to restore the rights, property, and sovereign prerogatives of the People.

This is where Prosecutor Ex Rel / Plaintiff's *Argument* section explains how constitutional principles, commercial doctrines, and legislative structures converge to supply the remedies necessary to reverse the systemic *"capture"* of the American People, to reestablish the proper relationship between sovereign and servant, and to apply commercial liability to officials whose unlawful conduct contributes to national injury.

The rights of the People in the fruits of their own labor form the foundation of both liberty and commerce. Early federal tax jurisprudence recognized that an individual's labor is property which cannot be taxed simply by changing terminology.

The Supreme Court stated repeatedly that "*income*" refers to _gain_ derived from capital or labor, _not the labor itself_. The Court distinguished between taxing *privileged* activities and taxing inherent *rights*, holding that an individual's earnings from personal labor are not taxable as "*income*" absent a gain or conversion into taxable form.

These rulings preserved the fundamental principle that a person's labor belongs wholly to that person. Yet, over time, through administrative interpretations, expanded statutory definitions, and judicial deference to executive agencies, this principle was eroded. The phrase "*income*," through linguistic manipulation rather than constitutional amendment, became an instrument through which the People's rights to the products of their labor were diminished and, in effect, licensed back to them through governmental grace.

This shift coincided with the judicial expansion of the Commerce Clause beyond its constitutional boundaries.

The Commerce Clause originally empowered Congress to regulate trade among the States, ensuring uniformity in interstate transactions and preventing economic warfare between States. It did not empower Congress to regulate the private conduct of individuals wholly within a State, nor did it authorize Congress to regulate the States themselves. Yet, through decisions such as *Wickard v. Filburn* and its progeny, courts adopted aggregation theories and economic effects doctrines that transformed virtually all human activity into regulable *commerce*.

This reinterpretation blurred the distinction between sovereign and subject, converting the People from principals who delegate authority into regulated participants whose personal choices could be subjected to federal oversight. As the administrative state grew, the People found themselves increasingly governed not by legislation enacted through constitutional procedures but by rules promulgated by agencies, enforced through procedural mechanisms that rarely considered constitutional limits.

The judiciary, influenced heavily by BAR-controlled institutions and professional incentives, contributed to this misalignment. Courts began to treat *rights* as though they were *privileges*, subject to licensure, permission, or administrative qualification. Activities historically protected by the First Amendment, the Fourth Amendment, and the fundamental liberties doctrine were reframed as privileges requiring government authorization.

At the same time, courts erected procedural obstacles that prevented litigants from reaching the merits of constitutional claims. They dismissed cases on technicalities, refused to hear challenges to administrative overreach, declined to consider structural injury, and justified these refusals through doctrines such as standing, immunity, or prosecutorial discretion that were never

intended to apply to structural constitutional violations.

These procedural doctrines, when used to avoid the Constitution, constituted violations of the Accardi Doctrine and the Rules Enabling Act, which forbid agencies and courts from using procedure to negate substantive rights.

Appendix E-2, incorporated here in its entirety, proposes a legislative remedy to reverse these distortions and restore the original constitutional design.

The first prong is legislative: to clarify federal definitions, limit administrative reinterpretations, and reassert the boundaries of federal authority. Statutory definitions of income, earnings, commerce, and authority must be revisited and aligned with constitutional principles.

Congress retains power to regulate commerce among the States, but not to transform every act of private life into commerce by definitional fiat. Congress may tax income, but it may not tax labor itself, nor treat inherent rights as taxable privileges.

Legislative reform must also require transparency regarding administrative interpretations, enforce strict limits on agency rulemaking authority, and mandate constitutional auditing of federal programs to ensure that delegated authority is not being used to undermine the People's sovereignty.

The second prong of Appendix E-2 is commercial: to attach liability to individual actors whose misconduct contributes to systemic injury, including the National Debt.

Government does not act; *individuals* act. When officials – whether elected, appointed, or licensed – misuse authority, obstruct remedies, violate the Constitution, or facilitate unlawful administrative expansion, they create a commercial injury borne by the People. In commercial law, the wrongdoer – not the principal – pays.

The fiduciary nature of public office means that salary, benefits, pension rights, and other emoluments associated with public authority function as trust property contingent upon lawful performance of duty. When an official breaches that duty, gains derived from office become subject to constructive trust, disgorgement, surcharge, or equitable forfeiture. Courts have long recognized that individuals who abuse fiduciary positions must surrender ill-gotten gains. The same principle applies here: those responsible for unconstitutional reinterpretations, administrative overreach, and obstruction of rights can be held personally liable for the commercial harm they helped create.

## XI. Commercial attachment thus becomes not only a remedy for individual harm but a mechanism for national restoration.

The national debt represents, in part, the cumulative cost of federal actions taken outside constitutional boundaries. When officials exceed their lawful authority, they act without

sovereign consent. Their acts become commercial *trespasses,* and the damages arising from those trespasses are not properly borne by the People.

Under equitable principles, courts may trace benefits derived from unlawful conduct, impose constructive trusts on future earnings or pensions of wrongdoing officials, order surcharge against institutions responsible for oversight failures, and compel reimbursement to the public treasury. These remedies do not originate from punitive intent; they arise from the commercial principle that one who causes damage must make the injured party whole.

The judicial role in this restorative framework is indispensable. Article III courts possess authority not only to adjudicate disputes but to enforce constitutional boundaries. When government actors breach their fiduciary or statutory duties, the People, acting through a statutory Private Attorney General or common law Private Public Proxy, may compel judicial intervention.

The counts in the Complaint identify the breaches; the Appendices identify the actors and their actions; the doctrines of equitable attachment, constructive trust, and commercial distress identify the remedies; and Article III supplies the enforcement authority.

The court may impose structural injunctions to halt ongoing constitutional violations, declaratory judgments to clarify rights and duties, monetary damages to compensate injury, and commercial attachments to ensure restitution. If defendants refuse compliance, the court may order the United States Marshals to enforce its decrees. These enforcement tools are not extraordinary; they are inherent in the judicial power.

Restoration of sovereignty requires recognition of the People as principals and the governments as agents. Under the Constitution, the People do not derive rights from governments; governments derives authority from the People. When the agent oversteps, the principal may revoke, restrain, or correct the misuse of delegated power. Judicial enforcement is not merely permitted – it is required.

Courts are the final guardians of constitutional structure, responsible for ensuring that the People remain sovereign and that government remains accountable. This Complaint calls upon the court to fulfill that duty by applying established doctrines – constitutional, commercial, and equitable – to restore the proper alignment between governed and governing.

The remedies sought herein thus form an integrated system designed to reverse decades of unconstitutional expansion, commercial dishonor, and fiduciary breach. Legislative reform will correct statutory misinterpretations; commercial liability will ensure that the wrongdoers, not the public, bear the financial cost of constitutional violations; judicial remedies will restore access to rights; and the People, acting through lawful process, will reaffirm the foundational structure of American governance.

This is neither novel nor radical; it is the natural and necessary application of constitutional law,

130

commercial equity, and fiduciary accountability to a government that has drifted from its lawful moorings.

Through this integration of constitutional doctrine, commercial principles, and legislative restoration, This Argument portion of Prosecutor Ex Rel's federal Complaint concludes by establishing not only why the court may act, but why the court *must* act. The People cannot remain sovereign unless the law recognizes their supremacy. The Constitution cannot remain binding unless courts enforce its limits. And the government cannot remain legitimate unless it operates within the authority delegated to it.

This framework returns the Nation to its proper course, restores accountability to those who breach public trust, and ensures that the People – not their servants – remain the ultimate repository of American sovereignty.

# COUNTS

## UNIVERSAL PREAMBLE TO ALL COUNTS

Prosecutor Ex Rel / Plaintiff incorporates by reference all preceding allegations, all facts set forth in the FACTS section, all constitutional and commercial doctrines established in the ARGUMENT section, and all defendant assignments contained in Appendix A-1, which identifies the individuals and entities directly and indirectly liable under each Count.

For every Count stated below, the defendants listed in Appendix A-1 for that Count are liable for their direct violations, omissions, refusals, and breaches. Defendants connected through enterprise structures, supervisory chains, coordinated group conduct, or shared participation in obstructive or retaliatory schemes are likewise liable under the principles of wheel conspiracies and chain conspiracies, enterprise liability, aiding and abetting, joint and several responsibility, and commercial surety exposure arising from dishonor, breach of fiduciary duty, and ultra vires conduct.

All Counts are asserted under the court's authority in law, equity, and commerce as established in ARGUMENT Sections IX through XI of this Complaint.

All Counts below are also subject to the Global Reaffirmation of Enterprise and Conspiracy Liability set forth at the conclusion of this section

131

## COUNT I —
### Housing Enterprise Misconduct (HUD LIHTC & Section 8)

Liability. Defendants associated with the HUD-administered LIHTC and Section 8 housing enterprise are liable for enterprise-level misconduct arising from their administration of federally funded housing programs under color of law. By misapplying eligibility rules; repeatedly denying required disclosures and imposing unauthorized information demands in violation of the Paperwork Reduction Act; issuing contradictory determinations; denying or bypassing mandatory Administrative Procedure Act processes; failing to honor federally mandated ADA accommodations; failing to honor federally mandated ADA accommodations, manipulating recertification and tenancy procedures; and retaliating against protected petitioning and whistleblowing activity, these defendants breached non-discretionary duties imposed by federal statute, funding conditions, and fiduciary obligations inherent in program administration. Their coordinated actions and omissions constitute misuse of federal funds, *ultra vires* conduct, and deprivation of federally protected housing rights, rendering each defendant liable both for direct participation and for enterprise-based responsibility through supervisory chains, delegated authority, and joint conduct within the housing apparatus.

Remedy. This Count activates the Court's equitable, statutory, and commercial remedial authority to halt ongoing violations, unwind unlawful determinations, and restore compliant administration of HUD housing programs. Appropriate relief includes declaratory and injunctive orders enforcing federal housing and ADA requirements; corrective restructuring of recertification and accommodation procedures; restitution and disgorgement of benefits obtained through noncompliance; compensatory damages for housing instability and related harms; and such additional relief as necessary to ensure future program integrity. Where misconduct implicates federal funding conditions, remedies further include enforcement measures sufficient to cure default, prevent recurrence, and realign the housing enterprise with constitutional and statutory mandates.

## COUNT II —
### Social Security / Treasury Deductions Fraud
### (SSA–Treasury Benefit Stream Misconduct)

Liability. Defendants associated with the administration, reporting, withholding, and coordination of Social Security and Treasury benefit streams are liable for enterprise-level misconduct arising from the misclassification, misreporting, diversion, and unlawful deduction of federally protected benefits under color of law. By issuing contradictory eligibility determinations, manipulating benefit classifications, failing to provide required notices and appeal procedures, withholding or redirecting funds without lawful authority, and retaliating against protected petitioning and whistleblowing activity, these defendants violated non-discretionary duties imposed by the Social Security Act, Treasury regulations, due-process guarantees, and federal funding conditions. Their coordinated conduct constitutes fraudulent

132

administration of benefit streams, *ultra vires* action, and deprivation of property interests secured by federal law, rendering each defendant liable for direct participation and for enterprise-based responsibility through supervisory authority, inter-agency coordination, and joint conduct within the SSA–Treasury apparatus.

<u>Remedy</u>. Declaratory relief is required to establish that the challenged benefit classifications, deductions, reporting practices, and administrative actions are unlawful and void. Injunctive relief is required to compel correction of records, restoration of unlawfully withheld benefits, provision of lawful notice and hearing procedures, and prospective compliance with the Social Security Act, Treasury regulations, due-process guarantees, and federal funding conditions. Monetary relief is required, including restitution of wrongfully withheld amounts, compensatory and consequential damages, and statutory remedies authorized by law. Equitable relief is further required to prevent recurrence of the misconduct and to enforce accountability within the federal benefit and treasury systems, consistent with constitutional mandates and non-discretionary statutory duties.

## <u>COUNT III</u> —
### Medicaid Umbrella Concealment & State-Level Administrative Fraud

<u>Liability</u>. Defendants associated with the administration and oversight of Medicaid programs at the State and federal levels are liable for enterprise-level misconduct arising from the concealment, misclassification, and manipulation of Medicaid eligibility, benefits, and reporting mechanisms under color of law. By imposing coercive and false classifications, conditioning access to medically necessary coverage on perjurious statements, fragmenting or obscuring benefit *"strands"* for and *"cookie cutter"* programs for administrative convenience and as barriers to access, refusing mandatory reporting, issuing contradictory determinations, denying lawful accommodations, and obstructing review and appeal mechanisms, these defendants breached non-discretionary duties imposed by the Medicaid Act, federal funding conditions, due-process guarantees, and fiduciary obligations inherent in administering public benefits. Their coordinated acts and omissions constitute administrative fraud, *ultra vires* conduct, misuse of federal funds, and deprivation of federally protected rights, giving rise to direct, supervisory, and enterprise-based liability through joint participation and inter-agency coordination within the Medicaid apparatus.

<u>Remedy</u>. Declaratory relief is required to establish that the challenged Medicaid classifications, coercive practices, reporting failures, and administrative actions are unlawful and void. Injunctive relief is required to compel lawful benefit administration, accurate classification, mandatory reporting compliance, provision of required accommodations, correction of records, and adherence to federally mandated notice and hearing procedures. Monetary relief is required, including restitution of benefits wrongfully denied or withheld, compensatory and consequential damages, and statutory remedies authorized by law. Equitable relief is further required to prevent

recurrence of the misconduct and to enforce accountability within State and federally funded Medicaid systems, consistent with constitutional mandates and binding conditions of participation.

## COUNT IV —
### Access-to-Courts Obstruction & Judicial Sabotage
### (Backward-Looking Injury)

Liability. Defendants associated with judicial, clerical, prosecutorial, and administrative functions are liable for access-to-courts obstruction and judicial sabotage arising from backward-looking injury inflicted through the denial, delay, manipulation, and suppression of lawful process under color of law. By refusing filings, withholding hearings and appeals, falsifying or altering docket activity, weaponizing procedural rules, denying ADA-mandated access and accommodations, suppressing evidence, and invoking misapplied doctrines to foreclose merits review, these actors breached non-discretionary constitutional and statutory duties imposed by the First, Fifth, and Fourteenth Amendments, Title II of the ADA, the Rules Enabling Act, and binding access-to-courts jurisprudence. Such coordinated acts and omissions constitute *ultra vires* conduct, deprivation of federally protected rights, and enterprise-level misconduct attributable both to direct participation and to supervisory, delegated, and joint action within the judicial apparatus.

Remedy. Upon establishment of backward-looking injury to the right of access to courts, the law mandates declaratory and injunctive relief sufficient to restore lost procedural opportunities, neutralize the effects of prior obstruction, and prevent recurrence. Appropriate remedies include declarations of constitutional and statutory violations; *vacatur* or disregard of tainted procedural outcomes; reopening or provision of substitute processes adequate to redress the foreclosed claims; mandatory ADA-compliant access measures; preservation and production of records; corrective directives to clerks and judicial administrators; and such structural relief as is necessary to ensure future compliance. Where warranted, equitable relief, sanctions, and compensatory consequences follow as a matter of law to remedy the completed denial of access and to reestablish lawful judicial process.

## COUNT V —
### Retaliation for Protected Whistleblowing & Petitioning Activity
(Retaliation Across Housing, Benefit Systems, Law Enforcement, Judicial Channels, and Federal-State Networks)

Liability. Defendants across housing, benefits administration, law enforcement, judicial systems, and interlocking federal–state networks are liable for retaliation against protected whistleblowing

and petitioning activity undertaken under the First Amendment and federal whistleblower statutes. By initiating or coordinating adverse actions, threats, intimidation, benefit interference, housing instability, procedural obstruction, selective enforcement, surveillance, and reputational harm in response to protected reporting and petitioning, these defendants engaged in unlawful retaliation under color of law. Such conduct constitutes intentional interference with federally protected activity, abuse of delegated authority, and enterprise-level retaliation attributable both to direct participation and to joint action through supervisory chains, interagency coordination, and shared retaliatory objectives.

Remedy. Upon proof of retaliatory motive and adverse action linked to protected activity, the law compels declaratory and injunctive relief sufficient to halt retaliation, reverse its effects, and prevent recurrence across all implicated systems. Required remedies include declarations of First Amendment and statutory violations; prohibitory and mandatory injunctions barring further retaliatory conduct; restoration of status, benefits, housing stability, and procedural access lost due to retaliation; expungement or correction of retaliatory records; and structural directives ensuring protected reporting and petitioning proceed free from reprisal. Where appropriate, compensatory and deterrent consequences follow as a matter of law to remedy completed retaliation and to reestablish lawful conditions for protected activity.

## COUNT VI —
## State-Created Danger & Government-Created Risk to Life, Safety, and Stability
(Constitutional Violations Arising From Federal–State Retaliatory Conduct and Administrative Abuse)

Liability. Defendants are liable for state-created danger and government-created risk where, under color of law, they affirmatively created, increased, or knowingly exposed persons to foreseeable risks to life, safety, health, housing stability, and medical continuity. Through coordinated federal–state retaliatory conduct and administrative abuse – including deliberate nonfeasance after actual notice, interference with protective services, destabilization of housing and benefits, obstruction of medical and safety accommodations, selective enforcement, and escalation of hostile conditions – defendants departed from constitutional norms and placed affected persons in positions of heightened danger they would not otherwise have faced. Such conduct satisfies the elements of the state-created danger doctrine and constitutes substantive due-process violations attributable both to direct acts and to enterprise-level action through supervisory chains, interagency coordination, and joint participation.

Remedy. Where government action creates or amplifies a foreseeable risk of serious harm, the Constitution compels immediate declaratory and injunctive relief to neutralize the danger, prevent recurrence, and restore safe conditions. Required remedies include prohibitory and mandatory injunctions to cease risk-creating practices; affirmative orders ensuring protection, continuity of housing and benefits, and access to medical and safety accommodations; corrective

135

directives addressing the administrative mechanisms that generated the risk; and ongoing court supervision sufficient to ensure compliance. Where harm has occurred, compensatory and deterrent consequences follow as a matter of law to redress injury and to reestablish constitutional boundaries governing governmental conduct.

## COUNT VII —
### Failure to Intervene / Deliberate Non-Enforcement After Actual Notice
(Federal and State Officials' Knowing Refusal to Act Despite Comprehensive Evidence and Repeated Disclosures)

Liability. Defendants are liable for failure to intervene and deliberate non-enforcement where, after actual notice supported by comprehensive evidence and repeated disclosures, they knowingly refused to act to halt ongoing violations of federal law. By declining mandatory intervention duties, suppressing or ignoring substantiated reports, withholding required referrals, and permitting known misconduct to continue across agencies and supervisory levels, defendants engaged in deliberate indifference and nonfeasance under color of law. Such knowing inaction constitutes an actionable breach of non-discretionary duties imposed by the Constitution, federal statutes, funding conditions, and fiduciary obligations, and attaches liability both for direct refusals and for enterprise-level responsibility arising from supervisory authority, coordinated decision-making, and joint omission.

Remedy. Where officials with actual notice refuse to intervene, the law compels declaratory and injunctive relief to enforce performance of mandatory duties, terminate ongoing violations, and prevent future harm. Appropriate remedies include orders compelling intervention and enforcement actions unlawfully withheld; prohibitions against continued non-enforcement; corrective directives restoring required processes and referrals; preservation and production of records evidencing notice and refusal; and court supervision to ensure durable compliance. Where injuries resulted from the knowing refusal to act, compensatory and deterrent consequences are required to redress harm and to restore lawful administration.

## COUNT VIII —
### Enterprise-Level Fraud & Constructive Fraud Across Federally Funded Programs
(Coordinated Misrepresentation, Concealment, and Abuse of Public Trust Across Housing, SSA, Medicaid, Treasury, and Judicial Actors)

Liability. Defendants are liable for enterprise-level fraud and constructive fraud arising from coordinated misrepresentation, concealment, and abuse of public trust across federally funded programs, including housing, SSA, Medicaid, Treasury-linked benefit streams, and judicial-adjacent administration. Through synchronized false statements, material omissions,

136

contradictory determinations, data manipulation, suppression of adverse information, and misuse of authority to maintain improper outcomes, defendants operated as a continuing enterprise under color of law. These acts and omissions breached non-discretionary statutory duties, funding conditions, fiduciary obligations, and duties of honesty and fair dealing inherent in public administration, establishing liability for direct participation as well as enterprise-based responsibility through supervisory chains, delegated authority, risk-pooling arrangements, and coordinated conduct.

Remedy. Where enterprise fraud and constructive fraud infect federally funded programs, the law compels remedies sufficient to unwind deception, restore integrity, and prevent recurrence. Appropriate relief includes declaratory findings of breach; injunctive orders mandating truthful administration, corrective disclosures, and program reformation; restitution and disgorgement of benefits obtained through misrepresentation; imposition of constructive trusts and equitable liens on interests derived from the misconduct; and court supervision to ensure compliance with federal requirements. Where fraud impacted federal funds, statutory consequences attach to secure recovery and deterrence commensurate with the scope of the enterprise-level violations.


### COUNT IX —
### Ultra Vires Conduct, Abuse of Office, and Deprivation of Rights Under Color of Law
### (42 U.S.C. § 1983)
(State and Federal Actors Exceeding Lawful Authority to Retaliate, Conceal Misconduct, and Deny Constitutionally Guaranteed Rights)

Liability. Defendants acting under color of state and federal law are liable for ultra vires conduct, abuse of office, and deprivation of constitutionally guaranteed rights in violation of 42 U.S.C. § 1983. By exceeding lawful authority, misusing delegated power, obstructing access to courts, retaliating for protected speech and petitioning activity, concealing misconduct, denying due process, and selectively enforcing or refusing to enforce mandatory duties, these defendants acted outside the scope of any legitimate governmental function. Such conduct constitutes state action undertaken without lawful justification, stripping defendants of any claim to immunity and rendering them personally and enterprise-level liable for direct participation, supervisory authorization, ratification, and coordinated action within their respective agencies, courts, and administrative structures.

Remedy. Upon establishment of ultra vires conduct and constitutional deprivation under color of law, federal courts are compelled to impose declaratory and injunctive relief, structural corrective orders, and monetary accountability sufficient to remedy the violations and prevent recurrence. Appropriate remedies include prospective injunctions restraining further unconstitutional action, declaratory judgments confirming the unlawfulness of defendants' conduct, compensatory and punitive damages as authorized by § 1983, and equitable relief necessary to restore access to rights, processes, and protections denied through abuse of office. Where violations were systemic, coordinated, or undertaken in conscious disregard of constitutional limits, remedies

137

must extend to institutional reform, personal accountability, and enforcement measures sufficient to vindicate federal supremacy and deter future misconduct.

## COUNT X —
### Violations of the Americans with Disabilities Act (Title II): Denial of Access, Refusal of Accommodations, and Discriminatory Retaliation
(Systemic Exclusion of a Quad-Amputee from Housing, Benefits, Judicial Processes, and Public Programs)

Liability. Defendants subject to Title II of the Americans with Disabilities Act are liable for discrimination, denial of access, refusal to provide reasonable accommodations, and retaliatory conduct against a qualified individual with a disability. By denying meaningful access to housing programs, benefits administration, court procedures, administrative remedies, electronic filing systems, records access, and other public services; by refusing or ignoring accommodation requests; by imposing barriers that effectively excluded participation; and by retaliating against protected advocacy and petitioning activity, defendants violated non-discretionary obligations imposed by 42 U.S.C. §§ 12131–12134 and implementing regulations. Such conduct constitutes intentional discrimination, deliberate indifference, and systemic exclusion carried out under color of law, rendering defendants liable individually and collectively through supervisory authority, delegated functions, institutional policy, and coordinated conduct across agencies and programs.

Remedy. Upon proof of Title II violations, federal courts are required to order immediate and effective injunctive relief to eliminate discriminatory barriers, compel reasonable accommodations, and ensure meaningful access to public services, programs, and judicial processes. Appropriate remedies include declaratory judgments establishing ongoing ADA violations; mandatory injunctive orders requiring policy modification, procedural correction, and accommodation implementation; compensatory damages for intentional discrimination; and enforcement measures sufficient to prevent retaliation and future exclusion. Where violations are systemic and inter-agency in nature, remedies must include structural relief and court supervision adequate to restore compliance with federal disability law and to secure equal participation in all covered governmental functions.

## COUNT XI —
### Violations of the Administrative Procedure Act (APA) and Federal Oversight Duties
(Arbitrary and Capricious Non-Action, Withholding of Required Responses, and Failure to Enforce Federal Law After Actual Notice)

Liability. Defendants subject to the Administrative Procedure Act and related federal oversight obligations are liable for arbitrary, capricious, and unlawful agency action and inaction in

138

violation of 5 U.S.C. §§ 551–706. By refusing to act after actual notice, failing to respond to mandatory submissions, withholding required determinations, ignoring non-discretionary duties, failing to enforce governing statutes and funding conditions, and engaging in unexplained delays and blanket non-responses, these defendants violated the APA's core requirements of reasoned decision-making, timely action, and lawful enforcement. Such conduct constitutes *ultra vires* action, abdication of statutory responsibility, and administrative dishonor, rendering each defendant liable for direct nonfeasance as well as for enterprise-level responsibility through supervisory authority, delegated oversight functions, and coordinated agency inaction.

Remedy. Where APA violations are established, federal courts are compelled to set aside unlawful agency action, compel agency action unlawfully withheld or unreasonably delayed, and issue declaratory and injunctive relief necessary to enforce compliance with federal law. Appropriate remedies include *mandamus*-style orders requiring agencies and oversight officials to perform mandatory duties, respond to submissions, issue required determinations, and enforce governing statutes and funding conditions; declaratory judgments establishing arbitrary and capricious conduct; and injunctive relief preventing continued non-action and procedural evasion. Where violations reflect systemic failure rather than isolated error, courts must impose structural relief and ongoing supervision sufficient to restore lawful administrative operation and ensure future compliance.

## COUNT XII —
### Federal Funding Violations & Misuse of Federal Appropriations
(HUD, SSA, Medicare/Medicaid, Treasury, and Federally Funded State Programs)

Liability. Defendants who received, administered, oversaw, or benefited from federal funds are liable for violations of Spending Clause requirements, misuse of federal appropriations, and breach of mandatory funding conditions attached to HUD, SSA, Medicare/Medicaid, Treasury, and related federally funded State programs. By accepting federal funds while failing to comply with nondiscretionary statutory conditions, misrepresenting compliance, concealing material facts, diverting funds from their authorized purposes, tolerating or facilitating discriminatory practices, and refusing to enforce governing requirements after actual notice, these defendants entered federal funding default. Such conduct constitutes *ultra vires* action, constructive fraud, and breach of fiduciary obligations inherent in the administration of public funds, rendering each defendant liable for direct misuse as well as enterprise-based responsibility through supervisory authority, delegated administration, and coordinated programmatic misconduct.

Remedy. Upon proof of federal funding violations, courts are compelled to declare the defendants in breach of funding conditions, order restitution and disgorgement of misused funds, impose corrective compliance measures, and enjoin continued receipt or administration of federal funds absent demonstrated conformity with statutory requirements. Appropriate remedies include declaratory judgments establishing funding noncompliance; injunctive relief mandating program correction, transparency, and lawful administration; restitution to the appropriate federal

accounts; referral-triggering findings for statutory enforcement where required by law; and structural relief sufficient to prevent recurrence. Where misuse reflects systemic or enterprise-level failure, courts must impose remedies that restore program integrity, protect beneficiaries, and ensure that federal appropriations are used solely for their lawful purposes.

## COUNT XIII —
## Constitutional Violations: First, Fifth, and Fourteenth Amendments
(Retaliation for Speech & Petitioning, Deprivation of Liberty & Property, Equal-Protection Violations, and State-Created Danger)

Liability. Defendants acting under color of state and federal law are liable for direct and coordinated violations of the First, Fifth, and Fourteenth Amendments by retaliating against protected speech and petitioning activity, depriving liberty and property without due process, denying equal protection of the laws, and affirmatively creating or escalating danger through official action and deliberate indifference. By punishing lawful petitioning and whistleblowing, suppressing access to courts and remedies, manipulating administrative and judicial processes, and using governmental power to impose instability, coercion, and risk, these defendants exceeded lawful authority and breached constitutional duties owed to the People. Their conduct constitutes both individual constitutional violations and enterprise-level responsibility through coordinated action, supervisory chains, delegated authority, and joint participation in retaliatory and obstructive schemes.

Remedy. Where constitutional violations are established, courts are compelled to declare the challenged conduct unlawful, enjoin ongoing and future retaliation, restore and protect access to constitutionally guaranteed rights, and impose remedies sufficient to neutralize the effects of past violations. Appropriate relief includes declaratory judgments confirming First, Fifth, and Fourteenth Amendment breaches; injunctive orders prohibiting retaliatory use of governmental power; corrective measures restoring due process and equal protection; and structural remedies necessary to prevent recurrence of state-created danger. Constitutional violations require remedies that are effective, prospective, and comprehensive, ensuring that governmental authority is exercised within constitutional limits and that the supremacy of federal constitutional guarantees is fully enforced.

## First Amendment —
## Retaliation & Interference With Petitioning the Government for Redress

Liability. Defendants are liable for violating the First Amendment by retaliating against protected speech and petitioning activity, including the submission of complaints, evidence, requests for oversight, and invocation of lawful processes. By using housing authority, benefits administration, law enforcement discretion, clerical power, judicial process, and administrative mechanisms to punish, deter, or suppress petitioning activity, defendants imposed adverse

140

consequences for constitutionally protected conduct. Such retaliation constitutes a direct constitutional injury and an abuse of governmental authority under color of law, aggravated by coordination across agencies and enterprise structures designed to chill redress and silence reporting.

Remedy. First Amendment retaliation compels declaratory and injunctive relief prohibiting further interference with petitioning activity, nullifying retaliatory actions, and restoring full access to governmental and judicial channels. Courts are required to restrain the use of public power as a weapon against speech, impose corrective measures preventing recurrence, and ensure that petitioning rights remain free from coercion, punishment, or deterrent effect. Where retaliation is shown, structural relief is required to eliminate practices that burden the exercise of First Amendment rights.

## Fifth Amendment —
## Federal Due-Process Violations & Property Deprivations

Liability. Defendants exercising federal authority, or acting in concert with federal agencies, are liable for violating the Fifth Amendment by depriving liberty and property interests without due process of law. These violations include arbitrary benefit deductions, concealment of material determinations, denial of notice and opportunity to be heard, manipulation of eligibility classifications, and administrative actions taken without lawful procedure. By withholding process, refusing required responses, and imposing deprivations through opaque or retaliatory means, defendants breached non-discretionary constitutional duties binding federal actors and those acting under federal authority.

Defendants further acted arbitrarily, capriciously, and contrary to law by manipulating and conflating federal and state *"income"* categories – including earned income, unearned income, deemed income, household income, and imputed income – not to administer benefits, but to fabricate administrative and commercial jurisdiction over Prosecutor Ex Rel / Plaintiff. These shifting definitions were applied without disclosure, rulemaking authority, or consistent standards, and were used to deny benefits, coerce certifications, and generate false narratives of ineligibility or noncompliance. Such conduct violates the Administrative Procedure Act, fundamental due process, and the prohibition against jurisdiction manufactured by administrative fiat.

Remedy. Fifth Amendment violations require declaratory findings of unlawful deprivation and injunctive relief restoring constitutionally required procedures. Courts must order cessation of arbitrary deprivations, compel lawful notice and hearing, and impose corrective administrative structures ensuring future compliance with due-process guarantees. Remedies must fully neutralize the effects of unlawful federal action and prevent further deprivation absent constitutionally sufficient process.

**Fourteenth Amendment —**
**Due Process, Equal Protection, and State-Created Danger**

Liability. State actors and those acting under color of state law are liable under the Fourteenth Amendment for depriving due process, denying equal protection, and affirmatively creating or exacerbating danger through official action and deliberate indifference. By selectively enforcing rules, weaponizing administrative and judicial processes, discriminating against a disabled whistleblower, and knowingly escalating risk to life, safety, and stability, defendants violated core constitutional protections. State-created danger arises where official conduct places an individual in a position of heightened risk that would not otherwise exist, and where defendants act with knowledge of that risk and deliberate disregard of its consequences.

Remedy. Fourteenth Amendment violations compel injunctive relief restraining unconstitutional practices, corrective measures restoring equal protection and due process, and judicial orders neutralizing state-created dangers. Courts must prohibit discriminatory enforcement, require protective action where danger was created or amplified by the State, and impose structural remedies sufficient to prevent future constitutional harm. Relief must be adequate to restore constitutional equilibrium and prevent continued misuse of state power.

**Unified Constitutional Injury**

Liability. The foregoing First, Fifth, and Fourteenth Amendment violations do not exist in isolation but operate together as a unified constitutional injury arising from coordinated federal-state misconduct. Through interlocking retaliation, procedural deprivation, discrimination, and risk creation, defendants transformed governmental authority into an instrument of punishment and coercion, collapsing constitutional safeguards across multiple systems. This convergence of violations establishes enterprise-level constitutional liability, joint and several responsibility, and enhanced culpability for actors operating within coordinated structures of authority.

Remedy. These combined violations constitute a unified constitutional injury that cannot be compartmentalized or dismissed as isolated errors. The coordinated retaliation, procedural sabotage, deprivation of liberty and property interests, denial of equal protection, and creation of foreseeable danger reflect a systemic pattern of unconstitutional conduct carried out under color of law. Accordingly, the Constitution compels relief sufficient to halt ongoing violations, correct falsified or tainted processes, restore lawful access to rights and remedies, and prevent future recurrence through declaratory, injunctive, and structural measures, including relief sufficient to fully remedy the concrete, individualized constitutional injuries suffered as a direct result of the defendants' coordinated misconduct, in addition to the structural and prospective relief required to prevent recurrence.

**COUNT XIV — False Statements, Misrepresentations, and Falsification of Government Records**

142

(Fabricated Classifications, Contradictory Notices, Manipulated Housing Files, and Misrepresented Federal Compliance)

Liability. Defendants are liable for false statements, misrepresentations, and falsification of government records arising from fabricated Medicaid classifications, contradictory and misleading notices, manipulated housing and benefits files, falsified or altered judicial and administrative records, suppression or distortion of federal whistleblower evidence, and coordinated enterprise-level misrepresentation of federal compliance. By creating, using, endorsing, or relying upon records known to be false or misleading – and by concealing material facts required by federal law – defendants breached non-discretionary duties of accuracy, candor, record integrity, and truthful administration imposed by the Constitution, federal statutes and regulations, funding conditions, and fiduciary obligations inherent in public office and federally funded program administration. These actions constitute *ultra vires* conduct, obstruction of lawful process, deprivation of rights under color of law, misuse of federal funds, and constructive fraud, establishing liability for direct participation as well as enterprise-based responsibility through supervisory chains, delegated authority, joint action, and coordinated concealment.

Remedy. The law compels corrective and deterrent relief sufficient to restore record integrity and remedy the consequences of falsification, including declarations that the identified records and classifications are unlawful and void; mandatory correction, supplementation, and reissuance of accurate records; preservation and production of all underlying data and communications; injunctions prohibiting continued reliance on false records; restitution and disgorgement tied to misrepresented compliance; statutory damages and penalties where authorized; equitable remedies such as constructive trust and surcharge for fiduciary breach; and structural relief ensuring compliant recordkeeping, auditing, and oversight going forward, including relief sufficient to fully remedy the concrete, individualized injuries caused by the falsified records, in addition to the systemic and prospective relief required to prevent recurrence.

## Medicaid Classification Manipulation and Concealment

Liability. Defendants associated with Medicaid administration are liable for manipulation and concealment of beneficiary classifications through the fabrication, coercion, or distortion of medical and functional assessments, the suppression of accurate records, and the imposition of false dependency narratives to force program compliance. Such conduct violates federal Medicaid statutes, implementing regulations, mandatory reporting obligations, and Spending Clause conditions, and constitutes administrative fraud, ultra vires action, and breach of fiduciary duty owed in the administration of federally funded benefits.

Remedy. Law requires corrective relief including declaratory findings of falsification and noncompliance, injunctive orders mandating accurate reclassification and prospective compliance, record correction and preservation, restitution and disgorgement of funds obtained or retained through misclassification, and structural oversight sufficient to prevent recurrence, together with any equitable remedies necessary to cure the effects of the unlawful classifications.

143

**False Judicial and Administrative Records (Clerks, Courts, Legal Services)**

Liability. Defendants operating within judicial and administrative recordkeeping functions are liable for the creation, alteration, suppression, or maintenance of false records, including docket entries, notices, certifications, and agency files, used to obstruct review, misrepresent compliance, or defeat access to process. Such acts violate federal records laws, due process guarantees, the Rules Enabling Act, and fiduciary obligations inherent in custodial control of official records.

Remedy. Law compels declaratory relief establishing record falsification, injunctive orders requiring correction, reconstruction, and preservation of records, compulsory disclosure of suppressed materials, and structural safeguards governing record integrity, along with equitable remedies—including sanctions, surcharge, and other relief—necessary to restore lawful process and prevent further obstruction.

**Federal Whistleblower Evidence of False Statements**

Liability. Defendants are liable for making, endorsing, or propagating false statements and omissions in matters involving federal oversight and whistleblower disclosures, including misrepresentations to investigators, agencies, courts, or contractors, and retaliatory distortion of evidence. This conduct violates federal whistleblower protection statutes, obstruction prohibitions, and program-integrity requirements, and constitutes knowing interference with federally protected reporting mechanisms.

Remedy. Law mandates protective and corrective relief including declarations of falsity and retaliation, injunctions barring further interference, compelled acceptance and transmission of evidence to appropriate oversight bodies, remedial oversight to ensure truthful reporting, and all equitable measures necessary to neutralize retaliatory effects and secure the integrity of federal review processes.

**Enterprise-Level Misrepresentation**

Liability. Defendants acting in concert across agencies and contractors are liable for enterprise-level misrepresentation through coordinated concealment, inconsistent positions, and systemic falsehoods designed to mask noncompliance across housing, benefits, judicial, and oversight functions. Such conduct satisfies the elements of constructive fraud and enterprise liability, including knowledge, coordination, reliance by downstream decisionmakers, and resulting institutional harm.

Remedy. Law requires enterprise-wide declaratory relief identifying coordinated misrepresentation, injunctive restructuring to eliminate deceptive practices, restitution and disgorgement of benefits derived from misrepresentation, compliance audits, and ongoing judicial supervision sufficient to dismantle the misrepresentational architecture and ensure truthful, lawful administration going forward.

**Legal Consequences**

Liability. As a consequence of the foregoing falsifications and misrepresentations, defendants are liable for cumulative violations of constitutional, statutory, fiduciary, and commercial obligations, including joint and several responsibility arising from coordinated conduct, supervisory chains, and delegated authority. The aggregate misconduct establishes default and dishonor under principles of equity and public trust, eliminating reliance on discretion or immunity for acts taken outside lawful authority.

Remedy. Law compels comprehensive relief proportionate to the scope of the violations, including declaratory judgments, injunctive and structural remedies, restitution, disgorgement, surcharge, equitable liens or constructive trusts where appropriate, and continuing jurisdiction to enforce compliance – including relief sufficient to fully remedy the concrete, individualized constitutional injuries suffered as a direct result of the defendants' coordinated misconduct, in addition to the structural and prospective relief required to prevent recurrence.

## COUNT XV —
## Failure to Provide Mandated Repairs, Safe Housing, and ADA-Compliant Living Conditions
(Violations of HUD Standards, Life-Safety Requirements, Disability Accommodations, and Federal Housing Funding Conditions)

Liability. Defendants associated with federally funded housing programs are liable for failing to provide mandated repairs, safe and habitable housing, and ADA-compliant living conditions as required by HUD regulations, life-safety standards, federal funding conditions, and nondiscretionary duties imposed by federal law. By allowing known hazards to persist, refusing or delaying required repairs, denying reasonable accommodations and modifications, issuing or enforcing tenancy actions without curing safety defects, and misrepresenting compliance status, these defendants engaged in *ultra vires* conduct, breached fiduciary obligations inherent in program administration, and deprived residents of federally protected housing and disability rights under color of law.

Remedy. Law compels declaratory findings of noncompliance and injunctive relief mandating immediate remediation of safety hazards, completion of all required repairs, implementation of ADA-compliant accommodations and modifications, and verification of ongoing compliance through inspections and reporting. Further required are restitution and disgorgement for funds retained while standards were unmet, equitable remedies sufficient to cure the effects of unsafe and inaccessible conditions, and continuing judicial oversight to ensure durable compliance with HUD standards, life-safety requirements, and federal funding conditions.

145

## COUNT XVI —
### Withholding of Appeals, Hearings, and Administrative Due Process
(Systemic Denial of Meaningful Review Across Housing, SSA, Medicaid, Treasury, Legal Services, and Judicial Channels)

Liability. Defendants are liable for systemic denial of administrative due process arising from the withholding, obstruction, or constructive nullification of appeals, hearings, and meaningful review mechanisms mandated by federal law. By refusing to docket appeals, failing to issue appealable determinations, ignoring or delaying hearing requests, denying access to records necessary for review, misdirecting or misinforming parties about procedural rights, and collapsing multi-layered review structures into nonreviewable administrative dead ends, defendants breached nondiscretionary duties imposed by the APA, the Due Process Clauses of the Fifth and Fourteenth Amendments, federal funding conditions, and governing program statutes. These actions and omissions constitute *ultra vires* conduct and procedural sabotage designed to defeat substantive rights, rendering defendants liable for deprivation of lawful process under color of law.

Remedy. Law requires declaratory relief establishing that the denial and obstruction of appeals and hearings violated mandatory procedural guarantees, together with injunctive relief compelling restoration of accessible, timely, and meaningful review processes across all affected programs and channels. Required remedies further include orders mandating proper notice of appeal rights, reinstatement or reopening of unlawfully denied proceedings, production of records necessary for review, compliance with APA standards, and prospective judicial supervision sufficient to prevent continued procedural manipulation and to ensure that administrative remedies function as lawful gateways rather than barriers to federal rights.

## COUNT XVII —
### Retaliatory Use of Clerical Power and Procedural Weaponization
(Judicial and Administrative Obstruction to Deny Access to Courts and Suppress Evidence)

Liability. Defendants are liable for the retaliatory misuse of clerical authority and procedural mechanisms to obstruct access to courts and suppress evidence under color of law. By manipulating dockets, refusing filings, misrouting or withholding submissions, altering or omitting entries, issuing contradictory or nonappealable notices, imposing unauthorized technical barriers, and selectively enforcing procedural rules to block review, defendants breached nondiscretionary duties imposed by the Constitution, the Rules Enabling Act, the APA, and federal access-to-courts guarantees. Such conduct constitutes *ultra vires* action and procedural bad faith designed to defeat substantive rights, rendering defendants liable for deprivation of

146

judicial access, obstruction of lawful process, and enterprise-based responsibility arising from coordinated administrative and judicial conduct.

Remedy. Law compels declaratory relief establishing that the weaponization of clerical and procedural power violated mandatory access-to-courts protections, together with injunctive relief requiring immediate cessation of such practices and affirmative corrective measures. Required remedies include orders compelling acceptance and proper docketing of filings, restoration or reconstruction of suppressed records, uniform application of procedural rules consistent with the Rules Enabling Act, preservation of evidence, reopening of affected proceedings where appropriate, and prospective judicial supervision sufficient to prevent recurrence and to ensure that court and administrative processes operate as lawful conduits to adjudication rather than instruments of retaliation.

## COUNT XVIII —
## Misuse of Law Enforcement Authority and Failure to Protect
(Retaliatory Non-Response, Selective Enforcement, and Law-Enforcement Participation in the Federal–State Misconduct Continuum)

Liability. Defendants are liable for misuse of law enforcement authority and deliberate failure to protect by engaging in retaliatory non-response, selective enforcement, and coordinated participation in a broader federal–state misconduct continuum under color of law. By refusing to take reports, declining mandatory investigative or protective actions after actual notice, selectively enforcing laws to favor institutional interests, and aligning enforcement decisions with retaliatory administrative or judicial objectives, defendants breached nondiscretionary duties imposed by the Constitution, federal civil-rights statutes, spending-clause conditions tied to federally funded policing and programs, and common-law duties to protect. Such conduct constitutes *ultra vires* action, deliberate indifference, and deprivation of federally protected rights, giving rise to direct and enterprise-based liability.

Remedy. Law requires declaratory relief establishing the illegality of retaliatory non-response and selective enforcement, together with injunctive relief compelling lawful performance of mandatory policing and protective duties. Required remedies include orders mandating acceptance and processing of reports, impartial enforcement consistent with equal protection, preservation and disclosure of enforcement records, referral and coordination with appropriate oversight bodies, and structural safeguards to prevent retaliatory alignment with administrative or judicial misconduct. Where appropriate, equitable relief must include prospective supervision, corrective training mandates, and remedial measures sufficient to restore lawful protection, deter recurrence, and ensure enforcement authority is exercised in conformity with constitutional and statutory obligations.

147

## COUNT XIX —
## Fraudulent Concealment, Suppression of Evidence, and Destruction of Critical Records
(Intentional Withholding, Alteration, and Erasure of Documents Needed for Due Process, Protection, and Judicial Review)

Liability. Defendants are liable for fraudulent concealment, suppression of evidence, and destruction of critical records arising from their intentional withholding, alteration, spoliation, and erasure of documents required by law to be preserved and produced for due process, protection of federally guaranteed rights, and meaningful judicial review. By concealing material records, manipulating files, destroying electronically stored information, refusing lawful disclosure, and obstructing access to evidence after actual notice of claims and investigations, defendants violated constitutional due-process guarantees, federal records statutes, discovery and preservation duties, APA obligations, federal funding conditions, and fiduciary duties inherent in public office and federally funded program administration. Such conduct constitutes *ultra vires* action, enterprise-level misconduct, and commercial dishonor, and renders defendants liable both for direct participation and for coordinated concealment carried out through supervisory chains, delegated authority, and joint action within the enterprise.

Remedy. As a matter of law and equity, these violations compel remedies including mandatory preservation and production orders, adverse-inference and evidentiary sanctions, declaratory findings of spoliation and obstruction, injunctive relief prohibiting further destruction or concealment, and court-supervised recovery, reconstruction, and auditing of affected records. Where concealment or destruction facilitated deprivation of rights or misuse of federal funds, remedies further include disgorgement, restitution, constructive trust, equitable liens, surcharge of responsible fiduciaries, and all consequential relief necessary to restore the integrity of judicial and administrative processes, deter recurrence, and fully remediate the harms flowing from defendants' fraudulent suppression of evidence.

## COUNT XX —
## Failure to Train, Supervise, and Discipline Personnel Despite Actual Notice of Ongoing Violations
(Institutional Negligence, Deliberate Indifference, and Enterprise-Level Nonfeasance Across Housing, Benefits, Law Enforcement, and Judicial Systems)

Liability. Defendants are liable for failure to train, supervise, and discipline personnel despite actual notice of ongoing violations, constituting institutional negligence, deliberate indifference, and enterprise-level nonfeasance. By ignoring documented complaints, disregarding repeated disclosures, failing to implement corrective training, tolerating known patterns of misconduct, and permitting unqualified or uncorrected actors to continue exercising authority under color of law, defendants breached non-discretionary duties imposed by the Constitution, federal statutes,

148

federal funding conditions, and fiduciary obligations inherent in public office and program administration. This sustained inaction, after notice, amounts to ratification of unlawful conduct and establishes supervisory, municipal, and enterprise liability through policy, custom, and coordinated omission.

Remedy. These violations compel remedial relief as a matter of law and equity, including declaratory findings of deliberate indifference, injunctive orders requiring comprehensive training, supervision, and discipline reforms, appointment of monitors or reporting requirements where necessary, and prohibition of continued delegation of authority absent compliance. Where failures to train and supervise enabled constitutional deprivations, retaliation, or misuse of federal funds, remedies further include restitution, disgorgement, surcharge of responsible supervisors, constructive trust, and all structural and consequential relief required to cure the enterprise failure, prevent recurrence, and restore lawful administration consistent with federal mandates.

## COUNT XXI —
## Negligent, Reckless, and Malicious Infliction of Emotional Distress and Physical Endangerment
(Government-Created Trauma, Medical Risk, Psychological Harm, and Coercive Pressure Directed at a Disabled Whistleblower)

Liability. Defendants are liable for negligent, reckless, and malicious infliction of emotional distress and physical endangerment arising from government-created trauma, medical risk, and coercive pressure. By knowingly subjecting a disabled whistleblower to prolonged uncertainty, retaliation, threats to housing and benefits, denial of medically necessary supports, coercive administrative demands, and exposure to foreseeable harm after actual notice of vulnerability, defendants breached duties of care imposed by the Constitution, federal disability law, civil-rights statutes, and common-law principles prohibiting reckless disregard for health and safety. These acts and omissions were not isolated but occurred within coordinated administrative and enterprise structures, rendering defendants liable for both direct misconduct and compounding harm through joint action, supervisory ratification, and deliberate indifference.

Remedy. These violations compel remedies sufficient in law and equity to address both the personal injuries inflicted and the systemic conditions that produced them, including declaratory findings of liability, compensatory and consequential damages for emotional distress and physical endangerment, and punitive damages where reckless or malicious conduct is shown. Further required are injunctive orders prohibiting continued coercive practices, mandating protective protocols for disabled whistleblowers, and imposing structural safeguards to prevent recurrence, together with all equitable and commercial relief necessary to restore safety, dignity, and lawful administration consistent with federal mandates.

149

## COUNT XXII —
## Unjust Enrichment and Improper Benefit From Federal Funds, Public Offices, and Positions of Authority
(Retention of Financial, Institutional, and Professional Benefits While Violating Federal Obligations and Constitutional Duties)

Liability. Defendants are liable for unjust enrichment and improper benefit obtained through the retention of financial, institutional, and professional advantages derived from federal funds, public offices, and positions of authority while simultaneously violating federal obligations and constitutional duties. By continuing to draw salaries, benefits, professional standing, institutional protection, and programmatic funding while engaging in or ratifying unlawful conduct, defendants accepted the benefits of office and federal participation without performing the correlative duties imposed by law. Such conduct constitutes unjust enrichment under equitable principles, breach of fiduciary trust inherent in public office, misuse of federally conditioned funds, and enterprise-level benefit derived from *ultra vires* action and systemic noncompliance.

Remedy. These violations compel equitable relief requiring disgorgement of improperly retained benefits, restitution of misused federal funds, imposition of constructive trusts over compensation or advantages traceable to the misconduct, and surcharge against responsible actors and entities. Additional relief must include declaratory findings that defendants may not lawfully retain benefits obtained through unconstitutional or unlawful conduct, together with injunctive and structural remedies ensuring that future receipt of federal funds, salaries, or institutional protections is conditioned upon strict compliance with constitutional, statutory, and fiduciary obligations.

## COUNT XXIII —
## Conspiracy to Interfere With Civil Rights (42 U.S.C. § 1985)
(Coordinated Agreement to Retaliate, Obstruct Justice, Suppress Evidence, and Deny Equal Protection)

Liability. Defendants are liable for conspiracy to interfere with civil rights under 42 U.S.C. § 1985 by entering into coordinated agreements – explicit and implicit – to retaliate against protected activity, obstruct justice, suppress evidence, and deny equal protection of the laws. Through concerted action across agencies, offices, and institutional roles, defendants acted in furtherance of a shared objective to impede access to lawful remedies, frustrate enforcement of federal rights, and shield misconduct from review. These coordinated acts, taken under color of law and through enterprise relationships, constitute wheel and chain conspiracies marked by agreement, overt acts, and resulting deprivation of federally protected rights.

150

Remedy. These violations require declaratory relief establishing the existence of unlawful conspiracies, injunctive relief barring further coordinated interference with civil rights, and equitable remedies to dismantle the structures and practices facilitating such conspiracies. Remedies must further include joint and several liability for all co-conspirators, compensatory and punitive damages as authorized by law, and structural orders sufficient to prevent recurrence, ensure transparency, and restore equal protection and access to justice free from coordinated obstruction.

## COUNT XXIV —
### Abuse of Process and Malicious Use of Governmental Procedures
(Retaliatory Manipulation of Administrative, Judicial, and Housing Processes to Silence a Disabled Whistleblower)

Liability. Defendants are liable for abuse of process and malicious use of governmental procedures by intentionally manipulating administrative, judicial, and housing mechanisms for retaliatory purposes unrelated to their lawful objectives. By initiating, prolonging, distorting, or weaponizing processes to silence protected whistleblowing and petitioning activity, defendants employed official procedures as tools of coercion and suppression rather than for their intended adjudicatory or regulatory functions. Such conduct constitutes bad faith, *ultra vires* action, and deprivation of federally protected rights, undertaken individually and through coordinated enterprise relationships under color of law.

Remedy. These violations compel declaratory relief confirming the unlawful misuse of process; injunctive relief prohibiting further retaliatory or pretextual deployment of governmental procedures; and equitable remedies to unwind tainted actions, correct records, and restore access to neutral processes. Remedies must also include damages sufficient to redress harms caused by malicious procedural weaponization, joint and several liability where coordination is shown, and structural safeguards ensuring that governmental processes cannot be repurposed to retaliate against protected activity.

## COUNT XXV —
### Retaliatory Harassment, Threats, Intimidation, and Coercion Against a Disabled Whistleblower
(Use of Governmental Authority to Instill Fear, Suppress Reporting, and Punish Protected Activity)

Liability. Defendants associated with housing, benefits administration, law enforcement, judicial channels, and related federal–state networks are liable for retaliatory harassment, threats, intimidation, and coercion carried out under color of law against a disabled whistleblower. By

151

engaging in coordinated conduct designed to instill fear, suppress reporting, deter protected petitioning activity, and punish lawful whistleblowing, these defendants violated non-discretionary duties imposed by the First Amendment, the ADA, federal whistleblower protections, and federal funding conditions. Such conduct constitutes intentional retaliation, abuse of governmental authority, and enterprise-level misconduct, rendering each defendant liable for direct participation as well as for joint and several responsibility arising from coordinated action, supervisory acquiescence, and participation in retaliatory schemes.

Remedy. These violations compel the imposition of injunctive and declaratory relief prohibiting further retaliatory conduct, mandating cessation of intimidation practices, and requiring corrective measures sufficient to protect whistleblowers and restore lawful reporting channels. The law further authorizes compensatory and punitive damages, statutory remedies where applicable, and equitable relief necessary to remedy the harm caused by coercive misuse of authority, deter future retaliation, and ensure that governmental power is not employed to silence protected activity or discriminate against disabled individuals.

## COUNT XXVI —
### Interference With Federal Oversight, Reporting, and Whistleblower Processes
(Obstruction of Federal Review Mechanisms, Suppression of Mandatory Disclosures, and Retaliation Against Lawful Whistleblowing)

Liability. Defendants associated with federal and state agencies, oversight bodies, and affiliated entities are liable for interference with federal oversight, reporting, and whistleblower processes carried out under color of law. By obstructing federal review mechanisms, suppressing or failing to transmit mandatory disclosures, discouraging or penalizing protected reporting, and retaliating against lawful whistleblowing, these defendants violated non-discretionary duties imposed by federal statutes, funding conditions, and oversight frameworks. Such conduct constitutes obstruction, abuse of office, and enterprise-level misconduct, establishing liability for direct participation as well as for joint and several responsibility arising from coordinated action, supervisory approval, and participation in obstructive schemes.

Remedy. These violations compel declaratory and injunctive relief requiring the unimpeded processing and transmission of mandatory disclosures, restoration of lawful oversight pathways, and cessation of retaliatory practices. The law further authorizes equitable relief to ensure compliance with federal reporting duties, statutory remedies and damages where provided, and corrective measures sufficient to deter future interference, protect whistleblower processes, and reestablish the integrity of federal oversight mechanisms.

152

## COUNT XXVII —
## Systemic and Coordinated Deprivation of Constitutionally Guaranteed Rights Under Color of Law
(Multi-Agency, Multi-State, Enterprise-Level Violations of the First, Fifth, and Fourteenth Amendments Carried Out Through Government Authority)

Liability. Defendants acting across multiple agencies, jurisdictions, and institutional levels are liable for systemic and coordinated deprivation of constitutionally guaranteed rights under color of law. Through concerted action, mutual reinforcement, and enterprise-level coordination, these defendants engaged in conduct that violated the First, Fifth, and Fourteenth Amendments, including retaliation against protected speech and petitioning, deprivation of liberty and property without due process, denial of equal protection, and state-created danger. The coordinated nature of these acts establishes liability not only for direct participation but also under principles of joint and several responsibility, supervisory liability, enterprise participation, and conspiratorial association arising from shared objectives, interdependent conduct, and collective misuse of governmental authority.

Remedy. These constitutional violations compel declaratory and injunctive relief sufficient to halt ongoing deprivations, dismantle coordinated practices that facilitate rights violations, and restore constitutional compliance across affected agencies and jurisdictions. The law further authorizes compensatory, consequential, and punitive damages, as well as equitable relief necessary to remedy concrete constitutional injuries, deter future coordinated misconduct, and ensure that governmental authority is exercised within constitutional bounds rather than as an instrument of systemic abuse.

## COUNT XXVIII —
## Americans With Disabilities Act (Title II) — Disability Discrimination, Denial of Access, Failure to Accommodate, and Retaliation
(Systemic ADA Title II Violations Across Housing, Benefits, Judicial Systems, Law Enforcement, and Federally Funded Agencies)

Liability. Defendants associated with housing authorities, benefits administrators, courts, law enforcement, and other federally funded entities are liable for systemic violations of Title II of the Americans with Disabilities Act. Acting under color of law and as recipients of federal funds, these defendants denied meaningful access to programs, services, information, and activities; refused reasonable accommodations; imposed discriminatory conditions; and engaged in retaliatory conduct in response to protected requests for accommodation and enforcement of disability rights. Such conduct constitutes discrimination by reason of disability, reflects deliberate indifference to known accommodation obligations, and establishes enterprise-level liability through coordinated practices, supervisory failures, and interdependent actions across agencies.

Remedy. These violations compel declaratory and injunctive relief requiring immediate cessation of discriminatory practices, implementation of lawful accommodation policies, training and oversight sufficient to ensure ADA compliance, and prospective safeguards against retaliation. The law further authorizes compensatory relief, equitable remedies, and ongoing court supervision necessary to fully remedy individualized injuries caused by ADA violations, restore equal access to public programs and judicial processes, and prevent recurrence of systemic discrimination within federally funded operations.

## COUNT XXIX —
## Rehabilitation Act § 504 (29 U.S.C. § 794)
Disability Discrimination, Denial of Benefits, Exclusion From Participation, and Retaliation in Federally Funded Programs

Liability. Defendants receiving and administering federal financial assistance are liable under § 504 of the Rehabilitation Act for discriminating against a qualified individual with a disability solely by reason of disability. By denying benefits, excluding participation, imposing inaccessible procedures, withholding information, refusing reasonable accommodations, retaliating against protected activity, and administering federally funded programs in a manner that had the effect of subjecting a disabled individual to discrimination, these defendants violated non-discretionary conditions attached to federal funding. Such conduct constitutes statutory discrimination, deliberate indifference, and unlawful program administration under color of federal authority, giving rise to direct and enterprise-based liability.

Remedy. The Rehabilitation Act mandates full remedial relief to cure and prevent disability discrimination in federally funded programs, including declaratory and injunctive relief compelling compliance, cessation of discriminatory practices, and implementation of lawful accommodations and accessible procedures. Remedies further include compensatory relief sufficient to redress concrete, individualized injuries caused by exclusion, denial of benefits, retaliation, and loss of meaningful access, together with such additional relief as is necessary to enforce federal funding conditions and restore nondiscriminatory participation in covered programs.

## COUNT XXX —
## Fair Housing Act (42 U.S.C. § 3601 et seq.)

Liability. Defendants associated with the administration, management, oversight, and enforcement of federally funded and federally assisted housing programs are liable under the

154

Fair Housing Act for discriminatory housing practices undertaken under color of law. By making housing unavailable, imposing discriminatory terms and conditions, refusing reasonable accommodations, issuing retaliatory notices, manipulating tenancy and recertification processes, withholding information, and interfering with the exercise of fair-housing rights on the basis of disability and protected activity, these defendants violated statutory prohibitions against discrimination, retaliation, and coercion. Such conduct constitutes intentional discrimination, disparate impact, and unlawful interference with federally protected housing rights, rendering defendants liable both individually and through enterprise, supervisory, and joint participation.

Remedy. The Fair Housing Act compels declaratory and injunctive relief sufficient to eliminate discriminatory housing practices, prevent retaliation, and require compliance with reasonable-accommodation and nondiscrimination mandates. Remedies further include compensatory damages for housing instability, emotional distress, economic loss, and loss of federally protected rights, together with punitive or enhanced relief where warranted to deter willful and reckless misconduct, and such additional relief as is necessary to restore fair, equal, and lawful access to housing free from discrimination or retaliation.

### COUNT XXXI —
### False Claims Act (31 U.S.C. § 3729 et seq.) &
### Whistleblower Retaliation (31 U.S.C. § 3730(h))
Submission of False Statements, Concealment of Material Facts, Retaliatory Acts Against a Whistleblower, and Misuse of Federal Program Funds

Liability. Defendants who submitted, caused to be submitted, or knowingly tolerated false claims, false statements, material omissions, and fraudulent certifications in connection with federally funded housing, Medicaid, SSA, Treasury, and related programs are liable under the False Claims Act. By misrepresenting compliance, concealing material facts, manipulating classifications, suppressing evidence of noncompliance, and continuing to draw or retain federal funds while violating statutory and funding conditions, these defendants knowingly defrauded the United States. Defendants further incurred liability under § 3730(h) by retaliating against a whistleblower through intimidation, adverse administrative actions, denial of benefits, housing interference, procedural obstruction, and coordinated reprisals designed to punish lawful reporting and to deter further disclosure of fraud.

Remedy. The False Claims Act mandates liability for treble damages, civil penalties, disgorgement of improperly obtained funds, and recovery of losses sustained by the United States as a result of defendants' fraudulent conduct. In addition, § 3730(h) compels relief sufficient to remedy retaliation, including reinstatement of rights and protections, compensation for economic and non-economic harms, and measures necessary to prevent further retaliatory conduct. These remedies operate as a matter of law to enforce federal spending integrity, to deter future fraud, and to ensure that federal funds are not administered or retained through deception,

155

concealment, or retaliation against protected whistleblowing activity.

## COUNT XXXII —
### Violations of Federal Spending Clause Requirements & Program-Compliance Conditions
(HUD, SSA, Treasury, Medicaid, and State Agencies Receiving Federal Funds While Failing to Meet Mandatory Federal Obligations)

Liability. Defendants who accepted and administered federal funds through HUD, SSA, Treasury, Medicaid, and related programs are liable for violations of Spending Clause conditions that operate as binding statutory obligations, not discretionary guidance. By failing to comply with mandatory program requirements, including nondiscrimination, ADA compliance, due process protections, accurate reporting, lawful eligibility determinations, record retention, and oversight cooperation, these defendants breached the conditions attached to federal funds. Acceptance of such funds constituted assent to these obligations; continued receipt and use of funds while operating in noncompliance rendered defendants liable for *ultra vires* conduct, constructive fraud, and deprivation of federally protected rights under color of law.

Remedy. Federal law compels remedies sufficient to enforce Spending Clause conditions, including declaratory relief establishing noncompliance, injunctive relief prohibiting continued violations, restitution and disgorgement of improperly obtained or retained funds, and corrective measures necessary to restore lawful program administration. Where violations are systemic, relief must include structural remedies ensuring future compliance and accountability. These remedies arise by operation of law to protect the integrity of federal spending programs, to prevent misuse of appropriated funds, and to ensure that federal resources are administered in strict accordance with the conditions imposed by Congress.

## COUNT XXXIII —
### Freedom of Information Act Violations (5 U.S.C. § 552)
Failure to Respond, Improper Withholding, Suppression of Federal Records, and Obstruction of Access to Evidence

Liability. Defendants subject to FOIA are liable for unlawfully withholding agency records, failing to conduct adequate searches, delaying or refusing responses beyond statutory deadlines, improperly invoking exemptions, and suppressing or concealing federal records material to oversight and redress. These actions constitute violations of non-discretionary duties imposed by 5 U.S.C. § 552, including the duty to promptly make records available, to segregate and disclose non-exempt material, and to process requests in good faith. Coordinated obstruction, silence after acknowledgment, and the rerouting or disappearance of requests further establish knowing

noncompliance and interference with federally protected access-to-information rights.

Remedy. FOIA mandates judicial remedies sufficient to compel disclosure and ensure transparency, including declaratory relief establishing unlawful withholding, injunctive relief ordering immediate production of records, prospective compliance measures to prevent recurrence, and recovery of costs and fees where authorized. Where violations are systemic or retaliatory, relief must include court-ordered oversight and corrective procedures to restore lawful records access. These remedies arise by operation of federal law to vindicate the public's right to information, to preserve evidentiary integrity, and to prevent agencies from defeating accountability through delay, concealment, or obstruction.

### COUNT XXXIV —
### Paperwork Reduction Act Violations (44 U.S.C. § 3501 et seq.)
Unauthorized Information Demands, Improper Burden Imposition, Contradictory Requirements, and Discriminatory Barriers Against a Disabled Whistleblower

Liability. Defendants are liable for violating the Paperwork Reduction Act by imposing unauthorized information-collection demands, enforcing requirements lacking valid OMB control numbers, issuing contradictory or duplicative requests, and conditioning access to benefits, housing, hearings, or remedies on compliance with unlawful paperwork burdens. By shifting administrative convenience onto regulated persons, disregarding PRA clearance and notice requirements, and applying requirements in a discriminatory manner -- particularly where disability-related barriers magnify burden -- defendants acted contrary to non-discretionary federal mandates governing information collection, burden minimization, and lawful program administration.

Remedy. The PRA requires judicial relief sufficient to nullify and enjoin enforcement of unlawful information demands, declare invalid any adverse action predicated on noncompliance with unauthorized collections, and compel agencies to cease, correct, and reform collection practices to conform with OMB approval, burden-reduction standards, and accessibility obligations. Where violations are systemic or retaliatory, relief must include prospective compliance measures, corrective notice to affected parties, and court oversight to prevent recurrence, all as compelled by federal statute to restore lawful administration and prevent procedural devices from defeating substantive rights.

### COUNT XXXV —
### Commercial Liability, Bond Violations, and Surety Breach in Public Office
(Including, but not limited to, the preserved $100-billion Coram Nobis claim and federal guarantor liability)

157

<u>Liability</u>. Defendants acting in public office are liable for commercial dishonor arising from failure to lawfully qualify for office, breach of fiduciary duty, *ultra vires* conduct, and the substitution of pooled risk instruments or indemnity schemes for statutorily required individual bonds and oaths. By exercising governmental power without compliant qualification, concealing or refusing disclosure of bonding and surety instruments, and relying on enterprise protection to externalize losses, defendants incurred personal and enterprise-level liability under common-law surety principles, public-fiduciary obligations, and commercial doctrines governing default, nonperformance, and dishonor. Such conduct also implicates guarantor responsibility where federal funds, assurances, or program guarantees were accepted while statutory conditions and accountability mechanisms were disregarded.

<u>Remedy</u>. Commercial law compels remedies sufficient to cure default and restore accountability, including declarations of non-qualification and dishonor, enforcement against responsible sureties and guarantors, disgorgement and restitution of improperly retained benefits, imposition of constructive trusts, and other equitable measures necessary to satisfy obligations arising from breach. Where qualification failures and bond substitutions are systemic, relief must include orders compelling production of lawful bonds and oaths, enforcement against guarantors, and remedial measures to realign public office with fiduciary accountability. These remedies operate by force of law to redress commercial breach, preserve all *Coram Nobis* claims, and ensure that losses are borne by responsible actors rather than externalized onto the public.

## COUNT XXXVI —
### Violations of Federal Records Laws
Destruction, Concealment, Manipulation, and Withholding of Required Government Records by Federal and State Actors

<u>Liability</u>. Defendants are liable for violating federal records laws by destroying, concealing, manipulating, misclassifying, or withholding records required to be created, preserved, and disclosed in the course of administering federally funded programs, adjudicatory proceedings, oversight functions, and law-enforcement activities. By failing to preserve accurate records, altering or suppressing documentary evidence, refusing lawful disclosure, and permitting records to disappear after actual notice of disputes, complaints, and investigations, defendants acted in breach of mandatory statutory duties and fiduciary obligations. Such conduct constitutes unlawful obstruction of transparency, interference with lawful oversight, and *ultra vires* action under color of law, rendering each participating actor responsible for direct violations and enterprise-level concealment.

<u>Remedy</u>. The law compels remedies sufficient to restore record integrity and accountability, including declarations of violation, orders compelling production and reconstruction of records, preservation injunctions, independent audits, and adverse inferences where destruction or concealment has occurred. Where records misconduct was coordinated or systemic, relief must

158

include enterprise-wide corrective measures, sanctions, and equitable remedies necessary to cure the effects of spoliation and prevent recurrence. These remedies operate as a matter of law to reestablish lawful recordkeeping, enable meaningful oversight and adjudication, and ensure that no defendant benefits from concealment or destruction of evidence required to be maintained for the protection of rights and the public trust.

(This Count is asserted to preserve and invoke the Court's remedial authority.)

## COUNT XXXVII —
## Declaratory and Injunctive Relief
(Ongoing Violations of Federal Law, Immediate Irreparable Harm, and the Necessity of Court-Ordered Structural Remedies)

Liability. Defendants are liable for ongoing and continuing violations of federal law where unlawful practices persist, remedies at law are inadequate, and structural defects in administration, oversight, qualification, and accountability remain uncorrected. The persistence of *ultra vires* conduct, noncompliance with mandatory statutes and funding conditions, obstruction of access to lawful processes, and concealment of records establishes a present and future risk of irreparable harm. Where violations are systemic or enterprise-wide, liability attaches to all responsible actors for maintaining conditions that perpetuate illegality and frustrate effective relief.

Remedy. The law compels declaratory and injunctive relief sufficient to halt ongoing violations, prevent recurrence, and restore lawful governance, including declarations of rights and duties, prohibitory and mandatory injunctions, structural reforms, compliance monitoring, and ancillary equitable measures necessary to make relief effective nationwide. Such relief issues by operation of law to restrain unlawful action, compel performance of non-discretionary duties, preserve evidence, and ensure immediate compliance where delay would cause irreparable harm, independent of damages and in addition to all other remedies authorized.

(This Count is asserted to preserve and invoke the Court's remedial authority.)

## COUNT XXXVIII —
## Administrative Procedure Act Violations & Mandamus Relief
(5 U.S.C. §§ 701–706; 28 U.S.C. § 1361 — Federal Agencies Acting Arbitrarily, Capriciously, Contrary to Law, and in Refusal to Perform Mandatory Duties)

Liability. Federal defendants are liable for agency action unlawfully withheld or unreasonably

159

delayed, arbitrary and capricious non-action, decisions contrary to law, and failures to perform non-discretionary duties imposed by statute and binding regulations. By ignoring required submissions, refusing to issue determinations, failing to investigate after actual notice, withholding mandatory responses, and employing procedural devices to evade substantive obligations, defendants violated the APA and acted ultra vires. Such conduct, including coordinated inaction and obstruction within supervisory chains, establishes liability for both direct violations and enterprise-level maintenance of unlawful practices that defeat statutory purpose.

Defendants further acted arbitrarily, capriciously, and contrary to law by manipulating and conflating federal and state *"income"* categories – including earned income, unearned income, deemed income, household income, and imputed income – not to administer benefits, but to fabricate administrative and commercial jurisdiction over Prosecutor Ex Rel / Plaintiff. These shifting definitions were applied without disclosure, rulemaking authority, or consistent standards, and were used to deny benefits, coerce certifications, and generate false narratives of ineligibility or noncompliance. Such conduct violates the Administrative Procedure Act, fundamental due process, and the prohibition against jurisdiction manufactured by administrative fiat.

Remedy. The law compels *vacatur* of unlawful action or inaction, declaratory relief establishing statutory duties, and writs of *mandamus* compelling performance of non-discretionary acts forthwith. Appropriate relief includes orders requiring agencies to accept and process submissions, issue determinations, conduct investigations, produce records, and comply with governing procedures within fixed timelines, together with ancillary injunctive measures necessary to make relief effective. These remedies issue as a matter of law to restore lawful administration, foreclose evasion through delay, and ensure ongoing compliance independent of damages and cumulative with all other authorized relief.

(This Count is asserted to preserve and invoke the Court's remedial authority.)
## COUNT XXXIX —
### Damages
Constitutional, Statutory, Commercial, Compensatory, Consequential, and Punitive Damages
Resulting from Federal and State Misconduct

Liability. Defendants are liable for damages proximately caused by their constitutional violations, statutory breaches, commercial dishonor, fiduciary defaults, and enterprise-level misconduct, including coordinated retaliation, obstruction, concealment, and *ultra vires* action under color of law. Where defendants acted individually and through wheel and chain conspiracies, supervisory chains, and enterprise structures, liability is joint and several and encompasses all foreseeable harms flowing from the misconduct. To the extent defendants' conduct constitutes racketeering activity, false claims, or retaliatory suppression of whistleblowing tied to federal funds, liability includes enhanced measures authorized by law,

160

including treble damages and statutory multipliers, without duplication and subject to applicable proof standards.

Remedy. The law compels an award of damages sufficient to make whole all injuries caused by defendants' misconduct and to deter recurrence, including compensatory and consequential damages, punitive damages where authorized, statutory damages, and enhanced damages such as trebling under RICO and the False Claims Act where applicable. Remedies further include prejudgment and post-judgment interest, costs, and such equitable monetary relief as restitution, disgorgement, and surcharge necessary to cure commercial default and fiduciary breach. These damages are cumulative with declaratory and injunctive relief and issue by operation of law to allocate losses to responsible actors rather than externalize them onto the public.

## COUNT XL —
### Comprehensive Relief, Reservation of Rights, and Continuing Jurisdiction
(Omnibus Remedy Clause, Preservation of Constitutional, Statutory, and Commercial Claims, and Court Oversight of Ongoing Violations)

Liability. Defendants are liable for the necessity of comprehensive and continuing relief where their coordinated misconduct, concealment, and obstruction created a remedial landscape in which piecemeal adjudication would be inadequate and ineffective. By engaging in overlapping constitutional, statutory, fiduciary, and commercial violations – many of which were designed to evade review, fragment accountability, or moot remedies – defendants necessitated invocation of the Court's full remedial authority. Liability attaches for maintaining conditions that require ongoing supervision, reservation of claims, and judicial retention of jurisdiction to ensure compliance and prevent further evasion. Liability attaches both for direct acts and for participation through wheel conspiracies, chain conspiracies, supervisory hierarchies, and coordinated enterprise conduct, including acts taken in furtherance of shared retaliatory or obstructive objectives.

Remedy. The law compels comprehensive relief preserving all constitutional, statutory, and commercial claims not expressly resolved, authorizing cumulative and alternative remedies, and vesting the Court with continuing jurisdiction to enforce compliance, modify relief, and address future violations arising from the same enterprise conduct. Appropriate relief includes omnibus remedial orders, reservation of rights against all responsible actors and guarantors, and retained oversight to ensure that declaratory, injunctive, and monetary remedies are effectuated in practice. These measures issue by operation of law to prevent defendants from exploiting procedural fragmentation, to secure durable compliance, and to restore accountability on a continuing basis.

Pursuant to 18 U.S.C. § 1964(c), Prosecutor Ex Rel / Plaintiff seeks all relief authorized for civil RICO violations, including treble damages, costs, and reasonable attorneys' fees, jointly and

severally against all liable Defendants.

## DAMAGES

### Overview and Housing-Related Harms

The damages alleged in this Complaint arise from a continuous and interlocking course of conduct carried out through housing, benefits, and judicial systems that defendants knew, or were obligated to know, would cause severe injury to a medically frail, totally and permanently disabled quad-amputee. These damages are not episodic or incidental. They represent the foreseeable consequences of destabilizing the basic conditions required for human survival – safe housing, medical continuity, lawful benefits administration, and protection from retaliation – while weaponizing administrative power against a disabled whistleblower.

For a quad-amputee, housing stability is not merely an economic interest; it is a life-preserving medical necessity. Housing determines infection risk, injury exposure, access to medical equipment, continuity of care, and the physical feasibility of daily living. Defendants' actions within the housing enterprise therefore operated as direct medical stressors, converting administrative misconduct into bodily harm. The damages flowing from housing misconduct must be understood not as secondary effects, but as primary injuries caused by defendants' acts and omissions.

From the outset of tenancy, defendants associated with the HUD-administered LIHTC and Section 8 housing apparatus imposed instability, mismanagement, and unsafe conditions that predictably endangered Prosecutor Ex Rel / Plaintiff's health and safety. The record reflects repeated turnover of local management, lack of continuity in oversight, and the absence of any meaningful accommodation planning for a resident known to be medically frail and permanently disabled. This pattern of neglect coincided with the use of federally subsidized housing funds, placing defendants under heightened statutory and fiduciary duties that were systematically ignored.

Housing defendants compounded these failures through affirmative misconduct. At least one local manager diverted Prosecutor Ex Rel / Plaintiff's rental payment to cover a fabricated repair, an act that directly depleted limited resources while undermining trust in the integrity of the housing program. Such misuse of funds did not occur in isolation; it occurred within an enterprise structure that failed to correct, investigate, or remediate the wrongdoing, thereby ratifying its effects and amplifying the resulting damages.

Physical hazards at the housing complex further escalated injury. Defendants permitted prolonged construction conditions after non-compliant building work required removal of all siding, exposing residents to environmental stressors, rodent infestation, and safety risks. These conditions persisted for more than a year and were imposed on a population consisting largely of elderly, disabled, and otherwise vulnerable residents. For a quad-amputee with circulatory compromise and immune impairment, such exposure materially increases the risk of infection,

injury, and systemic deterioration.

Winter maintenance failures added another layer of harm. Defendants neglected snow and ice removal, obstructed access routes, and failed to maintain safe ingress and egress. Prosecutor Ex Rel / Plaintiff suffered a slip-and-fall injury attributable directly to these omissions. This was not an unforeseeable accident; it was the predictable outcome of ignoring safety obligations owed to residents with mobility impairments. Each such incident inflicted not only acute physical injury but also long-term exacerbation of pain, functional limitation, and fear of movement within one's own residence.

Access barriers compounded these harms. Postal access was routinely blocked for days at a time due to snow and ice accumulation, interfering with receipt of medical correspondence, legal notices, and benefit communications. For an individual already forced into constant administrative defense, such obstructions directly increased stress, delayed care, and heightened the risk of cascading losses. These barriers functioned as *de facto* denials of access to essential services tied to housing.

Housing-related threats intensified the damage. Defendants issued eviction threats and communications indicating intent to confiscate or discard Prosecutor Ex Rel / Plaintiff's property, including medically necessary equipment. For a quad-amputee, the threatened loss of prosthetics, mobility devices, and adaptive equipment is not a mere property dispute; it is a threat to bodily integrity and survival. These threats operated as coercive pressure points, magnifying psychological distress while forcing defensive expenditures of time, energy, and limited resources.

The cumulative effect of housing misconduct was the sustained destabilization of Prosecutor Ex Rel / Plaintiff's living environment. This destabilization directly aggravated medical vulnerability, increased exposure to injury, impaired recovery, and forced continuous hypervigilance. The damages here include physical injury, heightened infection risk, exacerbation of chronic conditions, pain, loss of bodily security, and the erosion of dignity and autonomy. These injuries were foreseeable, preventable, and directly traceable to defendants' conduct within the housing enterprise.

This housing-based damage did not occur in isolation. It functioned as the first layer in a broader chain of harm that intersected with Medicaid deprivation, federal benefit obstruction, and judicial sabotage, each compounding the injuries already inflicted. The housing defendants' actions therefore serve as both an independent source of damages and a catalyst that intensified all subsequent harms addressed in the following sections.

### Housing-Driven Medical Deterioration, Economic Harm, and Causal Linkage

The housing-related misconduct described above did not merely coexist with Prosecutor Ex Rel / Plaintiff's medical fragility; it actively drove medical deterioration by disrupting the conditions necessary for stability, continuity of care, and functional independence. For a quad-amputee with

documented immune compromise, circulatory injury, and multiple unresolved medical conditions, housing instability operates as a continuous physiological stressor. Defendants' acts and omissions converted federally subsidized housing from a protective mechanism into an instrument of harm.

Unsafe housing conditions directly interfered with medical management. Prolonged construction exposure, rodent infestation risks, temperature instability, and unaddressed maintenance deficiencies aggravated existing conditions and heightened susceptibility to infection. These risks were well within defendants' knowledge, given Prosecutor Ex Rel / Plaintiff's repeated disclosures of medical frailty and disability status. Nevertheless, defendants failed to implement basic risk mitigation, demonstrating deliberate indifference to foreseeable medical consequences.

The slip-and-fall injury suffered due to unremediated ice and snow hazards illustrates how housing neglect translated into acute bodily harm. For an amputee reliant on upper-body strength and adaptive balance, falls carry disproportionate risk of secondary injury, prolonged pain, and permanent functional loss. Such injuries compound existing musculoskeletal strain and directly contribute to deterioration of remaining joints and soft tissue. The housing defendants' failure to maintain safe premises therefore constitutes a proximate cause of physical injury and long-term impairment.

Housing instability also directly interfered with access to medical equipment and adaptive devices. Threats of eviction and property confiscation placed Prosecutor Ex Rel / Plaintiff's prosthetics, mobility equipment, and medical supplies at risk. The psychological and physical toll of defending against these threats forced diversion of limited energy away from healing and medical coordination toward survival-oriented administrative defense. The law recognizes that forced redirection of effort in medically fragile individuals constitutes actionable harm when it exacerbates injury or delays care.

Economic damages flowed predictably from these conditions. Housing misconduct forced Prosecutor Ex Rel / Plaintiff to absorb costs that would not have existed in a stable, lawfully administered housing environment. The compelled purchase and maintenance of a vehicle – despite inability to drive – arose directly from the intersection of housing location, lack of accessible services, and the State's withdrawal of supportive services. When those supports were terminated in retaliation, the vehicle became an ongoing financial drain rather than a functional asset, culminating in its forced relinquishment under threat of renewed homelessness.

The diversion of rental payments through fabricated repair charges further depleted limited resources and destabilized financial planning. These acts occurred within a federally funded housing enterprise that owed heightened duties of transparency and fiduciary care. The resulting economic harm was not merely monetary; it constrained Prosecutor Ex Rel / Plaintiff's ability to secure medical care, adaptive equipment, and basic necessities, thereby amplifying physical and psychological injury.

Housing conditions also intensified administrative burdens that themselves constituted damage.

164

Obstructed access to mail delayed receipt of medical communications, benefit notices, and legal correspondence. Each delay increased the risk of missed deadlines, interrupted care, and cascading penalties. For a quad-amputee already managing extensive paperwork without writing assistance, these obstructions materially increased stress, exhaustion, and error risk, further undermining health and stability.

The causal linkage between housing misconduct and broader damages is documented throughout the record, including the 1/17/24 *"Interim Lease Change"* addendum, eviction correspondence, and extensive submissions to State and federal authorities. These materials demonstrate that housing defendants acted with actual notice of Prosecutor Ex Rel / Plaintiff's vulnerability and the consequences of instability, yet persisted in conduct that magnified harm. The damages alleged are therefore not attenuated or speculative; they are the direct, foreseeable outcomes of decisions made within the housing enterprise.

Housing misconduct also functioned as a gateway to further deprivation. By destabilizing residence and threatening eviction, defendants created leverage points exploited in parallel benefit and administrative systems. Housing insecurity amplified the impact of Medicaid denial, reduced access to community resources, and heightened susceptibility to coercive demands by medical and governmental actors. The resulting injuries must be understood as cumulative and reinforcing, not discrete.

In sum, the housing defendants' conduct caused and exacerbated physical injury, medical deterioration, economic loss, and psychological distress. These damages were foreseeable, preventable, and proximately caused by defendants' failure to honor statutory duties, accommodation requirements, and basic standards of care owed to a medically frail resident of federally subsidized housing. The injuries sustained form a foundational layer of the overall damages profile addressed in this Complaint.

### Retaliatory Housing Actions, Whistleblower Nexus, and Enterprise-Level Causation

The housing-related damages described herein cannot be separated from the retaliatory context in which they arose. Housing instability, threats of eviction, administrative manipulation, and economic pressure intensified following Prosecutor Ex Rel / Plaintiff's protected disclosures, complaints, and whistleblowing activity regarding housing compliance, benefit misclassification, and federal funding violations. The timing, escalation, and coordination of housing actions demonstrate that instability was not accidental but instrumental.

The 1/17/24 *"Interim Lease Change"* addendum illustrates this nexus. While framed as an administrative adjustment, it arose after prolonged refusal by housing administrators to consolidate recertification schedules and honor accommodation requests. The eventual *"solution"* emerged only after sustained pressure and documentation by Prosecutor Ex Rel / Plaintiff, confirming that housing compliance occurred not as routine administration but as a defensive response to exposure. The delay itself inflicted damage by prolonging uncertainty, compounding stress, and risking eviction during a period of heightened medical vulnerability.

Subsequent eviction threats further demonstrate retaliatory causation. The three eviction letters documented in the Complaint were not isolated enforcement actions; they followed disclosures transmitted to State and federal authorities, including the 308-page E-3 submission and subsequent federal filings. These threats placed Prosecutor Ex Rel / Plaintiff's housing, medical equipment, and personal property at immediate risk, forcing defensive action and diverting limited physical and cognitive resources away from medical care and recovery.

The retaliatory character of these actions is underscored by their coordination with other streams of obstruction. Housing defendants operated within an enterprise context that included State benefit administrators, legal services actors, and federal oversight bodies. The same disclosures that triggered housing hostility were simultaneously ignored or suppressed elsewhere, confirming a pattern of collective response rather than independent error. This coordination magnified damages by closing multiple avenues of relief at once.

Enterprise-level causation is further demonstrated by the uniform refusal to correct records, provide transparency, or engage substantively with complaints. Housing defendants did not act in isolation; they relied on pooled risk structures, legal counsel, and administrative opacity to externalize harm while insulating decision-makers. The absence of meaningful internal correction mechanisms ensured that retaliatory actions could persist without accountability, thereby prolonging injury.

For a quad-amputee, retaliatory housing actions have uniquely severe consequences. Housing is not merely shelter; it is the platform upon which all medical care, equipment use, hygiene, and recovery depend. Threats to housing therefore function as threats to bodily integrity and survival. Defendants knew or should have known that destabilizing housing for a medically frail individual would predictably worsen physical conditions, increase infection risk, and exacerbate chronic pain and impairment.

The damages flowing from this retaliation include heightened anxiety, sleep disruption, autonomic stress responses, and physiological deterioration. These effects are not subjective impressions but medically recognized consequences of sustained threat and instability in vulnerable populations. The law recognizes that retaliatory conduct that foreseeably aggravates medical conditions constitutes compensable harm.

Housing retaliation also imposed reputational and dignitary harm. Being treated as a disposable tenant rather than a rights-bearing individual reinforced institutional betrayal and loss of trust. The humiliation of repeated threats, confrontations, and defensive communications compounded emotional distress and eroded psychological resilience already strained by disability and prior trauma.

Critically, these damages are traceable to identifiable enterprise actions documented in the record. They are corroborated by audio evidence, written notices, and patterns identified in Appendices A, A-2, A-3, E-2, and related materials. The record demonstrates that housing

166

defendants acted with actual notice of both vulnerability and consequences, yet persisted.

In totality, the housing stream of misconduct produced a layered damage profile: immediate physical risk, long-term medical deterioration, economic loss, emotional distress, and dignitary harm. These injuries were not incidental side effects of neutral policy but the foreseeable outcomes of retaliatory, coordinated, and enterprise-enabled conduct following protected activity.

## Medicaid Deprivation, State-Level Administrative Obstruction, and Medical Deterioration

The Medicaid and State-administration stream constitutes one of the most direct and medically consequential sources of damage suffered by Prosecutor Ex Rel / Plaintiff. Unlike abstract regulatory harm, Medicaid deprivation translated immediately into bodily injury, medical instability, economic loss, and heightened risk of life-threatening outcomes for a totally and permanently disabled quad-amputee living in a medically frail condition.

Upon arrival in South Dakota, Prosecutor Ex Rel / Plaintiff was already formally designated "*Medically Frail*," immuno-compromised, and dependent upon continuity of care, transportation, and support services to prevent cascading medical decline. Medicaid was not a discretionary benefit; it was the statutory mechanism through which federally mandated medical assistance, transportation, and ancillary supports were to be provided to ensure survivability and access to care. State defendants nonetheless denied, delayed, fragmented, and manipulated Medicaid access despite full knowledge of medical vulnerability.

The three-plus-hour documentary evidence captures the mechanics of this deprivation. State actors attempted to coerce Prosecutor Ex Rel / Plaintiff into committing Medicaid fraud by falsely claiming total dependency in order to fit within a "*cookie-cutter*" benefits package, despite his express objection and accurate representation of his actual needs. This coercive posture placed Prosecutor Ex Rel / Plaintiff in an impossible position: submit to false classification under penalty of perjury or forfeit essential medical assistance altogether. The law recognizes that forcing a disabled individual to choose between fraud and medical abandonment constitutes actionable harm.

When Prosecutor Ex Rel / Plaintiff refused to commit fraud, State defendants failed to provide any lawful alternative path to coverage. Instead, Medicaid assistance necessary to cover the 20% gap left by Medicare was withheld, despite later admissions by State personnel that Medicaid benefits could, when convenient for the agency, be divided into separate "*strands*." This inconsistency confirms that denial was not driven by law but by administrative convenience and retaliation.

The immediate consequence of Medicaid deprivation was disruption of medical continuity. Prosecutor Ex Rel / Plaintiff was forced to reconstruct medical care relationships from the ground up while lacking transportation, writing assistance, and support services. Post-surgical records from Michigan never arrived due to non-response by prior providers and lack of follow-

167

up by State defendants, yet the absence of those records was then weaponized to justify denial of coverage. This circular obstruction inflicted foreseeable harm by delaying treatment, impairing diagnosis, and exposing Prosecutor Ex Rel / Plaintiff to unmanaged conditions.

Transportation deprivation alone produced significant damage. Without Medicaid-supported transportation, Prosecutor Ex Rel / Plaintiff was compelled to incur costs and burdens wholly inconsistent with his disability, including purchasing and maintaining a vehicle he could not drive. This burden persisted for years, draining limited resources, diverting energy from medical recovery, and ultimately contributing to further loss when eviction threats forced relinquishment of the vehicle altogether.

The termination of chore services compounded medical injury. For a quad-amputee, assistance with housekeeping, groceries, and basic maintenance is not a convenience but a medical necessity. Removal of these services forced Prosecutor Ex Rel / Plaintiff to overexert his upper body, resulting in torn rotator cuffs in both shoulders, chronic pain, and permanent mobility limitation. These injuries are directly attributable to State defendants' decision to terminate support despite actual notice of medical frailty.

Medical providers responded predictably to Medicaid denial by withdrawing services. Physical therapy ceased due to inability to collect the remaining 20% not covered by Medicare. This cessation directly impaired prosthetic fitting, gait training, and pain management, accelerating physical deterioration and loss of function. The resulting harm is not speculative; it is documented deterioration caused by interrupted care.

State-level administrative obstruction also imposed severe paperwork burdens without accommodation. Prosecutor Ex Rel / Plaintiff was repeatedly issued multi-page forms across Medicaid, medical, SNAP, and related systems without writing assistance, despite profound physical limitations. Each form represented not merely inconvenience but an additional barrier to care, forcing humiliating dependence on others and delaying access to services. The stress associated with these demands further exacerbated medical fragility.

The physiological consequences of prolonged stress and deprivation are well established. Chronic stress suppresses immune function, elevates infection risk, worsens cardiovascular strain, and impairs healing. For an individual already lacking a spleen, living with kidney disease, and recovering from systemic sepsis, these stressors materially increased the likelihood of severe medical events. State defendants acted with actual or constructive knowledge of these risks and persisted regardless.

The Medicaid deprivation also generated cascading economic harm that fed back into medical injury. Aggressive debt collection by medical billing entities intensified stress, disrupted sleep, and forced prioritization of financial survival over health maintenance. This cycle of debt and deprivation constitutes a form of administrative coercion with predictable medical consequences.

Taken together, the Medicaid and State stream inflicted damages that include medical

168

deterioration, preventable injury, chronic pain, loss of function, heightened infection risk, economic loss, emotional distress, and dignitary harm. These injuries flowed directly from deliberate administrative obstruction following protected activity and were foreseeable to any reasonable official charged with administering medical assistance to a medically frail individual.

## Federal Nonfeasance After Actual Notice and Compounding Medical Harm

The damages inflicted by State-level Medicaid obstruction were substantially magnified by federal nonfeasance after actual notice. Once comprehensive evidence of retaliation, misclassification, and benefit deprivation was transmitted to federal agencies, the federal stream assumed an independent duty to act. The failure of federal defendants to intervene, investigate, or enforce funding conditions converted what might otherwise have been remediable harm into prolonged, compounding medical injury.

Federal agencies received repeated, detailed submissions documenting Medicaid coercion, denial of accommodations, retaliation, and resulting medical instability. These submissions included the 308-page E-3 filing delivered to State authorities and copied to federal agencies over multiple months, preceeded by the 575-page and 488-page federal submissions. Each contained sworn statements, video evidence, statutory analysis, and explicit notice that a medically frail quad-amputee was being deprived of federally mandated assistance. Federal defendants acknowledged receipt yet took no corrective action.

The foreseeable consequence of federal silence was continuation of State misconduct. Medicaid deprivation persisted. Transportation and chore services remained denied. Medical providers continued to withdraw care. Debt collection intensified. Housing instability escalated. Federal defendants' failure to act thus functioned as tacit authorization of ongoing harm, allowing preventable injury to continue unabated.

Federal nonfeasance carries particular medical consequences in cases involving severe disability. Federal funding statutes, ADA Title II, the Rehabilitation Act, and Medicaid oversight provisions exist precisely to prevent State actors from imposing life-threatening deprivation on vulnerable individuals. When federal agencies refuse to enforce those protections after actual notice, they expose the injured party to prolonged physiological stress and deterioration that federal law is designed to avert.

Medical harm during this period was not static; it progressed. The absence of Medicaid support and federal intervention contributed to untreated conditions, delayed follow-up for post-sepsis complications, worsening blood pressure and its effect upon kidney disease, unmanaged hernia pain, deterioration of prosthetic function, and escalating musculoskeletal injury. These are cumulative harms that intensified over time precisely because corrective intervention never occurred.

Federal defendants also failed to coordinate or compel production of medical records necessary for continuity of care. The inability to obtain post-surgical records from Michigan providers,

despite federal oversight authority and notice of need, left Prosecutor Ex Rel / Plaintiff without documentation required for diagnosis, treatment planning, and benefit eligibility. This gap materially impaired medical care and prolonged suffering.

The federal stream further contributed to psychological and physiological harm by reinforcing uncertainty and abandonment. Knowing that federal oversight bodies had been notified yet refused to act intensified stress, fear, and hypervigilance. For an immuno-compromised individual, such stress directly undermines immune response and healing capacity, increasing susceptibility to infection and systemic failure.

Federal inaction also permitted State defendants to escalate retaliation without fear of oversight. The continuation of eviction threats, benefit denials, and administrative coercion occurred in a context where federal agencies had effectively withdrawn as safeguards. This absence of federal backstop transformed administrative misconduct into sustained medical endangerment.

The law recognizes that failure to act after actual notice can be a proximate cause of injury where intervention would have prevented further harm. Here, federal defendants' refusal to enforce funding conditions, ADA compliance, and oversight duties directly contributed to the duration and severity of medical injury suffered. The harm was foreseeable, ongoing, and preventable.

The damages attributable to federal nonfeasance include prolonged medical deterioration, exacerbation of chronic conditions, heightened infection risk, increased pain and functional loss, emotional distress, and erosion of trust in protective institutions. These harms are distinct from, yet inseparable from, State-level misconduct; together they form a continuous causal chain.

## Judicial Obstruction, Closure of Remedies, and Compounding Injury

The final and most structurally determinative stream of damages arose from judicial obstruction and the systematic closure of lawful remedies after actual notice. Once administrative and federal avenues failed, the courts became the forum of last resort for arresting harm, restoring benefits, stabilizing housing, and protecting bodily integrity. Instead, judicial actors and court-controlled processes operated to foreclose review, suppress evidence, and insulate prior misconduct, thereby converting remediable injury into prolonged and compounding harm.

Judicial obstruction inflicted damage not merely by adverse rulings, but by the manner in which access to adjudication was denied. Dismissals on procedural grounds, refusals to correct the record, suppression of filings, and denial of hearings functioned to prevent consideration of substance despite a record saturated with sworn evidence, video documentation, and statutory violations. For a medically frail quad-amputee, delay itself is injury; denial of adjudication ensured that destabilizing conditions persisted long enough to cause irreversible harm.

The record reflects repeated efforts to invoke judicial process to correct falsified classifications, restore benefits, halt retaliation, and secure accommodations. Motions to correct the record, petitions for grand jury review, and filings seeking prospective relief were met not with

170

adjudication, but with deflection, concealment, or summary termination. Each instance reinforced administrative actors' ability to continue harmful conduct without consequence, thereby magnifying damages across housing, Medicaid, and medical domains.

Judicial obstruction also imposed independent psychological and physiological harm. Courts are constitutionally designated to provide neutral adjudication and protection against abuse of power. When that function collapses, particularly after documented notice of medical vulnerability, the resulting stress is severe. The knowledge that no forum would intervene to stop eviction threats, restore medical assistance, or restrain retaliation created a continuous state of emergency for Prosecutor Ex Rel / Plaintiff, producing sustained autonomic stress responses with predictable medical consequences.

The denial of ADA accommodations within judicial processes further compounded injury. Refusals to permit recording, failure to provide meaningful participation accommodations, and reliance on inaccessible procedures deprived Prosecutor Ex Rel / Plaintiff of the ability to preserve evidence, create an accurate record, and protect his own interests. These denials were not neutral omissions; they directly impaired his capacity to secure relief necessary to prevent ongoing harm.

Judicial obstruction also interacted with enterprise-level incentives. Where pooled-risk structures, agency insulation, and federal nonfeasance already discouraged correction, judicial closure completed the circuit by eliminating the final accountability mechanism. This convergence allowed misconduct to persist without interruption, converting discrete harms into long-term injury. The law recognizes that when courts deny access to remedies, downstream damages are attributable to that denial.

The medical impact of prolonged judicial obstruction is concrete. During periods when judicial intervention could have halted eviction, compelled benefit restoration, or enforced accommodations, Prosecutor Ex Rel / Plaintiff instead endured continued medical decline, untreated conditions, and preventable injuries. Each month without adjudication increased the likelihood of infection, musculoskeletal deterioration, and systemic stress-related harm. These outcomes were foreseeable to any reasonable judicial officer aware of the medical record.

Judicial actions also inflicted dignitary harm by signaling that documented injury, disability, and statutory violations were unworthy of consideration. This erosion of legal personhood intensified emotional distress and reinforced institutional betrayal. For a whistleblower acting to enforce federal law, judicial silence functioned as punishment, further chilling protected activity and compounding psychological injury.

Importantly, the damages flowing from judicial obstruction are not speculative or derivative; they are causal. Had courts exercised their lawful role upon notice, housing retaliation could have been restrained, Medicaid deprivation corrected, and federal oversight compelled. The failure to do so ensured that harm continued long enough to cause lasting injury.

The injuries attributable to judicial obstruction include prolonged medical deterioration, exacerbation of chronic conditions, preventable physical injury, emotional distress, loss of dignity, and erosion of bodily integrity. These damages are inseparable from the administrative and federal harms already described; together they form a continuous injury chain spanning all branches involved.

## Unified Causation, Enterprise Responsibility, and Compensable Injury

Taken together, the damages suffered by Prosecutor Ex Rel / Plaintiff did not arise from isolated acts, individual errors, or unfortunate coincidence. They arose from a continuous, interlocking chain of conduct across housing administration, state Medicaid systems, federal nonfeasance, and judicial obstruction, each layer reinforcing the next after actual notice. The law recognizes this pattern as cumulative causation: where multiple actors, acting independently or in coordination, contribute to a single, indivisible injury, each is liable for the full scope of foreseeable harm.

Unlawful Seizure of Federal Disability Benefits. Defendants' conduct directly caused the unlawful seizure and diversion of Prosecutor Ex Rel / Plaintiff's Social Security disability benefits through automated Treasury offsets and Medicare premium deductions imposed without lawful notice, consent, or adjudication. These benefits constitute protected property interests earned through prior contributions and guaranteed by federal statute. The seizures occurred while Prosecutor Ex Rel / Plaintiff was medically frail, homeless, and dependent upon uninterrupted benefit continuity for survival, resulting in immediate financial loss, deprivation of medical access, destabilization of housing, and cascading downstream harms. Defendants are liable for restitution of all seized amounts, consequential damages flowing from the deprivation, and enhanced damages due to the knowing and retaliatory nature of the conduct.

The housing stream destabilized the physical environment essential for survival, imposing unsafe conditions, retaliatory lease manipulation, and credible threats of eviction and confiscation of life-sustaining equipment. The Medicaid and state administrative stream removed medical continuity, transportation, and chore services with knowledge of medical frailty, forcing compensatory overexertion, untreated conditions, and cascading debt. The federal oversight stream received exhaustive notice yet failed to intervene, allowing violations to persist unchecked. The judicial stream then foreclosed corrective relief, converting preventable injury into permanent harm.

Each defendant category operated with actual or constructive knowledge of the foreseeable consequences to a medically fragile quad-amputee. The record reflects repeated disclosures, sworn submissions, video documentation, formal complaints, and direct warnings that continued destabilization would result in medical deterioration, physical injury, and psychological harm. Under established tort, civil-rights, and constitutional principles, harm occurring after such notice is presumptively attributable to the actors who refused to correct course.

The damages therefore encompass both direct injuries and aggravation injuries. Direct injuries include physical harm from falls, overuse injuries, untreated medical conditions, pain, and bodily

172

deterioration. Aggravation injuries include the worsening of preexisting conditions caused by stress, deprivation, instability, and denial of accommodations. The law does not discount damages merely because an injured party was already disabled; rather, it recognizes heightened duty where vulnerability is known.

Economic damages form an additional, independent category. These include out-of-pocket medical expenses, transportation costs forced by benefit denial, loss of medical services, debt accumulation, property loss risk, and costs associated with forced administrative labor imposed to preserve survival. The time expended performing unpaid administrative defense – forms, appeals, complaints, records requests, and litigation – represents a measurable economic loss imposed by defendants' unlawful conduct.

Non-economic damages are equally substantial. Pain and suffering, loss of bodily integrity, humiliation, fear of homelessness, fear of medical abandonment, and prolonged psychological distress are compensable harms where they arise from abuse of authority and denial of rights. For a quad-amputee, dignity is inseparable from autonomy and safety; the repeated stripping of both constitutes real injury, not rhetorical grievance.

The injuries described are indivisible. No single defendant can isolate its conduct from the harm caused, because each relied on the others' inaction to persist. Housing retaliation relied on Medicaid deprivation to weaken resistance. Medicaid denial relied on judicial nonintervention. Judicial obstruction relied on administrative opacity and federal silence. This is the precise scenario in which joint and several liability attaches.

Accordingly, damages must be sufficient not only to compensate past harm, but to account for future deterioration, ongoing medical risk, permanent impairment, and the long-term consequences of prolonged destabilization. Where conduct created continuing risk, damages may include future medical costs, adaptive needs, pain, and loss of life quality reasonably certain to occur.

The damages pleaded here also serve a corrective function recognized in civil-rights and constitutional litigation. When institutional misconduct is permitted to externalize its human cost onto the most vulnerable, damages operate as both compensation and deterrence. They ensure that systemic abuse does not become economically rational simply because its victims lack power.

Finally, these damages are inseparable from the exercise of protected activity. Retaliation against whistleblowing and petitioning amplified every injury described. Where harm is imposed as punishment for invoking federal rights, the law treats damages with particular gravity.

In sum, the DAMAGES section establishes a unified injury profile: physical, medical, psychological, economic, and dignitary harms proximately caused by defendants' coordinated misconduct after notice. These injuries are concrete, severe, foreseeable, and ongoing. They demand full compensation commensurate with the harm inflicted and the risks imposed.

173

## **DEMAND FOR RELIEF**

WHEREFORE, Prosecutor Ex Rel / Plaintiff respectfully demands that this Court enter judgment in his favor and grant the following relief, each item being independently warranted and collectively necessary to remedy the constitutional, statutory, fiduciary, and commercial injuries proven in this action:

## A. **Declaratory Relief**

Declare that Defendants' acts and omissions, individually and collectively, violated the Constitution of the United States, including but not limited to the First, Fifth, and Fourteenth Amendments, as well as federal statutory law, including the ADA (Title II), Rehabilitation Act § 504, Fair Housing Act, Administrative Procedure Act, False Claims Act, federal funding conditions, and federal records laws.

Declare that Defendants acted *ultra vires,* outside lawful authority, and in breach of fiduciary duties owed to the sovereign People, including Prosecutor Ex Rel / Plaintiff, and that such conduct is not shielded by sovereign immunity, qualified immunity, prosecutorial discretion, or judicial immunity where applicable.

Declare that Prosecutor Ex Rel / Plaintiff is entitled to pursue this action in law, equity, and commerce, including in a representative and enforcement capacity where authorized by statute, common law, and constitutional doctrine.

## B. **Injunctive and Structural Relief**

Permanently enjoin Defendants and all persons acting in concert with them from continuing or repeating the unlawful practices described in this Complaint, including retaliation, obstruction of process, denial of accommodations, misuse of administrative power, and suppression of evidence.

Order structural injunctive relief sufficient to correct systemic failures documented in this action, including but not limited to:

- restoration and maintenance of ADA-compliant access to housing, benefits, and courts;

- cessation of retaliatory housing, benefit, and administrative practices;

- mandatory compliance with federal funding conditions and oversight duties;

- preservation and production of records required by federal law.

174

Order affirmative relief requiring Defendants to restore lawful processes previously denied, including access to hearings, appeals, reviews, accommodations, and federally mandated protections wrongfully withheld.

## C. **Compensatory and Consequential Damages**

Award compensatory damages in an amount to be determined at trial sufficient to fully remedy all proven injuries, including but not limited to:

- physical and medical injuries;

- pain and suffering;

- loss of bodily integrity;

- emotional and psychological distress;

- economic losses, debt burdens, and out-of-pocket expenses;

- loss of dignity, autonomy, and security;

- future medical costs and foreseeable deterioration caused by Defendants' conduct.

Award consequential damages for all downstream harms proximately caused by Defendants' actions, including those aggravated by Defendants' knowledge of Prosecutor Ex Rel / Plaintiff's medical frailty and disability.

## D. **Statutory, Treble, and Enhanced Damages**

Award treble damages where authorized by law, including under RICO, the False Claims Act, and related statutes, for enterprise-level misconduct, coordinated retaliation, fraud, and misuse of federally funded programs.

Award statutory damages and penalties as provided by applicable federal statutes, including but not limited to the False Claims Act, ADA, Rehabilitation Act, Fair Housing Act, FOIA, and Paperwork Reduction Act.

## E. **Equitable, Fiduciary, and Commercial Remedies**

Impose equitable relief including constructive trusts, equitable liens, disgorgement, surcharge, and forfeiture where Defendants obtained benefits, authority, compensation, or institutional advantage through unlawful conduct or breach of public trust.

Recognize and enforce surety, bond, and guarantor liability arising from breaches of public

175

office, fiduciary duty, and official oaths, including all preserved *Coram Nobis* claims.

## F. Attorneys' Fees, Costs, and Litigation Expenses

Award reasonable costs, fees, and expenses where authorized by statute or equity, including fees associated with enforcing federal civil-rights and whistleblower protections, notwithstanding Defendants' obstruction and refusal to act.

## G. Continuing Jurisdiction and Oversight

Retain continuing jurisdiction over this matter to ensure compliance with all declaratory, injunctive, and structural relief ordered by the Court.

Order such additional relief as justice, equity, and the Constitution require to prevent recurrence and to restore lawful governance.

## H. Reservation of Rights

Preserve all constitutional, statutory, common-law, and commercial rights and remedies, whether or not specifically enumerated herein, including the right to amend, supplement, or enforce relief as facts develop.

## EMERGENCY AND INTERIM RELIEF REQUESTED

Prosecutor Ex Rel / Plaintiff respectfully invokes this Court's inherent equitable authority, Article III powers, and jurisdiction under Federal Rule of Civil Procedure 65, *Ex parte Young*, and applicable federal statutes to issue immediate and interim relief necessary to preserve life, evidence, jurisdiction, and the integrity of federal oversight pending adjudication of the merits.

The emergency relief sought herein is not punitive, final, or merits-determinative. It is narrowly tailored to preserve the *status quo*, prevent irreparable harm, prevent spoliation of evidence, and restrain ongoing retaliation and obstruction occurring under color of law, where delay would render later relief ineffective or meaningless.

## A. Emergency Preservation and Restoration of Electronic Evidence (Yahoo! Inc.)

Immediate injunctive relief is required to compel the preservation of, and restoration of access to, electronically stored information maintained by Yahoo! Inc. relating to Prosecutor Ex Rel / Plaintiff's long-standing email account, which contains extensive federal whistleblower communications, evidentiary records, complaints, disclosures, and correspondence material to this action and to federal oversight.

Yahoo!'s obstruction or denial of access constitutes an imminent risk of spoliation of evidence, interference with protected whistleblower activity, and denial of ADA-mandated access to

176

essential communication tools relied upon by a totally and permanently disabled litigant. Preservation is required regardless of Yahoo!'s status as a non-party, where the risk of destruction or alteration of relevant evidence is substantial and foreseeable.

Accordingly, <u>Prosecutor Ex Rel / Plaintiff seeks an immediate order</u>:

- Requiring Yahoo! Inc. to preserve all electronically stored information associated with the subject account, including metadata, backups, logs, attachments, and archives;

- Prohibiting deletion, alteration, suspension, or conditional restriction of access pending further order of the Court;

- Compelling restoration of reasonable access necessary for Prosecutor Ex Rel / Plaintiff to retrieve and use evidence for litigation and federal reporting purposes; and

- Directing compliance consistent with ADA Title II and III access obligations.

**B. <u>Emergency Injunction Against Retaliatory Eviction and Housing Destabilization</u>**

Immediate injunctive relief is required to restrain ongoing and threatened retaliatory eviction actions and housing destabilization by defendants operating HUD-subsidized and federally regulated housing programs.

The threatened loss of housing to a medically frail quad-amputee constitutes irreparable harm as a matter of law. Eviction, displacement, or confiscation of essential medical equipment cannot be undone by post-hoc damages and would expose Prosecutor Ex Rel / Plaintiff to immediate risk of medical deterioration, homelessness, and loss of life-sustaining supports.

Accordingly, <u>Prosecutor Ex Rel / Plaintiff seeks an emergency order</u>:

- Enjoining all eviction, lockout, removal, or interference with tenancy pending resolution of this action;

- Freezing the status quo of HUD subsidy participation and housing assistance payments to prevent retaliatory termination or manipulation;

- Prohibiting confiscation, removal, or interference with durable medical equipment, assistive devices, prosthetics, or personal medical property; and

- Requiring compliance with federal housing, ADA, and funding-condition obligations pending adjudication.

**C. <u>Emergency Federal Jurisdictional Protection and Anti-Retaliation Relief</u> (Parallel Whistleblower Threats)**

177

The record before this Court establishes, at minimum, credible information and belief that coordinated retaliatory conduct, obstruction, and life-threatening endangerment are occurring across state lines against another federally protected disabled whistleblower, Reverend Jason Goodwill, between Wisconsin and Michigan, as documented in Appendix F.

Where substantial evidence indicates systemic retaliation, suppression of whistleblower disclosures, and threats to life and safety occurring beyond a single district, this Court possesses authority to issue prospective relief restraining ongoing constitutional violations and to reaffirm federal jurisdiction over interstate retaliatory schemes.

Accordingly, <u>Prosecutor Ex Rel / Plaintiff seeks emergency relief</u>:

- Declaring that federal jurisdiction attaches to coordinated interstate retaliation against federally protected whistleblowers;

- Enjoining further retaliatory acts, intimidation, or obstruction directed at Reverend Jason Goodwill pending appropriate federal review;

- Ordering preservation of evidence related to the matters documented in Appendix F; and

- Directing appropriate referrals and transmission of evidence to federal authorities pursuant to 28 U.S.C. § 535(b) and other mandatory reporting statutes.

## D. **Findings of Irreparable Harm and Necessity of Immediate Action**

Absent immediate intervention, Prosecutor Ex Rel / Plaintiff faces irreparable harm including loss of evidence, loss of housing, medical destabilization, obstruction of federal reporting, and continued retaliation for protected activity. No adequate remedy at law exists for these harms once realized.

The balance of equities favors preservation and restraint. The public interest strongly supports protection of disabled individuals, preservation of evidence, enforcement of federal civil-rights statutes, and safeguarding whistleblower disclosures implicating misuse of federal funds and constitutional violations.

Accordingly, immediate emergency and interim relief is necessary, proper, and compelled by law.

## **JURY DEMAND**

Prosecutor Ex Rel / Plaintiff demands trial by jury on all issues so triable.

## AFFIDAVIT IN DECLARATION OF TRUTH

I, David Schied, being of lawful age and competent to testify, hereby declare, affirm, and state the following to be true and correct to the best of my knowledge, information, and belief:

I am the Prosecutor Ex Rel, acting sui juris, and a Private Public Proxy for the People, bringing this action in a lawful enforcement capacity grounded in constitutional authority, federal statute, common law, and equity.

I am a Totally and Permanently Disabled Quad-Amputee, as a result of catastrophic medical injury, and am further medically classified as immuno-compromised and medically frail. My disabilities substantially affect major life activities, including mobility, dexterity, endurance, and the physical act of handwriting.

I have personal knowledge of the facts set forth in this Complaint, its Counts, Appendices, Exhibits, and incorporated materials, except where stated upon information and belief, and as to those matters I believe them to be true.

The factual allegations contained in this Complaint are based upon my direct experiences, documentary evidence, sworn declarations, contemporaneous records, correspondence, recordings, agency filings, judicial filings, and extensive disclosures made to state and federal authorities over a multi-year period.

All statements of fact herein are made in good faith, without malice, and for the sole purpose of seeking lawful redress, enforcement of federal rights, protection of life and safety, preservation of evidence, and restoration of constitutional order.

I affirm that this action is not brought for harassment, delay, or improper purpose, but to restrain ongoing violations of federal law, to compel accountability for misuse of authority, and to invoke the jurisdiction and remedial powers of the Court where administrative and prosecutorial mechanisms have failed.

I further affirm that all claims asserted herein are grounded in existing law or in non-frivolous arguments for the extension, modification, or application of existing law, and that the factual contentions have evidentiary support or will likely have evidentiary support after reasonable discovery.

Due to my permanent disabilities, this Affidavit and the accompanying Complaint are executed using an electronic signature. The use of an electronic signature is a reasonable accommodation under the Americans with Disabilities Act, Title II, and applicable federal court accessibility requirements.

I respectfully request that the Court recognize my need for continued reasonable accommodations, including but not limited to electronic filing access, extended deadlines where appropriate, and accommodation of physical limitations affecting document preparation and execution.

I affirm that I have reviewed the entire Complaint, including all Counts, Appendices, and requested relief, and that it accurately reflects the truth of the matters asserted to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 13th day of December, 2025.

/s/ David Schied
David Schied (authorized electronic signature by ADA accommodation)
Prosecutor Ex Rel, sui juris
Private Public Proxy for the People
Totally and Permanently Disabled Quad-Amputee
P.O. Box 321
Spearfish, S.D. 57783
Telephone: 605-340-4439
Email: dschied@protonmail.com

Pursuant to Titles II and III of the Americans with Disabilities Act (42 U.S.C. §§ 12101 et seq.) and implementing regulations requiring equal access to governmental processes, this Affidavit is executed by digital signature.

Because of the declarant's severe mobility impairment and amputation status, physical hand-signing is not practicably available. Under the ADA and 28 C.F.R. § 35.130, digital authentication constitutes a reasonable accommodation ensuring equal participation in court and administrative proceedings.

Therefore, this electronic signature carries the same legal effect as a handwritten signature pursuant to 28 U.S.C. § 1746, 15 U.S.C. § 7001 (E-SIGN Act), and all other applicable laws recognizing electronic signatures.

This digital execution is made necessary by continuing governmental deprivation of basic ADA access and transportation accommodations. The State and its agents have withheld Medicaid-funded mobility and community-access services, thereby preventing physical access to public facilities including the United States Post Office—an essential component of "access to the courts" guaranteed under both the First and Fourteenth Amendments.

Until the State fulfills its statutory duty to provide equal access and transportation for a Totally and Permanently Disabled individual, digital execution remains the only lawful and reasonable means by which I may file and serve pleadings. This declaration is therefore not only procedurally valid but substantively protected under federal disability-rights law.